**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

KAREN B. COAN, Individually and on behalf
of the K.L.C. Inc 401(k) Profit Sharing Plan,

        Plaintiffs,

        v.

ALAN H. KAUFMAN, ET AL.,
        Defendants.

:     CIVIL ACTION NO.
:     3:01CV1737 (MJK)
:
:
:
:
:
:
:
:     OCTOBER 15, 2003

**DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT
OF UNDISPUTED MATERIAL FACTS**

Pursuant to this Court's Local Rule 56(a)(1), defendants Alan Kaufman and Edgar Lee ("Defendants") submit this Statement of Undisputed Material Facts, with accompanying exhibits.

1.     Karen Coan began working for KLC in 1977, and eventually became the company's controller.  (Complaint at ¶ 6, attached hereto as Exhibit A.)

2.     Coan worked at KLC through its acquisition by Unicapital and her subsequent termination by Unicapital management (not either of the Defendants) in July 2000.  (March 18, 2003 Deposition of Karen B. Coan ("Coan Dep.")[1] at pp. 155-56.)

3.     Beginning in the 1990s, Coan was able to contribute a portion of her paycheck to a 401(k) Fund established by Kaufman, as KLC's President, and Lee, as its Vice President.  KLC provided matching funds for its employees' 401(k) contributions. (See, e.g., "The K.L.C., Inc. Profit Sharing Plan Report for the Plan Year Ending December 31, 1997," at p. 5, attached hereto as Exhibit C.)

---

[1] Relevant portions of the Coan Dep. are attached hereto as Exhibit B.

4.      In addition to the 401(k) Fund, moreover, KLC implemented additional retirement opportunities for its employees as part of a 401(k) Plan as to which Kaufman and Lee were the sole trustees.  (March 25, 2003 Deposition of Alan H. Kaufman ("Kaufman Dep.")[2] at p. 65.)

5.      In 1987, KLC created a Profit-Sharing Fund, funded entirely by annual KLC contributions that totalled close to $1 million by the year 2000.  (See Summaries of Financial Activity 1991-1998, attached hereto as Group Exhibit E; see Coan Dep. at 91-92, Ex. B hereto; Kaufman Dep. at 65, Ex. D hereto.)  Over 40 KLC employees, including Coan, ultimately participated in the Profit-Sharing Fund.  (See "KLC, Inc. Profit Sharing Account Distribution Factors," attached hereto as Exhibit F.)

6.      Kaufman and Lee, as well as several of their children who were employed by KLC, also participated in the Profit-Sharing Fund.  (Coan Dep. at 59-60, Ex. B hereto.)   Apart from Kaufman and Lee, Coan had the greatest share of assets in the Profit-Sharing Fund.  (See Ex. F hereto.)

7.      During the entire time that the Profit-Sharing Fund was in existence, Kaufman and Lee did not charge the Profit-Sharing Fund for their time spent on behalf of the Fund, meaning that the Fund never incurred any management expenses.  (See, e.g., Summary Annual Report For Plan Year Ending December 31, 1990, attached hereto as Exhibit G; see also January 8, 2003 Deposition of Vahan Janjigian ("Janjigian Dep."), at pp. 120-22.)[3]

8.      In 1992, KLC rolled over into the 401(k) Plan a Rollover Fund that had been created through the termination of a defined benefit plan, funded entirely by KLC.  (See "The

---

[2] Relevant portions of the Kaufman Dep. are attached hereto as Exhibit D.

[3] Relevant portions of the Janjigian Dep. are attached hereto as Exhibit H.

Terminated Target Benefit Pension Plan," attached hereto as Exhibit I; see also Coan Dep. at pp. 91-92, Ex. B hereto; Kaufman Dep. at p. 65, Ex. D hereto.)

9.     The Rollover Fund contained approximately $260,000 of assets contributed by KLC for the benefit of approximately 20 of its employees, including Coan, plus accrued interest. (See Ex. I hereto.)

10.     Kaufman and Lee owned the majority of the assets in the Rollover Fund.  (See id.; Kaufman Dep. at p. 192, Ex. D hereto.)  Almost all of the other Plan participants with Rollover Fund assets also had assets in the Profit-Sharing Fund.  (Kaufman Dep. at pp. 192-93, Ex. D hereto.)

11.     Notwithstanding the fact that they declined any compensation for their efforts, Kaufman and Lee spent countless hours in their role as trustees for the two Profit-Sharing Fund (including the Rollover Fund).  On a weekly basis, they conferred regularly about appropriate investment vehicles and strategies.  (Affidavit of Edgar Lee ("Lee Aff.")[4] at ¶ 7.)  These conferences took a minimum of two to three hours weekly.  (Id., Ex. J hereto.)

12.     As fiduciaries of the two Funds, Kaufman and Lee followed a series of steps, questions and decision-making processes before investing assets.  (Id. at ¶ 6, Ex. J hereto.) Among other things, Kaufman and Lee undertook to (1) review the investment vehicle's performance history and prospects, (2) compare that investment vehicle's performance history against market indexes, (3) telephone the managers of the investment vehicles (i.e., the mutual fund manager or some other official of the mutual fund in question), (4) interview whichever investment broker had suggested the investment, (5) discuss the prospective investment with their informal investment committee, (6) analyze the size of the proposed investment, (7) analyze

---

[4] The Lee Aff. is attached hereto as Exhibit J.

who the recipient of the funds would be, (8) analyze the proposed investment decision as compared to past decisions, (9) analyze the history of involvement with the investment company, (10) analyze how the investment at issue fit in with other investments and how it would affect liquidity, (11) hold informal discussions with people whose opinion they respected, and (12) review published materials such as the Wall Street Journal, the Investors Business Daily, Morningstar reports (for mutual funds), and various Internet resources.  (Lee Aff. at ¶ 8, Ex. J hereto; see Kaufman Dep. at pp. 80-81, 86, 197, 204-07, Ex. D hereto; Coan Dep. at p. 108, Ex. B hereto.)

13.     Through the 1990s, as a result of the investment strategy pursued by Kaufman and Lee, the Profit-Sharing Fund and the Rollover Fund performed very well.  Indeed, a comparison of the rates of return generated by the two Funds with the rate of return earned by the investment portfolios of the California Public Employees Retirement System ("CalPERS,") a large and widely respected pension plan, during the same time frame shows that the Profit-Sharing Fund and the Rollover Fund were for the most part meeting or beating CalPERS' performance on an annual basis. (See Affidavit of Warren F. Mulhern and Table I of attached report, "Observations of and Opinions on An Analysis of the Asset Allocation, Diversification, and Performance of the K.L.C. 401(k) Pension/Rollover Fund and Profit Sharing Fund, 1998 to 2001," attached hereto as Exhibit K).   Indeed, over the years 1992 through 1998, the 401(k) Plan outperformed the CalPERS plan by a cumulative total of 4.9 percentage points. (See id.)

14.     In 1998, KLC was acquired by Unicapital.  (Coan Dep. at p. 132, Ex. B hereto.)  As a part of that acquisition, Unicapital directed KLC to terminate its 401(k) Plan, including the Profit-Sharing Plan and the Rollover Plan, and to forward the assets to Unicapital for its own 401(k) plan.  (Id. at p. 75, Ex. B hereto.)

15.    KLC, through Kaufman and Lee, forwarded the 401(k) Fund portion of the 401(k) Plan as directed by Unicapital.  (Id. at p. 87, Ex. B hereto.)  However, concerned that Unicapital's 401(k) plan did not offer participants opportunities as attractive as those offered by their own 401(k) Plan, Kaufman and Lee held back the assets in the Profit-Sharing Fund and the Rollover Fund while the Unicapital acquisition was ongoing.  (Id. at pp. 75-76, 91, Ex. B hereto.)

16.    Kaufman and Lee knew, however, that ultimately the Profit-Sharing Fund and the Rollover Fund would be terminated as part of the Unicapital acquisition.  (Lee Aff. at ¶ 11, Ex. J hereto.)  Pension Consultants, the company that administered the Profit Sharing Plan on KLC's behalf, advised Kaufman and Lee that the plan termination process, which included review by the Internal Revenue Service ("IRS") would take between six months and a year.  (Id. at ¶ 12, Ex. J hereto.)  Accordingly, at the beginning of the termination process in 1999, Kaufman and Lee decided that they needed to improve the Funds' liquidity so that the assets in the Funds could be disbursed easily upon termination.  (Id. at. ¶ 13, Ex. J hereto; see Kaufman Dep. at pp. 80-81, Ex. D hereto.)

17.    Kaufman and Lee therefore decided to move a substantial portion of the Funds' assets out of the multiple investment vehicles (many of which were equity-based) in which they had been invested and into a single, less volatile, non-equity vehicle to facilitate disbursement. (Lee Aff. at ¶ 13, Ex. J hereto; see Kaufman Dep. at pp. 102-04, Ex. D hereto.)

18.    After consulting with their investment advisers and following the deliberative process described above, in March 1999, Kaufman and Lee decided to invest a portion of the Funds into the BlackRock Government Income Portfolio (the "BlackRock Portfolio"), a large government bond fund made up of a variety of the highest-rated government and agency bonds, with at least 65 percent of its assets in obligations issued or guaranteed by the United States

government and its agencies.  (Lee Aff. at ¶¶ 10-14, Ex. J hereto; see Kaufman Dep. at pp. 80-

81, 102-04, 197-99, Ex. D hereto; see also BlackRock Government Income Portfolio, attached

hereto as Exhibit L.)

19.     In particular, Kaufman and Lee had obtained advice from Edward Wahlberg, a

financial advisor and the Vice President of Wealth Management for Merrill Lynch.  (Deposition

of Edward J. Wahlberg ("Wahlberg Dep.")[5] at pp. 7-8, 25-31.)  After careful consideration,

including his own consultation of sources such as Bloomberg, Morning Star, and Merrill Lynch

private research, Wahlberg recommended the BlackRock Portfolio.  (Id. at 29-30.)

20.     In rendering this investment decision and moving a large portion of the Funds'

assets out of the volatile equity market, Kaufman and Lee believed they were conforming to the

appropriate risk profile for a Plan on the brink of termination.  (Lee Aff. at ¶ 14, Ex. J hereto; see

Kaufman Dep. at pp. 80-81, 102-04, 195-96, Ex. D hereto.)

21.     By early 2000, it became apparent that the IRS' plan termination review would

take longer than expected.  (Lee Aff. at ¶ 17, Ex. J hereto.)  Indeed, the process ultimately took

over 16 months.  (Coan Dep. at p. 99, Ex. B hereto.)  After following the deliberative process

described above, Kaufman and Lee decided to revamp their investment strategy to accommodate

their growing uncertainty as to when the Plan ultimately would be terminated, and in the interim

to achieve even greater stability for the majority of Plan assets than the BlackRock Portfolio had

provided.  (Lee Aff. at ¶¶ 15-19, Ex. J hereto.)

22.     Accordingly, in February, 2000, Kaufman and Lee sold the shares owned in the

BlackRock Portfolio and moved the proceeds into a money market account.  (Id. at ¶ 16, Ex. J

hereto.)

_____

[5] Relevant portions of the Wahlberg Dep. are attached hereto as Exhibit M.

23.    Because it was unclear how long the termination process would take, however, Kaufman and Lee determined that leaving all of the Plan's assets in cash would ill serve participants by minimizing possible returns for the duration of ther termination period.  (See Lee Aff. at ¶¶ 17-18, Ex. J hereto.  )  Accordingly, they decided to place a small portion of Plan assets in equity-based mutual funds.  (See Lee Aff. at ¶¶ 18-19, Ex. J hereto.  )

24.    Ultimately, in hindsight, Kaufman and Lee's decisions resulted in Plan performance between 1999 and 2001 that was just slightly worse than the benchmark identified by Coan's own expert.  According to Coan's expert, starting in 1999 when Plan termination commenced and ending in 2001 when the Plan ultimately was terminated, the Plan underperformed a hypothetical, passive 60/40 blend of stocks and bonds by just over six percent in 1999 and just under 6 percent in 2000.  It outperformed the hypothetical 60/40 blend by almost 3 percent in 2001.  (Compare An Analysis of the Asset Allocation, Diversification, and Performance of the K.L.C. 401(k) Pension/Rollover Fund and Profit Sharing Fund, 1998 to 2001, Table I, attached hereto as Exhibit N, with "401(k) Profit Sharing Analysis (Gains/Losses)," attached hereto as Exhibit O.)

25.    The Plan's overall growth from inception to termination, however, was considerable: from employer contributions totalling approximately $1.3 million, KLC ultimately distributed approximately $2.5 million to Plan participants on termination.  (Kaufman Dep. at p. 199, Ex. D hereto.)

26.    As the participants with the largest amount of vested assets in the Plan, Kaufman and Lee, and their children, experienced the greatest "loss" from the Plan's slight underperformance between 1999 and 2001.  (See Coan Dep. at 59-60, Ex. B hereto.)  Obviously, neither Kaufman nor Lee realized any benefit from any such "losses" to the Plan.

27.     In the meantime, as set forth above, KLC had been acquired by Unicapital.  (Id. at p. 132, Ex. B hereto.)  Upon the acquisition, Kaufman and Lee made a personal gift to Coan of $40,000.  (Id. at pp. 138-39, Ex. B hereto.)

28.     Coan initially was employed by Unicapital as a controller.  (Id. at pp. 155-56, Ex. B hereto.)   In July 2000, however, Coan's employment was terminated as part of a reduction in force by Unicapital.  (Id., Ex. B hereto.)

29.     Neither Kaufman nor Lee played any role in the decision to terminate Coan.  (See Kaufman Dep. at p. 166, Ex. D hereto.)

30.     Coan has not been employed by either KLC or Unicapital since 2000.  (Coan Dep. at pp. 155-56, Ex. B hereto.)

31.     Following Coan's termination from employment at Unicapital, she was principally responsible for administering the termination of the 401(k) Plan and disbursing assets to Plan participants.  (See Coan Dep. at pp. 97-98, 111-16, Ex. B hereto.)

32.     Unlike Kaufman and Lee, who were never reimbursed for their work performed on behalf of the Plan, Coan billed approximately $8700.00 for her services.  (See March 30, 2001 Invoice to K.L.C. Inc. 401(k) Profit Sharing Plan, attached hereto as Exhibit P.)

DEFENDANTS,
ALAN H. KAUFMAN and EDGAR W. LEE


By_____
       Glenn W. Dowd (ct# 12847)
       Daniel A. Schwartz (ct# 15823)
       Kristin Thomas (ct#24578)
       Day, Berry & Howard LLP
       CityPlace I, 185 Asylum Street
       Hartford, CT  06103-3499
       (860) 275-0100
       (860) 275-0343 (fax)
       email:  gwdowd@dbh.com
               daschwartz@dbh.com
               kthomas@dbh.com


## **CERTIFICATION**

       THIS IS TO CERTIFY that a copy of the foregoing has been sent this date via first-class mail, postage prepaid, to:

Thomas G. Moukawsher              Ian O. Smith
Moukawsher & Walsh LLC        Moukawsher & Walsh LLC
328 Mitchell Street                  21 Oak Street, Suite 100
P. O. Box 966                       Hartford, CT  06106
Groton, CT 06340


                                    _____
                                    Glenn W. Dowd