```
                                                              1
 1   STATE OF CONNECTICUT    :    SUPERIOR COURT

 2   JUDICIAL DISTRICT OF HARTFORD

 3   AT HARTFORD

 4

 5
     -------------------------x
 6
     KAREN B. COAN,           :
 7
              Plaintiff,      :
 8
         -versus-             : No. CV-01-0810762S
 9
     ALAN H. KAUFMAN and      :
10   KEYSTONE EQUIPMENT
     FINANCE CORPORATION,     :
11
              Defendants.     :
12
     -------------------------x
13

14

15

16              Deposition of KAREN B. COAN,

17       taken pursuant to Section 13-26 et seq. of

18       the Connecticut Practice Book, at the law

19       offices of Day, Berry & Howard, L.L.P.,

20       CityPlace I, 185 Asylum Street, Hartford,

21       Connecticut, before Larry Dorfman, L.S.R.

22       #00062 and a Notary Public in and for the

23       State of Connecticut, on March 18, 2003, at

24       9:13 a.m.

25
```

59

```
1      A.   Yes.
2      Q.   And you have a balance of 165,000?
3      A.   Yes.
4      Q.   So if we look at the last page, which
5  is page 31, do you see the total, grand total,
6  of assets in the plan is 2,851,880?
7      A.   No.
8      Q.   Are you looking at the vested
9  balance?
10     A.   Yes.
11     Q.   Okay.  We can look at that.
12     A.   Ending balance, I have it, sorry.
13     Q.   But there is an ending balance of
14 2,851,000 and change?
15     A.   Yes.
16     Q.   Vested balance of 2,804,000 and
17 change, correct?
18     A.   Yes.
19     Q.   And if we look at Kaufmans and Lees,
20 meaning Mr. Kaufman and his son and Mr. Lee and
21 his son, of that two million eight of vested
22 balances, and you can take a look, it's about a
23 million 670 that were held by the Kaufmans and
24 Lees in the plan?
25     A.   I believe you if you have added that
```

                                                          60
1   up together, yes.
2        Q.   So about 60 percent of the vested
3   assets held in the plan were held by Mr. Kaufman
4   and his son and Mr. Lee and his son?  Does that
5   sound about right to you?
6        A.   Yes, but I would have to do the
7   calculations.
8        Q.   I understand you don't have a
9   calculator or mind that can do it that quickly,
10  I don't either, but roughly 60 percent, that
11  doesn't sound out of the ballpark?
12       A.   It doesn't sound out of whack.
13       Q.   Now, did you ever hear Mr. Kaufman,
14  Mr. Lee, and by Mr. Kaufman and Mr. Lee, I am
15  talking about Alan Kaufman and Ed Lee, in any
16  way suggest that they were not interested in
17  earning a return on the assets that they had in
18  the KLC plan?
19       A.   No.
20       Q.   Did you ever see them take any action
21  that suggested to you that they were not
22  interested in earning a return on the assets
23  that they had in the KLC plan?
24       A.   No.
25       Q.   Would you agree with me that given the

75

```
 1        A.    That's correct, I didn't.  Why would I
 2   have an opinion?  I am not a fiduciary and I
 3   have no expertise.
 4        Q.    All right.  What were the
 5   circumstances that the plan was facing in the
 6   latter stages of 1998?  Were there any
 7   circumstances then that you were aware of?
 8        A.    Yes, there was.  Unicapital was trying
 9   to get us to turn all of our monies in the
10   profit sharing over to their plan with Smith
11   Barney.
12        Q.    Okay.  And what was the reaction to
13   that request?
14        A.    The reaction was that we didn't want
15   to.
16        Q.    Who is "we"?
17        A.    Anybody at Keystone.  Everybody was
18   uncomfortable, all the employees were
19   uncomfortable about turning anything over to
20   Unicapital.  Not because of past history, it's
21   just they were new.
22        Q.    Okay.  And what was Mr. Kaufman's
23   reaction to the request to turn the funds over
24   to Unicapital?
25        A.    Mr. Kaufman did not want to turn them
```

76

1  over.
2      Q.   And Mr. Lee?
3      A.   Mr. Lee did not want to turn them
4  over.
5      Q.   Did you have discussions with
6  Mr. Kaufman and Mr. Lee about whether you
7  thought it would be appropriate to turn the
8  assets over to Unicapital?
9      A.   Yes, I did.
10     Q.   Okay.  And did you counsel them that
11 in your opinion it wasn't appropriate for them
12 to turn the funds over to Unicapital?
13     A.   I didn't counsel them.  I probably
14 agreed with them that this is something we
15 shouldn't do.
16     Q.   Okay.
17     A.   We are talking $2 million into another
18 fund.
19     Q.   Did you have any discussions with
20 anyone else on this issue?
21     A.   I don't remember.  You are talking
22 about what, four, five years ago?
23     Q.   Did you talk with Jeffrey Winnick
24 about there issue?
25     A.   Yes, I did, as a matter of fact.

                                                         87
1   was originally a defined benefit pension plan
2   and that tainted the monies, so they didn't want
3   all the monies, they only wanted part of the
4   monies.  Another attorney said, "No, we want all
5   the monies," and they were not -- they were not
6   in agreement in Florida as to quite what should
7   be done and they didn't have their act
8   together.  Because they didn't have their act
9   together, why should we send anything?
10              The end result is there were a
11  couple of funds that we liquidated, and the
12  companies that held those funds sent the money
13  directly to Unicapital.
14              So what Unicapital wound up with
15  was about $300,000 that was actually from the
16  defined benefit pension plan that it shouldn't
17  have been, but what we did is we traded off down
18  the road those funds for like amount in the
19  profit sharing.
20      Q.   Wasn't it the 401(k) component of the
21  funds that was sent down to Unicapital
22  ultimately?
23      A.   Yes, it was.
24      Q.   Okay.
25      A.   But the wrong funds got sent to them,

                                              91
1   to handle this.
2        Q.   Weren't Mr. Kaufman and Mr. Lee
3   disregarding directions they were receiving from
4   essentially their bosses at Unicapital when they
5   refused to send down the plan money?
6        A.   Yes, but it was a lot of money and
7   Alan didn't want to send it.
8        Q.   Okay.  And you, I mean, did you have
9   any respect or admiration for them standing up
10  and disregarding a direction that they thought
11  was not in the interest of the folks in the
12  plan?
13       A.   As I say, there were a number of other
14  components, Mr. Dowd, one of which was the
15  funds, not knowing which ones should come down.
16  Steve Lapides said send them all.  Burrett said
17  don't send the ones that have the profit plan.
18  They were going back and forth between, not even
19  knowing what they quite wanted from Keystone, so
20  it was a standoff.  Wait until we figure out
21  what we want because we don't want to taint the
22  funds.
23       Q.   And you understand also, don't you,
24  Ms. Coan, that all of the funds that are at
25  issue in this case, including the funds that we

```
                                              92
 1   have laid out and set forth in Exhibit 1, were
 2   funds contributed by the company, right?
 3        A.   Yes.  They were one of the benefits.
 4        Q.   And Mr. Kaufman and Mr. Lee set up
 5   this plan voluntarily, correct?
 6        A.   For their benefit, yes.
 7        Q.   For their own benefit?
 8        A.   For their own benefit.  It was top
 9   heavy, it was a way they could invest in
10   tax-deferred money.
11        Q.   Okay.  As I'm looking at that
12   statement that's Exhibit 1, it looks as though
13   60 percent of the funds in the plan or so were
14   for them or their sons, correct?
15        A.   Correct.
16        Q.   From a tax-planning standpoint, did it
17   make sense for them to give away 40 percent of
18   that money to employees so they --
19        A.   They could write off the total
20   contribution every year as an expense.
21        Q.   So this was solely for their own
22   benefit in your view?
23        A.   It was for the benefit of everyone,
24   but it certainly benefitted Ed and Alan and it
25   certainly benefitted the corporations.  Did it
```

97

1  account, set up a checking account with Ed
2  Wahlberg.  Ed Wahlberg came to my office and we
3  set up all the forms that needed to be signed by
4  Ed and Alan so they could write checks, deposit
5  slips, all that kind of thing, and to my
6  knowledge, the only expense that we were going
7  to have was a hundred-dollar-a-year fee to
8  maintain the checking account.
9           So obviously, when I saw that the
10 funds were almost a hundred thousand dollars
11 less, I was a little bit surprised because I
12 thought that our monies were in a money market.
13     Q.  Okay.  Let me ask you this, we will go
14 back to that issue:  Were you the principal
15 person responsible for administering the
16 termination of the plan?
17     A.  Yes, I was.
18     Q.  And with whom did you work on that
19 project?
20     A.  I worked with Alan.  I worked with
21 Pension Consultants.  I worked with Jeff
22 Winnick.
23     Q.  Okay.
24     A.  Probably.
25     Q.  In terms of the day-to-day issues

```
                                               98
1    relating to that, you were the person who was
2    handling that?
3         A.   Well, it wasn't day-to-day issues,
4    Mr. Dowd, because I was no longer employed
5    there.  They hired me on a consulting basis to
6    come back -- once the different percentages were
7    worked out at Pension Consultants, they asked me
8    to come back and figure out what everybody's
9    portion was in both the profit sharing and the
10   rollover, because there are different
11   participants in both plans.
12        Q.   Okay.  Now, what did you understand
13   the timetable to be, how long it was going to
14   take to terminate the plan, when you embarked on
15   the process?
16        A.   If my memory serves me correct, I
17   thought it was going to be between six and nine
18   months to get an IRS determination to terminate
19   the plan.
20        Q.   Okay.  And did that ultimately turn
21   out to be the time frame that it took to get
22   this accomplished?
23        A.   I don't know when the actual papers
24   were filed to terminate the plan.  I do know
25   that we were notified that the termination
```

99

1  process was beginning in January of 2000.
2          By the time we got the IRS
3  determination, I want to say it was December of
4  2000, we liquidated all of the monies.  Pension
5  Consultants figured out what the apportionment
6  was.  They figured out twice what the
7  apportionment was, once at year-end and once as
8  of March 31, 2001.
9      Q.  Okay.  So from when you became aware
10 that a plan termination was to occur to when the
11 money was ultimately distributed, is it your
12 testimony that it was about 16 months from the
13 beginning of 2000 until April of 2001?
14     A.  Yes.
15     Q.  And you had no information suggesting
16 the plan was to be terminated during 1999?
17     A.  I believe Alan told me that we were
18 terminating the plan, but we had no legal papers
19 to that effect and that it was going to be
20 terminated, and I don't know why it wasn't
21 started in fall of 1999 rather than spring of
22 2000.  Not sure.
23     Q.  Okay.
24     A.  I'm sure there was a reason, and I
25 might think of it at two o'clock in the morning,

108

1  or Mr. Lee took to determine that it was
2  appropriate for the fund to invest in PBHG in
3  2000?
4       A.   Alan would normally -- and I'm
5  assuming that he did this with PBHG, he would
6  normally look at the newspaper, see how much the
7  fund's gone up over the last six months, year,
8  two years, call up the fund and ask the manager
9  of that fund, "Do you think that this is a
10 prudent investment for a profit-sharing plan?"
11          That was Alan's MO with most of
12 his investments.  He would look to see what its
13 track record was and then he would call the
14 asset manager of that particular fund and ask
15 them if they thought it was prudent.
16      Q.   Do you have any information on whether
17 or not Mr. Kaufman did that with respect to the
18 purchase of the PBHG fund in 2000?
19      A.   I don't.
20      Q.   Do you have any information at all on
21 the steps that Mr. Kaufman took or Mr. Lee took
22 to determine the appropriateness of the PBHG
23 purchase in 2000?
24      A.   I don't.
25      Q.   Would it be untrue, Ms. Coan, to say

                                                111
1    services that you didn't render?
2         A.   Yes.
3         Q.   And if you put down on a bill
4    somewhere that you were dealing with an issue,
5    you would agree with me that the person should
6    have dealt with that issue that they put down?
7         A.   Yes.
8         Q.   And, Ms. Coan, are you affiliated with
9    a company called ANCO, A-N-C-O?
10        A.   That's my husband's.
11        Q.   Okay.  Did you use ANCO as a medium
12   for billing KLC for services you rendered to the
13   retirement plan, KLC profit-sharing plan?
14        A.   Yes.
15             MR. DOWD:  Would you mark that as
16   2, please, Larry?
17             (Defendants' Exhibit 2 marked
18        for identification.)
19        Q.   Is this an invoice you submitted to
20   KLC for services you rendered with respect to
21   the 401(k) profit-sharing plan?
22        A.   Yes, it is.
23        Q.   And you described I assume your
24   services you provided accurately, did you not,
25   Ms. Coan?

```
                                           112
 1      A.   Yes.
 2      Q.   Could you turn to the second page for
 3 me, Ms. Coan?
 4      A.   Yes.
 5      Q.   I am looking, there is an entry, kind
 6 of the last one or second-to-last itemized
 7 entry, that says "Numerous conversations with
 8 Alan Kaufman regarding plan assets, four hours."
 9 Do you see that?
10      A.   Yes.
11      Q.   So you had numerous conversations with
12 Mr. Kaufman regarding plan assets over the
13 period that's covered by this bill; isn't that
14 true?
15      A.   Yes.
16      Q.   And if you look down a couple of lines
17 from that, there is an entry for 38.5 hours,
18 Ms. Coan.  Do you see that?
19      A.   I do.
20      Q.   And you have an entry there, "Numerous
21 conversations with Merrill Lynch regarding
22 assets."  Do you see that?
23      A.   Yes.
24      Q.   Can you explain to me how it is that
25 you would have billed the company for these
```

113

1  entries if you did not in fact have involvement
2  in the plan investment decisions?
3          MR. MOUKAWSHER:  Objection; form.
4     A.   I had to contact Merrill Lynch to
5  liquidate the assets.  I had to talk to Alan
6  about the plans.  Alan is the one who approved
7  this bill.  Alan knows that I had many, many
8  conversations with him.  He knows that I went
9  into the office many times only for the purpose
10 of the calculations, figuring out what was going
11 on.  Where are the calculations?
12    Q.   Let me cut through this, Ms. Coan.  Is
13 it your testimony that these two entries that we
14 are looking at here have no relationship to the
15 investments of the plan assets at all?
16         MR. MOUKAWSHER:  Objection;
17 form.
18    A.   Of course they have something to do
19 with the plan assets, correspondence and
20 telephone communication with 40 participants of
21 plans and following up for responses.  I had to
22 talk to 40 different people.  I had to write to
23 40 different people.  I had to type the letter.
24 I had to receive the letters, open them up and
25 respond to them.