+

Observations of and Opinions on:

The Asset Allocation, Diversification and Performance of the K.L.C. 401(k)
Pension/Rollover Fund and Profit Sharing Fund, 1998 to 2001

Prepared by:

Warren F. Mulhern
265 Beacon Street, Unit 1
Boston, MA 02116

October 15, 2003

The observations and opinions expressed in this report are strictly those of Mr. Mulhern and do not reflect the views of his employer or any other party.

**Report Preparation**

In preparation for the production of this report I have reviewed the following:
a) discovery materials forwarded to me by defense counsel including but not limited to account statements, spreadsheets, third party administrator (TPA) reports and other relevant documentation pertaining to the investments made in the K.L.C. 401(k) Profit Sharing Plan;
b) the interrogatories and affirmative defense responses supplied by counsel;
c) a review of the requirements of the Employment Retirement Income Security Act of 1974 (ERISA);
d) the expert witness report (titled *An analysis of the Asset Allocation, Diversification, and Performance of the K.L.C. 401(k) Pension/Rollover Fund and Profit Sharing Fund, 1998 to 2001*) written by Vahan Janjigian, Ph.D.

In making my observations and reaching my conclusions, I relied on the above mentioned materials as well as my twenty-two years of experience working for Wall Street firms in an investment advisory capacity (often as a fiduciary) for numerous clients including individuals, corporations, municipalities and unions specifically in the area of retirement plans.

**General Overview:**

ERISA clearly delineates that a fiduciary must act "with the care, skill, prudence, and diligence *under the circumstances then prevailing* that a prudent person acting in like capacity and familiar with such matters would use." From a general overview perspective, the specific actions taken by the Trustees of the K.L.C. Plan, relative to the decisions at issue, appear to pass the "Prudent Investor" test. Trustees exhibited care and diligence in their decision-making process. Decisions by the Trustees seem to be the unanimous result of careful deliberation by an informal investment committee. The committee was aided in their decision-making process by the counsel of an experienced financial advisor (Edward Wahlberg of Merrill Lynch Pierce Fenner & Smith). The Trustees carefully reviewed both the Fund's prospectus and an independent third party (Morningstar) research report which gave the fund high marks for safety. Prior to allocating capital to BlackRock Government Fund and as part of the due diligence process, the Trustees directly contacted a representative of the fund's manager and interviewed the associate in an effort to determine whether the fund filled the plan's goals and objectives. The Trustees also consulted two additional investment advisors in an effort to determine if the proposed investment was a prudent one. These actions surely meet and/or exceed those standards of action expected of a prudent investor.

In review of the matter, the plaintiff's expert questions some decisions made by the Trustees of the K.L.C. Plan. In these instances he appears to consider the issues severally, independently and/or in a vacuum - without the frame of reference of other issues or considerations (prevailing circumstances). In these cases, ERISA is unequivocal; it mandates that prudence be judged on a portfolio basis rather than an individual investment basis – the decisions must be looked at in their totality and all

prevailing circumstances must be considered. In all instances relative to the decisions at issue, there appear to be prevailing circumstances (such as changes in investment horizons and risk tolerance) that, when included in the discussion, make it apparent that these decisions were, indeed, prudent given the information that the Trustees of K.L.C. had at the time.

ERISA also requires that fiduciaries diversify investments to minimize the risk of large losses unless *under the circumstances it is clearly prudent not to do so*. A close review of the details of this matter reveals that the trustees not only carefully considered this edict, but that many of their actions were driven by their desire to comply with it.

### K.L.C.'s Holdings Prior to 1999

Relative to the Plan's holdings prior to 1999, I make two observations:

Observation # 1:
Prior to 1999, the Trustees of the K.L.C. Plan had the assets of the Plan invested in a diversified basket of largely equity mutual funds. The Plaintiff's expert categorically suggests on page bates #403 of his report that a) the portfolio should have included fixed income and b) the portfolio should have included more value stocks. Both of these assessments may or may not be true.

The prudence of an asset allocation for any client is a function of a number of variables including most importantly a) the client's investment horizon and b) the client's tolerance for risk. Without fully understanding all the variables surrounding these issues it is impossible to determine the appropriateness of any specific asset allocation. Without fully reviewing the demographics of the plans constituents, we are merely guessing at a number of inputs and surmising a result. What was a reasonable asset mix? What was the Plan's investment horizon? What were the Plan participants' tolerance for risk? What were the Plan's liquidity needs? To answer these questions one must examine such issues as the average age and years to retirement for Plan participants. The demographics of a plan's participants may suggest an asset allocation that differs markedly from the best fit allocation for a similar size plan with different participants.

Observation #2:
The allocation of this plan seems ideally suited to take maximum advantage of the prevalent market conditions. Although one should determine the asset allocation of a portfolio based on the inputs discussed above (investment horizon, risk tolerance, etc.), the asset mix that was chosen and the mutual funds that were used to execute that asset allocation deployed the Plan's capital largely in the asset classes, sub-classes and sectors that stood to benefit the most from the growth-led equity rally of the 1990s.

Once it was decided to have a heavy weighting in equities, the growth bias of the portfolio offered the greatest return to investors over that market cycle.

Using the notes and reports of the third party administrator (TPA) that were part of the discovery documents, I calculated annual return figures using year-end values and simply dollar-weighting returns. By way of comparison: The California Public Employees Retirement System (CalPERS) is the largest, and one of the best run and most widely admired retirement pension plans in the United States. If we use CalPERS' portfolio as a proxy for a well-run plan and examine results strictly on absolute-return terms, we see that during the period from 1992 through 1998 inclusive, the K.L.C. Plan's portfolio outperformed the CalPERS portfolio four of the seven calendar years by a cumulative total of 490 basis points or 4.9%, an average of 70 basis points, or .7% per year (attachment 1). Moreover, using year-end data over the examined period, a simple growth of $100,000 chart shows that $100,000 invested in the K.L.C. portfolio exceeds the same $100,000 invested in the CalPERS portfolio over the period. The conclusion to be drawn is that Plan participants were not penalized by either the asset allocation or manager selection decisions of the Plan's Trustees during this period.

**Performance of Stock an Bond Markets, 1998 to Q1 2001**

The Plaintiff's expert reviews the experience of the stock and bond markets on page bates #403 of his report.

Observation #3
His assumption that every asset allocation for a retirement plan must include fixed income to be prudent is a flawed one. A retirement plan portfolio does not have to include fixed income to be appropriate for retirement plan assets. Ibbotson Associates, founded by Roger G. Ibbotson, Ph.D., is widely considered to be the premier consultant on asset allocation issues. Ibbotson Associates identifies five target asset mixes that are considered appropriate for 401(k) investment depending on an investors investment horizon and risk tolerance (attachment 2). The most aggressive asset mix identified by Ibbotson Associates allocates no capital to fixed income.

One might also argue that the benchmarks he uses for both equity and fixed income may not be appropriate for all retirement plan portfolios. The Wilshire 5000, his proxy for equity, is practically the broadest domestic equity index available. Most managers/funds have a difficult time selecting securities from the smallest strata of capitalization due to liquidity issues. A more appropriate benchmark may be the Russell 3000 which includes the largest one thousand equities in the Russell universe as well as the next largest two thousand (small-to-mid cap) equities. Many retirement plans use the Lehman Brothers Government/Credit index as their fixed income benchmark.

**K.L.C.'s 1999 Investment Decisions**

The Plaintiff's expert argues that the Plan should have had exposure to fixed income all through the 1990's, yet when the Trustees allocated to fixed income at nearly the most opportune moment (March 1999), he finds fault with that decision as well. Their expert does not disagree with the decision to allocate to fixed income (indeed he maintains the Plan should have had an allocation to fixed income earlier), the selection of the

manager/fund, the BlackRock Government Fund, (quoting the Plaintiff's Expert Report on page bates #403, "I would consider it an appropriate fund for exposure to fixed income"), only the scale of the investment, ("The decision to invest in government bonds was a prudent one. But the decision to allocate such a large amount to government bonds was not.", page bates #403). He assumes that because the Plan's Trustees allocated more than 70% of the portfolio to fixed income, it must have been a market timing move. He further surmises that this move had something to do with a back-end load that locked the portfolio into the fund for a year precluding it from getting "out of the fund in a cost-efficient manner if interest rates begin to rise.", ( page bates #403.)

Observation #4:
Here the Plaintiff's expert wants to have it both ways. On one hand he rails against the Trustees of the Plan for market timing, on the other he decries the Trustees for locking in a bond fund for more than a year (which would prevent their market timing.) Would not the swap out of a bond fund simply predicated on whether "interest rates begin to rise" (page bates #403) constitute the epitome of market timing?

The question here is moot for a number of reasons:

Observation #5:
The Plaintiff's expert fails to take into consideration the *prevailing circumstances* that the Plan's investment horizon had changed During the first quarter of 1999, material issues arose to give the Trustees reason to review the Plan's allocation. Those issues were the purchase of K.L.C. by a larger corporation and the anticipation of the eventual cash liquidation of the Plan. It was certainly most prudent to review the Plan's allocation and make changes as the informal investment committee saw fit given these prevailing circumstances. Indeed, not to do so certainly would have been construed as imprudent.

Given these prevailing circumstances, and after extensive deliberation and due diligence, the Trustees decided that a prudent course of action was to allocate the bulk of the Plan's assets to fixed income in anticipation of the Plan's liquidation. At that time, the equity markets were at or near historical levels of volatility. The choice of a high quality government bond fund (the BlackRock Government Fund) was made in an effort to lower the Plan's exposure to risk (i.e. the volatility of the equity markets) given that the Trustees were uncertain of the timeframe for liquidation.

Observation #6:
The Plaintiff's expert's assumption that the Plan was locked into the BlackRock Government Fund because of a contingent deferred sales charge (cdsc) - commonly known as a back-end load – is erroneous. The Plan purchased institutional shares which means BlackRock waived any cdsc. The plaintiff's expert observes that account statements show no cdsc and correctly surmises that it may have been waived. Nevertheless, he proceeds to read into the Trustee's actions through the lens of an investor concerned with a back-end sales charge.

**K.L.C.'s 2000 Investment Decisions**

Observation #7:
The plaintiffs expert assumes motivation that did not exist and proceeds to calculate a hypothetical return to determine opportunity cost of actions predicated on that motivation. Again, what he fails to recognize is the prevailing circumstances of the Plan.

In his report the Plaintiff's expert ascribes motivation, ("Indeed, K.L.C. may have timed the sale in order to avoid this back-end load...The appearance is that the trustees had come to regret their decision to invest in the BlackRock fund, but felt compelled to remain invested until they could avoid having to pay the load." page bates #404) based on the assumption that the Trustees of the Plan took action based on their desire to avoid a mythical $74,000 sales charge. In drawing conclusions on motivation, the Plaintiff's expert completely overlooks the fact that material issues had arisen giving the Trustees reason to review and change the Plan's allocation. The Plaintiff's expert also proceeds to participate in classic 20/20 hind sight when he calculates the potential return of the portfolio if the Trustees had stayed in the fund. No one knows the outcome of any investment except ex post facto. Indeed, with the changes in existing circumstances, the Trustees may have been imprudent if they had not changed the allocation.

Observation #8:
The Plaintiff's expert seizes on the fact that in 2000 the Plan went to cash and then invested a small component of the portfolio in equities in the second quarter as the smoking gun that the Trustees regretted their prudent decisions in 1999.

Once again, the Plaintiff's expert does not take all of the facts into consideration when drawing his conclusions. Due to administrative issues, it became apparent to the Trustees that it may be difficult to predict the timetable for the liquidation of the Plan. In other words, the investment horizon for the Plan was less certain. Again, after considerable deliberation, unaffected by concerns of any cdsc, the informal investment committee voted unanimously to sell the BlackRock Government Fund and go to cash. Although one can second guess this decision with perfect 20/20 hindsight, given the Trustees lack of visibility on a timetable for liquidation and distribution of the plan, this, too, was a prudent action by the Trustees.

Observation #9:

By mid 2000, the liquidation process had clearly taken longer than expected and it was still unclear when a final determination would be made. As a result, the Trustees of the Plan became concerned about opportunity cost. ERISA requires that fiduciaries diversify investments to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so. The Trustees also recognized an obligation to glean the

most reward for plan participants within a reasonable level of risk. Therefore, they were concerned that leaving the Plan's portfolio totally invested in cash without clarity on when the final liquidation may occur, may not be the most prudent action under the present circumstances.

Consequently, the informal investment committee unanimously agreed to allocate a small percentage of the portfolio to equities while keeping the bulk of the Plan's assets in the safest investment available – cash. The Trustees hoped that this approach, similar to a "barbell" strategy in fixed income asset management, would give the Plan a small amount of equity exposure that could be expected to out-return cash and/or fixed income over time while off-setting the risk with preponderance off capital invested in the most risk adverse asset class.

It is easy to second guess this decision with the crystal clarity of hindsight. Given the capital market expectations at the time and the lack of visibility of the Plan's time horizon, however, this small allocation to equity was not unreasonable. It offered the investor an opportunity to participate in the equity markets without exposing the bulk of the portfolio to equity market volatility.

Again, the Trustees exercised prudent due diligence in their decision-making. Again, they consulted their investment advisor (Mr. Wahlberg) as well as two other professional investment advisors. Again, they reviewed third party research reports (Morningstar) and read the prospectus for each fund. Again, they contacted the fund manager and interviewed him relative to the fund, its process and the appropriateness of the Plan's investment in it. Certainly, these efforts meet or exceed the Prudent Investor mandate of a fiduciary as defined by ERISA.

### **Conclusion:**

It is my opinion that the trustees of the K.L.C. plan acted in a prudent fashion when they reassessed their asset allocation in the first quarter of 1999 given the fact that the prevailing circumstances had changed. This change in the Plan's asset allocation certainly satisfies the Prudent Investor standards of ERISA.

# Warren F. Mulhern
## Biographical Information

As Senior Consultant & Vice President- Due Diligence, Warren leads Advest's Due Diligence Group in the managed money area of its Wealth Management & Private Client Services Department. His more than twenty-two years of experience in an investment advisory capacity with such Wall Street firms as Shearson Lehman Brothers, L.F. Rothschild and Gruntal & Company brings vast experience to the group.

Mr. Mulhern's group specializes in research and analysis on asset managers as well as asset allocation issues for the firm. Warren also serves as consultant to a number of institutional defined contribution pension funds while working with and acting as a resource for Advest Financial Advisors in their effort to become more consultatively focused.

Prior to assuming these responsibilities, as Director of Operations & Consultant, Warren helped manage The Hannah Consulting Group which supplied investment consulting services to over $6 billion of municipal and Taft/Hartley defined benefit pension plans.

Mr. Mulhern is a frequent speaker on investment consulting topics at various investment management conferences including those held by the Investment Management Institute. Mr. Mulhern has also been invited to appear on the Commonwealth of Massachusetts' Public Employee Retirement Administration Commission's (P.E.R.A.C.'s) Pension Consultant's Roundtable.

Besides holding Series 3,6,7,24,63 and 65 as well as Life & Health Insurance licenses, Warren has completed Advest's in-house course to be accredited as a Certified Retirement Planning Specialist. Warren is a graduate of the University of Pennsylvania with a BA in Economics and History.

**Statement of Compensation**

The time spent in preparation of this report amounted to thirty-five (35) hours billable at a rate if $250.00 per hour for total compensation of $8,750.00

Respectfully submitted by,

*[signature]*

Warren F. Mulhern
265 Beacon Street, Unit 1
Boston, MA 02116

Coan v. Kaufman

**Rate of Return**

| | Consolidated Rate of Return for Target and Profit plans | CalPERS rate of return year end 12/31 | NET |
|---|---|---|---|
| 1992 | +9.7% | +6.5% | +3.2% |
| 1993 | +13.7% | +13.4 | +.3% |
| 1994 | -0.4% | -1.0% | +.6% |
| 1995 | +23.8% | +25.3% | (1.5%) |
| 1996 | +12.1% | +12.8% | (.7%) |
| 1997 | +22.1% | +19.0% | +3.1% |
| 1998 | 18.4% | 18.5% | (.1%) |
| 1992-8 | +4.9% cumulative excess return | | .7%[1] per annum |
| 1999[2] | +7.43% | +16.0% | |
| 2000 | -7.69% | -1.4% | |
| 2001 | -3.28 | -6.2% | |

---

[1] Average excess return for years 1991-8.

[2] 1999- 2001 uses plaintiff's calculations.



Cumulative Performance
Dec-91 - Dec-98

Rolled-Up Asset Class Level Portfolios

| Asset Class | Portfolios | | | | |
|---|---|---|---|---|---|
| | Conservative | Moderate-Conservative | Moderate | Moderate-Aggressive | Aggressive |
| Large-Cap Growth Stocks | 6 | 9 | 13 | 17 | 20 |
| Large-Cap Value Stocks | 9 | 13 | 17 | 22 | 24 |
| Mid-Cap Stocks | - | 8 | 9 | 12 | 14 |
| Small-Cap Stocks | - | - | 6 | 9 | 13 |
| International Stocks | 5 | 10 | 15 | 20 | 24 |
| Aggregate Bonds | 60 | 50 | 35 | 20 | - |
| Cash Equivalents | 20 | 10 | 5 | - | 5 |
| | | | | | |
| Percent Equity | 20 | 40 | 60 | 80 | 95 |
| Percent Fixed Income | 80 | 60 | 40 | 20 | 5 |
| | | | | | |
| Expected Return | 7.5 | 9.2 | 10.9 | 12.5 | 13.6 |
| Standard Deviation | 6.5 | 9.1 | 12.5 | 16.0 | 18.8 |

© 2002 Ibbotson Associates