LEXSEE 2003 US DIST LEXIS 17492

In Re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION, PAMELA M. TITTLE, THOMAS O. PADGETT, GARY S. DREADIN, JANICE FARMER, LINDA BRYAN, JOHN L. MOORE, BETTY J. CLARK, SHELLY FARIAS, PATRICK CAMPBELL, FANETTE PERRY, CHARLES PRESTWOOD, ROY RINARD, STEVE LACEY, CATHERINE STEVENS, ROGER W. BOYCE, WAYNE M. STEVENS, NORMAN L. AND PAULA H. YOUNG, MICHAEL L. MCCOWN, AND DAN SCHULTZ, on behalf of themselves and a class of persons similarly situated, and on behalf of the Enron Corp. Savings Plan, the Enron Corp. Employee Stock Ownership Plan, and the Enron Corp. Cash Balance Plan, Plaintiffs VS. ENRON CORP., an Oregon Corporation, ENRON CORP. SAVINGS PLAN ADMINISTRATIVE COMMITTEE, ENRON EMPLOYEE STOCK OWNERSHIP PLAN ADMINISTRATIVE COMMITTEE, CINDY K. OLSON, MIKIE RATH, JAMES S. PRESTON, MARY K. JOYCE, SHEILA KNUDSEN, ROD HAYSLETT, PAULA RIEKER, WILLIAM D. GATHMANN, TOD A. LINDHOLM, PHILIP BAZELIDES, JAMES G. BARNHART, KEITH CRANE, WILLIAM J. GULYASSY, DAVID SHIELDS, JOHN DOES NOS. 1-100, UNKNOWN FIDUCIARIES OF THE ENRON CORP. SAVINGS PLAN OR THE ESOP, THE NORTHERN TRUST CO., KENNETH L. LAY, JEFFREY SKILLING, ANDREW S. FASTOW, MICHAEL KOPPER, RICHARD CAUSEY, JAMES V. DERRICK, JR., THE ESTATE OF J. CLIFFORD BAXTER, MARK A. FREVERT, STANLEY C. HORTON, KENNETH RICE, RICHARD B. BUY, LOU L. PAI, ROBERT A. BELFER, NORMAN P. BLAKE, JR., RONNIE C. CHAN, JOHN H. DUNCAN, WENDY L. GRAMM, ROBERT K. JAEDICKE, CHARLES A. LEMAISTRE, JOE H. FOY, JOSEPH M. HIRKO, KEN L. HARRISON, MARK E. KOENIG, STEVEN J. KEAN, REBECCA P. MARK-JUSBASCHE, MICHAEL S. MCCONNELL, JEFFREY MCMAHON, J. MARK METTS, JOSEPH W. SUTTON, ARTHUR ANDERSEN & CO. WORLDWIDE SOCIETE COOPERATIVE, ARTHUR ANDERSEN LLP, ARTHUR ANDERSEN UNITED KINGDOM, DAVID B. DUNCAN, THOMAS H. BAUER, DEBRA A. CASH, ROGER D. WILLARD D. STEPHEN GODDARD, JR., MICHAEL M. LOWTHER, GARY B. GOOLSBY, MICHAEL C. ODOM, MICHAEL D. JONES, WILLIAM SWANSON, JOHN STEWART, NANCY A. TEMPLE, DONALD DREYFUSS, JAMES A. FRIEDLIEB, JOSEPH F. BERARDINO, ANDERSEN DOES 2 THROUGH 1800 UNKNOWN PARTNERS IN ANDERSEN LLP, MERRILL LYNCH & CO., INC., J.P. MORGAN CHASE & CO., CREDIT SUISSE FIRST BOSTON CORPORATION, CITIGROUP, INC., SALOMON SMITH BARNEY INC., VINSON & ELKINS, LLP, RONALD T. ASTIN, JOSEPH DILG, MICHAEL FINCH, AND MAX HENDRICK, III, Defendants.

MDL 1446, CIVIL ACTION NO. H-01-3913 CONSOLIDATED CASES

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

2003 U.S. Dist. LEXIS 17492

September 30, 2003, Decided
September 30, 2003, Entered

**JUDGES:** [*1] MELINDA HARMON, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** MELINDA HARMON

**OPINION:**

*TITTLE* ROADMAP

I. Overview of Causes of Action and Pending Motions

II. Applicable Law

  A. ERISA

    1. Fiduciary Liability

      a. Expansive Definition

      b. Fiduciary Duties

      c. "Two-Hat" Doctrine

      d. Power to Appoint/Remove Plan Fiduciaries

      e. Duty to Disclose

      f. Personal Liability of Corporate Employees

      g. Professional Liability

      h. Section 404(c) Plans

      i. Causation

    2. Co-fiduciary Liability

    3. Directed Trustee Liability

    4. Standing and Remedies

    5. Service on and Liability of the Administrative Committees of the Plans as Unincorporated Associations

  B. RICO Amendment

  C. Common Law Claims

    1. Preemption and the Federal Statutes at Issue

      a. ERISA (Generally)

      b. SLUSA (Generally)

    2. ERISA Preemption and Plaintiffs' Common-Law Conspiracy Claim

    3. ERISA Preemption and Plaintiffs' Common-Law Negligent Misrepresentation Claim

III. Application of the Law to the Complaint's Allegations

  A. Procedural Objections

  B. RICO Amendment

  C. ERISA Breach of Fiduciary and Co-Fiduciary Duty

    1. [*2] Count I and Count V

    2. Count II

    3. Count III

    4. Count IV

  D. Texas Common Law Causes of Action

    1. Count IX: Civil Conspiracy

    2. Count VIII: Negligent Misrepresentation

**MEMORANDUM AND ORDER *RE* TITTLE DEFENDANTS' MOTIONS TO DISMISS**

The above referenced action is brought on behalf of Enron Corporation ("Enron") employees who were participants in three employee pension benefit plans governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), § 3(2), 29 U.S.C. § 1002(2), specifically the Enron Corporation Savings Plan ("Savings Plan"), the Enron Corporation Employee Stock Ownership Plan ("ESOP"), and the Enron Corporation Cash Balance Plan ("Cash Balance Plan"), n1 and also on behalf of Enron employees who received "phantom stock" as compensation. n2 The first consolidated amended class action complaint (instrument # 145) alleges that Defendants are liable for the following violations during a proposed Class Period from January 20, 1998 through December 2, 2001: (1) breach of fiduciary and co-fiduciary duties under ERISA, 29 U.S.C. §§ 1104 and 1105; (2) the commission of [*3] or conspiracy to commit unlawful acts or omissions in the conduct of certain enterprises' affairs through a pattern of racketeering activity in a scheme to mislead and defraud Enron employees, shareholders, potential investors, and the securities market in violation of the Racketeer Influenced and Corrupt Organizations Act (civil "RICO"), 18 U.S.C. §§ 1961-1968; and (3) negligence and civil conspiracy under Texas common law.

    n1 While various parties have submitted copies of the relevant plans and trust agreements, some not the controlling version, the governing versions of all three are available as exhibits A.1-A.5 to the Joint Appendix in Support of Defendants' Motions to Dismiss Amended and Consolidated Complaint

(# 271) and as exhibits A-D to *Tittle* Plaintiffs' Appendix for Opposition to Defendants' Motions to Dismiss the First Consolidated and Amended Complaint (# 322).

n2 The complaint at 54, P192 states that the phantom stock was given in lieu of money as wages (or bonuses for work done) and "was not part of any ERISA plan." ERISA governs only employee welfare benefit plans (which provide medical, unemployment, disability, death, vacation, and other benefits) and employee pension benefits plans (which provide retirement income to employees or defers payment of income to employees until termination of covered employment or thereafter), or plans that are a combination of the two. 29 U.S.C. § 1002 (1), (2), and (3); *Absher v. Flexi International Software, Inc.*, No. Civ. 3:02CV171 (AHN), 2003 WL 2002778, *6 (D. Conn. Apr. 10, 2003), citing *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) (Where payments are made not to "provide retirement income" but for some other purpose, ERISA does not apply.); *Hahn v. Nat'l Westminster Bank, N.A.*, 99 F. Supp. 2d 275, 278-81 (E.D.N.Y. 2000) (citing Department of Labor regulation, 29 C.F.R. § 2510.3-2(c), excluding from the definition of employee benefit plans those that involve payments made to employees as "bonuses for work performed"). In contrast to a pension benefit plan, a bonus plan does not proffer retirement income, but functions for another purpose, such as increased compensation for an incentive or a reward for good work. *Absher*, 2003 WL 2002778 at *6. In the *Tittle* complaint there are no allegations that the phantom stock was designated for retirement income so that it might have constituted an employer "program" that might qualify as an "employee pension benefit" plan under 29 U.S.C. § 1002(2)(A)(i). *See, e.g., Massachusetts v. Morash*, 490 U.S. 107, 118-20 (1989) (payments by an employer out of general company assets as compensation for work, even if deferred, are not employee welfare benefit plans under ERISA); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 927, 931-32 (8th Cir. 1999) (holding that a phantom stock plan for executive employees to provide incentives and compensation for remaining in their employment "with additional incentives for industry and efficiency," was not a pension plan because redemption of shares was not conditioned upon termination of employment and its purpose was not deferral of income, but was instead a bonus plan exempted from coverage by ERISA). Thus the Court assumes none of the ERISA causes of action is or can be asserted on behalf of the proposed class of the phantom stock recipients.

Moreover, phantom stock is not actually stock. It has been defined as

> [a] right . . . to receive an award with a value equal to the appreciation of a share of stock from the date that Phantom Stock is cashed out. . . . Phantom Stock programs are designed to provide executives with cash payments equivalent to amounts they could receive under an actual stock option or similar program. . . . Phantom programs are based on "phantom" or "hypothetical" shares or units.

*Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1327 (11th Cir. 1998) (*quoting* Coopers & Lybrand, *Executive Summary of Nonqualified Long-term Incentive Plans*, CV01 ALI-ABA 619, 632 (1996)). The *Tittle* complaint fails to state what company issued the stock, but in Plaintiffs' Opposition to Defendants' Motions to Dismiss State Law Claims (# 319 at 19), Plaintiffs represent that at this stage of the litigation they believe the stock does not constitute a "covered security," or a "nationally traded security" or a security issued by a registered investment company under 15 U.S.C. § 77r(b), nor that it constitutes an investment contract of any kind and thus any conduct related to the phantom stock is not actionable under the federal securities laws.

The complaint does assert phantom stock claims under RICO and Texas common law civil conspiracy.

[*4]

## I. OVERVIEW OF CAUSES OF ACTION AND PENDING MOTIONS

Defendants fall into five groups: (1) Enron and individual officers and directors of the company; (2) committees, trustees, and individuals that administered the three pension plans; (3) Enron's accountant Arthur Andersen LLP and some of its individual partners and employees (Thomas H. Bauer, Joseph F. Berardino, Debra A. Cash, Donald Dreyfus, James A. Friedlieb, D. Stephen Goddard, Jr., Gary B. Goolsby, Michael D. Jones, Michael M. Lowther, John Stewart, William Swanson, Nancy A. Temple, and Roger D. Willard); (4) Enron's outside law firm Vinson & Elkins L.L.P. and some of its individual partners (Ronald Astin, Joseph Dilg, Michael Finch, and

Max Hendrick, III); and (5) five investment banks (J.P. Morgan Chase & Co., Merrill Lynch & Co., Inc., Credit Suisse First Boston, Citigroup, Inc., and Salomon Smith Barney, Inc).

The complaint asserts its causes of action in nine counts: five under ERISA, two under RICO, one under Texas common-law negligence, and the last under Texas common-law civil conspiracy.

Count I originally asserted a claim on behalf of the Savings Plan and the ESOP n3 against Defendants Enron, the Enron ERISA [*5] Defendants, n4 Kenneth L. Lay, n5 Jeffrey K. Skilling [to be dismissed], n6 Richard A. Causey [to be dimsissed], n7 and Arthur Andersen, n8 at a time when Enron, the Enron ERISA Defendants, Lay, and Skilling knew or should have known that Enron stock was an imprudent investment choice, for breaches of their fiduciary and co-fiduciary duties of prudence, care and loyalty under 29 U.S.C. §§ 1104(a)(1)(A)-(D) n9 and 1105, for (1) allowing Savings Plan participants the ability to direct the Plan's fiduciaries to purchase Enron stock for their individual accounts from monies the participants contributed as deductions from their salaries; (2) inducing the participants to direct the fiduciaries to purchase Enron stock for their individual accounts in exchange for funds they contributed to the Plan; (3) causing and allowing the Savings Plan to purchase or accept Enron's matching contributions in the form of Enron stock; (4) imposing and maintaining age restrictions and other restrictions on the participants' ability to direct the Savings Plan fiduciaries to transfer both Savings Plan and ESOP assets out of Enron stock; and (5) inducing the Savings Plan and ESOP participants [*6] to direct or allow the fiduciaries of both Plans to maintain investments in Enron stock. Arthur Andersen is charged with breaching its fiduciary duty under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), by participating in the Enron Defendants' breach of fiduciary duties by actively concealing from the Plan fiduciaries and Plan participants the actual financial condition of Enron and the imprudence of investing in Enron stock.

> n3 As explained by the Sixth Circuit Court of Appeals in *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 425 (6th Cir. 2002), *cert. denied*, 123 S. Ct. 966 (2003),
>
>> Under ERISA, a plan that primarily invests in shares of stock of the employer that creates the plan is referred to as an ESOP. . . . Congress intended ESOPS to function as both "an employee retirement benefit plan and a 'technique of corporate finance' that would encourage employee ownership." . . . "Because of these dual purposes, ESOPS are not designed to guarantee retirement benefits, and they place employee retirement assets at much greater risk than the typical diversified ERISA plan." [citations omitted]

The Fifth Circuit has provided "a thumbnail sketch of basic ESOP mechanics":

> An employer desiring to set up an ESOP will execute a written document to define the terms of the plan and the right of beneficiaries under it. 29 U.S.C. § 1102(a) (1976). The plan document must provide for one or more named fiduciaries "to control and manage the operation and administration of the plan." *Id.*, § 1102(a)(1). A trust will be established to hold the assets of the ESOP. *Id.*, § 1103. The employer may then make tax-deductible contributions to the plan in the form of its own stock or cash. If cash is contributed, the ESOP then purchases stock in the sponsoring company, either from the company itself or from existing shareholders. Unlike other ERISA-covered plans, an ESOP may also borrow in order to invest in the employer's stock. In that event, the employer's cash contributions to the ESOP would be used to retire the debt.

*Donovan v. Cunningham*, 716 F.2d 1455, 1459 (5th Cir. 1983), *cert. denied*, 467 U.S. 1251 (1984).

Furthermore the fiduciary of an ESOP is not relieved of his traditional duties of loyalty, prudence, and care under § 404 of ERISA, (9 U.S.C. § 1104(a), although the fiduciary is not bound by the requirement of diversification of plan assets under § 404(a)(2), 29 U.S.C. § 1104(a)(2), or by the prohibited transaction rules of § 406, 29 U.S.C. § 1106 and § 408, 29 U.S.C. § 1108(e), to be discussed in detail later. *Id.* at 1463-67. Plaintiffs here maintain that they are not alleging that Defendants failed to diversify the ESOP assets, but that in breach of their fiduciary duties to plan participants and beneficiaries, they permitted an imprudent investment in Enron stock when they knew or should have known it was very risky.

The Third Circuit has held that in light of the

Case 3:01-cv-01737-MRK    Document 52-23    Filed 10/16/2003    Page 5 of 15

Page 5
2003 U.S. Dist. LEXIS 17492, *6

special nature of an ESOP and the special provisions for it, an ESOP trustee is entitled to a presumption that it acted consistently with ERISA in investing plan assets in the employer's securities unless a showing was made that circumstances have arisen that would make such an investment defeat or impair the original purpose of the trust. *Moench v. Robertson*, 62 F.3d 553, 568-71 (3d Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996). A determination as to whether an ESOP fiduciary breached its fiduciary duty should not be made on a motion to dismiss, but only after discovery develops a factual record. *Id.* (reviewing whether ERISA fiduciary was entitled to presumption on summary judgment; under a showing of circumstances that made such an investment defeat or impair the original purpose of the trust, the trustee was subject to the prudent man rule); *in accord Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995); *In re IKON Office Solutions, Inc.*, 86 F. Supp. 2d 481, 492 (E.D. Pa. 2000) (denying motion to dismiss because "it would be premature to dismiss even a portion of the ERISA complaint without giving plaintiffs an opportunity to overcome the presumption"). *But see Canale v. Yegen*, 782 F. Supp. 963, 967-68 ("the allegation that [an ESOP] Plan administrator has failed to prudently diversify plan assets invested exclusively in the stock of the beneficiaries' employer can state a claim for breach of fiduciary duty under ERISA."), *on reargument*, 789 F. Supp. 147, 153-54 nn.4 & 5 (D.N.J. 1992) (the relevant fiduciary duty, described in the [earlier] opinion only in terms of the duty to diversify, is better characterized as both the duty to diversify and to discharge her duties with the prudence that a prudent person would use in the conduct of a like enterprise.").

[*7]

n4 The complaint at P62 states that the term "Enron ERISA Defendants" refers to those Defendants named in PP44-61, i.e., the Enron Corp. Savings Plan Administrative Committee ("Administrative Committee"), the Enron Stock Ownership Plan Administrative Committee ("ESOP Administrative Committee"), the Cash Balance Plan Administrative Committee, Cindy Olson, Mikie Rath (since dismissed from this action, # 367), James S. Prentice, Mary K. Joyce, Sheila Knudsen, Rod Hayslett, Paula Rieker, William D. Gathmann (since dismissed from this action, # 363), Tod A. Lindholm, Philip J. Bazelides, James G. Barnhart, Keith Crane, William J. Gulyassy, David Shields, and John Does Nos. 1-100 (at all relevant times members of the Administrative Committees of the Savings Plan, ESOP, and/or the Cash Balance Plan).

Plaintiffs have indicated that they are dismissing without prejudice Counts I-V against Gathmann and Barnhart. # 314 at 11. They are also dismissing without prejudice Defendant the Cash Balance Plan, successor to the Enron Corporation Retirement Plan, which is sued only under Count IV. *Id.* at 10-11.

n5 The complaint asserts that Lay was Chairman of the Board of Directors of Enron, served as Enron's CEO from 1986-February 2001 and August 2001-January 2002, and was a fiduciary of the Savings Plan, the ESOP, and the Cash Balance Plan. In their Overview Memorandum (# 314) at 11 n.5, Plaintiffs state they are dismissing their Count I claim against Lay based on "his alleged fraudulent promotion of Enron stock," but not their claim against Lay for breach of his fiduciary duty to monitor the appointment and conduct of the Savings Plan and ESOP Committee Members.

[*8]

n6 According to the complaint, Skilling was a director of Enron at all relevant times, was CEO of Enron from February 2001-August 14, 2001, and was a fiduciary of the Savings Plan, the ESOP, and the Cash Balance Plan. In Plaintiffs' Overview Memorandum (# 314) at 11 and n.5, Plaintiffs state they are dismissing their Counts I and II claims against Skilling.

n7 Causey was Executive Vice-President and Chief Accounting Officer of Enron. He is alleged to have signed each of Enron's Form 10-K's and 10-Q's that were filed with the SEC from 1997-2000. Plaintiffs have indicated they are dismissing without prejudice their claims against Causey under Counts I-IV. # 314 at 11.

n8 Arthur Andersen L.L.P. is sued in its capacity as auditor of the Savings Plan and in its capacity as the auditor of Enron's financial statements generally.

n9 Section 404(a) of ERISA, 29 U.S.C. § 1104(a), addressing fiduciary duties and the prudent man standard of care, provides,

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect

to a plan solely in the interest of the participants and beneficiaries and–
(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;
(B) with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

This provision imposes fiduciary duties that overlap one another, i.e., a duty to diversify the investments of the plan, a duty of loyalty, and a duty of care. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 293-94 (5th Cir. 2000).

[*9]

Count II is brought on behalf of the Savings Plan and the ESOP against Defendants Enron, the Enron ERISA Defendants, Lay, Skilling [since dismissed], Causey [since dismissed], and the Northern Trust Company ("Northern Trust"), for breach of their fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A) – (D) and 1105, based on the lockdown (freeze, blackout) n10 of the two Plans, without adequate notice to participants, effectually from October 17, 2001 until November 14, 2001, n11 while the Plans were switched to a new record keeper and trustee, n12 during which time the price of Enron stock fell from $33.84 to $10.00 per share. n13

n10 The complaint states that Northern Trust was a trustee and fiduciary of the Savings Plan and the ESOP within the meaning of 29 U.S.C. § 1002(21)(A). According to the complaint, during the lockdown, plan participants were unable to move their investments from one plan investment fund to another despite exigent circumstances that made the blackout imprudent. The complaint asserts that Northern Trust exercised authority and control over the plan assets by imposing the lockdown, which it had the ability to stop or delay, and that by not stopping or delaying that lockdown, Northern Trust breached its fiduciary duties to plan participants.

In its *amicus curiae* brief (# 446), the SPARK (Society of Professional Administrators and Recordkeepers) Institute insists that Northern Trust filled two distinct roles, one as a directed trustee and one as a recordkeeper, and charges that the Department of Labor in its own *amicus curiae* brief is trying to conflate the two to make Northern Trust a trustee of the Savings Plan. *Id.* at 14. SPARK Institute insists that the allegations in the complaint, i.e., that Northern Trust exercised authority and control over the plan by imposing the blackout and not delaying it in breach of its duties to the participants, relate solely to Northern Trust's role as a nonfiduciary, ministerial recordkeeper. *Id.* at 15. SPARK Institute explains the typical procedure of a lockdown and the trustee's role. # 446 at 8 n.1. SPARK Institute asserts that "lockdown" is not a term used in the retirement services industry. Instead "conversion" is used to identify the transaction in which a plan transfers administration of the plan from one recordkeeper to another, while a "blackout," which is one part of the conversion process, is a cessation of trading activity relating to the plan investments so that the transfer can occur without mistakes. *Id.* at 8 n.1. According to SPARK Institute, during a blackout, generally salary deferrals, employer matching contributions, and monthly payments to retirees are not frozen, but exchanges from one investment option to another, in-service withdrawals, loans, and lump-sum final distributions are. *Id.* at 8-9. SPARK Institute contends that there is no independent decision to impose a blackout; it is a mandatory part of the complex process of conversion, and the only way to prevent a blackout is to stop the conversion. *Id.* at 16. Moreover, SPARK Institute maintains that the decision regarding conversion and imposition of a blackout is controlled by the plan sponsor and named fiduciary, not by the recordkeeper. *Id.* at 9. The plan documents adopted by the plan sponsor establish the rules and procedures governing the plan, including the handling of employer securities, while named fiduciaries give the orders. *Id.* at 10. Furthermore, the recordkeeping contract generally requires a recordkeeper to cooperate with a plan sponsor and the successor recordkeeper in ef-

fecting the conversion, while Department of Labor regulations require that these contracts must be terminable on reasonably short notice. *Id.* at 8, 17, 18. SPARK Institute argues that the recordkeeper's role is purely ministerial and nonfiduciary (consisting of keeping track of all the individual accounts, the sources of the funds in each and the amounts, employer matching contributions, pre- and post-tax contributions, rollovers from other 401(k) plans, etc., matters largely handled by automated systems), and that conversion activities are conducted exclusively by recordkeepers). *Id.* at 11-13. See *Freimark & Thurston Agency, Inc. v. National City Bank of Dayton*, 231 F. Supp. 2d 713, 715 (S.D. Ohio 2002) (record keeper charged with delaying a conversion, had no discretion in the transfer and was not a fiduciary).

Plaintiffs charge SPARK Institute with obfuscation because Plaintiffs have not sued the recordkeeper here, but only Northern Trust in what Plaintiffs contend is its role as trustee and fiduciary. They also point out that Northern Trust, itself, has never argued that it was not the proper defendant nor that the functions challenged by Plaintiffs amounted to mere recordkeeping. This Court has previously ruled that Plaintiffs have produced sufficient evidence under seal to raise material issues of fact about the nature of Northern Trust's role.

[*10]

n11 The complaint highlights the significance of the timing of the lockdown by emphasizing the extreme circumstances that Plaintiffs maintain made the lockdown imprudent. On October 16, 2001, Enron made a surprise announcement, stunning Wall Street and triggering the first public investigations, that Enron was taking a $1.2 billion charge against its third quarter results. According to the complaint, stories immediately appeared in the media questioning Enron's financial condition, and many class members complained to Northern Trust and requested or demanded a postponement of the lockdowns. According to the complaint, when Enron asked Northern Trust and Hewitt Associates (the incoming recordkeeper) about the possibility of postponing the lockdowns, both responded that a postponement would be possible. On October 22, 2001 Enron publicly announced that the SEC had opened an informal investigation of Enron's accounting practices. On October 24, 2001 Andrew S. Fastow was forced to relinquish his position as Chief Accounting Officer, which was assumed by Jeff McMahon, who had previously complained about accounting improprieties. Just before midnight on October 25, 2001, Enron sent employees an e-mail stating that it would not delay the lockdown because it would be too inconvenient to do so. The alleged "constructive and/or actual" lockdown of the assets in the Savings Plan and the ESOP occurred between October 17 and 26, 2001. Meanwhile, the price of Enron stock declined during this period until it closed at $11.17 per share on November 5, 2001. The lockdown was lifted on November 14, 2001. The price of Enron stock continued to plunge, closing at $4.11 on November 27, 2001. Enron filed for bankruptcy protection on December 2, 2001.

[*11]

n12 Purportedly from Northern Trust and its recordkeeper, Northern Trust Retirement Consulting, to new trustee Wilmington Trust and new recordkeeper Hewitt Associates.

n13 Northern Trust argues that Plaintiffs fundamentally misconstrue the terms of the ESOP (Ex. B to # 243), as opposed to the Savings Plan, and that there was no "lockdown" of the ESOP. See footnotes 3 and 10 of this memorandum and order. Northern Trust contends that unlike the members of the Savings Plan, members of the ESOP do not choose what investments should be made with their contributions; they can only choose to contribute or withdraw funds from the ESOP. Furthermore, under the terms of the ESOP, at any and all times participants were required to submit any request to sell assets held in the ESOP by the twentieth day of the month in which the request was made or they would have to wait until the last day of the next month for the withdrawal to be effective. # 243, Ex. B at XIII-2.

Plaintiffs respond that their claim is not based on the normal business schedule, but on the fact that the exigent circumstances required Northern Trust, pursuant to its overriding fiduciary duty to act prudently and loyally in the best interests of plan participants and beneficiaries at all times, to disrupt that routine procedure to prevent grievous harm to them, and that although it had the ability to stop or delay the lockdown, Northern Trust breached its fiduciary duties in failing to do so.

[*12]

In Count III, Plaintiffs, on behalf of the Savings

Plan, n14 assert a breach of fiduciary duty in violation of 29 U.S.C. § 1104(a)(1)(D) against Enron, the Enron ERISA Defendants (excluding the ESOP Administrative Committee and the Cash Balance Administrative Committee), Lay, Skilling, Causey [since dismissed], and the Northern Trust Company for their failure to diversify the Savings Plan assets, i.e., to liquidate the Enron stock, in accordance with the terms of the plan, because Defendants knew or should have known that investment in Enron stock was imprudent.

> n14 Plaintiffs have indicated that they will seek leave of Court to amend to add the ESOP Plan to Count III based on ESOP plan language requiring Northern Trust to ensure prudent diversification of plan assets. # 316 at 38 n.19. With respect to ESOPS' purchases of employer securities generally, courts have held that fiduciary duties are met where the decision to purchase is made by or on the recommendation of independent financial and legal advisors after thorough examination of all relevant matters and consideration of the positive and negative effects of such investment to plan participants and beneficiaries. *See, e.g., Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982), *cert. denied*, 459 U.S. 1069 (1982); *Andrade v. Parsons Corp.*, 1992 U.S. App. LEXIS 18220 (9th Cir. 1992). At least two district courts have determined there is a duty of prudence on new plan fiduciaries to protect existing ESOP assets. *Keach v. U.S. Trust Co.*, 240 F. Supp. 2d 840, 844-45 (C.D. Ill. 2002); *Neyer, Tiseo & Hindo, Ltd. v. Russell*, 1993 WL 334951, *11 (E.D. Pa. 1993), *aff'd*, 37 F.3d 1488 (3d Cir. 1994) (Table).

[*13]

In Count IV Plaintiffs on behalf of Certain Retirement Plan Participants and Beneficiaries assert against Enron, the Enron ERISA Defendants, and the Enron Corp. Cash Balance Plan as Successor to the Enron Corp. Retirement Plan [since dismissed], another claim of breach of fiduciary duty, this time with respect to offsets (reductions) of accrued pension benefits that were based on the artificially inflated price of Enron stock from 1998-2000. The Enron Corp. Cash Balance Plan and its predecessor, the Enron Corp. Retirement Plan, constituted a "defined benefit plan" under 29 U.S.C. § 1002(35) n15 and was fully funded by Enron. In essence Plaintiffs allege that until January 1, 1996, the retirement benefits provided to a plan participant of five years or more service were determined by adding different percentages of final average pay multiplied by levels of years of accrued service, and then offset by the annuity value of a portion of that participant's account in the ESOP ("Offset Account") as of certain determination dates, usually the date the benefit payments began or, if earlier, the date(s) of distribution(s) from the Offset Account. Effective January 1, 1996, the [*14] Retirement Plan was amended, renamed the Enron Corp. Cash Balance Plan, and the benefit formula was changed from an average pay formula to a cash balance formula, while the offset arrangement between the Plan and the ESOP was to be phased out over the coming five-year period. Under the new plan, a plan participant's accrued benefit under the Cash Balance Plan was based on his employment from 1987-1994 and was offset over the five-year phase-out period by the value of his ESOP stock based on a formula set out in §§ 5.1-5.5 of the Plan. Each January 1st from 1996-2000, the value of one-fifth of the shares of Enron stock credited to each participant's Offset Account was to be calculated based on the stock's market price on that date as reported at closing time on the New York Stock Exchange and was thereafter permanently fixed at that amount. Plaintiffs allege that Defendants knew or should have known that the market price of Enron stock from 1998 to 2000 was artificially inflated and not representative of its true value, and that Defendants breached their fiduciary duty by not computing the component of the offset at its true, much lower value. As a result, participants and beneficiaries [*15] who accrued benefits under the Retirement Plan between January 1, 1987 and December 31, 1994 have suffered losses because their retirement benefits would be offset by the inflated market price of one-fifth of the shares of Enron stock in their ESOP Offset Account in 1998, 1999, and 2000.

> n15 There are two broad categories of employee benefit plans: defined benefit plans and defined contributions plans. The S.E.C. in S.E.C. Release No. 33-6188, 1980 WL 29482, at *6-7 Feb. 1, 1980), succinctly explains the difference:
> 
> > A defined benefit plan pays fixed or determinable benefits. The benefits ordinarily are described in a formula which specifies the amount payable in monthly or annual installments to participants who retire at a certain age.
> > 
> > As long as the plan and the employer(s) contributing to the plan remain solvent, and the plan continues to be operated, vested participants will receive the benefits specified. In the event the investment results of the plan do not meet expectations, the employer(s) usually will be required, on the basis of actuarial computations, to

Case 3:01-cv-01737-MRK   Document 52-23   Filed 10/16/2003   Page 9 of 15

Page 9
2003 U.S. Dist. LEXIS 17492, *15

make additional contributions to fund the promised benefits. Conversely, if the plan earnings are better than anticipated, the employer(s) may be permitted to make contributions that are less than the projected amounts.

A defined contribution plan does not pay any fixed or determinable benefits. Instead, benefits will vary depending on the amount of plan contributions, the investment success of the plan, and allocations made of benefits forfeited by non-vested participants who terminate employment. Thus the amount of benefits is based, in part, on the earnings generated by the plan.

Both defined benefit and defined contribution plans can provide for employee contributions. In addition, defined contribution plans maintain individual accounts for all participating employees. These accounts reflect each participant's share in the underlying trust assets and are adjusted annually to take into account plan contributions, earnings and forfeitures. In contrast defined benefit plans ordinarily do not maintain individual accounts, except to the extent necessary under the Internal Revenue Code to record benefits attributable to voluntary contributions by employees. [footnotes omitted]

Of the plans at issue here, only the Cash Balance Plan was a defined benefit plan, the others being defined contribution plans. ERISA created the Pension Benefit Guarantee Corporation, which insures minimum pension benefits for defined benefit plans if the employer becomes unable to pay the pension; there is no insurance for the defined contribution plans like the Savings Plan and the ESOP.

[*16]

Count V, brought on behalf of the Savings Plan, the ESOP, and the Cash Balance Plan against Enron and the Compensation Committee Defendants, alleges another breach of fiduciary and co-fiduciary duties under 29 U.S.C. § 1104(a)(1)(A)-(D) and § 1105 relating to their failure to appoint and monitor other plan fiduciaries and their failure to disclose to the investing fiduciaries material information about Enron's true financial condition. Specifically Plaintiffs claim that Defendants breached their fiduciary duties (1) by appointing fiduciaries to manage Plan assets that Defendants knew, or should have known, were not qualified to manage Plan assets loyally and prudently; (2) by failing to monitor adequately the investing fiduciaries' investment of these assets; (3) by failing to monitor adequately the Plans' other fiduciaries' implementation of the terms of the Plans, including but not limited to investment of the assets; (4) by failing to disclose to the investing fiduciaries material facts concerning Enron's financial condition that they knew or should have known were material to loyal, prudent investment decisions concerning the use of Enron stock in the [*17] Plans and/or with respect to the implementation of the terms of the Plans; (5) by failing to remove fiduciaries who Defendants knew or should have known were not qualified to manage the Plans' assets loyally and prudently; (6) by knowingly participating in the investing fiduciaries' breaches by accepting the benefits of those breaches, both personally and on behalf of Enron; (7) by knowingly undertaking to hide acts and omissions of the fiduciaries that Defendants knew constituted fiduciary breaches; and (8) by failing to remedy those fiduciaries' known breaches.

Count VI asserts RICO violations under section 1962(c), conducting the affairs of a RICO enterprise through a pattern of racketeering activities involving Enron stock, and 1962(d), conspiring to do so, thereby causing injury to Plaintiffs' and proposed Class Members' property. n16 Count VI is brought on behalf of all proposed classes against the "Enron Insider Defendants" (i.e., Kenneth L. Lay, Jeffrey K. Skilling, Andrew S. Fastow, n17 Michael Kopper, n18 Richard A. Causey, James V. Derrick, Jr. n19, the Estate of J. Clifford Baxter, n20 Mark A. Frevert, n21 Stanley C. Horton, n22 Kenneth Rice, n23 Richard B. Buy, n24 Lou [*18] L. Pai, n25 Robert A. Belfer, Norman P. Blake, Ronnie C. Chan, John H. Duncan, Wendy L. Gramm, Robert K. Jaedicke, Charles A. LeMaistre, Joe H. Foy, n26 Joseph M. Hirko, n27 Ken L. Harrison, n28 Mark E. Koenig, n29 Steven J. Kean, n30 Rebecca P. Mark-Jusbasche, n31 Michael S. McConnell, n32 Jeffrey McMahon, n33 J. Mark Metts, n34 Joseph W. Sutton n35); the "Accounting Defendants" (Arthur Andersen, n36 David B. Duncan, Thomas H. Bauer, Debra A. Cash, Roger D. Willard, D. Stephen Goddard, Jr., Michael M. Lowther, Gary B. Goolsby, Michael C. Odom, Michael D. Jones, William Swanson, John E. Stewart, Nancy A. Temple, Donald Dreyfuss, James A. Friedlieb, Joseph F. Berardino, and Andersen Does 2 through 1800); the "Attorney Defendants" (Vinson & Elkins, LLP, Ronald T. Astin, Joseph Dilg, Michael P. Finch, and Max Hendrick, III); and the "Investment Banking Defendants" (Merrill

Lynch & Co., Inc., J.P. Morgan Chase & Co., Credit Suisse First Boston Corporation, and Citigroup, Inc. and its subsidiaries, Citigroup Securities and Salomon Smith Barney).

n16 Section 1962(c) states,

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The word, "conduct," means "participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). The defendant who directs the enterprise need not have the primary responsibility for directing the enterprise, but must have some role in directing it. *Id.* at 179. "Operation" of an enterprise can be performed by upper management or by "lower rung participants in the enterprise who are under the direction of the upper management." *Id.* at 184. The "pattern of racketeering activity" must consist of two or more related predicate acts, which are federal or state crimes, and which amount to or pose a threat of continued criminal activity. *In re MasterCard Intern., Inc.*, 313 F.3d 257, 261-62 (5th Cir. 2002). A plaintiff's injury for purposes of § 1962(c) must flow from one of the alleged predicate acts. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).

Section 1962(d) provides, "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

[*19]

n17 Fastow was Chief Financial Officer of Enron at all relevant times.

n18 The complaint describes Kopper as a Managing director of Enron's Global Equity Markets Group, "an underling of Fastow," and the person who ran Chewco and JEDI.

n19 Derrick was Senior Vice President and General Counsel of Enron before July 1999, when he became Executive Vice President and General Counsel.

n20 Baxter was Chairman and Chief Executive Officer of Enron North America Corporation from June 1999-June 2000, Vice Chairman of Enron from October 2000, and Chief Strategy Officer from June 2000 until his death.

n21 Frevert is identified as Chairman and Chief Executive Officer of Enron Wholesale Services since June 2000, after serving as Chairman and Chief Executive Officer of Enron Europe from March 1997-June 2000.

n22 Horton was Chairman and Chief Executive Officer of Enron Transportation Services at all relevant times.

n23 Rice was Chairman and Chief Executive Officer of Enron Capital and Trade ("ECT")-North America from March 1997-June 1999, and Chairman and Chief Executive Officer of Enron Broadband Services, Inc. since June 2000.

n24 Buy was Managing Director and Chief Risk Officer of ECT from January 1998-March 1999, Senior Vice President and Chief Risk Officer from March 1999-July 1999, and Executive Vice President and Chief Risk Officer of Enron since July 1999.

[*20]

n25 Pai was Chairman and CEO of Enron Accelerator, after serving as director of Enron Energy Services, and became the Chairman of New Power, one of the vehicles allegedly used by Enron to inflate its earnings and conceal losses through unlawful, labyrinthine transactions.

n26 According to the complaint, Robert A. Belfer, Blake, Chan, Duncan, Gramm, Jaedicke, LeMaistre, and Foy were directors of Enron. Blake, Duncan, Jaedicke and LeMaistre were also members of the Compensation and Management Committee of the Enron Board of Directors (collectively, "Compensation Committee Defendants") and allegedly fiduciaries with respect to the Enron Corp. Savings Plan and the ESOP.

Outside Directors state the proper name of the committee is the Compensation and Management Development Committees," which were charged with "creating an employee compensation system linked to the enhancement of shareholder value." # 240 at 3 n.2.

n27 Hirko was Chief Executive Officer of Enron Broadband.

n28 Harrison was Chief Executive Officer of Portland General Electric, a subsidiary of Enron, until March 31, 2000, when he became a director of Enron.

n29 The complaint states that Koenig was Executive Vice President, Investor Relations of Enron at all relevant times.

[*21]

n30 Kean was Executive Vice President and Chief of Staff of Enron since 1999.

n31 The complaint identifies Mark-Jusbasche as a director of Enron until August 2000.

n32 McConnell was Executive Vice President, Technology during all relevant times.

n33 McMahon was Chief Financial Officer of Enron Europe from 1994-July 1998, Senior Vice President, Finance and Treasurer from July 1998 to July 1999, and Executive Vice President, Finance and Treasurer of the Company from July 1999.

n34 Metts was Executive Vice President, Corporate Development.

n35 Sutton was Vice Chairman of Enron until early 2001.

n36 Plaintiffs have settled with and dismissed the foreign Arthur Andersen entities.

Count VI identifies the following as RICO enterprises, either legal entities or association-in-fact enterprises: Enron Corporation; an association-in-fact enterprise comprised of the Enron Insider Defendants, the Enron ERISA Defendants, the Accounting Defendants and/or Andersen, the Attorney Defendants, the Investment Banking Defendants, and other investment banks not named as defendants in the [*22] complaint (Canadian Imperial Bank of Commerce, Deutsche Bank, Bank America, Lehman Brothers, Barclays Bank, UBS Warburg, First Union Wachovia, Bear Stearns, and Morgan Stanley Dean Witter); the Savings Plan/ESOP/Cash Balance Plan Enterprise (consisting of three separate RICO enterprises, i.e., legal entities); the Enron-Andersen Enterprise (association-in-fact enterprise); the Andersen Enterprise; the LJM1 Enterprise; the LJM2 Enterprise; the Enron-Merrill Lynch Enterprise(s) (association-in-fact enterprise); the Enron-J.P. Morgan Chase-Mahonia Enterprise (association-in-fact enterprise); the Enron-CSFB Enterprise (association-in-fact enterprise); and the Enron-Citigroup Enterprise (association-in-fact enterprise).

According to Count VI, the pattern of racketeering which Defendants allegedly committed, aided and abetted, or conspired to commit was made up of predicate offenses, e.g., violations of various federal statutes, including 18 U.S.C. § 664 (embezzlement and conversion of assets of an ERISA employee pension benefit plan), n37 18 U.S.C. §§ 1341 and 1343 (federal mail and wire fraud), n38 18 U.S.C. § 1512 [*23] (b)(2) (obstruction of justice n39), and 18 U.S.C. § 2314 (interstate transportation offenses n40).

n37 A person violates title 18 U.S.C. § 664 if he "embezzles, steals or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, . . . or other assets of any . . . employee pension plan . . ." subject to ERISA. *United States v. Wiseman*, 274 F.3d 1235, 1240 (9th Cir. 2001). The elements of the violation are that the defendant (1) embezzled (2) funds (3) from an employee benefit plan with (4) specific intent to deprive the plan of funds. *United States v. Todd*, 108 F.3d 1329, 1330 (11th Cir. 1997).

n38 The elements comprising mail and wire fraud under 18 U.S.C. § 1341 and § 1343 are (1) the defendant's participation in a scheme to defraud, which includes false or fraudulent pretenses, representations or promises; (2) the use of the mails or wire communications to execute the scheme; and (3) specific intent to defraud. *United States v. Bieganowski*, 313 F.3d 264, 275 (5th Cir. 2002), *cert. denied*, 123 S. Ct. 1959 (2003); *Chris Albritton Const. Co., Inc. v. Pitney Bowes, Inc.*, 304 F.3d 527, 532 (5th Cir. 2002); *United States v. Caldwell*, 302 F.3d 399, 406 (5th Cir. 2002); *United States v. Odiodio*, 244 F.3d 398, 402 (5th Cir. 2001). The defendant must act knowingly, willfully, and with the specific intent to defraud. *United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000), *cert. denied sub nom. Braugh v. U.S.*, 531 U.S. 826 (2002), *overruled on other grounds, U.S. v. Cotton*, 535 U.S. 625, 629 (2002).

[*24]

n39 Title 18 U.S.C. § 1512(b)(2)(B) states that a person may be fined or imprisoned for obstructing justice if he "knowingly uses intimidation or physical force, threatens or corruptly persuades another person with intent to—(1) cause or induce any person to—(A) withhold testimony, or withhold a record, document or other object, from an official proceeding; [or] (B) alter, destroy, mutilate

or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding."

The complaint at P796 charges defendants with persuading certain individuals to "(i) withhold records, documents and other objects from official proceedings (including, but not limited to, the SEC investigation), and (ii) alter, destroy, mutilate and conceal objects with the intent to impair those objects' integrity or availability for use in such official proceedings."

n40 To prove an offense in violation of 18 U.S.C. § 2314, the government must demonstrate (1) the interstate transportation of (2) goods, merchandise, wares, money or securities valued at $5,000 or more and (3) knowledge by the defendant that such items were stolen, converted, or taken by fraud. *United States v. Onyiego*, 286 F.3d 249, 253 (5th Cir. 2002), *cert. denied sub nom. Biegon v. U.S.*, 123 S. Ct. 254 (2002); *United States v. McIntosh*, 280 F.3d 479, 483 (5th Cir. 2002), *cert. denied sub nom. Braugh v. U.S.*, 531 U.S. 826 (2000), *overruled on other grounds, U.S. v. Cotton*, 535 U.S. 625, 629 (2002). A defendant need not have transported anything himself, but need only have caused the interstate transportation. *McIntosh*, 280 F.3d at 483.

Section 2314 also prohibits interstate transportation of persons in the execution of a scheme to defraud. The elements are (1) the defendant devised a scheme (2) intending to defraud the victim of money or property of a minimum value of $5,000 and (3) the scheme induced the victim to travel in interstate commerce. *United States v. Richards*, 204 F.3d at 206.

The complaint at PP281-82 asserts violations of both provisions of § 2314, i.e., that Defendants (1) transmitted or transferred in interstate commerce money taken from the Savings Plan participants' contributions to the Savings Plan and/or investment in stock offered by the Savings Plan and (2) caused Enron employees to travel to Houston to attend meetings on May 18, 1999, July 13, 1999, December 1, 1999, February 28, 2000, and October 3, 2000, and others, conducted by Enron Insiders, at which the employees were assured that their 401(k) plan funds were safely invested and that they should hold their investments in Enron stock. For a violation of § 2314, a defendant must have fraudulent intent. *United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir. 1980), *cert. denied*, 450 U.S. 910 (1981).

[*25]

Count VII asserts a claim against Enron Insider Defendants, Arthur Andersen, and the Investment Banking Defendants for investing income that was derived from racketeering activities involving Enron stock in RICO enterprises, under §§ 1962(a) n41 and 1962(d). Among the various alleged enterprises is an Association-in-Fact Enterprise comprised of the Enron Insider Defendants, the Enron ERISA Defendants, the Accounting Defendants and/or Andersen, the Attorney Defendants, the Investment Banking Defendants, and other investment banks (Canadian Imperial Bank of Commerce, Deutsche Bank, Bank America, Lehman Brothers, Barclays Bank, UBS Warburg, First Union Wachovia, Bear Stearns, and Morgan Stanley Dean Witter). Also named are the Enron Enterprise, the Savings Plan/ESOP/Cash Balance Plan Enterprise, the LJM1-LJM2 Enterprise, the Accountant Defendants Enterprise, the Enron-JP Morgan Chase-Mahonia Enterprise, the Enron CSFB Enterprise, the Enron-Citigroup Enterprise, and the TNPC-New Power Enterprise.

> n41 Section 1962(a) provides that a person who has received income from a pattern of racketeering activity cannot invest that income in the acquisition or operation of a RICO enterprise. A plaintiff asserting a claim under this provision must establish (1) the existence of an enterprise, (2) the acquisition of income by the defendant from a pattern of racketeering activity, (3) the use of any part or all of that income in acquiring an interest in or operating the enterprise, and (4) a nexus between the alleged violation (investment of the income received from the pattern of racketeering activity) and the plaintiff's injury. *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000).

[*26]

Count VIII asserts a Texas common-law claim for negligent misrepresentation on behalf of the participants and beneficiaries of the Savings Plan and the ESOP against the Andersen Defendants based on Andersen's data, audits, and certified financial statements for Enron.

Finally, Count IX alleges on behalf of all proposed classes a civil conspiracy claim against Andersen, the Enron Insider Defendants, the Attorney Defendants, and the Investment Banking Defendants. Specifically Count IX states that these Defendants conspired to conceal Enron's true financial condition and deceive Enron employees into accepting overvalued stock and phantom stock as compensation for their work, into keeping their

retirement assets in artificially inflated Enron stock, and into continuing to work at Enron based on a false belief that it was a strong company.

In light of the length of the complaint, which is available to all counsel, and the fact that the *Tittle* action arises from many of the same facts summarized in detail in instrument # 1194 in *Newby*, the Court will not here reiterate the facts alleged, but will reference relevant allegations relating to its decisions regarding the following [*27] pending motions:

(1) Defendant Michael J. Kopper's motion to dismiss for failure to state claims upon which relief can be granted (instrument # 207);

(2) Arthur Andersen LLP and Andersen Individual Defendants' motion to dismiss the complaint (# 208);

(3) Defendant Rebecca Mark-Jusbasche's Rule 12(b)(6) motion to dismiss all claims asserted against her (# 209);

(4) Defendant Michael C. Odom's motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA (# 210);

(5) Defendant Ken L. Harrison's Rule 12(b)(6) motion to dismiss with prejudice all claims against him (# 216);

(6) Defendant Lou Pai's motion to dismiss first consolidated and amended complaint (# 222);

(7) Defendants Citigroup, Inc. and Salomon Smith Barney, Inc.'s motion to dismiss Plaintiffs' first consolidated and amended complaint (# 227);

(8) Defendant J.P. Morgan Chase & Co.'s motion to dismiss Plaintiffs' first consolidated and amended complaint (# 229) and corrected motion to dismiss (# 351);

(9) Defendants Enron Corp. Savings Plan Administrative Committee, the [*28] Administrative Committee of the Enron Corp. Cash Balance Plan [since dismissed], and the Administrative Committee of the Enron Employee Stock Ownership Plan (# 231);

(10) Vinson & Elkins Defendants' motion to dismiss (# 232);

(11) Defendant James V. Derrick, Jr.'s motion to dismiss Plaintiffs' first consolidated and amended complaint (# 233);

(13) Defendant Cindy K. Olson's motion to dismiss (# 234);

(12) Defendant Richard A. Causey's motion to dismiss (# 235);

(13) Defendant Credit Suisse First Boston Corporation's motion to dismiss Plaintiffs' first consolidated and amended complaint (# 236);

(14) Defendant Merrill Lynch & Co.'s motion to dismiss Plaintiffs' first consolidated and amended complaint (# 238);

(15) The Outside Director Defendants' motion to dismiss Plaintiffs' first consolidated and amended complaint (# 240);

(16) Defendant the Northern Trust Company's motion to dismiss Counts II and III of Plaintiffs' first consolidated and amended complaint as to the Northern Trust Company (# 241);

(17) Defendant Andrew S. Fastow's motion to dismiss (# 244);

(18) Defendant Joseph W. Sutton's motion to dismiss (# 251);

(19) Defendant [*29] Jeffrey K. Skilling's motion to dismiss first consolidated and amended complaint (# 262);

(20) Defendant Kenneth L. Lay's motion to dismiss (# 264);

(21) Motion to dismiss Certain Officer Defendants (collectively, "Officer Defendants," i.e., The Estate of J. Clifford Baxter, Mark A. Frevert, Stanley C. Horton, Kenneth D. Rice, Richard B. Buy, Joseph M. Hirko, Mark E. Koenig, Steven J. Kean, Michael S. McConnell, Jeffrey McMahon, and J. Mark Metts, who are named as

Defendants only in the two RICO and the common law conspiracy claims) (# 265);

(22) Motion to dismiss on behalf of Certain Administrative Committee Members (Philip J. Bazelides, n42 James G. Barnhart, Keith Crane, William Gulyassy, Rod Hayslett, Mary K. Joyce, n43 Sheila Knudsen, Tod A. Lindholm, James S. Prentice, n44 Paula Rieker, and David Shields n45) (# 269) n46; and

(23) Enron Corp.'s n47 motion to dismiss the first consolidated and amended complaint (# 370).

n42 Bazelides is identified as Chairman of the Enron Corp. Savings Plan Administrative Committee ("Administrative Committee") and Vice President in Charge of Employee Benefits through 1998, and thus allegdly a fiduciary of the Savings Plan, the ESOP, and the Cash Balance Plan within the meaning of 29 U.S.C. § 1002(21)(A).

[*30]

n43 Joyce was vice-president of Compensation and Benefits for Enron, a member of the Administrative Committee, and allegedly a fiduciary of the Savings Plan within the meaning of 29 U.S.C. § 1002(21)(A). The complaint asserts that in her capacity as a Plan sponsor and as a Plan administrator, she signed the Savings Plan's Internal Revenue Service Form 5500 for the year ending December 31, 1998.

n44 Prentice, a chemical engineer, was Senior Vice President of Liquids Operations at EOTT Energy (an Enron affiliate), and was Chairman of the Savings Plan Administrative Committee from 1999 until 2002 and a member of the Committee for ten years, and thus a fiduciary of that Plan.

n45 The complaint states that Barnhart (since dismissed), Crane, Gulyassy, Hayslett, Knudsen, Lindholm, Rieker, and Shields were members of the Administrative Committee, and therefore fiduciaries, of the Savings Plan within the meaning of 29 U.S.C. § 1002(21)(A).

n46 Originally Defendant Mikie Rath, Enron's benefits manager and a fiduciary of the Savings Plan, the ESOP, and the Cash Balance Plan, joined the motion, but Rath was subsequently dismissed from this suit on July 8, 2002 (# 367) and, as noted, Plaintiffs are dismissing all claims against the Cash Balance Plan without prejudice (# 314 at 10).

[*31]

n47 The bankruptcy court ordered that the automatic stay against Enron Corporation be lifted as of June 21, 2002. Enron is sued under the first five counts, charging breach of fiduciary and co-fiduciary duties in violation of ERISA.

When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor the plaintiff and take all well-pleaded facts as true. *Kane Enterprises v. MacGregor (US), Inc.*, 322 F.3d 371, 374 (5th Cir. 2003), citing *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986). It may not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id., quoting Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Nevertheless, a plaintiff must plead specific facts, not merely conclusory allegations to avoid dismissal. *Id., citing Collins v, Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) ("We will thus not [*32] accept as true conclusory allegations or unwarranted deductions of fact."). In addition to the complaint, the court may review documents attached to the complaint and documents attached to the motions to dismiss to which the complaint refers and which are central to the plaintiff's claim(s). *Collins*, 224 F.3d at 498-99.

## II. APPLICABLE LAW

The Court hereby incorporates the conclusions of law set forth in its memoranda and orders dealing with the motions to dismiss in *Newby*. After reviewing the briefs and researching the issues raised in *Tittle*, the Court concludes that the following law applies.

### A. ERISA

#### 1. Fiduciary Liability

The issue of fiduciary status is a mixed question of law and fact. *Reich v. Lancaster*, 55 F.3d 1034, 1044 (5th Cir. 1995).

##### a. Expansive Definition of Fiduciary

Under ERISA, a person or entity may be deemed a fiduciary either by assumption of the fiduciary obligations (the functional or *de facto* method) or by express designation by the ERISA plan documents.

The phrase, "fiduciary with respect to a plan" is de-

fined *de facto* in functional terms of control and authority in § [*33] 3(21)(A), 29 U.S.C. § 1002(21)(A):

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan or has any discretionary authority or discretionary responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

"The phrase 'to the extent' indicates that a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority and control." *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan* ("*Sommers II*"), 883 F.2d 345, 352 (5th Cir. 1989). *See also Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998) ("Fiduciary status is not an all or nothing proposition . . . ."). "Fiduciary status under ERISA is to be construed liberally, consistent [*34] with ERISA's policies and objectives," and is defined "'in functional terms of control and authority over the plan, . . . thus expanding the universe of persons subject to fiduciary duties–and to damages–under § 409(a).'" *Arizona State Carpenters Pension Trust Fund v. Citibank (Arizona)*, 125 F.3d 715, 720 (9th Cir. 1997), *citing John Hancock Mut. Life Ins. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 96 (1993), and *quoting Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262 (1993). "Fiduciary obligations can apply to managing, advising, and administering an ERISA plan." *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000). Nevertheless, "'a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control.'" *Bannistor v. Ullman*, 287 F.3d 394, 401 (5th Cir. 2002), *quoting Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.* ("*Sommers I*"), 793 F.2d 1456, 1459-60 (5th Cir. 1986), *cert. denied*, 479 U.S. 1034 (1987). n48 "Fiduciary status is to be determined by looking at the *actual* authority or power demonstrated, [*35] as well as the formal title and duties of the parties at issue [emphasis in original]." *Landry v. Air Line Pilots Ass'n Inter. AFL-CIO*, 901 F.2d 404, 418 (5th Cir. 1990), *cert. denied*, 498 U.S. 895 (1990).

> n48 *See* Dept. of Labor, Interpretive Bulletin 75-8, 29 C.F.R. § 2509.75-8, Question D-4 (2000):
>
>> Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of the Act.
>
> Federal courts regularly cite to and rely upon Labor Department interpretive bulletins in determining the scope of ERISA liability and fiduciary responsibilities. *See, e.g., Varity Corp. v. Howe*, 516 U.S. 489, 511-12 (1996).

In recent years several Circuit Courts of Appeals have focused on and contrasted the language used in the two clauses of subsection (i) of § 1002(21)(A), defining a fiduciary [*36] as a person who "exercises any **discretionary authority or discretionary control** respecting management of such a plan or who "exercises **any authority or control over the management or disposition of its assets**") and highlighted the fact that the word, "discretionary," is used only with regard to the first clause [emphasis added]. From a close reading of the literal language and structure of the provision, they conclude that where the person exercises any authority or control over the management or disposition of the **assets** of the plan, discretion is not required of a fiduciary. *See Board of Trustees of Bricklayers and Allied Craftsmen Local 6 of New Jersey Welfare Fund v. Wettlin Associates, Inc.*, 237 F.3d 270, 273 (3d Cir. 2001), *quoting IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997) ("any control over disposition of plan money makes the person who has control a fiduciary"), *cert. denied*, 522 U.S. 1068 (1998); *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir.) ("Note that this section imposes fiduciary duties only if one exercises *discretionary* authority [*37] or control over plan *management*, but imposes those duties *whenever* one deals with plan *assets*. This distinction is not accidental—it reflects the high standard of care trust law imposes upon those who handle money or other assets on behalf of another."), *cert. denied sub nom. Vercoe v. FirsTier Bank, N.A.*, 513 U.S. 871 (1994); *Board of Trustees of Western Lake Superior Piping Industry Pension Fund v. American Benefit Adm'rs, Inc.*, 925 F. Supp. 1424, 1429 (D. Minn. 1996). n49

> n49 The Fifth Circuit has not expressly addressed the structure of the statute and the verbal "discretion" distinction between control over plan management and control over plan assets. Although the district court in *Tower Loan of Mississippi v. Hospital Benefits, Inc.*, 200 F. Supp. 2d 642, 648-49