Case 3:01-cv-01737-MRK    Document 52-25    Filed 10/16/2003    Page 1 of 10

2003 U.S. Dist. LEXIS 4186; 30 Employee Benefits Cas. (BNA) 1874

a benefit of any type from an employee benefit plan which covers employees of such employ." *29 U.S.C. § 1002(7) (2000).* HN14"In order to establish that he or she is eligible or 'may become eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117-18, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989).*

The complaint acknowledges that neither Bona *39 nor Thomas completed the necessary hours of service to become entitled to benefits under the terms of the Union Mutual Fund Pension Plan. (Compl. P 23) Moreover, the complaint acknowledges that neither plaintiff has participated in the Plan since June, 1999. (Compl. PP 17, 21) Accordingly, based on their own allegations, Bona and Thomas have no standing to commence a private action as participants in the Union Mutual Pension Plan.

Individual Plaintiffs offer two separate theories to support Bona's and Thomas's standing to sue under *ERISA § 502(a).* In their complaint, Individual Plaintiffs assert that, although Bona and Thomas worked an insufficient amount of time to qualify for vested benefits from the Union Mutual Fund Pension Plan, they would have received benefits but for the excessive fees extracted from the Plan by the Barasch Enterprise. (Compl. P 23) In their opposition papers, Individual Plaintiffs argue that, under Howe, ex-employees and ex-participants can maintain an action for appropriate equitable relief against ERISA fiduciaries.

Both theories are inadequate. The first theory -- that Bona and Thomas would have been participants but for defendants' alleged wrongdoing *40 -- ignores HN15the plain language of *section 502(a),* according to which a plaintiff must already be a plan participant in order to sue. The second theory -- that former plan participants can sue under *section 502(a)(3)* -- simply does not apply to the present case. Defendants do not argue that Bona and Thomas lack standing to sue because they are no longer members of the ATC; rather, they argue that Bona and Thomas lack standing because, according to the complaint, they worked an insufficient amount of time to qualify for benefits. Although Howe indicated that former participants or beneficiaries could obtain equitable relief under *section 502(a)(3),* the *Howe* Court did not dispense with the statutory requirement that plaintiff, in the first instance, be a "participant," "beneficiary," or "fiduciary" in order to sue under *section 502(a).* Because they never met the provisions's standing requirements, Bona and Thomas, as well as the class of employees unvested in the Union Mutual Fund Pension Plan whom they purport to represent, do not have standing to sue

under *ERISA § 502(a).*

C. The Union Mutual Medical Fund

The Benefit Fund Trustees move to dismiss the ERISA claims against the *41 trustees of the Union Mutual Medical Fund on the ground that Individual Plaintiffs, as well as Miranda, lack standing under *29 U.S.C. § 1002(7) (2000)* to bring ERISA claims against these defendants.

Under the Union Mutual Medical Fund's Summary Plan, to be eligible for participation in the Union Mutual Medical Fund, individuals must first be members of the Union Medical Benefit Association. (See Parker Aff. Ex. D at 6) Although Individual Plaintiffs broadly allege that they are "participants" in the four Employee Benefit Plans (Compl. P 1), Individual Plaintiffs do not allege that they are members of the Union Medical Benefit Association, and Miranda does not allege that he is a trustee of the Union Mutual Medical Fund. The trustees of the Union Mutual Medical Fund argue that, absent such allegations, the ERISA claims against them must be dismissed.

Neither Miranda nor Individual Plaintiffs even dispute that their claims against the Union Mutual Medical Fund's trustees should be dismissed. Thus, regardless of whether thee broad allegations in the complaint are sufficient to state a claim against trustees of the Union Mutual Medical Fund, plaintiffs have *42 abandoned their claims against those trustees. See *Frink Am., Inc. v. Champion Road Mach., Ltd., 48 F. Supp. 2d 198, 209 (N.D.N.Y. 1999)* (collecting cases supporting dismissal of abandoned claims).

IV.

Several defendants move to dismiss plaintiffs' ERISA claims as time-barred. HN16Dismissal for failure to state a claim based on a statute of limitations is appropriate only if a complaint clearly shows that a claim is not timely. *Harris v. City of New York, 186 F.3d 243, 251 (2d Cir. 1999).*

The limitations period applicable to claims alleging breach of fiduciary duty under ERISA is codified at *29 U.S.C. § 1113.* That section provides:

HN17No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of:

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff *43 had actual knowledge of the breach or vio-

lation.

Thus, HN18a claim alleging breach of fiduciary duty under ERISA must be brought "within either six years of the date of the last action which constituted part of the breach ... or three years after the earliest date on which the plaintiff had actual knowledge of the breach, whichever is earlier." *Katsaros v. Cody, 744 F.2d 270, 280 (2d Cir. 1984)*.

A. The Three-Year Limit

Several defendants contend that the ERISA claims brought by Individual Plaintiffs must be dismissed because these plaintiffs had actual knowledge of the alleged breaches of fiduciary duty more than three years before they sued. According to the Benefit Fund Trustees, the ERISA claims are untimely because the allegation that the Barasches have engaged in the course of conduct giving rise to the claims since 1958 establishes that plaintiffs knew about that conduct more than three years before they brought this lawsuit. According to non-trustee defendants, Financial Administrators, and BBB, the ERISA claims are untimely because the Employee Benefit Funds each filed a Form 5500 with the IRS disclosing its payments to service providers more than three *44 years before the complaint was filed. This Form, defendants appear to argue, gave Individual Plaintiffs notice of the allegedly imprudent agreements.

HN19To trigger the three-year statute of limitations, a plaintiff must "have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Reich v. Lancaster, 55 F.3d 1034, 1057 (5th Cir. 1995)*. It is not enough that a plaintiff suspects something is awry; rather, the plaintiff must have specific knowledge of the actual breach on which he sues. *Martin v. Consultants & Adm'rs., Inc., 966 F.2d 1078, 1086 (7th Cir. 1992)*. However, the plaintiff need not have "knowledge of the law or exacting factual details" in order to have actual knowledge. *Crimi v. PAS Indus., 1995 U.S. Dist. LEXIS 6180, 1995 WL 272580 at *3 (S.D.N.Y. May 9, 1995)*.

As a threshold matter, defendants do not argue that Miranda had actual knowledge of the alleged ERISA violations three years before the original complaint in this matter. Plaintiffs filed the original complaint on March 19, 2001, approximately *45 14 months after Miranda became a trustee to the various funds. Numerous courts have concluded that, HN20for ERISA statute of limitations purposes, the relevant question is when a current trustee, and not the plan itself through any of its previous agents, had actual knowledge of a breach of fiduciary duty. *Landwehr v. Dupree, 72 F.3d 726, 731-32 (9th Cir. 1995)*; *Gluck v. Unisys Corp.,*

*960 F.2d 1168, 1176-77 (3rd Cir. 1992)*; *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co., 919 F.2d 1216, 1222 (7th Cir. 1990)*; *Dist. 65 Ret. Trust for Members of the Bureau of Wholesale Sales Representatives v. Prudential Sec., Inc., 925 F. Supp. 1551, 1559 (N.D. Ga. 1996)* ("The ERISA statute of limitations plainly states that it is the plaintiff's actual knowledge that triggers the three-year time bar. Had Congress wished to impute the knowledge of former fiduciaries to successor trustees, Congress certainly could have done so."). Because Miranda served as a trustee for less than three years before plaintiffs filed their complaint, he cannot be charged with disqualifying knowledge of the alleged breaches of fiduciary duty.

Contrary to defendants' *46 contentions, Individual Plaintiffs also cannot, based on the pleadings alone, be charged with actual knowledge of the alleged breaches of fiduciary duty. First, although plaintiffs' allegations that defendants' course of conduct took place over many years and attracted public attention could conceivably be grounds to impute knowledge of the conduct to Individual Plaintiffs, these allegations do not support the inference that those plaintiffs had actual knowledge of the conduct. See *Martin, 966 F.2d at 1086 n.6* (explaining that *section 413* was amended to delete a constructive knowledge provision and replace it with a more stringent actual knowledge requirement). Indeed, other than noting that plaintiffs have alleged that defendants' wrongdoing goes back to 1958, the Benefit Fund Trustees do not offer any theory as to how plaintiffs actually knew about the potential claims arising from the agreements.

Non-trustee and service provider defendants, on the other hand, argue that Individual Plaintiffs had knowledge of the transactions between Barasch-controlled entities and the Union Mutual Fund Pension Plan because the Pension Plan began filing Forms 5500 with the IRS in *47 1991 and Plan participants were invited to review these forms by a clause in the Summary Plan Description. n12 (See Kipnees Decl. Ex. A at 23). Plaintiffs respond that it was not until June, 1998 that any of the Forms 5500 acknowledged that the fees were paid to service providers pursuant to long-term unilaterally renewable agreements. Plaintiffs claim also that the full extent of defendants' activities was not apparent until early 2001, when they discovered the United States Senate Report identifying the Barasch Family as owning Churchill.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n12 Although they ask for dismissal of the ERISA claims in their entirety, defendants do not explain why claims arising out of contracts other than the 1991 agreement

between the Union Mutual Fund Pension Plan and Financial Administrators should be dismissed under *ERISA § 413(2)*. Defendants assert that all the Funds filed Forms 5500, but they do not argue, nor could they, that these forms gave Individual Plaintiffs actual notice of the alleged breaches of fiduciary duty.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**\*48**

Notwithstanding the Forms 5500 filed by the Union Mutual Fund Pension Plan since 1991, Individual Plaintiffs' ERISA claims cannot be dismissed in any part based on the three-year statute of limitations. First, without any factual development on the issue, it is impossible to conclude that the Forms 5500 gave plaintiffs actual knowledge of the "essential facts" of the transactions constituting the violation. *Martin, 966 F.2d at 1086*. Plaintiffs allege not only that service providers charged excessive fees, but also that they were granted long-term contracts without competitive bidding. (Compl. P 33)

Second, like the public attention that the alleged ERISA violations supposedly received, the financial reports filed with the IRS might suggest that Individual Plaintiffs had constructive notice of some alleged violations. See *Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 283 (2d Cir. 1992)* HN21("A defendant who is on notice that conduct violates a fiduciary duty is chargeable with constructive knowledge of the breach if a reasonably diligent investigation would have revealed the breach."). However, a single clause in a Summary Plan Description **\*49** referencing the Plan's financial reports does not, on its own, give actual notice of the content of those reports. Even where a plaintiff openly questioned the legality of a transaction more than three years before filing suit, a court in this district found that the plaintiff did not necessarily have actual knowledge of an ERISA violation under *section 413(2) of the ERISA* statute. See *United States v. Mason Tenders Dist. Council, 909 F. Supp. 882, 891 (S.D.N.Y. 1995)* (finding that a newspaper article quoting a Labor Department official as saying that real estate transactions "certainly looked interesting" did not indicate that the Department had actual knowledge of the violations, but only that "the United States Department of Labor was alert to the need to conduct an investigation into the transactions"). Here, defendants have demonstrated only that plaintiffs could have examined tax forms detailing the fees paid for services provided to one plan. Absent a showing that plaintiffs actually did examine those forms and learned of the transactions, the court cannot impute actual knowledge to them.

**B. The Six-Year Limit**

HN22Under § *413(1)*, an ERISA suit must be initiated **\*50** within six years of the last action which constituted a part of the breach. With the exception of Stephen Barasch, all ERISA defendants argue that plaintiffs' breach of fiduciary duty claims are barred by the six-year statute of limitations. According to these defendants, when fiduciaries engage in a series of alleged ERISA violations, the statute of limitations runs from the time of the first violation and does not run anew for successive violations that merely maintain the status quo. Thus, plaintiffs' ERISA claims accrued when each the fiduciaries first entered into the disputed contracts with each of the service providers over six years ago.

Individual Plaintiffs and Miranda rely on the Seventh Circuit's decision in Martin. That case involved a Department of Labor ("DOL") suit against both the trustees of a multi-employer health and welfare fund and Consultants & Administrators ("C & A"), a corporation that supplied the fund with dental services. The DOL charged that the trustees violated provisions of ERISA by awarding noncompetetive contracts to C & A, by operating a kickback scheme with C & A, and by otherwise breaching their fiduciary duties. *Martin, 966 F.2d at 1082.* **\*51** Defendants moved for summary judgment on the ground that the claims were barred by ERISA's statute of limitations. With respect to plaintiff's claim that the trustees had used improper bidding procedures, the Seventh Circuit found that plaintiff was aware of the 1984 procedure and that the ERISA claim based on that contract was therefore barred under the three-year statute of limitations used in actual notice cases. *Id. at 1087.* However, the Court rejected defendants' argument that because the bidding procedure for the service contract did not change between 1984 and 1987, the claims arising out of the 1987 contract were also barred by the statute of limitations:The flaw in the trustees' argument is that it ignores the continuing nature of a trustee's duty under ERISA to review plan investments and eliminate imprudent ones. If knowledge of an ERISA violation barred claims based on similar future conduct, this continuing fiduciary duty would be severely weakened, and trustees would be left free to engage in repeated violations, so long as they have once been discovered but not sued. On the other hand, we must not allow the "continuing violation" theory to be **\*52** abused by plaintiffs who delay bringing suit in the hope of racking up damages. Such abuse is avoided here because we have found that the DOL may not recover for bidding activities on the 1984 contract. Strictly speaking, we are faced here with a repeated, rather

than a continued, violation. The bidding activity on the 1987 contract ... is more accurately characterized factually as a distinct transaction. First, it involved a new and separate contract. And second, although the trustees employed similar bidding procedures for the 1984 and 1987 contracts, those procedures, rather than being part of a formal policy, were separately considered and decided upon with respect to each contract. *Id. at 1087-88.* Thus, the *Martin* Court allowed the suit to go forward insofar as it was based on the renewal of the service contract.

Plaintiffs argue that, because all of the agreements at issue in this case have been renewed within six years of the date on which the complaint was filed, the present action is timely under the reasoning in Martin. Defendants respond that Martin is distinguishable from this case and that, rather than following Martin, this court *53 should follow *Miele v. Pension Plan of New York State Teamsters Conference Pension & Retirement Fund, 72 F. Supp. 2d 88 (E.D.N.Y. 1999).*

Miele involved an ERISA action against employee pension fund trustees alleging that they miscalculated Miele's benefits. The trustees argued that Miele's claims were barred by the six-year statute of limitations, because the claims accrued when Miele was informed of the alleged miscalculation almost ten years before he filed suit. Miele argued that a new statute of limitations began to run upon each monthly payment of the miscalculated benefit. *Id. at 100.* The Court rejected Miele's "continuing violation" theory. Referring to the Ninth Circuit's decision in *Meagher v. International Ass'n of Machinists & Aerospace Workers Pension Plan, 856 F.2d 1418 (9th Cir. 1988),* in which the Ninth Circuit held that a pension plan amendment which resulted in the plaintiff's receiving reduced benefits triggered new causes of action and thus new statutes of limitations with the issuance of each check, the Miele Court explained:Recent Ninth Circuit case law calls into question the viability of the *54 continuing claims theory, and courts in other circuits, including this one, have rejected the Meagher approach. As a result, the court does not attach much significance to the plaintiff's reliance on Meagher.

But most importantly, the court does not believe that the continuing claims doctrine is applicable to facts of the instant case. It is well-settled that the continuing claims doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time. Rather, for the continuing claim doctrine to apply, the plaintiff's claims must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages.*Id. at 101-02.* (citations and footnote omitted).

Defendants reliance on *Miele* is misplaced. The Miele

Court explained exactly why the "continuing violation" theory is problematic as applied to miscalculations of benefits. According to Miele, fiduciaries have no obligation "to continually reassess claim denials or benefit underpayments on a monthly basis." *Miele, 72 F. Supp. 2d at 102 n.14.* Because there *55 is no such obligation, the fiduciary does not independently violate ERISA each time a Plan pays out too much or too little as a result of an initial miscalculation of benefits.

Yet this reasoning does not apply to the renewal of long-term contracts with service providers. Martin concluded that "strictly speaking, we are faced with a repeated, rather than a continued, violation," *Martin, 966 F.2d at 1088* (emphasis in original), because, HN3unlike the disbursement of benefits subsequent to a calculation of how much a participant is owed, the renewal of a contract clearly implicates a trustee's duty to review plan investments and eliminate imprudent ones. See *id. at 1087-88* ("The flaw in the trustees' argument is that it ignores the continuing nature of a trustee's duty under ERISA to review plan investments and eliminate imprudent ones."); see also *Morrissey v. Curran, 567 F.2d 546, 549 n.9 (2d Cir. 1977)* ("The trustee's obligation to dispose of improper investments within a reasonable time is well established at common law.").

A case from this district, cited by Martin and distinguished by Miele, is also persuasive. *56 In *Buccino v. Continental Insurance Co., 578 F. Supp. 1518 (S.D.N.Y. 1983),* the plaintiffs alleged that fiduciaries of an employee benefit fund knowingly induced the fund to buy and retain individual life insurance policies even though they were more costly than a group policy. The defendants claimed that the action was barred by the six-year statute of limitations because the decision to acquire individual life insurance policies was made in 1971 and the payment of excessive premiums "simply flowed from the 1971 purchase decision." *Id. at 1521.* The Court rejected that argument, reasoning that "as HN24Fund fiduciaries they were under a continuing obligation to advise the Fund to divest itself of unlawful or imprudent investments" and concluding a new claim arose each time the Fund made a premium payment. *Id.* (citing *Morrissey, 567 F.2d at 548-49*).

Like the defendants in *Martin* and *Buccino,* defendants in this case have a continuing duty to review plan investments. If the facts alleged in the complaint are proved, that duty was violated each time defendants renewed imprudent contracts with fund administrators. Applied to the *57 present case, Martin and Buccino dictate that plaintiffs may sue defendants for renewing service contracts within six years of the date on which

the complaint was filed, but not for entering those contracts in the first instance. n13 See *Martin, 966 F.2d at 1088* (finding that "the 1984 bidding claim is barred by the statute of limitations, but the 1987 bidding claim survives"); *Buccino, 578 F. Supp. at 1522-23* (allowing the action go forward "to the extent that it is based upon defendants' failure to terminate the allegedly unlawful and imprudent insurance policies"). Thus, the complaint is dismissed to the extent plaintiffs seek relief for harms resulting from contracts entered into or renewed before September 7, 1995. n14 However, the statute of limitations does not bar plaintiffs' action to the extent that it is based upon renewals of those contracts within six years of filing the complaint.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n13 Just as allowing a plaintiff to use the continuing violations theory to delay bringing suit after learning about ERISA violations would frustrate the purpose of *section 413(2)*, allowing a plaintiff to use the theory to recover for violations occurring over six years before a complaint is filed would frustrate the purpose of *section 413(1)*. See *Buccino, 578 F. Supp. at 1522.* HN25Once the renewal of a contract is deemed to be a separate transaction, *section 413(1)* directly bars only suits arising out of the original contract, or renewals, entered into more than six years before the complaint was filed.

**\*58**

n14 The original complaint in this action is dated September 7, 2001.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

V.

Plaintiffs allege that, in addition to the trustees, George Barasch, Stephen Barasch, Linda Barasch Glazer, and Richard Glazer have breached their fiduciary duties under ERISA. (Compl. PP 57-61) These defendants move to dismiss the ERISA claims against them on the ground that they are not fiduciaries within the meaning of ERISA. In response, plaintiffs argue that they have adequately alleged that these defendants are fiduciaries of the Funds. Plaintiffs argue also that, even if particular defendants named in the complaint are not fiduciaries, they can be held liable for the trustees' breaches of fiduciary duty under *sections 404, 405, and 406* of ERISA.

As a threshold matter, the court will not address the second argument, which amounts to an attempt by plaintiffs to rewrite their complaint by claiming in their opposition papers that they seek relief from non-fiduciaries. To remedy the abuses underlying the first and second claims for relief, plaintiffs ask the court to:(a) permanently enjoin Defendant Trustees and **\*59** fiduciaries from serving in a fiduciary capacity in a labor organization or employee benefit plan or as a party in interest to any employee benefit plans and (b) enter judgment against the Defendant Trustees, jointly and severally, in favor of George Miranda, the Individual Plaintiffs and the class they represent of employee benefit fund participants, in an amount of money equal to the damages they suffered as a result of the conduct by Defendants.(Compl. at 38). Thus, clause (a) of the "Prayer for Relief" is directed to trustees and fiduciaries, not non-fiduciaries, and clause (b) is directed to trustees only. If particular defendants named in the complaint are not fiduciaries, then the complaint demands no relief from them as to the first two claims for relief.

ERISA defines a fiduciary of an employee benefit plan as follows:HN26A person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, **\*60** with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.*29 U.S.C. § 1002(21)(A) (2000)*. Thus, HN27"ERISA makes the existence of discretion a sine qua non of fiduciary duty." *Pohl v. Nat'l Benefits Consultants, Inc., 956 F.2d 126, 129 (7th Cir. 1992)*.

The Department of Labor regulations that set forth the Department's interpretative guidelines further define the responsibilities of a fiduciary. HN28The regulations provide that "persons who have no power to make any decisions as to plan policy, interpretations, practices or procedures" and thus perform "purely ministerial functions" are not fiduciaries. *29 C.F.R. § 2509.75-8*. The regulations further explain that the performance of ministerial functions includes, among other things, the application of rules determining eligibility for participation or benefits, the maintenance of service and employment records, the calculation of benefits, and the processing of claims. *Id.* See also *Geller v. County Line Auto Sales, 86 F.3d 18, 21 (2d Cir. 1996).* **\*61**

According to non-trustee defendants, the allegations that they exercised discretionary authority and control over the funds are contradicted by the relevant plan

documents and administrative services contracts, under which the trustees made all non-ministerial decisions on behalf of their respective funds. The terms of the employee benefit plans may be considered on this motion to dismiss, because these documents are referenced in and essential to the complaint. See *Brass v. Am. Film Techs., 987 F.2d 142, 150 (2d Cir. 1993)*. However, these documents cannot establish dispositively that George Barasch, Stephen Barasch, Linda Barasch Glazer, and Richard Glazer were not fiduciaries of the Employee Benefit Funds.

HN29Whether or not a person is a fiduciary is determined by the functions performed by that person, not by his or her title. *Mertens, 508 U.S. at 252; Blatt v. Marshall & Lassman, 812 F.2d 810, 812 (2d Cir. 1987)*. The complaint alleges that non-trustee defendants performed non-ministerial functions for the Employee Benefit Funds. First, the complaint alleges that, prior to 1999, these defendants made all decisions to invest the hundreds *62 of millions of dollars controlled by the funds. (Compl. P 55 (c)) Second, the complaint alleges that these defendants selected the funds' trustees. (Compl. P 55) Finally, the complaint alleges that these defendants make ultimate determinations regarding eligibility for benefits. (Compl. P 55(f))

Unlike ministerial functions such as drafting plan documents, providing advice on tax and insurance issues, and making initial determinations about eligibility for benefits, the tasks isolated in the complaint -- HN30directing the Funds' investments, selecting the trustees, and making final decisions about eligibility -- are not ministerial. See *Blue Cross & Blue Shield of Ala. v. Sanders, 138 F.3d 1347, 1353 (11th Cir. 1998)* (holding that third-party administrators are fiduciaries if they "have the authority to make ultimate decisions regarding benefits eligibility"); *Reich v. Lancaster, 55 F.3d 1034, 1046 (5th Cir. 1995)* (concluding that a party is a fiduciary to a fund where he "in effect, exercised discretionary authority and control over assets of the Fund" because the trustees accepted every recommendation he made); *Hickman v. Tosco Corp., 840 F.2d 564, 566 (8th Cir. 1988)* *63 (explaining that a defendant corporation "is a fiduciary within the meaning of ERISA ... because it appoints and removes the members of the administrative committee that administers the pension plan"); *Liss v. Smith, 991 F. Supp. 278, 301 (S.D.N.Y. 1998)* (explaining that while "mere influence does not transform an advisor into a fiduciary, in 'some situations, an advisor's influence may be so great that it confers effective discretionary authority'") (quoting *Reich, 55 F.3d at 1048*); *Whitfield v. Tomasso, 682 F. Supp. 1287, 1305 (E.D.N.Y. 1988)* (concluding that a union is liable for trustees' fiduciary breaches where it appointed and removed the trustees). In light of plaintiffs' allegations that Barasch

Family members performed non-ministerial functions, this court cannot conclude, as a matter of law, that they are not fiduciaries.

The cases from this district relied on by defendants do not support a different result. In *DeLaurentis v. Job Shop Technical Services, Inc., 912 F. Supp. 57, 61-62 (S.D.N.Y. 1996)*, the Court held that a plaintiff had not alleged facts sufficient to establish a defendant's fiduciary *64 status where the complaint merely identified the defendant as the entity responsible for drafting a plan and preparing quarterly statements. Likewise, in *Protocare of Metropolitan New York v. Mutual Ass'n Administrators, Inc., 866 F. Supp. 757, 762 (S.D.N.Y. 1994)*, this Court held that a plaintiff had not alleged facts sufficient to establish an administrator's fiduciary status where the complaint stated only that an administrator made initial eligibility determinations based on pension plan rules. In each of these cases, the plaintiffs did not make factual allegations supporting the inference that the defendants performed non-ministerial functions. n15 Here, by contrast, plaintiffs have alleged several facts supporting that inference.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n15 Similarly, in *Geller, 86 F.3d at 21*, the Second Circuit affirmed the dismissal of a complaint stating only that an employer and two of its officers sent reports to benefit plan trustees, acknowledged and guaranteed that the employees listed were in fact eligible for the group insurance, and remitted premiums. Unlike those allegations, the allegations in this case support the inference that defendants are fiduciaries.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

*65

Defendants' attempts to cast doubt on plaintiffs' factual allegations are also unavailing at this stage of the litigation. Defendants assert that, consistent with the terms of the contracts between the Funds and the administrators, they merely provided investment advice to the trustees. Yet the complaint alleges the opposite. (Compl. P 55(c)). Defendants assert also that they simply applied pension plan rules in making initial determinations regarding eligibility. Once again, the complaint alleges the opposite. (Compl. P 55(f)) Finally, defendants assert that, in light of the *Labor Management Relations Act*'s requirement that half the trustees of each benefit fund be elected by the con-

tributing employers, they could not possibly select enough trustees to control the employee benefit funds. Although this assertion seems plausible, HN31the role of a district court in reviewing a motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984)* (internal quotation marks omitted). **\*66** This court cannot grant defendants' motion to dismiss simply because defendants deny the allegations in the complaint and offer plausible grounds on which to discount the allegations. Plaintiffs are entitled to prove that George Barasch, Stephen Barasch, Linda Barasch Glazer, and Richard Glazer are ERISA fiduciaries.

VI.

UMF Trustees move to dismiss the ERISA claims against them on the alternative ground that plaintiffs' allegations are so conclusory as to be meaningless. According to UMF Trustees, the allegations fail to give fair notice of plaintiffs' claims and the grounds on which they rest. I disagree.

Plaintiffs claim that the trustees and non-trustees have violated *sections 404, 405, and 406* of ERISA. *Section 404*, in relevant part, provides:HN32A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-- (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity **\*67** and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.*Section 405*, in relevant part, provides:HN33In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach ..., if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.*Section 406*, in relevant part, provides:HN34A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect-- sale or exchange, or leasing, of any property between the plan and a party

in interest **\*68** ..., furnishing of goods, services, or facilities between the plan and a party in interest ..., transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

With respect to *section 404*, the complaint alleges, inter alia, that the Funds' fiduciaries directed the Funds to enter long-term, one-sided administrative services contracts under which service providers have been overpaid. Plaintiffs allege also that the trustees failed to diversify the investments of the plan. With regard to *section 405*, the complaint alleges that non-trustee defendants participated knowingly in the trustees' breaches of fiduciary duty as co-fiduciaries, and failed to remedy those breaches. Finally, with respect to *section 406*, the complaint alleges that the trustees of the Funds engaged in transactions that constituted sales to, exchanges with, and transfers to parties in interest. The complaint alleges also that non-trustee defendants dealt with the assets of the Employee Benefit Funds in their own interest rather than in the interest of the Funds. These allegations give defendants fair notice of plaintiffs' claims, and are sufficient to withstand a motion to dismiss. **\*69** See *Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988)* HN35("Dismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.").

VII.

Defendants move to dismiss the two RICO claims on the ground that plaintiffs lack standing to bring those claims under *18 U.S.C. § 1964(c)*. This motion is properly construed as a *Rule 12(b)(6)* motion rather than a *Rule 12(b)(1)* motion. See *Lerner v. Fleet Bank, 318 F.3d 113, 128 (2d Cir. 2003)*.

HN36"RICO renders criminally and civilly liable 'any person' a who uses or invests income derived 'from a pattern of racketeering activity' to acquire an interest in or to operate an enterprise engaged in interstate commerce, *18 U.S.C. § 1962(a)*; b who acquires or maintains an interest in or control of such an enterprise 'through a pattern of racketeering activity,' *§ 1962(b)*; c who, being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs 'through a pattern of racketeering activity,' *§ 1962(c)*, or, finally, d **\*70** who conspires to violate any of the first three subsections of *18 U.S.C. § 1962, § 1962(d)*." *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 232-33, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)* (quoting *18 U.S.C. § 1962*). HN37The civil RICO cause of action arises out of *18 U.S.C. § 1964(c)*, which provides: "Any person injured in his business or property by reason of a violation of *section 1962* of this chapter

2003 U.S. Dist. LEXIS 4186; 30 Employee Benefits Cas. (BNA) 1874

may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee ...."

The complaint alleges that plaintiffs were harmed by (1) the increase in union dues caused by the diversion of funds from the treasury of ATC; and (2) the limitations and restrictions on benefits offered to participants in the Employee Benefit Funds, which resulted from the alleged mismanagement of the funds by the trustees and other members of the Barasch Enterprise. Defendants argue that plaintiffs lack standing to bring a RICO action because they have not adequately alleged that they were injured "by reason of" the *71 RICO predicate acts alleged in the complaint. For the following reasons, I agree.

In *Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992),* HN38the Supreme Court held that the "by reason of" language in *section 1964(c)* requires a showing by the plaintiff that his or her injuries are proximately caused by the defendant's actionable conduct. *Id. at 268.* In determining whether a plaintiff's injuries have been proximately caused by a defendant's violations of *section 1962,* the crucial question is whether there is a direct connection "between the injury asserted and the injurious conduct alleged." *Id. at 269.* Absent such a direct connection, a plaintiff has no standing to bring a RICO suit. *Id. at 268-69.*

The Holmes Court isolated three reasons for RICO's directness requirement:First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly *72 injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.*Id. at 269* (citations omitted).

Following the proximate cause analysis in *Holmes,* the Second Circuit has repeatedly reaffirmed that HN39only "the targets, competitors and intended victims of the racketeering enterprise" have standing to bring civil RICO claims. *Lerner, 318 F.3d at 124;* see also *Lewis ex rel. American Express Co. v. Robinson (In re American Express Co. Shareholder Litig.), 39 F.3d 395, 400 (2d Cir. 1994)* (denying RICO standing

to American Express shareholders because injury to the shareholders was neither the "preconceived purpose" nor the "specifically-intended consequence" of a scheme to discredit an American Express competitor); *Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir. 1990)* *73 (holding that the loss of employment for failure to cooperate in a RICO scheme was not proximately caused by racketeering activity because the employee was not "the target of the racketeering activity").

Accordingly, HN40where damages to a plaintiff derive from an injury to a third party, the plaintiff lacks standing to bring a RICO action. See *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229 (2d Cir. 1999)* (concluding that union health and benefit fund lacked standing under RICO to sue tobacco companies for increased medical costs resulting from participants' and beneficiaries' tobacco-related illnesses because increased costs to the funds were a secondary result of direct harm suffered by the participants and beneficiaries at the hands of the companies); *Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 849 (2d Cir. 1986)* (dismissing civil RICO suit by shareholders of a bankrupt corporation against suppliers who allegedly forced the corporation into bankruptcy because "the legal injury, if any, was to the firm" and "any decrease in value of plaintiffs' shares merely reflects the decrease in value of the firm as a result of the *74 alleged illegal conduct").

As in *Rand,* HN41courts have consistently found that shareholders, creditors, and employees of a corporation lack standing to sue under RICO where their injuries derive from direct injuries to the corporation itself. E.g., *Manson v. Stacescu, 11 F.3d 1127 (2d Cir. 1993)* (dismissing RICO claims by shareholders, creditors and employees of a bankrupt company because their injuries were derivative of injuries to the corporation). Courts have also applied the direct injury test where a non-corporate entity, rather than one of its members, has been directly harmed. E.g., *Pappas v. Passias, 887 F. Supp. 465, 470 (E.D.N.Y. 1995)* (concluding that a member of a Greek Orthodox Church had no standing to bring a civil RICO action against the hierarchy in the Archdiocese for allegedly misappropriating funds because "the injury he alleges has been incurred by an association or organization of which he is a member, and any derivative injury to him is no different from that sustained by similarly situated members of the same association or organization").

At least two district courts in this circuit have dismissed RICO claims brought by *75 participants in employee benefit funds based on the direct injury test. See *Donohue v. Teamsters Local 282 Welfare, Pension, Annuity, Job Training & Vacation & Sick Leave Trust*

*Funds*, 12 F. Supp. 2d 273, 278 (E.D.N.Y. 1998) (dismissing for lack of standing RICO claims brought by a fund participant against union officers and welfare fund trustees for alleged embezzlement of fund assets because the fund, rather than the individual plaintiff, was directly injured by the alleged embezzlement); *Diduck v. Kaszynski & Sons Contractors, Inc., 737 F. Supp. 792, 798 (S.D.N.Y. 1990)* (dismissing for lack of standing a RICO claim brought by a benefit fund participant against a contributing employer for fraud because plaintiff who alleged his benefits were adversely affected was not directly injured by the alleged fraud -- rather, the fund was directly injured), aff'd in part, rev'd in part on other grounds, *974 F.2d 270 (2d Cir. 1992)*.

Moreover, two circuit courts, as well as a district court in this Circuit, have dismissed RICO claims brought by union members based on the direct injury test where damages resulted from injuries to the unions. See *Adams-Lundy v. Ass'n of Pro. Flight Attendants, 844 F.2d 245, 250 (5th Cir. 1988)* *76 (concluding that union member plaintiffs lacked standing to sue other union members because "any financial improprieties occurred with union funds and directly injured solely the union"); *Bass v. Campagnone, 838 F.2d 10, 12 (1st Cir. 1988)* (affirming dismissal of a suit brought by union members against union president on the ground that "union members allege an injury sustained by all of the members of the local collectively, rather than themselves individually"); *Mayes v. Local 106, Int'l Union of Operating Eng'rs, 1999 U.S. Dist. LEXIS 1118, 1999 WL 60135,* at *3 (N.D.N.Y. Feb. 5, 1999) HN42("A plaintiff cannot bring a civil suit under RICO, in a personal capacity, where the injury he alleges has been incurred by a union of which he is a member and any derivative injury to him is no different from that sustained by similarly situated members of the same union."), aff'd *201 F.3d 431 (2d Cir. 1999)*.

The Second Circuit examined RICO standing in *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc., 271 F.3d 374 (2d Cir. 2001)*. That case involved a class-action suit by a cleaning service alleging that a competitor *77 hired undocumented aliens in violation of federal law, thereby enabling itself to underbid competing firms. Relying on the three policy factors addressed by Holmes, the Second Circuit held that Commercial's allegations satisfied the proximate cause requirement for civil RICO cases. According to the Court, the first factor -- the difficulty of determining damages attributable to the RICO violations -- weighed against dismissal of the RICO action because hiring illegal alien workers may have directly affected the plaintiff's bargaining power. *Id. at 382* ("If plaintiffs can substantiate their claims, the plaintiffs may well show that they lost contracts directly because of the cost savings defendant realized through

its scheme to employ illegal workers."). The second factor -- the difficulty of apportioning damages among injured parties -- also weighed against dismissal of the action because the class members were not alleging a derivative injury. *Id. at 384* ("Unlike the situation in Holmes, Commercial and its fellow class members are not alleging an injury that was derivative of injury to others."). Finally, the third factor -- the ability of *78 other parties to vindicate the aims of the RICO statute -- weighed against dismissal of the action because no class of potential plaintiffs were more directly injured by the alleged RICO violations. *Id. at 385* ("In Holmes, those directly injured could be expected to sue, and their recovery would redound to the benefit of the plaintiffs suing for indirect injury. Here, in contrast, suits by governmental authorities to recover lost taxes and fees would do nothing to alleviate the plaintiffs' loss of profits.").

Unlike the plaintiffs in *Commercial,* plaintiffs in this case cannot pass the direct injury test, because, as in *Pappas,* Mayes, *Donohue, Bass,* and *Adams-Lundy,* the damages allegedly sustained by plaintiffs in this case merely derive from injuries to third parties. Because the injuries are derivative of direct injuries to the Employee Benefit Funds and ATC, the first two policy factors addressed by Holmes weigh against granting standing to Individual Plaintiffs. First, even if plaintiffs can prove their allegations, the damages attributable to the RICO violation would be difficult to determine, because factors aside from defendants' misconduct *79 could account for the allegedly deficient benefits received by participants in Employee Benefit Funds and for the increased dues paid by ATC members. Second, it would also be difficult to apportion damages between the parties directly harmed by defendants' alleged misconduct, namely the union and the Funds, and Individual Plaintiffs.

However, the impact of the third Holmes factor -- namely, the ability of other parties to vindicate the aims of the RICO statute -- is unclear in this case. On the one hand, unlike in *Commercial,* there are private parties who have suffered direct injuries as a result of defendants' misconduct, and these parties appear to be the proper plaintiffs. On the other hand, denying standing to plaintiffs with derivative injuries is based on the presumed ability of the directly injured institutions to prosecute claims in their own name. Individual Plaintiffs argue that it is unrealistic to expect unions to sue those who control them. If the agency problem isolated by Individual Plaintiffs actually exists, n16 the third Holmes factor arguably weighs against dismissal.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 ATC Defendants cite several cases in

which unions have sued their officers under RICO. E.g., *Doyle v. Kamenkowitz, 114 F.3d 371 (2d Cir. 1997)* (local union was plaintiff in a RICO action against its former officers); *Int'l Bhd. of Teamsters v. Carey et al., 163 F. Supp. 2d 271 (S.D.N.Y. 2001)* (international union was plaintiff in a RICO case against a former union officer). However, these cases merely confirm that unions pursue RICO suits against former officers. They do not undermine plaintiffs' contention that it is unrealistic to expect unions to sue their existing leadership.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**\*80**

Recognizing that unions may choose not to bring actions against those who control them, the First Circuit in Bass left open the possibility that an exception to RICO's standing scheme might be crafted in cases where plaintiff union members obtain class certification: We recognize, of course, that the plaintiffs could not have initiated a derivative suit on behalf of the union ... And we realize that it would have been fruitless to insist that the president, who ordinarily might sue on behalf of the local, initiate a RICO action in which he himself was to be named as a defendant. But the plaintiffs could have shown that they had the requisite support from the local to initiate an action on its behalf by obtaining class certification; had they been successful in this attempt, their complaint might have survived the motion for dismissal because it would have then alleged an injury common to the class of local members. We find it significant, however, that, in support of its argument opposing class certification, the defendant presented affidavits signed by approximately one-half of the membership of the local, in which the affiants attested to their belief in the defendant's **\*81** innocence. Such strong opposition by those whom the action would assertedly benefit decisively undercuts the plaintiffs' claim for standing. *Bass, 838 F.2d at 13* (citations omitted). Similarly, in *Forbes v. Eagleson, 1996 U.S. Dist. LEXIS 10583* (E.D. Pa. July 23, 1996), after concluding that a class of union members had standing to pursue a RICO claim against their labor representative because the union assigned its claims to the plaintiffs, the Court noted that "plaintiffs might have had standing even without the assignment." *1996 U.S. Dist. LEXIS 10583* at \*14 n.8. The Forbes Court pointed out that, unlike in Bass, where more than half the union members opposed the suit, there was "no such divergence of interests between the union and its constituent members" in the case at bar, where the

plaintiffs had not yet moved for class certification. Id.

The dicta in *Bass* and Forbes suggest that if members of a union obtain class certification for a class made up of all union members, Holmes' directness requirement may be relaxed in order to ensure that union officials are held accountable for their misconduct. Under the logic **\*82** of these cases, this court could defer its decision on RICO standing until a certification motion is decided. At that point, if the class were certified, the court could allow the RICO claims to go forward.

Although there may be cases in which the proposed exception should be applied, I decline to apply it in this case. n17 The specific problem posed here -- namely, how to resolve a conflict among the *Holmes* policy factors -- is not new. In Laborers Local 17, the Second Circuit dealt with a case in which the first two Holmes factors weighed in favor of denying standing to a RICO plaintiff but the third factor appeared to weigh against dismissal for lack of standing. *Laborers Local 17, 191 F.3d at 229*. The case involved a RICO claim brought by labor union health and welfare trust funds against tobacco companies, alleging that the companies had engaged in a conspiracy to deceive the plaintiff funds with respect to the health risks associated with tobacco, causing the funds to expend millions of dollars to provide medical services for participants. The Court denied standing to the funds on the ground that their injuries derived from injuries to the individual **\*83** smokers. *Id. at 239*. The Court then noted that "this conclusion is consistent with the three policy factors addressed by Holmes." Id. After concluding that both the first and the second policy factors weighed in favor of dismissal of the RICO causes of action for lack of standing, the Court turned to the third factor. The Court reasoned: The Funds correctly note that these RICO causes of action could not be asserted by the smokers or by the Funds in a subrogation action because the RICO statute requires an injury to "business or property," whereas the smokers' injuries are personal in nature. Hence, the Funds conclude there are no more directly injured "private attorneys general" who could vindicate the law for these alleged RICO violations ...

Yet, to the contrary, our holding that plaintiffs lack standing under RICO need not bring about the result plaintiffs fear. The Funds may still bring a subrogation action to recover the medical costs paid out for the individual smokers, and the smokers themselves have sufficient independent incentive to pursue their own causes of action for such additional types of injuries as pain and suffering. Although **\*84** these will not be RICO claims, they will remedy the harm done by defendants' alleged misconduct ... Especially where such other actions are available, the lack of a RICO