(S.D. Miss. 2001) concluded that the Fifth Circuit has rejected the rule that control over plan assets, without discretion, makes a plan manager a fiduciary, this Court finds that the judge's determination is improperly imposed on statements by the appellate court that do not focus on the statutory language and structure. The court cites *Reich v. Lancaster*, 55 F.3d 1034, 1047 (5th Cir. 1995) in which the Fifth Circuit, citing *American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Society of the United States*, 841 F.2d 658, 663 (5th Cir. 1988) ("Holden's authority to grant or deny claims, to manage and disburse assets, and to maintain claims files clearly qualifies as discretionary control of a plan or its assets within the meaning of § 1002(21)(A)."), as holding that "a plan administrator, who possessed authority to grant or deny claims, to manage and disburse fund assets, and to maintain claim files, clearly has discretionary authority respecting management of a plan or its assets within the meaning of § 1002(21)(A) and therefor was an ERISA fiduciary." The Fifth Circuit merely viewed these duties together generally and conclusorily pronounced that they made the administrator a fiduciary; it did not examine the issue of control over plan assets alone and conclude that such control made the administrator a fiduciary, nor did examine the question of control over plan assets without discretion. In other words, a review of *Reich* and the underlying *American Federation* demonstrates that the Fifth Circuit looked at the authority granted by the contract to the plan administrator as a whole, without separate analysis of each duty.

[*38]

Such a distinction between authority and control over plan management versus over plan assets in requiring discretion only with regard to the former before fiduciary obligations are triggered appears to have roots in the fiduciary's traditional duties. "At common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries" and "the common law trustee's most defining concern historically has been the payment of money in the interest of the took up the subject of fiduciary responsibility under ERISA, it concentrated on fiduciaries' financial decisions, focusing on pension plans, the difficulty many retirees faced in getting the payments they expected, and the financial mismanagement that had too often deprived employees of their benefits." *Id.* at 232, *citing as examples*, S.Rep. No. 93-127, p. 5 (1973); S. Rep. No. 93-383, pp. 17, 95 (1973).

In contrast to the functional definition of fiduciary in § 1002(21)(A), § 402(a)(2) of ERISA, 29 U.S.C. § 1102(a)(2), defines a formally "named fiduciary" as "a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified [*39] in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly."

Section 409(a) of ERISA, 29 U.S.C. § 1109(a), provides, "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable." It makes no distinction between the functional definition of a trustee and the formal designation of a fiduciary named by the plan documents or by following the procedure in those documents for designating a fiduciary and thus applies to both.

### b. Fiduciary Duties

The common law of trusts "offers a 'starting point for analysis of [ERISA] . . . [unless] it is inconsistent with the language of the statute, its structure, or its purposes.'" *Harris Trust*, 530 U.S. at 249, quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999). "Rather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of [*40] trusts to define the general scope of their authority and responsibility.'" *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996), quoting *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 427 U.S. 559, 570 (1985). Thus a federal common law based on the traditional common law of trusts has developed and is applied to define the powers and duties of ERISA plan fiduciaries, at least in part, with modifications appropriate in light of the unique nature of the statutory employee benefit plans. *See, e.g., Pegram*, 530 U.S. at 224; *Varity Corp.*, 516 U.S. at 497 ("We also recognize . . . that trust law does not tell the entire story."); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000) ("Although ERISA's duties gain definition from the law of trusts, the usefulness of trust law to decide cases brought under ERISA is constrained by the statute's provisions."); *Donovan v. Cunningham*, 716 F.2d 1455, 1464 and n.15 (5th Cir. 1983) ("ERISA's modifications of existing trust law include imposition of duties upon a broader class of fiduciaries, 29 U.S.C. § 1003 [*41] (21)(1976), prohibition of exculpatory clauses, *id.* § 1110(a), broad disclosure and reporting requirements, *id.* §§ 1021-31, and nationwide uniformity of rules," and § 406's "detailed list" of *per se* illegal types of transactions), *cert. denied*, 467 U.S. 1251 (1984). For example, the traditional four overlapping fiduciary duties (of loyalty, care, diversification

of plan assets, and adherence to plan care, diversification of plan assets, and adherence to plan documents, where prudent), cited in footnote 9 of this memorandum and order and discussed in detail *infra*, are derived from the common law of trusts and are imposed upon ERISA fiduciaries. At the same time, in contrast to the common law of trusts, under ERISA the plan fiduciary may have multiple roles and wear many hats; he may serve as an employer and as a plan fiduciary. n50 The scope of the incorporation of the common law of trusts is not clearly defined, however, and different courts have frequently come to different conclusions about the extent of its application.

> n50 *See Variety Corp.*, 516 U.S. at 497: "In some instances, trust law will offer only a starting point, after which courts must go on to as whether, or to what extent, the language of the statute, its structure, or its purpose require departing from common-law trust requirements." The high court explained that Congress enacted ERISA to provide extra protections for both employers establishing ERISA benefit plans and for plan participants and beneficiaries that the law of trusts lacked. Thus, for example, ERISA permits an employer to serve as a plan administrator under 29 U.S.C. § 1002(1), unlike trust law. *See Varity Corp.*, 516 U.S. 489 (allowing employees to sue employer company for breach of fiduciary duty).

[*42]

The most fundamental duty of ERISA plan fiduciaries is a duty of complete loyalty, under 29 U.S.C. § 1104(a)(1)(B), to insure that they discharge their duty "solely in the interests of the participants and beneficiaries," and to "exclude all selfish interest and all consideration of the interests of third persons." *Id.* Fiduciaries must discharge their duties with respect to the plan "solely in the interest of the participants and the beneficiaries," i.e., "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 imposed on fiduciaries by ERISA is avoidance of conflicts of interest. *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993).

Second, the fiduciary must meet a "prudent man" standard under 29 U.S.C. § 1104(a)(1)(B), to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use" and "with single-minded devotion" to these plan participants and beneficiaries. According to the Department of [*43] Labor, 29 C.F.R. § 2550.404a-1(b), these requirements are satisfied if the fiduciary

> (i) Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and
>
> (ii) Has acted accordingly.

"Appropriate consideration" for purposes of this regulation includes but is not limited to

> (i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and
>
> (ii) Consideration of the following [*44] factors as they relate to such portion of the portfolio:
>
> (A) The composition of the portfolio with regard to diversification;
>
> (B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and
>
> (C) The projected return of the portfolio relative to the funding objectives of the plan.

*Id.* at § 2550.404a-1(b)(2); *Laborers National Pension Fund v. Northern Trust Quantitative Advisors, Inc.* 173 F.3d 313, 317-18 (5th Cir.) (noting that these regulations from the Department of Labor, 29 C.F.R. § 2550.404a-1, generally reflect that a fiduciary with investment duties must act as a prudent investment manager under the modern portfolio theory rather than under the common law of trusts standard which examined each investment with an eye toward its individual riskiness), *cert. denied*, 528 U.S. 967 (1999). In 29 C.F.R. § 2509.94-1 Interpretive Bulletin, the Department of Labor observes, " . . . Because

every investment necessarily causes a plan to forego other investment opportunities, an investment will not be prudent if [*45] it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return."

Regarding this overlapping duty of "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use," the Fifth Circuit has stated,

> In determining compliance with ERISA's prudent man standard, courts objectively assess whether the fiduciary, at the time of the transaction, utilized proper methods to investigate, evaluate and structure the investment; acted in a manner as would others familiar with such matters; and exercised independent judgment when making investment decisions. "'[ERISA's] test of prudence . . . is one of conduct, and not a test of the result of performance of the investment. The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed.'" Thus, the appropriate inquiry is "whether the individual trustees, at the time they engaged in the challenged transactions, [*46] employed the appropriate methods to investigate the merits of the investment and to structure the investment [citations omitted]."

*Laborers National Pension Fund v. Northern Trust Quantitative Advisors, Inc.* 173 F.3d at 317. Since the prudence standard focuses on whether the fiduciary utilized appropriate methods to investigate and evaluate the merits of a particular investment, the "appropriate methods" in a particular case depend "on the 'character' and 'aim' of the particular plan and decision at issue and the 'circumstances prevailing' at the time a particular course of action must be investigated and undertaken.'" *Bussian*, 223 F.3d at 299. Furthermore, the standard of the prudent man is an objective standard, and good faith is not a defense to a claim of imprudence. *Reich*, 55 F.3d at 1046; *Donovan v. Cunningham*, 716 F.2d at 1467 ("this is not a search for subjective good faith—a pure heart and an empty head are not enough").

Third, the ERISA fiduciary must diversify the plan's investments to minimize risk of loss unless, under the circumstances, it is clearly prudent not to diversify. 29 U.S.C. § 1104 [*47] (a)(1)(C). The legislative history offers some guidance about diversifying the assets of an ERISA plan:

> The degree of investment concentration that would violate this requirement to diversify cannot be stated as a fixed percentage, because a fiduciary must consider the facts and circumstances of each case. The factors to be considered include (1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares of stock or otherwise; (5) distribution as to geographical location; (6) distribution as to industries; (7) dates of maturity.

*Metzler v. Graham*, 112 F.3d 207, 208-09 (5th Cir. 1997), citing H.R. Rep. No. 1280, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5084-85 (Conf. Rpt. at 304). The panel further noted, "We think it is entirely appropriate for a fiduciary to consider the time horizon over which the plan will be required to pay out benefits in evaluating the risk of large loss from an investment strategy." *Metzler*, 112 F.3d at 210 n.6. Moreover, the panel admonished courts, "It is clearly imprudent [*48] to evaluate diversification solely in hindsight—plan fiduciaries can make honest mistakes that do not detract from a conclusion that their decisions were prudent at the time." *Id.* at 209.

To prevail on a claim that a fiduciary violated its duty to diversify, a plaintiff must show that the portfolio, on its face, is not diversified. The burden then shifts to the defendant to demonstrate that it was "clearly prudent" not to diversify, the express statutory exception to the duty to diversify. *Metzler*, 112 F.3d at 209. Factors such as the trustees' "investigation of the purchase, the evaluation of other investment alternatives, and the relative expertise of the trustee . . . are relevant to whether there was risk of large loss." *Id.* at 212. Both the plaintiff's evidentiary burden and the defendant's evidentiary burden "must be analyzed from the perspective of what both parties acknowledge as their purpose; to reduce the risk of large loss." *Id.* at 210. "Prudence is evaluated at the time of the investment without the benefit of hindsight." *Metzler*, 112 F.3d at 209.

Fourth, the plan fiduciary must follow [*49] the documents and instruments governing the plan to the extent that they are consistent with ERISA. 29 U.S.C. § 1104(a)(1)(D). "In case of a conflict, the provisions of the ERISA policies as set forth in the statute and regulations prevail over those of the Fund guidelines." *Laborers Nat. Pension Fund v. Northern Trust Quantitative Advisors, Inc.*, 173 F.3d at 322. *In accord, Central States, Southeast*

Case 3:01-cv-01737-MRK    Document 52-30    Filed 10/16/2003    Page 4 of 15

Page 19
2003 U.S. Dist. LEXIS 17492, *49

*and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 568 (1985) ("Trust documents cannot excuse trustees from their duties under ERISA and . . . trust documents must generally be construed in light of ERISA's policies . . . ."); *Donovan v. Cunningham*, 716 F.2d at 1467 ("Though freed by Section 408 from the prohibited transaction rules, ESOP fiduciaries remain subject to the general requirements of Section 404."); *Herman v. NationsBank Trust Co., (Georgia)*, 126 F.3d 1354, 1368 (11th Cir. 1997) (fiduciary was "obligated to determine whether the plan provisions . . . were contrary to ERISA" and to fulfill his duties to act prudently and solely in the interests of the plan participants), [*50] *cert. denied*, 525 U.S. 816 (1998). *See also Moench v. Robertson*, 62 F.3d 553, 567 (3d Cir. 1995) (where the plan language "constrains the [fiduciaries'] ability to act in the best interest of the beneficiaries," it is inconsistent with ERISA and with the common law of trusts and must not be followed), *cert. denied*, 516 U.S. 1115 (1996); *Eaves v. Penn*, 587 F.2d 453, 459 (10th Cir. 1978) ("While an ESOP fiduciary may be released from certain Per Se violations on investments in employer securities . . ., the structure of [ERISA] itself requires that in making an investment decision of whether or not a plan's assets should be invested in employers [*sic*] securities, an ESOP fiduciary, just as fiduciaries of other plans, is governed by the 'solely in the interest' and 'prudence' tests of §§ 404(a)(1)(A) and (B)."). n51

n51 Article VII of the ESOP mandates that "the assets of the Plan will at all times be primarily invested [80% or more]" in Enron stock. The Savings Plan at V.16(a) provided that the employer's contributions should be primarily in shares of its own stock. Plaintiffs contend that where the plans mandated that the plans acquire and retain Enron stock, ERISA requires that fiduciaries investing and managing plan assets must disregard the terms of the plan if following those terms would be disloyal, imprudent or otherwise violate ERISA.

[*51]

Given that a fiduciary's duties are "the highest known to the law," "[a] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir.), *cert. denied*, 459 U.S. 1069 (1982); *cited and quoted by Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000). In determining whether a trustee has breached his duties, the court examines both the merits of the challenged transaction(s) and the thoroughness of the fiduciary's investigation into the merits of the transaction(s). *Donovan v. Cunningham*, 716 F.2d at 1467. n52

n52 Where conflicting interests potentially involving a fiduciary and his duty to act in the best interests of the plan participants and beneficiaries arise, depending on the circumstances of the case and the degree of the conflict, to avoid any taint the fiduciary at minimum might have to perform an "'intensive and scrupulous independent investigation of [the fiduciary's] options.'" *Bussian*, 223 F.3d at 299. If the fiduciary chooses to obtain an independent expert's help, merely hiring an expert and relying blindly on his advice does not satisfy a conflicted fiduciary's investigative duty or serve as a complete defense to an imprudence charge; the fiduciary must "'(1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances.'" *Id.* at 301, *quoting Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996). The fiduciary needs to consider the expert's reputation and experience, the breadth and thoroughness of the expert's investigation, the material supporting his opinion, and the appropriateness of his methods and assumption. *Id.* Similarly, the fiduciary may not blindly rely on credit ratings or other ratings, but must investigate further. *Id.* Alternatively, in an extreme situation, the fiduciary may be forced to appoint an independent fiduciary. *Bussian*, 223 F.3d at 299.

[*52]

Unlike the law of conspiracy, "no fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." 29 U.S.C. § 1109(b); *see also Bannistor v. Ullman*, 287 F.3d 394, 405 (5th Cir. 2002).

### c. "Two-Hat" Doctrine

Unlike the trustee at common law, who must wear only his fiduciary hat when he acts in a manner to affect the beneficiary of the trust, an ERISA trustee may wear many hats, although only one at a time, and may have financial interests that are adverse to the interests of the beneficiaries but in the best interest of the company. *Pegram*, 530 U.S. at 225; *Bussian*, 223 F.3d at 294-95; *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 412-13 (5th Cir. 2003). For example a fiduciary may wear the hat of an employer and fire a beneficiary for reasons not related to the ERISA plan, or the hat of a plan spon-

Case 3:01-cv-01737-MRK   Document 52-30   Filed 10/16/2003   Page 5 of 15
Page 20
2003 U.S. Dist. LEXIS 17492, *52

sor and modify the terms of a plan to be less generous to the beneficiary. *Pegram*, 530 U.S. at 225. When making fiduciary decisions, however, a fiduciary [*53] may wear only his fiduciary hat. *Id*. Thus instead of defining a fiduciary merely as an administrator of or manager of or advisor to a plan, the statute states that he is a fiduciary only "to the extent" that he acts in such a capacity in relation to a plan." *Pegram*, 530 U.S. at 225-26, *citing* 29 U.S.C. § 1002(21)(A); *Schlumberger*, 338 F.3d at 412-13. Accordingly, when a plaintiff alleges a cause of action for breach of fiduciary duty, the threshold question is whether the defendant was acting as a fiduciary, i.e., performing a fiduciary function, when he performed the action that constitutes the basis of the complaint. *Pegram*, 530 U.S. at 226; *Schlumberger*, 338 F.3d at 413.

For example, under the "two hats" doctrine, adopted by the Supreme Court in *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995) (holding that an employer does not act as a fiduciary, but as a settlor n53 in adopting, amending n54 or terminating a welfare plan n55), a plan sponsor may function in a dual capacity as a business employer (settlor or plan sponsor n56) whose activity is not regulated [*54] by ERISA and as a fiduciary of its own established ERISA plan, subject to ERISA. "The . . . act of amending . . . does not constitute the action of a fiduciary"; "ERISA's fiduciary duty requirement simply is not implicated where [the employer], acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated." *Hughes Aircraft*, 525 U.S. at 444. The law does not require employers to establish employee benefit plans. Congress sought to encourage employers to set up plans voluntarily by offering tax incentives, methods to limit fiduciary liability, means to contain administrative costs, and giving employers flexibility and control over matters such as whether or when to establish an employee benefit plan, how to design a plan, how to amend a plan, when to terminate a plan, all of which are generally viewed as business decisions of a settlor, not of a fiduciary, and thus not subject to fiduciary obligations. *Pegram*, 530 U.S. 226-27; *Martinez v. Schlumberger, Ltd.*, 338 F.3d at 429 ("a company does not act [*55] in a fiduciary capacity by simply amending a plan" or by adopting, modifying or terminating a plan); *Akers v. Palmer*, 71 F.3d 226, 230 (6th Cir. 1995) ("a company is only subject to fiduciary restrictions when managing a plan according to its terms, but not when it decides what those terms are to be"), *cert. denied*, 518 U.S. 1004 (1996); *Bennett v. Conrail Matched Savings Plan Administrative Committee*, 168 F.3d 671, 679 (3d Cir.) ("in amending a plan, the employer is acting as a settlor"; thus "the mere fact that [the employer] amended its plan did not breach any fiduciary duties under ERISA"), *cert. denied*, 528 U.S. 871 (1999); *Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919, 924 (7th Cir. 2003) ("Since an employer has no duty to create a pension or welfare plan in the first place, neither does he have a duty to amend it to make it more generous, or a duty not to amend it if the amendment would make it less generous").

> n53 The plan sponsor is technically a settlor because it is creator of the trust fund in which the plan assets will be placed.

[*56]

> n54 *See, e.g., Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999) ("in general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties, which consist of such actions as the administration of the plan's assets"); *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996) (holding that "the act of amending a pension plan does not trigger ERISA's fiduciary provisions").

> n55 The Supreme Court subsequently extended the dual hat doctrine to pension benefit plans in *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996).

> n56 Title 29 U.S.C. § 1002(16)(B) defines "plan sponsor" as including the employer or employers responsible for establishment of the plan, or an employee organization if it is responsible.

With respect to amendment of a plan that has the effect of reducing or eliminating pension benefits, the general rule is that the employer who amends the plan according to the procedures laid out in the plan documents does not [*57] breach its fiduciary duty as long as the benefits that are reduced or eliminated had *not accrued or were not vested at the time and the amendment does not otherwise violate ERISA or the plan terms. Hines v. Massachusetts Mutual Life Ins.* Co., 43 F.3d 207, 210 (5th Cir. 1995), *citing Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1524 (5th Cir. 1994); *Heinz v. Central Laborers' Pension Fund*, 303 F.3d 802, 804 (7th Cir. 2002) ("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) ["substantial business hardship"] or 1441 [terminated multiemployer plans] of this title."), *petition for cert. filed*, 71 U.S.L.W. 3429 (Dec. 10, 2002), No. 02-891.

Section 204(g), as amended 29 U.S.C. § 1054(g), ERISA's anti-cutback provision, provides in relevant part,

> Decrease of accrued benefits through amendment of the plan
> (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan other than an amendment described in section 1082(c)(8) or 1441 of this title. [*58] n57
> (2) For purposes of paragraph (1), a plan amendment which has the effect of—
> (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
> (B) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.

Section 1054(g) statutorily protects against the reduction or elimination of accrued benefits, but not against reduction or elimination of benefits that are expected but not accrued. *Campbell v. BankBoston, N.A.*, 327 F.3d 1, 8-9 (1st Cir. 2003); *Board of Trustees of Sheet Metal Workers' Natl. Pension Fund v. C.I.R.*, 318 F.3d 599, 599 (4th Cir. 2003). "Accrued benefits" in the defined benefit context are defined as "the individual's accrued benefit determined under the plan," which is "equal to the employee's accumulated contributions." *Campbell*, 327 F.3d at 8, *citing* 29 U.S.C. § 1002(23)(A) and § 1054(c)(2)(B). Section 1002(23) of ERISA provides, "The term "accrued benefit means . . . in the case of a defined benefit plan, the individual's [*59] accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age." Section 411(d)(6) of the Internal Revenue Code, 26 U.S.C. § 411(d)(6), is a parallel provision prohibiting the same conduct, and Treasury Regulation § 1.411(d)-4, A-4(a), promulgated thereunder to "effectuate these 'anti-cutback' principles," provides in relevant part,"

> [A pension] plan that permits the employer, either directly or indirectly, through the exercise of discretion, to deny a participant a section 411(d)(6) protected benefit provided under the plan for which the participant is otherwise eligible (but for the employer's exercise of discretion) violates the requirements of section 411(d)(6).

*Perreca v. Gluck*, 295 F.3d 215, 228 (2d Cir. 2002), *citing* Treasury Regulation § 1.411(d)-4, A-4. Under Treasury Regulation § 1411(d)-4, A-5, "The term employer includes plan administrator . . . [and] trustee . . . ." *Id.* at 228 n.10.

 n57 Neither § 1441 nor § 1342 (addressing termination of a plan by the Pension Benefit Guarantee Corporation through appointment of a trustee) is relevant here.

[*60]

#### d. Power to Appoint/Remove Plan Fiduciaries

A person or entity that has the power to appoint, retain and/or remove a plan fiduciary from his position has discretionary authority or control over the management or administration of a plan and is a fiduciary to the extent that he or it exercises that power. *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("the power . . . to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)") n58; *Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir. 1988) ("Tosco is a fiduciary within the meaning of ERISA . . . because it appoints and removes the members of the administrative committee that administers the pension plan."); *American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc. of the U.S.*, 841 F.2d 658, 665 (5th Cir. 1988) ("Liability for failure to adequately train and supervise an ERISA fiduciary arises where the person exercising supervisory authority is in a position to appoint or remove plan administrators and monitor [*61] their activities."); *Henry v. Frontier Industries, Inc.*, 863 F.2d 886 (Table), No. 87-3879, 87-3898, 1988 WL 132577, *2 (9th Cir. Dec. 1, 1988) ("Largent was a fiduciary of the ESOP by virtue of his power to appoint and retain, and his duty to monitor, the member(s) of the Administrative Committee . . . ."); *Mehling v. New York Life Ins. Co.*, 163 F. Supp. 2d 502, 509-10 (E.D. Pa. 2001); *Liss v. Smith*, 991 F. Supp. 278, 310, 311 (S.D.N.Y. 1998) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status"; "the duty to monitor carries with it, of course, the duty to take action upon discovery that the appointed fiduciaries are not performing properly").

 n58 In *Coyne & Delany Co. v. Selman*, 98 F.3d at 1464-65, the Fourth Circuit recognized as an exception to the rule that plan sponsors are usually free to amend plans without triggering fiduciary status a situation where the sponsor amends to obtain and exercise the power to appoint, retain and remove plan fiduciaries.

[*62]

In *Leigh v. Engle*, 727 F.2d 113, 133-35 (7th Cir.

1984), the Seventh Circuit noted that 29 C.F.R. § 2509.75-5 at FR-3 provides that "a plan instrument which designates the corporation as 'named fiduciary' should provide for designation by the corporation of specified individuals or other persons to carry out specified fiduciary responsibilities under the plan." Furthermore, in *Leigh*, the Seventh Circuit concluded that two corporate officials exercising a duty to appoint fiduciaries had a duty to monitor their appointees' actions:

> As the fiduciaries responsible for selecting and retaining their close business associates as plan administrators, Engle and Libco had a duty to monitor appropriately the administrators' actions. Engle and Libco could not abdicate their duties under ERISA merely through the device of giving their lieutenants primary responsibility for the day to day management of the trust. Engle and Libco were obliged to operate with appropriate prudence and reasonableness in overseeing" their appointees' management of the trust.

727 F.2d at 134-35. *See also* ERISA Interpretative Bulletin 75-8, 29 [*63] § 2509.75-8 (D-4) (members of a board of directors "responsible for the selection and retention of plan fiduciaries" have "'discretionary authority or discretionary control respecting the management of such plan' and are, therefore, fiduciaries with respect to the plan."); (FR-17 Q&A) ("At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."). n59

> n59 Some Defendants have argued that the right to appoint and remove others to serve as fiduciaries by itself does not make one a fiduciary and have cited *In re WorldCom, Inc. ERISA Litigation*, No. 02-CIV. 4816 (DLC), 2003 WL 21385870 (S.D.N.Y. June 17, 2003). In that case, the plaintiffs had relied on 29 C.F.R. § 2509.75-78 (FR-17 Q&A) ("At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.") to impose fiduciary duties on three director defendants on WorldCom's Board, who were vested with WorldCom's power as plan administrator and investment fiduciary to appoint and remove individuals to positions. Disagreeing, Judge Cote granted the motions to dismiss filed by these three defendant directors. Defendants highlight Judge Cote's conclusion that the plaintiffs' arguments that the directors were ERISA fiduciaries merely because of their power to appoint and remove individuals as plan administrators or investment fiduciaries was "going too far. It would make any supervisor of an ERISA fiduciary also an ERISA fiduciary." *Id.* at *9.
>
> This Court finds that the facts in the case before Judge Cote can be easily distinguished from those in *Tittle*. Judge Cote began by observing established law that fiduciary status depends not merely on appointment to a fiduciary status or position, but upon the exercise of discretionary authority by that person: "a person is a fiduciary with respect to a plan *to the extent* . . . that he exercises any discretionary authority or discretionary control" over the management of the plan or disposition of its assets or administration of the plan. *Id.* at *6, quoting § 3(21)(A) of ERISA. (As this Court has noted, there is a difference of opinion about the need for discretion with respect to managing plan assets, but assets are not at issue in *Worldcom*.) A key factor in *WorldCom*, not present here, was a provision in the ERISA plan: "'If WorldCom, Inc. does not appoint individuals to carry out the duties of the Administrator or Investment Fiduciary . . . then *any officer* of WorldCom, Inc. shall have the authority to carry out, on behalf of WorldCom, Inc. the duties of the Administrator and the Investment Fiduciary.'" *Id.* at *3. In fact WorldCom did not appoint anyone to be the Plan Administrator or Investment Fiduciary, and Judge Cote *inter alia* dismissed claims against three other officers, whom plaintiffs sued because the officers fell within reach of the plan's phrase "any officer . . . shall have the authority" to carry out fiduciary duties. Judge Cote concluded that the complaint failed to allege that the three officers were appointed as fiduciaries *and* that they *functioned* as fiduciaries. As for the Director Defendants, the Plaintiffs made two arguments that Director Defendants were fiduciaries because of the exercise of control and authority over management of the plan: (1) they signed or authored a Section 10(a) prospectus that was included in the SEC Form S-8 statements for WorldCom and (2) they had the right to appoint and remove individuals to fill the positions of plan administrator and investment fiduciary. The judge concluded that the first was a nondiscretionary, ministerial act because "SEC filings are documents that directors must ex-

ecute to comply with corporation's obligations under the federal securities laws." *Id.* at 9. As for the power to appoint and remove fiduciaries, the judge noted that the plaintiffs provided no statutory or decisional support for their contention that this power made them fiduciaries, relied on a "Georgia statute that describes the general powers of a board of directors" and "addresses those circumstances in which a board is wearing its corporate 'hat' and not an ERISA 'hat,'" cited the DOL regulation *supra* that only "gives guidance for those who are already ERISA fiduciaries," and, significantly, "[did] not sufficiently allege that the Director Defendants functioned as ERISA fiduciaries." *Id.* at 9.

Here this Court has cited a number of opinions holding that the exercise of the power to appoint, retain and remove persons for fiduciary positions triggers fiduciary duties to monitor the appointees. Moreover in *WorldCom*, WorldCom did not appoint anyone as a fiduciary and there apparently were no allegations that Director Defendants *functioned* as fiduciaries, i.e., actually appointed persons to or removed persons from such positions. In *Tittle*, on the other hand, Defendants did appoint fiduciaries who, in turn, exercised discretionary authority or control over the plan and allegedly breached their fiduciary duties, while Director Defendants allegedly failed in their duty to monitor those appointed.

[*64]

Some courts have placed restrictions on such liability. For instance, in *Brock v. Self*, 632 F. Supp. 1509, 1523 (W.D. La. 1986), the district court wrote,

> If the Plan instrument itself provided for a procedure whereby a named fiduciary may designate persons who are not named fiduciaries to carry out fiduciary responsibilities, the named fiduciaries might not be liable for the acts or omissions of the Third-Party Defendants. 29 C.F.R. § 2509.75-8, FR-14 (1985). Because the Plan in the case at bar does not provide for any such procedure, however, then any designation of Third-Party Defendants as fiduciaries by Third-Party Plaintiffs will not relieve Third-Party Plaintiffs from responsibility or liability for the acts and omissions of Third-Party Defendants.")

See also *Newton v. Van Otterloo*, 756 F. Supp. 1121, 1132 (N.D. Ind. 1991) (directors have duties to monitor plan fiduciaries whom they appoint but do not breach duties in the absence of "notice of possible misadventure by their appointees").

### e. Duty to Disclose

Plaintiffs have alleged that Enron fiduciary Defendants, including the Administrative [*65] Committee members, Lay, and the Compensation Committee members (Blake, Duncan, Jaedicke and LeMaistre), have breached their duty of loyalty to the plan participants by affirmatively and materially misleading them about Enron's financial condition and performance and its accounting manipulations, while inducing them to hold and purchase additional Enron stock. Plaintiffs have also argued that Defendants charged in Count II (lockdown) and Count IV (Offset formula used by Cash Balance Plan) had a fiduciary duty to disclose Enron's financial condition to plan participants and beneficiaries.

The fiduciary's duty to disclose is an area of developing and controversial law.

Under the common law of trusts, which Congress indicated should apply as a threshold step to define duties of plan fiduciaries under ERISA, generally the trustee's duty to disclose information was triggered by a specific request from a plan participant or beneficiary. According to Restatement (Second) of Trusts § 173 (1959), n60

> The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature [*66] and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents related to the trust."

> n60 In *Harris Trust*, 530 U.S. at 250, the Supreme Court turned to the Restatement (Second) of Trusts as its source for the common law of trusts.

In addition, as embodied in comment d to § 173, are the seeds of the trustee's duty to disclose:

> The trustee is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest. . . .

Although the duty to disclose has its roots in the com-

mon law of trusts, courts recently have been expanding a fiduciary's affirmative duty to disclose material information to plan participants under ERISA.

It is well established that a plan administrator [*67] acts in a fiduciary capacity when it explains plan benefits, even likely future benefits, to its employees. *See, e.g., Varity Corp.*, 516 U.S. at 502-03, 504-05; *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 510-11 (5th Cir. 2001) ("Providing information about likely future plan benefits falls within ERISA's statutory definition of a fiduciary Act."), *cert. denied*, 534 U.S. 822 (2001). The Supreme Court has held that § 404(a) of ERISA, 29 U.S.C. § 1104(a)(1) ("a fiduciary shall discharge his fiduciary duty with respect to a plan solely in the interest of the participants and beneficiaries"), imposes a duty on a plan fiduciary not to affirmatively miscommunicate or mislead plan participants about material matters regarding their ERISA plan. *See, e.g., Varity Corp. v. Howe*, 516 U.S. 489, 493, 505 (1996) (holding that an employer which was also an ERISA Plan administrator breached its fiduciary duty of loyalty to the plan beneficiaries when it deceptively induced them to "switch employers and thereby voluntarily release [the company] from its obligation to provide them benefits"). [*68] In *Varity Corp.*, the Supreme Court proclaimed, "To participate knowingly and significantly in deceiving plan beneficiaries in order to save the employer money at the beneficiaries' expense is not to act solely in the interest of the participants and beneficiaries. . . . Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA"). *Id.* at 506. *See also Martinez v. Schlumberger*, Ltd., 338 F.3d at 425 ("When an ERISA plan administrator speaks in its fiduciary capacity concerning a material aspect of the plan, it must speak truthfully"); *McCall v. Burlington Northern/Santa Fe*, 237 F.3d at 510-11; *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 668 (2d Cir. 1994) (holding that "when a plan administrator speaks, it must speak truthfully").

In *Varity Corp.* 516 U.S. at 506, the Supreme Court chose not to "reach the question whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries." Nevertheless, in that case the Supreme Court found that a plan sponsor, which distributed [*69] materials and called a meeting where it persuaded approximately 1,500 employees to transfer, voluntarily, to positions at a new subsidiary by intentionally misrepresenting that the subsidiary was financially stable and the employees' benefits would be secure, was acting in a fiduciary capacity and violated its fiduciary duties. "While it may be true that amending or terminating a plan is beyond the power of a plan administrator—and, therefore, cannot be an act of plan 'management' or 'administration'—it does not follow that making statements about the likely future of the plan is also beyond the scope of plan administration. . . . [Plan administrators often have, and commonly exercise, discretionary authority to communicate with beneficiaries about the future of plan benefits." *Varity Corp.*, 516 U.S. at 505.

Courts have generally agreed that where an ERISA fiduciary makes statements about future benefits that misrepresent present facts, these misrepresentations are material if they would induce a reasonable person to rely on them. *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122-23 (2d Cir. 1997); *Mullins v. Pfizer*, 23 F.3d at 669; [*70] *Kurz v. Philadelphia Electric Co.*, 994 F.2d 136, 140 (3d Cir. 1993), *cert. denied sub nom Philadelphia Electric Co. v. Fischer*, 510 U.S. 1020 (1993); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 439 (6th Cir. 2002) ("[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing . . . benefits to which she may be entitled."), *cert. denied*, 123 S. Ct. 2077 (2003).

Concern for uninformed and vulnerable plan participants has increasingly led some courts, including the Third Circuit, to conclude that circumstances known to the plan fiduciary can give rise to an expanded affirmative duty to disclose information necessary to protect a participant or beneficiary because that participant or beneficiary "may have no reason to suspect that it should make inquiry into what may appear to be a routine matter." *Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc.*, 93 F.3d 1171, 1181 (3d Cir. 1996). *See also Griggs v. E.I. Dupont De Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001) [*71] ("ERISA administrators have a fiduciary obligation 'not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures.' . . . Moreover, a fiduciary is at times obligated to affirmatively provide information to the beneficiary . . . [including] 'facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection . . . [citations omitted].'"); *Bins v. Exxon Co. U.S.A.*, 189 F.3d 939 (1999) ("We believe that once an ERISA fiduciary has material information relevant to a plan participant or beneficiary, it must provide that information whether or not it is asked a question."), *on rehearing en banc*, 220 F.3d 1042, 1048-49 (9th Cir. 2000) (when a proposed change in retirement benefits becomes sufficiently likely and therefore material, the employer has a duty to provide complete and truthful information); *Schmidt v. Sheet Metal Workers' Nat. Pension Fund*, 128 F.3d 541, 546-47 (7th Cir. 1997) ("A plan fiduciary may violate its duties . . . either by affirmatively misleading plan participants about the [*72] operations of a plan, or by remaining silent in

circumstances where silence could be misleading."), *cert. denied*, 523 U.S. 1073 (1998).

A number of the Circuit Courts of Appeals have held that after an ERISA participant/beneficiary requests information from his plan's fiduciary, who is informed of that participant/beneficiary's circumstances, the fiduciary has a duty to provide full and accurate information material to the participant/beneficiary's situation, including information about which the participant/beneficiary did not specifically ask. *See, e.g., Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 114 (1st Cir. 2002); *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 380-81 (4th Cir. 2001); *Bowerman v. Wal-Mart-Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000); *Krohn v. Huron Memorial Hosp.*, 173 F.3d 542, 547-48 (6th Cir. 1999) ("[A] plan administrator has 'an affirmative duty to inform when it know that silence might be harmful' . . .," including full information about short-and long-term disability benefits when asked about disability benefits generally); *Shea v. Esensten*, 107 F.3d 625, 629 [*73] (8th Cir.) ("When an HMO's financial incentives discourage a treating doctor from providing essential health care referrals for conditions covered under the plan benefit structure, the incentives must be disclosed and the failure to do so is a breach of ERISA's fiduciary duties"), *cert. denied*, 522 U.S. 914 (1997); *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993); *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992) ("A fiduciary must give complete and accurate information in response to participants' questions . . . ."); *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750 (D.C. Cir. 1990) ("At the request of a beneficiary (and in some circumstances upon his own initiative), a fiduciary must convey complete and correct material information to a beneficiary.").

Thus some Circuits have concluded that there is an additional affirmative duty, beyond a full and accurate response triggered by a participant/beneficiary's specific question, to disclose material information to plan participants and beneficiaries. The Third Circuit, one of the most aggressive courts in this area, has held, [*74] "It is a breach of fiduciary duty for an employer to knowingly make material misleading statements about the stability of a benefits plan." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 480 (3d Cir. 2000), *citing In re Unisys Corp. Retiree Med. Benefits "ERISA" Litig.*, 57 F.3d 1255 (3d Cir. 1995), *cert. denied*, 517 U.S. 1103 (1996). "The 'duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'" *Bixler v. Central Pa. Teamsters Health-Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993), *quoted for that proposition by James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 452 (6th Cir. 2002), *cert. denied*, 123 S. Ct. 2077 (2003), *Watson v. Deaconess Waltham Hosp.*, 298 F.3d at 115, n61 *Shea v. Esensten*, 107 F.3d at 381, and *Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1054 (9th Cir. 2000) *(en banc). In accord, Griggs*, 237 F.3d at 381 ("An ERISA fiduciary [*75] that knows or should know that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent . . . ."); *Anweiler*, 3 F.3d at 991 ("Fiduciaries must also communicate material facts affecting the interests of beneficiaries. This duty exists when a beneficiary asks fiduciaries for information, and even when he or she does not."). The Third Circuit has asserted that

> an employer or plan administrator fails to discharge its fiduciary duty in the interest of the plan participants and beneficiaries when it provides, on its own initiative, materially false or inaccurate information to employees about the future benefits of a plan. Under these circumstances, it is not necessary that employees ask specific questions about future benefits or that they take the affirmative step of asking questions about the plan to trigger the fiduciary duty.

*James v. Pirelli*, 305 F.3d at 455; *in accord McGrath v. Lockheed Martin Corp.*, 48 Fed. Appx. 543, 555, Nos. 00-6601, 00-6602, 2002 WL 31269646, *10 (6th Cir. Oct. 9, 2002). *See also* Restatement (Second) of Trusts § 173 [*76] , comment d (1957) (The trustee "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows that the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person . . . ."). The Sixth Circuit has additionally held, "A fiduciary breaches his duty by providing plan participants with materially misleading information, 'regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.' . . ." *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d at 449.

   n61 The First Circuit has imposed two limitations on the concept of an affirmative fiduciary duty to inform ERISA beneficiaries of material facts about their ERISA plan: there must be a particular reason why fiduciary should know that his failure to communicate certain information would be harmful to the beneficiary/participant and a fiduciary does not have to provide unsolicited individual advice, but only advice general to the plan as a whole. 298 F.3d at 114-15.

[*77]

In comparison, in the very few cases in which the Fifth Circuit has addressed a fiduciary duty to disclose, and then only in narrow circumstances, the Fifth Circuit appears to impose such a duty cautiously. Rather than promulgating broad rules, it approaches the issue case by case, examining the facts and circumstances of each to determine the nature and extent of any duty to disclose that should be imposed. Like many courts, it views the plan administrator as having a fiduciary duty to plan participants as a whole, but not to individual participants with particular problems who do not make a specific request for information. The Fifth Circuit has stated, "Absent a specific participant-initiated inquiry, a plan administrator does not have any fiduciary duty to determine whether confusion about a plan term or condition exists. It is only after the plan administrator does receive an inquiry that it has a fiduciary duty to respond promptly and adequately in a way that is not misleading [footnotes omitted]." *Switzer v. Wal-Mart Stores, Inc.*, 52 F.3d 1294, 1299 (5th Cir. 1995) (holding that plan administrator has no duty to give personalized attention to each and every [*78] employee, and in particular to inform a plan participant that he was late in remitting his final COBRA premium).

Nevertheless, in *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995), *cert. denied*, 516 U.S. 1174 (1996), the panel observed, "Section 404(a) imposes on a fiduciary the duty of undivided loyalty to plan participants and beneficiaries, as well as a duty to exercise care, skill, prudence and diligence. An obvious component of those responsibilities is the duty to disclose material information." In *McDonald*, an appellate court held that § 404(a) required the fiduciary to disclose a change in its rate schedule that caused a prohibitive premium to be set because of the impact such a premium could have on small employers, including the plaintiff. Subsequently, in *Ehlmann v. Kaiser Foundation Health Plan of Texas*, 198 F.3d 552, 556 (5th Cir. 2000), *cert. dismissed*, 530 U.S. 1291 (2000) (holding that ERISA does not impose a fiduciary duty on health maintenance organizations to disclose physician compensation and reimbursement schemes to plan participants), n62 the Fifth Circuit described [*79] the imposition of a duty to disclose in *McDonald* as based on the "extreme impact" that the change in rate schedules would have on small employers. The panel observed about *McDonald inter alia*, "Clearly these cases, which adopt a case by case or an *ad hoc* approach, do not warrant the wholesale judicial legislation of a broad duty to disclose that would apply regardless of special circumstance or specific inquiry." *Id.* Thus the Fifth Circuit does recognize that in addition to a specific inquiry from a plan participant, special circumstances with a potentially "extreme impact" on a plan as a whole, where plan participants generally could be materially and negatively affected, might support imposition of such an affirmative duty in a particular case. n63

n62 The situation in *Ehlmann*, which focused narrowly on "why the text, structure, and legislative history of ERISA do not support the imposition [on health maintenance organizations ("HMOs") of a broad *duty to disclose physician compensation plans* [emphasis added]," is distinguishable from claims in *Tittle*. In *Ehlmann*, the panel, applying the canon of statutory construction that specific provisions control over general, pointed out that the general fiduciary provision of § 404 does not mention any duty to disclose, but that ERISA has "numerous other provisions detailing an HMO's disclosure duties [and] that these provisions do not reference physician reimbursement plans." 198 F.3d at 554. The panel reasoned that because Congress could have included such a requirement among these HMO-specific provisions, the absence of a disclosure requirement regarding physician compensation was probably intentional. *Id.* The appellate court stated, "Where ERISA provides a section specifically dealing with a particular information scheme," a court should not supplement that scheme by reference to another provision in another part of the statute. Id.

Here, with respect to the *Tittle* duty-to-disclose claims, there has been no showing of any such related detailed section of provisions in ERISA, so the general duties of § 404 and case law construing them govern.

[*80]

n63 As an example of the growing trend to impose and expand a fiduciary duty to disclose where necessary to protect the plan participants, under the two-hat theory, an employer was traditionally seen as not wearing his fiduciary hat when it adopted or changed a plan, because amendment was viewed as a business decision of a settlor to which ERISA's fiduciary duty law did not apply. Nevertheless, some courts have been eroding the protection of the dual hat rule in the context of plan modification by viewing the employer as an administrator-fiduciary and imposing on it fiduciary duties to act solely in the interest of the participants and beneficiaries, including a duty to disclose information about plan changes, either in response to an inquiry or by recognizing an affirmative duty to advise, *even where a change to the plan may not yet have been formally approved.*

A number of the federal appellate courts have adopted, with various modifications, the "serious consideration" test created by the Eleventh Circuit in *Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir. 1991), *cert. denied*, 502 U.S. 938 (1991), to determine whether a fiduciary obligation to disclose to plan participants the existence of or potential changes to an ERISA plan in response to a plan participant's inquiry has been triggered. *See, e.g., Hockett v. Sun Co., Inc.*, 109 F.3d 1515, 1522-25 (10th Cir. 1997); *Muse v. Int'l Bus. Machs. Corp.*, 103 F.3d 490, 493-94 (6th Cir. 1996), *cert. denied*, 520 U.S. 1240 (1997); *Wilson v. Southwestern Bell Tel. Co.*, 55 F.3d 399, 405 (8th Cir. 1995); *Vartanian v. Monsanto Co. ("Vartanian I")*, 14 F.3d 697, 702 (1st Cir. 1994). The test attempts to "balance the tension between an employee's right to information and an employer's need to operate on a day-today basis." *Hockett*, 109 F.3d at 1522. Under the test, a fiduciary's obligation to inform plan participants upon request about the existence of an ERISA plan or of potential changes to a plan arises at the point that the creation of a plan or proposed alterations to a plan come under "serious consideration." *Id.* If the breach of fiduciary duty claim is based on a misrepresentation, that misrepresentation had to occur when the plan was under serious consideration. *Id.* Three factors have been used to determine if a plan or changes have come under "serious consideration": (1) following initial steps of gathering information, developing strategies and analyzing options, a specific proposal is prepared; (2) practicalities of putting it into effect are being discussed; (3) and the discussion is by senior officials with the authority to effect the change. *Fischer v. Phila. Elec. Co.*, 96 F.3d 1533, 1539 (3d Cir. 1996); *basically in accord, McAuley v. IBM Corp.*, 165 F.3d 1038, 1043-45 (6th Cir. 1999); *Hockett*, 109 F.3d at 1523; *Vartanian v. Monsanto Co. ("Vartanian II")*, 131 F.3d 264, 268 (1st Cir. 2003).

The Second Circuit considers "serious consideration" as one factor in determining materiality, but not a determinative one; it has adopted "the simple view that when a plan administrator speaks, it must speak truthfully, regardless of how seriously any changes are being considered." *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 120, 122-24 (2d Cir. 1997) (holding that an employer can be liable for misrepresentation regarding a potential future retirement enhancement program even if it was not under serious consideration; the employer's statements about future benefits "are material if they would induce reasonable reliance").

Turning to securities law for guidance on the issue of the materiality of the employer's alleged misrepresentations, the Second Circuit identified the following as some specific factors:

> how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes; the special relationship of trust and confidence between the plan fiduciary and beneficiary; whether the employee was aware of other information or statements from the company tending to minimize the importance of the misrepresentation or should have been so aware taking into consideration the broad trust responsibilities owed by the plan administrator to the employee and the employee's reliance on the plan administrator for truthful information; and the specificity of the assurance. Whereas mere mispredictions are not actionable, false statements about future benefits may be material if couched as a guarantee, especially where, as alleged here, the guarantee is supported by specific statements of fact.

*Id.* at 125 (citations omitted). In *Wayne v. Pacific Bell*, 238 F.3d 1048, 150-51, 1055 (9th Cir. 2001), *cert. denied*, 534 U.S. 814 (2001), the Ninth Circuit adopted the Second Circuit's approach.

Others have rejected the idea of an affirmative duty to disclose potential plan changes absent an inquiry from a plan participant. *See, e.g., Bins v. Exxon Co. U.S.A.*, 220 F.3d at 1048-49 (holding that plan amendment is not plan management or administration, that "an employer's serious consideration of a change to a plan does not, in and of itself, implicate ERISA fiduciary duties," but that "when an employer communicates with its employees about a plan, fiduciary responsibilities come into play"). Nevertheless, the Ninth Circuit *en banc* indicated that outside of plan modification, it would still find "the existence of other 'affirmative' disclosure duties of an employer-fiduciary." *Id.* at 1053, n. 10, *citing inter alia Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995) ('holding that an ERISA fiduciary has a duty to investigate suspicions he has with respect to plan funding and maintenance, and that failing to convey information concerning those suspicions when re-

sponding to participants' inquiries can be construed as an affirmative misrepresentation").

In the recently issued *Schlumberger*, 338 F.3d at 416-25, the Fifth Circuit provided a lengthy and detailed review of the development of the serious consideration test. The Fifth Circuit, citing *Varity Corp.*, opined that

> when an employer chooses, in its discretion, to communicate about future plan benefits, it does so as an ERISA fiduciary. In speaking it is exercising discretionary authority in administration of the plan, a specifically enumerated fiduciary function under ERISA. . . . When an ERISA plan administrator speaks in its fiduciary capacity concerning a material aspect of the plan, it must speak truthfully.

*Id.* at 424-25. The panel flatly rejected the serious consideration test and concluded,

> We cannot agree that misrepresentations are actionable only after the company has seriously considered the plan change. *Varity* does not suggest that the obligation not to misrepresent materializes near the end of a progression, but rather implies that whenever an employer exercises a fiduciary function, it must speak truthfully. Nor do we find a safe harbor for predictions of the future. When an employer speaks to the future of a plan, employees are justified in concluding that it is backed by the authority of a plan administrator, and should therefore be entitled to trust in those representations.

*Id.* at 425 ("we reject the view that the duty to speak truthfully only arises once the employer begins seriously considering a plan"). Instead the Fifth Circuit adopted "a fact-specific approach akin to that promulgated by the Second Circuit in *Ballone* and followed by the Ninth Circuit in *Wayne. Id.* at 428. The overarching question in such an analysis is whether there is a substantial likelihood that a reasonable person in the plaintiffs' position would have considered the information an employer-administrator allegedly misrepresented important in making a decision to retire." *Id.* at 428. It did note that "the more seriously a plan is being considered, the more likely a representation about the plan is material." *Id.* Nevertheless, the Fifth Circuit has held that otherwise an employer has no affirmative duty to disclose that it is considering amending its plan. *Id.*

[*81]

The *Tittle* Plaintiffs complain not only of general material misrepresentations regarding Enron's financial condition and the inducement to purchase or hold Enron stock, but also of particular employee meetings held in which certain Defendants urged plan participants to continue their employment and purchase or hold Enron stock as part of Defendants' larger scheme to enrich themselves. Indeed, among the "predicate acts" alleged under their RICO claims, as factual support for their interstate transportation of persons and property in order to defraud, Plaintiffs claim that the Enron Insider Defendants, Arthur Andersen Defendants, and some Investment Banking Defendants conspired to induce Enron employees "to travel . . . in the execution of the wrongful scheme alleged herein, . . . to Houston, Texas, to attend meetings conducted by the Enron Insider Defendants at which ECSP participants were reassured that their 401(k) funds were safely invested and that they should hold and maintain their investments in Enron stock." (Complaint at 281-82, P796). The facts and holding in *Varity Corp.* have relevance here.

Mindful of Congress' balanced intent in enacting ERISA "'to offer employees [*82] enhanced protection for their benefits, on the one hand, and, on the other, . . . not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place," in *Schlumberger*, 338 F.3d at 413-16, the Fifth Circuit discussed *Varity Corp. v. Howe*, 516 U.S. 489, in some detail in the context of an employer/administrator/fiduciary's duty to disclose to plan participants future changes to their ERISA plan.

According to the Fifth Circuit, in *Varity Corp.*, former employees of Varity Corporation's subsidiary Massey-Ferguson, Inc. sued Varity, alleging that "Varity Corporation had affirmatively represented to them that their benefits would remain secure if they transferred to a new subsidiary, Massey Combines." *Schlumberger*, 338 F.3d at 414, citing *Varity*, 516 U.S. at 492-93. In fact Varity created Massey Combines in order to transfer Massey-Ferguson's money-losing divisions, including its benefit plans, and other debts to Massey Combines with the expectation that Massey Combines would fail. In order to convince the plan [*83] beneficiaries to switch to Massey Combines, Varity had a special meeting with the employees and promised that their benefits would remain

secure if they transferred, even though Varity knew the result would be quite different. Approximately 1500 employees relied on these promises and made the transfer; Massey Combines went into receivership within a couple of years and those employees lost their benefits. *Id.* at 414, citing *id.* at 494. Although Varity argued that it was wearing its settlor/employer hat when it urged Massey-Ferguson's employees to switch to Massey Combines, the Supreme Court concluded otherwise and found that when Varity convened the meeting to represent that the transfer would not threaten their benefits, it was acting in its fiduciary capacity as a plan administrator. *Id.* at 415, citing *id.* at 501-02. The high court opined that "'Varity was exercising 'discretionary authority' respecting the plan's 'management' or 'administration' when it made these misrepresentations'" and that "'conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be [*84] an exercise of a power 'appropriate' to carrying out an important plan purpose.'" *Id.* at 415, citing *id.* at 498, 502. Emphasizing that fiduciary duties primarily constrain the exercise of discretionary authority operating beyond duties laid out in the express terms of plan instruments, the Supreme Court emphasized the ERISA fiduciary's duty of loyalty and concluded that Varity had breached that duty in "'participating knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense'" and lying to the employee participants. *Id.* at 415-16, citing *id.* at 506.

Although the facts in *Varity Corp.* are not precisely on point with those in the instant suit, there are sufficient parallels with the *Tittle* Plaintiffs' allegations to state a claim for breach of fiduciary duty in their representations to employees in these meetings.

This Court concludes that in light of the fiduciary's duties of loyalty and of care, skill, prudence, and diligence, the *Tittle* plaintiffs have stated a claim generally for breach of a fiduciary duty to disclose based on material information in various ERISA counts, implied [*85] or express; they have asserted that Defendants breached their fiduciary duty regarding Enron's alleged fraudulent accounting, concealment of its deceitful business practices and of the company's precarious, swiftly deteriorating financial condition, and Defendants' alleged representations knowingly intended to induce the plan participants' continued participation in pension plans' purchase and holding of Enron stock, which were known or should have been known to plan fiduciaries. They have alleged with supporting facts that disclosure was essential to protect the interests (retirement assets) of plan participants and beneficiaries from the threat of substantial depletion. Plaintiffs have specifically alleged that Lay, Olson, the Compensation Committee, the Enron ERISA Defendants, and Enron breached their fiduciary duty under ERISA by failing to disclose information about Enron's dangerous financial condition that they knew or should have known n64 to plan participants, the Administrative Committee, or plan counsel, while these Defendants were individually selling large amounts of their own Enron holdings.

> n64 According to the complaint, not only did Sherron Watkins inform both Lay and Olson personally about what she saw as dangerous accounting irregularities that might result in catastrophe for the company, but Olson purportedly learned that Fastow wanted to fire Watkins for her disclosures and ordered that Watkins' computer be seized. Despite her fiduciary duties, Olson did nothing. Plaintiffs' Memorandum in Opposition, # 315 at 38, quotes Judge Cardoza in *Globe Woolen Co. v. Utica Gas and Electric Co.*, 224 N.Y. 483, , 121 N.E. 378, 380 (N.Y. 1918): "The trustee is free to stand aloof, while others act, if all is equitable and fair. He cannot rid himself of the duty to warn and denounce, if there is improvidence or oppression, either apparent on the surface, or lurking beneath the surface, but visible to his practiced eye."
>
> Furthermore among the red flags, Plaintiffs assert that had the fiduciaries cared to investigate, as was their fiduciary duty, regulatory filings would have revealed that Enron was in deep trouble. *See, e.g.*, "Enron Short Seller Spotted Trouble Ahead of the Crowd," *The Wall Street Journal*, November 6, 2001 (detailing how one analyst had discovered from a careful review of Enron's regulatory filings that Enron was a "hedge fund in disguise" whose stock price would ultimately tumble). # 315 at 37. Administrative Committee members owe "the highest duty known in the law." *Bierwirth*, 680 F.2d at 272. Plaintiffs scoff at Defendants' contention that they are "no different" from Plaintiffs and are also "victims" of the scheme like the defrauded shareholders, employees, and the market; Plaintiffs insist Defendants are not like Plaintiffs because Defendants had, but failed to discharge, their duties as Plan fiduciaries loyally and prudently.
>
> In their Memorandum in Opposition, # 315 at 39-40, referencing a memorandum from Defendant Max Hendrick, III of Vinson & Elkins following his August 29, 2001 interview of Defendant Paula Rieker, Plaintiffs state that they have recently learned that Rieker, who was Enron's Managing Director of Investor Relations, learned as early as 1999 of issues relating to Fastow's conflicted role in the LJM partnerships, Whitewing, and other related

party transactions that were utilized to hide Enron's actual financial condition. The memorandum also reflects that Rieker, through Vinson & Elkins' investigation, learned of Watkins' allegations of specific accounting improprieties involving Raptor and other related party transactions and thus by the end of August 2001 knew of Watkins' allegations, like Olson and Lay. Plaintiffs have also learned that Defendant Lindholm, an Enron Accounting executive, signed off on the "LJM Approval Sheet" that approved Enron's participation in transactions involving LJM1 and LJM2, entities used to defraud investors about Enron's precarious and illicit financial practices. The complaint charges these fiduciaries generally with failure to discharge their fiduciary duties to participants; while the new, specific allegations are not currently included in the consolidated complaint, as in *Newby*, in the interests of justice, this Court will permit *Tittle* Plaintiffs to replead to include them.

[*86]

Certain Committee and Outside Directors ("Compensation Committee") Defendants n65 have argued that if these Defendants met their duty of loyalty by selectively disclosing only to the plan participants non-public information about material accounting irregularities and financial improprieties, so that the participants could make an informed decision not to purchase additional shares or to sell their currently held shares of Enron stock before the market and the public found out and the price plunged, Defendants would be violating insider trading laws under the federal securities laws. n66

> n65 "Certain Committee Defendants" are the members of the Administrative Committees for Enron pension plans: Philip J. Bazelides, Keith Crane, Rod Hayslett, Mary K. Joyce, Shiela Knudsen, Tod A. Lindholm, James S. Prentice, Paula Rieker, and David Shields. As noted previously, the four Outside Directors against whom Plaintiffs assert ERISA claims are Blake, Duncan, Jaedicke and LeMaistre, all members of the Compensation and Management Development Committee of the Enron Board of Directors.

> n66 As will be discussed in greater detail later, under 29 U.S.C. § 1104(c), where a plan allows participants to control and manage their plan assets and meets certain requirements that qualify it as a "§ 404(c) plan," the directing participant will not be deemed a fiduciary and neither the participant nor the trustee/plan administrator would be liable for any loss that results from the plan participant's exercise of that control over the assets in his individual account. The statute is regulated by 29 C.F.R. § 2550.404c-1; subsection (c)(2) of the regulation provides that a participant's control of his investment decisions does not meet the requisite element of independence to qualify as a § 404(c) plan if a "plan fiduciary has concealed material non-public facts regarding the investment from the participant," unless disclosure would violate federal or state law that is not preempted by ERISA, such as the securities laws. As will be discussed subsequently, Plaintiffs have raised material issues of fact as to whether the Savings Plan would qualify as a § 404(c) plan. But assuming for this purpose that it does, and that the alleged material nondisclosure by Defendants were true, the issue is whether disclosure of the alleged material, non-public facts by Defendants about Enron's business practices and accounting fraud would necessarily violate insider trading laws under § 10b and Rule 10b-5. If so, Defendants would not be liable.

[*87]

Rule 10b-5, 17 C.F.R. § 240.10b-5, requires that a corporate insider, because he owes a fiduciary duty to shareholders, either disclose material non-public information publicly or abstain from trading his own shares for personal gain. *See, e.g., Chiarella v. United States*, 445 U.S. 222, 226-29 (1980). *See, generally*, # 1269 at 8-12 in *Newby*, H-01-3624. Furthermore, if a plan fiduciary were to tell plan participants of Enron's actual financial condition so they could sell at a high price based on this nonpublic information, he would also be violating insider trading laws and he, the plan participants as "tippees," and the Administrative Committee might be found liable of securities law violations. *See* 15 U.S.C. § 78u-1(a)(1)(B) (imposing civil penalties for insider trading against a person who directly or indirectly controlled a person who sold a security while in possession of such material, nonpublic information or violated the law in communicating such information) & (b)(1)(A) (imposing controlling person liability where the "controlling person knew or recklessly disregarded the fact that such controlled [*88] person was likely to engage in the act or acts constituting the violation and failed to take appropriate steps to prevent such act or acts before they occurred").

As authority for their argument, these Defendants cite two unpublished opinions, *Hull v. Policy Management Systems Corp.*, No. CIV.A.3:00-778-17, 2001 WL 1836286 (D.S.C. Feb. 9, 2001), and *In re McKesson HBOC, Inc. ERISA Litigation*, No. C00-2003RMW, 2002 WL 31431588, *6 (N.D. Cal. Sept. 30, 2002). In *Hull*