clude an order providing for reinstatement of an employee with back pay or for "the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions." ... The fact that a judicial remedy may require one party to pay money to another is not sufficient reason to characterize the relief as "money damages." Thus we have recognized that relief that orders a town to reimburse parents for educational costs that Congress intended the town to pay is not "damages."

487 U.S. at 893-94. Moreover, quoting from Judge Robert Bork in *Maryland Dept. of Human Resources v. Department of Health and Human Services*, 763 F.2d 1441 [1445-46] (D.C. Cir. 1985), regarding the fact that payment of money is not necessarily money damages, the *Bowen* majority further stated,

> "The term 'money damages' . . . normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he is entitled.' D. Dobbs, *Handbook on the Law of Remedies*, 135 (1973). Thus, while in many instances an award of money is an award of damages, 'occasionally a money award is also a specific remedy.' *Id.* Courts frequently describe equitable actions for monetary relief under a contract in exactly such terms. [Citing cases that allowed specific performance of a contract to borrow money, contrasting lump-sum damages for breach of promise to pay monthly support payments with an order decreeing specific performance as to future installments, and specific performance of a promise to pay a money bonus under a royalty contract."

*Id.* at 895.

Judge Scalia wrote a significant and predictive dissent to *Bowen*, and subsequently authored the majority opinion in *Great-West Life*, which narrowed the concept of restitution by returning to that "typically available in equity." *Great-West*, 534 U.S. at 210. In his dissent in *Bowen*, which reveals the seeds of *Great-West Life*, he asserted that there was an historical distinction between money damages, which "compensate the plaintiff for a loss," and specific relief, which "prevents or undoes the loss—for example, by ordering return to the plaintiff of a precise property that has been wrongfully taken or by enjoining acts that would damage the plaintiff's person or property." 487 U.S. at 914. He found that Maryland "sought money to compensate for the monetary loss it sustained by expending resources to provide services to the Government in reliance on the Government's contractual duty to pay," in other words, a "suit for money damages." *Id.* at 917. He characterized it as "a suit seeking to recover a past due amount of money that does no more than compensate a plaintiff's loss," i.e., "a suit for damages, not specific relief." *Id.* at 918.

[*209]

In *Great-West Life & Annuity Ins Co. v. Knudson*, 534 U.S. 204 (2002) (5-4 opinion), under § 502(a)(3) a medical insurance company sought specific performance of a reimbursement provision in an ERISA health insurance plan to compel a plan beneficiary to pay the proceeds the beneficiary recovered from a third-party tortfeasor in the settlement of a personal injury suit, as restitution for benefit payments previously made by the plan. The Supreme Court held that § 502(a)(3) did not authorize such relief, which in actuality was a legal remedy imposing personal liability on the beneficiary and his wife for a contractual obligation to pay past due money, relief not typically available in equity court.

Justice Scalia, this time writing for the majority of the high court (Justices Scalia, Rehnquist, O'Connor, Kennedy, and Thomas joining), construed § 502(a)(3)'s remedy of "other appropriate equitable relief" to redress violations or enforce provisions of ERISA and the plan. He examined remedies that, depending upon the circumstances, might be characterized as legal or equitable, such as restitution, and recognized what he concedes was, for the Supreme Court, a new "fine [*210] distinction between restitution at law and restitution in equity." *Id.* at 214-15. The majority's decision limited equitable restitution to remedies historically available in the courts of equity when they were separate from courts of law, substantially narrowing the availability of monetary relief under § 502(a)(3). Furthermore Justice Scalia reiterated the holding in *Mertens* that "the term 'equitable relief' in § 502(a)(3) must refer to 'those categories of relief that were *typically* available in equity.'" *Great-West*, 534 U.S.

at 219, *quoting Mertens*, 508 U.S. at 256. He observed that where a plaintiff seeks to impose personal liability on a defendant for a contractual obligation, the relief sought is not that typically available in equity, but in an action at law, because money damages "are the classic form of *legal* relief." *Id.* at 205, 210, *quoting Mertens*, 508 U.S. at 255. Expanding beyond contracts, he emphasized for the majority of the divided high court, "Almost invariably suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff [*211] are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Id., citing* Scalia's dissent in *Bowen*, 487 U.S. at 918-19. n97 Moreover, not all relief characterized as restitution or injunction was available in equity. *Id.* at 209-10, *quoting Mertens*, 508 U.S. at 258 n.8 ("'equitable relief must mean *something* less than *all* relief"). According to the majority, an action for restitution in equity, by means of an equitable lien or a security interest or a constructive trust, is appropriate in equity only where the plaintiff in good conscience is the true owner and the particular property being sought is identifiable and in the hands of the defendant; a court in equity could then order transfer of title (imposing a constructive trust) or of a security interest (enforcing an equitable lien) to the true owner. *Id.* at 213. n98 The defendant may have already disposed of the property at issue; the high court concluded that an action for disgorgement of proceeds is appropriate only where the defendant still holds those identifiable [*212] proceeds. The majority reasoned, "Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214-15. Furthermore, if the property that the plaintiff sought to recover or its proceeds has been dissipated, so that no property remains, the plaintiff's claim is only that of a general creditor and he cannot seek equitable remedies such as a constructive trust or a lien. *Id.* at 214.

> n97 For that reason, "an injunction to compel payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity." *Id.* at 210.

> n98 In contrast to the situation where a plaintiff could claim title or right to possession of identifiable property, where the plaintiff demonstrated that he was entitled to recover money for some benefit or service that a defendant had received from the plaintiff, the traditional right to restitution was at law through an action arising out of a common-law writ of assumpsit. *Id.* at 214-15. Thus the claim was legal rather than equitable because the plaintiff sought a judgment imposing personal liability on the defendant to pay money.

[*213]

A number of courts have applied the *Great-West Life* holding to dismiss claims under ERISA's § 502(a)(3). *See, e.g., Gerosa v. Savasta & Co.*, 329 F.3d 317 (2d Cir. 2003) (money sought as reimbursement from a loss in the plan based on the alleged negligent advice of an actuary was held to be consequential money damages since the money was never within the actuary's possession and thus restitution was not "appropriate equitable relief"), *petition for cert. filed* (Aug. 14, 2003, No. 03-263); *Rego v. Westavco Corp.*, 319 F.3d 140, 145 (4th Cir. 2003) (specific performance in the form of issuance of more company stock sought by terminated plan participant to make up the difference in valuation of his interest in his savings plan on the date he was initially entitled to a distribution and the date one month later when the distribution was actually made was held to not constitute "appropriate equitable relief" under ERISA because defendants possessed no particular fund or property clearly identifiable as belonging in good conscience to plaintiff and because defendants no longer possessed plaintiff's share in the savings plan); *Bauhaus USA, Inc. v. Copeland*, 292 F.3d 439 (5th Cir. 2002) [*214] (affirming dismissal of an ERISA plan administrator's declaratory judgment suit to enforce a reimbursement clause of the plan in order to obtain part of the settlement funds recovered in a plan participant's tort suit against a third party because the funds were no longer in the defendant's possession, but in a court registry, and thus the claim was for legal relief); *Wellmark, Inc. v. Deguara*, 257 F. Supp. 2d 1209, 1216 (S.D. Iowa 2003) ("This Court finds the possession theory is the correct reading of *Great-West*. That is, attempts by an ERISA plan or insurer to recover settlement proceeds to which it is entitled under a subrogation or reimbursement provision are only prohibited under § 502(a)(3) if the insured is not in possession of clearly identifiable proceeds," i.e., to make him whole.)

With respect to Count IV, n99 Plaintiffs, apparently drawing on an *amicus curiae* brief filed by the Secretary of Labor in another suit, seek to escape the reach of *Great-West* by arguing that under the common law of trusts, where a beneficiary sues a fiduciary for breach of fiduciary duty, equity required the fiduciary to restore the beneficiary to "the position he [*215] would have been if the trustee had not committed the breach of trust." Restatement (Second) of Trusts § 205, cmt. a (1959). Section 205 provides,

> If the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit that would have accrued to the trust estate if there had been no breach of trust.

Comment a, addressing "alternative remedies for breach of trust," states,

> If the trustee commits a breach of trust, the beneficiary may have the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust; or of pursuing a remedy which will give him any profit which the trustee has made by committing the breach of trust; or of pursuing a remedy which will put him in the position in which he would have been if the trustee had not committed the breach of trust. These three types of remedies are not always distinct and are not always all of them available. . . .

Comment c, which addresses § 205(a), [*216] provides in relevant part, "If as a result of his breach of trust, trust property is destroyed or lost, the trustee is chargeable with the value of the property so destroyed or lost." *See also* Restatement (Second) of Trusts § 199 (1959) (entitled "Equitable Remedies Of Beneficiary," which includes a suit "to compel the trustee to redress a breach of trust."); *Id.* § 197 ("Except as stated in § 198, the remedies of the beneficiary against the trustee are exclusively equitable."); *Id.*, § 198 (listing "Legal Remedies Of Beneficiary," cmt. a (stating that beneficiary has concurrent legal and equitable remedies against the trustee). The *Tittle* Plaintiffs distinguish *Mertens* and *Great-West* on the grounds that those suits grounded in § 502(a)(3) were actions against non-fiduciaries; monetary relief in such circumstances was legal relief, even though a court of equity had the power to grant it. n100 They urge that if the Court adopts the restrictive reading of equitable relief urged by Defendants' construction of *Great-West*, they and many other beneficiaries would be without remedy for serious breaches of duty by plan fiduciaries. [*217] n101

>       n99 The other ERISA Counts for breach of fiduciary duty are brought on behalf of the plans and seek "appropriate relief" under § 502(a)(2), 29 U.S.C. 1132(a)(2).
>
>       n100 Plaintiffs cite Scott & Fraher § 282, at 30 for the proposition that when a beneficiary sues both a trustee/fiduciary and a non-fiduciary for injuring the trust in the same transaction, the beneficiary may bring an equity action to enforce equitable rights against the fiduciary and a legal action to enforce legal rights against the non-fiduciary, simultaneously in the same court. *See also* Restatement (Second of Trusts) § 282 cmt. e.
>
>       n101 The argument that many beneficiaries will not have a remedy in a federal forum apparently holds little weight with the majority in *Great-West*. This Court observes that in their dissents to *Great-West*, Justice Stevens and Justice Ginsberg (joined by Justices Stevens, Souter, and Breyer) objected to the majority's interpretation of § 503(a)(3) as *limiting* the relief available rather than enlarging it. 534 U.S. at 222, 224. Justice Stevens complained that the effect of the majority's interpretation of "equitable" is "to treat as dispositive an ancient classification unrelated to the substance of the relief sought; and to obstruct the general goals of ERISA by relegating to state court (or to no court at all) an array of suits involving the interpretation of employee health plan provisions. *Id.* at 224. Similarly Justice Ginsberg's dissent objected to what she regarded as "the conflict between the Court's holding and Congress' stated goals in enacting ERISA":
>
>> After today, ERISA plans and fiduciaries unable to fit their suits within the confines the Court's opinion constructs are barred from a federal forum; they may seek enforcement of reimbursement provisions like the one here at issue only in state court. Many such suits may be precluded by antisubrogation laws, . . . others may be preempted by ERISA itself, and those that survive may produce diverse and potentially contradictory interpretations of the disputed plan terms.
>
> *Id.* at 227. The dissenters also detailed how in their view the majority opinion in *Great-West* was contrary to the high court's holdings in previous cases, including *Mertens, Varity Corp., Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), and *Tull v. United States*, 481 U.S. 412 (1987). *See generally* 534 U.S. at 227-34.

[*218]

Searching for further support in treatises for their contention that they seek an equitable remedy against fidu-

ciary Defendants for breach of their obligations of loyalty and prudence, Plaintiffs quote G. Bogert, *The Law of Trusts and Trustees* § 861 at 3-4 (Rev. 2d ed. 1995):

> Equity is primarily responsible for the protection of rights arising under trusts and will provide the beneficiary with whatever remedy is necessary to protect him and recompense him for the loss, in so far as this can be done without injustice to the trustee or third parties.

They also cite 3 A. Scott & W. Fraher, *The Law of Trusts* § 199 at 203-04, 206 (4th ed. 1988), characterizing payment of money to redress a fiduciary's breach as an "equitable" remedy available to the beneficiary.

Plaintiffs also rely on a Fifth Circuit case, *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321 (5th Cir. 1992), cert. denied, 506 U.S. 1033 (1992), n102 which they claim demonstrates that a fiduciary's duty to a beneficiary is equitable and that the remedies for breach of that duty (monetary make-whole relief under trust law principles) are not within the definition [*219] of "money damages" as defined by Justice Scalia in *Bowen*, 487 U.S. at 913 ("The term 'damages' refers to money awarded as reparation for injury resulting from breach of *legal* duty [emphasis added]."). In *Corcoran*, 965 F.2d at 1336, written ten years before *Great-West* was issued, the Fifth Circuit wrote about "other appropriate equitable relief" under § 502(a)(3)

> The characterization of equitable relief as encompassing damages necessary to make the plaintiff whole may well be consistent with the trust law principles that were incorporated into ERISA and which guide its interpretation. . . . Section 205 of the Restatement (Second) of Trusts allows for monetary damages as make whole relief, providing that a beneficiary has "the option of pursuing a remedy which will put him in the position in which he was before the trustee committed the breach of trust" or "of pursuing a remedy which will put him in the position in which he would have been if the trustee had not committed the breach of trust." In the context of the breach of a trustee's investment duties, "the general rule [is] that the object [*220] of damages is to make the injured party whole, that is, to put him in the same condition in which he would have been if the wrong had not been committed. . . . Both direct and consequential damages may be awarded. . . . [citations, some to the same sources as are relied upon by the *Tittle* Plaintiffs, omitted]

*Id.* at 1336. Moreover, in view of the preemption by ERISA of the plaintiffs' tort claim, the appellate court concluded that assuming that make-whole relief "is a proper construction of that section," it was not available to the plaintiffs because such extracontractual, make-whole damages for emotional distress and mental anguish are not available on a contract between a patient and a physician unless there is an express agreement to perform a particular service or achieve a particular cure, not present in the plan booklet, as well as the fact that it was "dubious" whether the relationship at issue constituted a fiduciary doctor-patient relationship that would support a contractual theory of recovery. *Corcoran*, 965 F.2d at 1336-38. It further wistfully noted that plaintiffs "have no remedy, state or federal, for what may have been [*221] a serious mistake." *Id.* at 1338.

> n102 In *Corcoran*, originally filed in state court and removed to federal court on ERISA preemption grounds, the parents of a fetus, which died after an employee disability plan concluded that hospitalization of the expectant mother was unnecessary and thus not covered by the plan, brought a wrongful death suit against the provider of utilization review services to the plan based on its allegedly erroneous decision. The district court granted summary judgment to the defendant on the grounds that the medical malpractice claim was preempted by ERISA, which barred any recovery of emotional distress damages. On appeal, the Fifth Circuit affirmed, finding that ERISA preempted the state-law cause of action and that money damages for emotional distress were "extracontractual damages" not available under ERISA. Although the original state court petition did not seek relief under § 503(a)(2), the parents filed a motion for reconsideration and requested damages under this provision.

[*222]

In *Corcoran*, however, the Fifth Circuit did not conclude as a certainty that make-whole relief is available under § 502(a)(3), but entertained it as a possibility, as it indicated in a later opinion. *Rogers v. Hartford Life and Acc. Ins. Co.*, 167 F.3d 933, 944 (5th Cir.1999) ("In *Corcoran*, we assumed without deciding, that the 'other appropriate equitable relief' provided for in section 502(a)(3) encompassed 'damages necessary to make the plaintiff whole.'"). Five years after *Corcoran*, after the issuance of *Mertens* but still before *Great-West*, the Fifth Circuit concluded in

Case 3:01-cv-01737-MRK     Document 52-33     Filed 10/16/2003     Page 5 of 15

Page 65
2003 U.S. Dist. LEXIS 17492, *222

*Rogers* that under *Mertens*, 508 U.S. at 255, such "make whole" relief was actually compensatory, i.e., legal, relief not recoverable under § 502(a)(3). 167 F.3d at 944.

More to the point of Plaintiffs' argument that they are entitled to "make-whole" monetary relief under § 502(a)(3), in *Rogers*, 167 F.3d at 944, the Fifth Circuit opined that it was not typical equitable relief:

> Although our decision in *Corcoran* may have "left the door open" to the possibility of recovering certain extra-contractual damages necessary [*223] to make a plaintiff whole, the Supreme Court firmly closed this door in *Mertens* . . . . In *Mertens*, the Supreme Court rejected the petitioners' arguments that ERISA permitted a remedy calculated to make them whole, holding that ERISA does not permit recovery of compensatory damages. As the Supreme Court stated,
>
>> Petitioners maintain that the object of their suit is "appropriate equitable relief" under § 502(a)(3) . . . . They do not, however, seek a remedy traditionally viewed as "equitable," such as an injunction or restitution. . . . Although they often dance around the word, what petitioners seek is nothing more than compensatory damages for all losses their plan sustained as a result of the alleged breach of fiduciary duties. Money damages are, of course, the classic form of legal relief. . . .

*Rogers*, 167 F.3d at 944, *quoting Mertens*, 508 U.S. at 255. The Fifth Circuit concluded, "Thus compensatory damages, whether extra-contractual or not, are not recoverable under ERISA." *Id.* This conclusion came even before *Great-West's* restrictive definition of equitable restitution.

Furthermore *Tittle* Plaintiffs urge that [*224] *Mertens* and *Great-West* were not suits against an employer/fiduciary for an alleged breach of fiduciary duty, but only suits against a non-fiduciary for unjust enrichment, unlike *Tittle* Plaintiffs here. The Court finds that *Tittle* Plaintiffs' distinction is without merit. In *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138 (2d Cir. 1999) (holding that "equitable relief" or "make-whole" relief under § 502(a)(3) includes compensatory damages for breach of fiduciary duty), another *pre-Great-West* case, the Second Circuit reviewed an action and agreed with many of the same arguments put forth by *Tittle* Plaintiffs here. It concluded that under § 502(a)(3) a half a million dollars was recoverable as "equitable relief." The "make-whole" relief in *Strom* was money that a plaintiff/widow would have received in life insurance proceeds under the terms of an ERISA plan had her deceased husband's employer not breached its fiduciary duty by failing to send timely his application to the insurer, with the result that the husband's life insurance did not become effective before his death. The Second Circuit found that the monetary relief sought was like that traditionally [*225] sought in an equitable action to enforce duties of loyalty and prudence owed by a fiduciary to a trust. After a lengthy and detailed analysis based on the same basic argument as *Tittle* Plaintiffs make here, the Second Circuit described the action as follows:

> Here, the gravamen of the claim against Goldman is not that it holds property which in equity and good conscience belongs to the plaintiff and which must be surrendered to avoid unjust enrichment. Rather the claim is that Goldman was a fiduciary within the meaning of ERISA and that it breached its fiduciary duty. Its analog is the conventional action by a *cestui que trust* against a trustee for breach of trust.
>
> Claims of this sort do not depend upon the fiction of constructive trusts but on the positive duties of loyalty and prudence owed by fiduciaries to their beneficiaries. They have lain at the heart of equitable jurisdiction from time immemorial.

*Id.* at 144.

In the aftermath of *Great-West*, however, although the Second Circuit has not re-examined its holding in *Strom*, several of its district courts have and have concluded that it has been abrogated. For example, in *Kishter v. Principal Life Ins. Co.*, 186 F. Supp. 2d 438, 444-45 (S.D.N.Y. 2002) [*226] (granting summary judgment to defendants on a claim brought by an executor of an ERISA beneficiary's estate, who sued to recover money that the beneficiary would have received if the defendants had not allegedly breached their fiduciary duty by failing to provide information about a life insurance policy), the district court concluded that "there is substantial reason to believe that *Great-West Life* has repudiated *Strom* and its reasoning" and documented how the majority of the Supreme Court in *Great-West* "expressly rejected" each of the arguments on which the *Strom* decision was founded. n103 In *De Pace v. Matsushita Elec. Corp. of America*, 257 F. Supp. 2d 543, 561-63 (E.D.N.Y. 2003), the court found that the monetary relief sought by former

employees claiming that they were fraudulently induced by their employer to participate in a voluntary resignation program was a tort-related monetary remedy that did not constitute "equitable relief" under § 502(a)(3) as construed in *Great-West*. Furthermore, in *Bona v. Barasch*, No. 01 CIV. 2289 (MBM), 2003 WL 1395932 (S.D.N.Y. Mar. 20, 2003), individual participants and beneficiaries of union [*227] employee benefit funds sued the funds' trustees, as well as the companies and officers involved in the management and investment services to those funds *inter alia*, claiming they had manipulated the services contracts to increase the fees and enrich themselves, i.e., failed to manage the funds prudently. The district court announced that "*Strom's* holding cannot be reconciled with *Great-West*," and addressed the specific distinction argued by *Tittle* Plaintiffs:

> On the surface *Strom* might be distinguished from *Great-West* because *Strom* involved an alleged breach of fiduciary duty, and "an alleged breach of fiduciary duty always has been within the exclusive jurisdiction of equity." *Strom*, 202 F.3d at 145. However the broad language in *Great-West* suggests otherwise.

*Id.* at *11, *citing Kishter*, 186 F. Supp. 2d at 444-45. The *Bona* judge concluded that the individual plaintiffs' request for monetary relief from the trustees was barred. *Id.*

> n103 These included *Great-West's* rejection of (1) the contention that "'the special equity-court powers applicable to trust define the reach of § 502(a)(3)'"; (2) that there is equitable restitution outside of restoration of money or property identified as belonging in good conscience to the plaintiff that can be traced to money or property still in the defendant' possession; (3) that equitable remedies include what were in actuality forced monetary payments (of insurance proceeds); (4) the analogy of such monetary relief to back-pay under Title VI; and the argument that under the statements in *Varity Corp.*, § 502(a)(3) had be read broadly to provide catch-all remedies for ERISA violations that were not covered by the other provisions in § 502(a). *Id.* at 444-45.

[*228]

The Fourth Circuit also has applied the holdings in *Mertens* and *Great-West* to a suit asserting breach of fiduciary duty and rejected the contention that "any remedy, when sought for breach of fiduciary duty, is always an equitable remedy." *Rego v. Westvaco Corp.*, 319 F.3d 140, 145 (4th Cir. 2003). In *Rego* a plan participant sued his employer, two ERISA-governed employee benefit plans (a Savings Plan and a pension plan), and the administrator of the plans, alleging *inter alia* breach of fiduciary duty in that they had failed to provide him with complete and accurate information about his benefit plans after he requested it in breach of their fiduciary duties and had prevented him from withdrawing his share of one of the plans in time to take advantage of a high price for the stock in the plan. He sought specific performance under § 502(a)(3) in the form of an order from the court that defendants issue to him Westvaco stock equal in value to the difference in the amount of money the stock was valued at on October 21, 1997 and on March 2, 1999. *Id.* at 144-45. Rego argued that at common law a beneficiary could only bring actions for breach [*229] of fiduciary duty by a trustee in equity and thus any remedy for such a cause of action "is always an equitable remedy." *Id.* at 145.

The Fourth Circuit disagreed and quoted from *Mertens*, 508 U.S. at 256-57 (rejecting this argument because it would render the adjective "'equitable'" superfluous because "'*all* relief available for breach of trust could be obtained from a court of equity'"; Section 502(a)(3), 29 U.S.C. § 1132(a)(3), "authorizes only 'those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages.'"), and *Great-West*, 534 U.S. at 213-14 (generally a claim for equitable restitution may not seek "'to impose personal liability on the defendant but to restore to the plaintiff particular funds or property in the defendant's possession,'" i.e., "money or property identified as belonging in good conscience to the plaintiff [that] could clearly be traced to particular funds or property in the defendant's possession.'"). 319 F.3d at 145. The Fourth Circuit found that the defendants possessed no particular [*230] fund or property that could clearly be identified as belonging in good conscience to Rego and that Rego's share of his Savings Plan had long ago been transferred to him and was no longer in defendants' possession. *Id.*

This Court is in full agreement with these cases. *Corcoran* and *Strom* are no longer good law. No matter how artfully pled, "make-whole" relief for a claim of breach of fiduciary duty by a trustee cannot cloak a claim for compensatory damages. Whether monetary relief is available under § 502(a)(3) under *Great West's* analysis depends upon whether it constitutes equitable restitution as defined by the majority, i.e., whether it is a type of relief that was *typically* available in equity and whether the suit seeks "to restore to the plaintiff particular funds or property in the defendant's possession." 534 U.S. at 214. n104

n104 Even before the *Great-West* decision was handed down, the Sixth Circuit had also rejected the *Strom* decision. *Helfrich v. PNC Bank, Kentucky, Inc.*, 267 F.3d 477, 482 n.5 (6th Cir. 2001), cert. denied, 535 U.S. 928 (2002). In *Helfrich*, a plan participant sought monetary compensation for losses he suffered when the defendant plan administrator failed to follow the participant's instructions to transfer the assets in his 401(k) profit-sharing plan to better performing mutual funds. The Sixth Circuit, reversing the district court's denial of the defendant's motion to dismiss, concluded that such relief constituted money damages, not restitution. *Id.* at 482-83 ("ERISA does not permit plan beneficiaries to claim money damages from plan fiduciaries. . . . Helfrich denominated his requested relief as 'restitution' while measuring that relief with reference to his losses rather than [the defendant's] gains. That measure is the hallmark of money damages."). The appellate court further observed,

> Had [the plan administrator] invested [Helfrich's] money for its own benefit in a separate unauthorized, but better performing account, [the plan administrator] would be liable to Helfrich in restitution for the principal and its ill-begotten gain. Helfrich's principal has, however, been restored and there is no allegation that [the plan administrator] profited by its improper maneuver. As such, there is nothing to *restore* to Helfrich, and therefore there is no basis for restitutionary relief.

*Id.* at 481. *See also Ostler v. OCE-USA, Inc.*, No. 00 C 7753, 2001 WL 1191183, *2 (N.D. Ill. 2001) (rejecting *Strom*).

[*231]

As a general matter, the Fifth Circuit has held that as long as the plaintiff is entitled to some type of relief under the ERISA, pleading of an unavailable remedy or failure to specify a particular kind of equitable relief to which the plaintiff claims entitlement will not result in dismissal. *Heimann v. Nat'l Elevator Industry Pension Fund*, 187 F.3d 493, 511 (5th Cir. 1999) n105 (holding that the plaintiffs' suit should not be dismissed even though they failed to specify that they were seeking equitable relief), citing *Doss v. South Central Bell Tel. Co.*, 834 F.2d 421, 423 n.3 (5th Cir. 1987) ("The court stated that it dismissed those claims because the plaintiff had requested legal relief rather than the equitable relief authorized by Title VII. However, demand of an improper remedy is not fatal to a party's pleading if the statement of the claim is otherwise sufficient to show entitlement to a different form of relief."); and Fed. R. Civ. P. 54(c) ("Every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the [*232] party's pleadings.").

n105 *Heimann* was overruled on other grounds in *Arana v. Ochsner Health Plan*, F.3d , 2003 WL 21554491 (5th Cir. 2003).

With respect to the lockdown claims under Count II, brought on behalf of the Savings Plan and the ESOP, Defendants have argued that Plaintiffs lack standing because they have not alleged that they, personally, complained about the lockdown at the time or that they would have ordered Northern Trust to sell their Enron stock had the lockdown not been imposed. The Court sees no reason, and Defendants provide no authority, for the proposition that Plaintiffs had to show that they, personally, complained in order to assert their claim that Defendants breached their fiduciary duty in proceeding with the lockdowns despite protests (notice, warning) from numerous plan participants. The general outcry, which has not been denied by Defendants, was sufficient to put Northern Trust on notice of the threat posed by the lockdowns.

Furthermore, [*233] Plaintiffs provide authority for their insistence that they do not have the burden of proving loss to the plans here, citing *Bierwirth*, 754 F.2d at 1056. In *Bierwirth*, the Second Circuit held that under § 409 [and § 502(a)(2) n106] the "appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Id.*, citing Restatement (Second) of Trusts § 205 (1959). n107 The Second Circuit explained,

> In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions. Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them. . . . Once a [*234] breach of trust is estab-

lished, uncertainties in fixing damages will be resolved against the wrongdoer.

*Id.* (if, but for the breach, the trust fund would have earned more than it actually earned, there is a "loss" to the plan), *citing Leigh v. Engle*, 727 F.2d at 138 ("We believe that the burden is on the defendants who are found to have breached their fiduciary duties to show which profits are attributable to their own investments apart from their control of the . . . trust assets. . . . While the court may be able to make only a rough approximation, it should resolve doubts in favor of the plaintiffs."). *See also Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1243-44 (2d Cir. 1989) ("uncertainties in fixing damages will generally be resolved against the defendant," except where "the defendant comes forward with particularly reliable evidence that, had the funds not been improperly invested, they would have been put into a particular alternate investments"); *Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 572 and n. 36 (D. Md. 2003).

> n106 In contrast to § 502(a)(3)'s "appropriate equitable relief," § 502(a)(2) allows a plan participant to sue for "appropriate relief" for a breach of fiduciary duty under § 409, 29 U.S.C. § 1109, which in turn provides that a fiduciary breaching his fiduciary duty may be "personally liable to make good to such plan any losses to the plan resulting from each such breach."

[*235]

> n107 Section 205 provides,
>
> If the trustee commits a breach of trust, he is chargeable with
> (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or
> (b) any profit made by him through the breach of trust; or
> (c) any profit which would have accrued to the trust estate if there had been no breach of trust.

ERISA does not provide for recovery of extra-contractual damages (e.g., punitive damages, damages for emotional distress). *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134 (1985); *Mertens*, 508 U.S. 248. An award of pre-judgment interest is discretionary with the court. *See, e.g., Diduck v. Kaszcki & Sons Contractors Inc.*, 974 F.2d 270, 286 (2d Cir. 1992); *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 131-32 (3d Cir. 2000).

### 5. Service on and Liability of the Administrative Committees of the Plans as Unincorporated Associations

Federal Rule of Civil Procedure 17(b), addressing "Capacity to Sue or to be Sued" [*236] for a federal statutory claim, indicates in relevant part that other than an individual or a corporation,

> in all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or the laws of the United States . . . . n108

> n108 *See also* Fed. R. Civ. p. 23.2, in relevant part: "An action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties may be maintained only if it appears that the representative parties will fairly and adequately protect the interests of the association and its members." Advisory Committee Notes to the rule make clear, "Although an action by or against representatives of the membership of an unincorporated association has often been viewed as a class action, the real or main purpose of this characterization has been to give 'entity treatment' to the association when for formal reasons it cannot sue or be sued as a jural person under Rule 17(b)."

[*237]

Defendants Enron Corp. Savings Plan Administrative Committee, the Administrative Committee of the Enron Corp. Cash Balance Plan, and the Administrative Committee of the Enron Employee Stock Ownership Plan n109 identify themselves as "unincorporated associations," but not under Texas law, and move to dismiss on the grounds that (1) they are not legal entities capable of being sued under the law of Texas, (2) retaining the Committees as parties to this action is "impractical, unnecessary, and inappropriate" under ERISA, (3) they have not been properly served, and (4) they should be dismissed because their individual committee members should be dismissed.

n109 The complaint designates twelve members of the Committees as "Enron ERISA Defendants" and fiduciaries with respect to the Savings Plan and ESOP Plan because they exercised control with respect to management of the assets of those plans, rendered investment advice for a fee or other compensation or had the authority to do so, and had discretionary authority or responsibility in the administration of one or more of all three plans, with respect to allegations in Counts I-IV. According to Plaintiffs, the membership of the three committees "was apparently at all times co-extensive and identical for each of the Plans." # 315 at 3. The complaint also identifies Blake, LeMaistre, Duncan and Jaedicke as "Compensation Committee Directors," and charges in Count V that they, along with Kenneth Lay, had and/or exercised the responsibility on behalf of Enron for appointing and monitoring the Plans' other Plan fiduciaries.

[*238]

Defendants argue that under the law of Texas "an unincorporated association is a voluntary group of persons without a charter formed by mutual consent for the purposes of promoting a common enterprise," which includes "churches, voters' groups, homeowners' associations, unions, and social groups such as the Independent Order of Odd Fellows." # 231 at 2, citing inter alia *Cox v. The Evergreen Church*, 836 S.W.2d 167, 169 (Tex. 1992); *Citizens for Fair Taxes v. Sweetwater Indep. School Dist. Bd. of Trustees*, 807 S.W.2d 451, 452 (Tex. App.-Eastland 1991, motion to file mandamus overruled); *Dutcher v. Owens*, 647 S.W.2d 948, 950 (Tex. 1983).

Committee Defendants argue that they do not fit the Texas definition of unincorporated associations because their service on the Plan Committees was not completely voluntary since the members are employees of Enron, appointed to the committee by Enron, removable by Enron, and their membership ceases if they cease employment by Enron. Thus membership is a function of their employment rather than a voluntary activity undertaken for their own purposes. Defendants further argue that they do not exhibit [*239] other characteristics of unincorporated associations, such as (i) a membership too large to join feasibly all members as defendants; (ii) operation under a constitution, bylaws, or other detailed organizational documents; (iii) accumulation of funds by the association for its own use; (iv) the conduct of business or other activities under its own name and for its own benefit or in furtherance of its own interests." # 231 at 3 (no authority cited).

Defendants also contend that under Plan documents, they act solely on behalf of the plans and their participants and beneficiaries and were never considered separate legal entities with the power to enter into contracts or conduct business for their own benefit. Nor have they registered as an association with Harris County. Tex. Bus. & Com. Code § 36.10 (2002) ("Any person who regularly conducts business or renders professional services other than as a corporation, limited partnership, registered limited liability partnership, or limited liability company in this state under an assumed name shall file in the office of the county clerk in each county in which such person has or will maintain business or professional [*240] premises or, if no business or professional premises are or will be maintained in any county, in each county where such person conducts business or renders a professional service, a certificate . . . ."). n110

n110 Defendants have failed to explain or cite any authority demonstrating that § 36.10 applies to an administrative committee of an employee benefit retirement plan of a corporation.

Plaintiffs respond that Defendants' argument is meritless because "a cursory search of the Westlaw or Lexis computer databases for cases involving ERISA claims of fiduciary breach in which a plan 'Admin. Committee' is named a defendant yields a score of cases . . . ." # 315 at 21. Plaintiffs do not provide any legal authority to support their claim that these committees are suable.

After reviewing the law related to the issue, the Court finds that Defendants' challenge is frivolous. First the Court points out that Defendants' list of typical unincorporated associations and their usual characteristics is not exclusive and [*241] that unincorporated associations have proved difficult to pigeonhole and have resulted in development of special and often flexible rules. *Cox*, 836 S.W.2d at 169 n.3 ("Unincorporated associations long have been a problem for the law. They are analogous to partnerships and yet not partnerships; analogous to corporations, and yet not corporations . . . ."); *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1286 (5th Cir. 1994) (analogically extending the law of unincorporated nonprofit associations to persons affiliated with and to unincorporated political campaign committees even though the latter are not organized with bylaws, membership rosters, or other instruments of governance or formalities characteristic of the unincorporated association). Although Defendants cite *Cox* as authority on the characteristics of an unincorporated association under Texas law, the Texas Supreme Court stated in that case. "An issue regarding what constitutes an unincorporated association is not before this Court." 836 S.W.2d at 162 n.1. Furthermore, issues such as whether the members' services were "vol-

untary" or whether or not the Administrative Committees [*242] are unincorporated associations under Texas law are questions which can only be answered after a factual record has been established. Moreover, assuming that the Administrative Committees are unincorporated associations, from the record before it, the Court cannot be sure whether they are nonprofit associations subject to the law of agency or they are associations organized for profit or to conduct a business, subject to the principles of partnership law. *Karl Rove*, 39 F.3d at 1284-85.

As for the merits of Defendants' argument, at common law an unincorporated association was not recognized as a legal entity, was not suable in its own name, but only in the name of its members, had no existence separate from that of its individual members, and one member's personal liability could not be enforced against any other members unless they also expressly or impliedly assented to, authorized or ratified the transaction on which liability was based. *Karl Rove*, 39 F.3d at 1285; *Cox v. Thee Evergreen Church*, 836 S.W.2d 167, 168-69 (Tex. 1992); *Beta Beta Chapter of Beta Theta Pi Fraternity v. May*, 611 So.2d 889, 892 (Miss. 1992). [*243] The reason for holding individual members personally liable was that since the unincorporated association was not recognized as a legal entity, no judgment could be rendered against it for contracts it entered into or torts that it may have perpetrated. *Karl Rove*, 39 F.3d at 1285 & n. 14.

Since that time, many states and the federal government have passed statutes that expressly or impliedly authorize suits by and against unincorporated associations. *Id.* at 1285-86; *Beta Beta*, 611 So.2d 891-92. It has become "well-established that the members of an unincorporated association may be sued, 'as to third parties, under the association's assumed name as a legal entity.'" *Gonzales v. American Postal Workers Union, AFL-CIO*, 948 S.W.2d 794, 798 (Tex. App.-San Antonio 1997, writ denied), *citing Cox*, 836 S.W.2d at 171. *See also Hutchins v. Grace Tabernacle United Pentecostal Church*, 804 S.W.2d 598, 600 (Tex. App.-Houston [1st Dist.] 1991, no writ) (Texas Rule of Civil Procedure 28 authorizes suit by or against an unincorporated association in the common name for purpose of defending or enforcing [*244] a substantive right, but does not enlarge or diminish any substantive rights or obligations of parties."). The authorization by statute for an unincorporated association to act as a legal entity in its own name need not be express, but may rise by implication from a statute. *Beta Beta*, 611 So.2d at 893-94. ERISA, which provides the substantive law here, expressly contemplates that when an administrative committee acts in the denial of plan benefits or as a fiduciary in breach of its fiduciary duties, it may be sued. In Texas, a statute now authorizes suits against an unincorporated association; furthermore the recognition of such a group as a jural person with entity status expressly does not "affect nor impair . . . the right of a plaintiff to sue in the individual names of . . . members." Tex. Rev. Civ. Stat. Ann. arts. 6133 ("Any unincorporated . . . association, whether foreign or domestic, doing business in this State, may sue or be sued in any court of this state having jurisdiction of the subject matter in its company or distinguishing name; and it shall not be necessary to make the individual . . . members thereof parties to [*245] the suit.") and 6138 (Vernon 1970 and Supp. 2003); *Kerney v. Fort Griffin Fandangle Ass'n, Inc.*, 624 F.2d 717, 719-20 (5th Cir. 1980). Thus contrary to Defendants' arguments, it appears that Plaintiffs may sue both the unincorporated association and its members in Texas. Moreover, like Fed. R. Civ. P. 17(b), Texas Rule of Civil Procedure 28 ("Any . . . unincorporated association . . . may sue or be sued in its . . . common name for the purpose of enforcing for or against it a substantive right") has been construed to permit such organizations a procedural right to sue or be sued as legal entities in their own names. *Cox*, 836 S.W.2d at 171-73.

Although Defendants argue that Plaintiffs should not be allowed to sue the unincorporated association and them, individually, this contention also lacks merit. In *Karl Rove*, 39 F.3d at 1286, the Fifth Circuit addressed this issue:

> One could argue, therefore, that it is no longer necessary or even appropriate for the laws of these jurisdictions to permit third parties to sue individually the members of an association for the contract debts incurred [*246] by the association in its own name. The argument would go as follows: The third party is no longer being misled or deceived about a nonexistent principal; such a party is contracting with a disclosed juridical entity, the assets of which can be reached to satisfy any debt that the association may owe.
>
> As appealing and logical as that argument might appear, however, that is not the way the law has developed. The courts of the states that have adopted statutes permitting suit against unincorporated associations have not altered or supplanted the preexisting common law rule governing the personal liability of association members. The courts of both Pennsylvania and Texas have continued to hew this line. [footnotes omitted]

As for service, under Federal Rule of Civil Procedure 4(h)(1), in relevant part,

> service upon . . . a partnership or other unincorporated association that is subject to suit under a common name, and from which a waiver of service has not been obtained and filed, shall be effected . . . in a judicial district of the United States in the manner prescribed for individuals by subdivision (e)(1), or by delivering a copy [*247] of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or law to receive service of process . . . .

*See also*, for recognized connections between unincorporated associations and partnerships insofar as defending a lawsuit is concerned, *Penrod Drilling Co. v. Johnson*, 414 F.2d 1217, 1219-25 (5th Cir. 1969), *cert. denied*, 396 U.S. 1003 (1970). A plaintiff suing an unincorporated association may either serve the entity under its common name or serve authorized individuals who comprise the group. *See, e.g., Furek v. Univ. of Del.*, 594 A.2d 506, 513-14 (Del. Super. 1991).

Administrative Committee Defendants have argued that they were not personally served. Plaintiffs state in a footnote, # 315 at 22 n.10, "The Admin. Committee's claim that as of the date of its filing it has not "been properly served with *any* complaint" is surprising in light of its counsel's agreement to accept service of the *Kemperer* complaint, consolidated herewith. If counsel is now withdrawing his agreement to accept service on behalf of the Committee, that can and will be [*248] promptly remedied through the use of a process server. . . ." If there is still a valid challenge that Defendants have not been properly served, the Court directs Defendants to file a specific motion to that effect.

Finally Defendants have contended that because the Enron bankruptcy court appointed State Street Bank and Trust Company to take over their duties, and because they have no longer have any assets that could be used to satisfy a judgment nor any power to cause recalculation and redistribution of benefits, a suit against them has no purpose. Plaintiffs' response is sufficient to deny the motion to dismiss: they seek declaratory as well as legal and equitable relief and co–fiduciary liability of others. Moreover they are entitled to discovery to determine whether there are any assets now controlled by the independent fiduciary that would be available to satisfy a judgment, if one is obtained.

**B. RICO Amendment**

Section 107 ("the RICO Amendment") of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as amended, 18 U.S.C. § 1964(c), to eliminate securities fraud as a predicate act under § 1961(1) for a private cause of action [*249] under RICO:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date the conviction becomes final.*

18 U.S.C. § 1964(c) (emphasis added).

Before the RICO Amendment, a plaintiff could allege a private civil RICO claim for securities laws violations sounding in fraud because "fraud in the sale of securities" was listed as a predicate offense. *Bald Eagle Area School Dist. v. Keystone Financial, Inc.*, 189 F.3d 321, 327 (3d Cir. 1999) (*citing Sedima*, 473 U.S. at 504-05 (Marshall, J., dissenting)), [*250] *cert. denied*, 526 U.S. 1067 (1999).

The Conference Committee Report for § 107 makes clear that the RICO Amendment was intended by Congress "to eliminate securities fraud as a predicate offense in a civil RICO action" and to bar a plaintiff from "pleading other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." *Bald Eagle*, 189 F.3d at 327, *quoting* H.R. Conf. Rep. No. 104-369, at 47 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 746. *See also Mathews v. Kidder Peabody & Co., Inc.*, 161 F.3d 156, 157 (3d Cir. 1998) (The PSLRA amended 18 U.S.C. § 1964 "to eliminate, as a predicate act for a private cause of action under [RICO], any conduct actionable as fraud in the purchase or sale of securities"), *cert. denied*, 526 U.S. 1067 (1999); *Scott v. Boos*, 215 F.3d 940, 945 (9th Cir. 2000); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481, 487 (E.D. Pa. 2000) (Congressional intent behind the RICO Amendment "was substantive—to [*251] deprive plaintiffs of the right to bring securities fraud based RICO claims."); *Heffernan v. HSBC Bank USA*, No. 1:99CV07981, 2001 WL 803719, *1-2 (E.D.N.Y. Mar. 29, 2001); *Mezzonen, S.A. v. Wright*, No. 97 CIV

9380 LMM, 1999 WL 1037866, *3-4 (S.D.N.Y. Nov. 16, 1999); *Krear v. Malek*, 961 F. Supp. 1065, 1074-75 (E.D. Mich. Mar. 31, 1997); *Ostler v. The Codman Research Group, Inc.*, No. CIV. 98-356-JD, 1999 WL 1059684, *6 (D.N.H. Apr. 20, 1999); *ABF Capital Management v. Askin Capital Management, Inc.*, 957 F. Supp. 1308, 1319 (S.D.N.Y. 1997). n111

> n111 Based on the language of the legislative history, the district court in *Krear*, 961 F. Supp. at 1074, asked "whether the amendment applies only to plaintiffs' predicate acts alleging securities fraud or to those alleging mail and wire fraud," and concluded, "It is abundantly clear that Congress intended that conduct constituting wire and mail fraud not form the basis of a predicate act under the amendment if such conduct would also be actionable as securities fraud. Since plaintiffs herein have pleaded predicate acts of mail fraud [and] wire fraud based on conduct that also forms the basis of their claims of securities fraud, all of plaintiffs' RICO claims must be dismissed unless an exception applies."

[*252]

The RICO Amendment's "focus" was on "completely eliminating the so-called 'treble damage blunderbuss of RICO' in securities fraud cases." *Matthews v. Kidder, Peabody & Co., Inc.*, 161 F.3d at 157 (quoting 141 Cong. Rec. H2771). See also *Hemispherx Biopharma, Inc. v. Asensio*, No. CIV. A. 98-5204, 1999 WL 144109, *4 (E.D. Pa. Mar. 15, 1999) ("The legislative history indicates that Congress intended that RICO, which provides treble damages and attorney's fees, not be used for securities fraud claims at all because there were, generally speaking, other statutes that more appropriately provided for recovery in such cases.").

Thus if Defendants' alleged misconduct to support a claim is characterized by the plaintiff as wire, mail, or bank fraud, but also "amounts to securities fraud," the court should not permit a "surgical presentation" of the cause of action to "undermine the congressional intent behind the RICO Amendment." *Bald Eagle*, 189 F.3d at 329-30; *Burton v. Ken-Crest Services, Inc.*, 127 F. Supp. 2d 673, 677 (E.D. Pa. 2001) (After Plaintiff recast as embezzlement and theft his claims that he was deprived of his [*253] legal right to select investments in his pension plan after plan officials with conflicts of interest chose low-yielding investments, the court opined, "There is no question that the whole of Plaintiff's allegations concern a fraudulent transaction of securities. Plaintiff cannot magically revive his claim by picking out discrete details of his allegations and then claiming that they are not actionable as securities fraud."); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481, 486-87 (E.D. Pa. 2000) (where plaintiff alleged as predicate acts accounting improprieties that were effected to provide certain individuals with large bonuses, but where they also inflated stock prices, the court found the acts actionable as securities fraud, the court dismissed "regardless of the injury alleged").

In *Bald Eagle*, a number of school districts sued a bank that was custodian of funds that they had collected from bonds, loans and other revenues and that acted according to investment directions from the plaintiffs' investment advisor. That bank in turn was a knowing and essential participant with the investment advisor in a Ponzi scheme involving numerous acts [*254] of what the plaintiffs characterized as bank, mail and wire fraud which defrauded the school districts of approximately $70 million. The bank used the funds in impermissible and risky investments in Collateralized Investment Agreements ("CIAs"), fraudulently reported market values as the value declined, failed to maintain the requisite 100% collateral on the assets in its custody, and paid out more money to withdrawing clients than their fair share so the bank could continue to conceal losses and entice new money for investments. Just before the plaintiffs filed their suit, the SEC contemporaneously brought a civil enforcement action based on the same scheme as a securities fraud action. The Third Circuit affirmed the district court's dismissal of the school districts' suit as barred by the RICO Amendment.

The proper inquiry according to the Third Circuit is not whether the wrongful conduct is "connected to and dependent upon securities fraud," but whether the conduct is "actionable as securities fraud." *Bald Eagle*, 189 F.3d at 330. The Third Circuit rejected plaintiffs' "contention that the conduct alleged as predicate offenses was not in connection with the purchase [*255] or sale of securities" on the grounds that their argument

> completely ignores the hard reality that the conduct was an integral part of Black's securities fraud Ponzi scheme. A Ponzi scheme is ongoing, and it continues only as long as new investors can be lured into it so that early investors can be paid a return on their "investment." Consequently, conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities.

*Id.*

The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause

Case 3:01-cv-01737-MRK    Document 52-33    Filed 10/16/2003    Page 13 of 15

Page 73
2003 U.S. Dist. LEXIS 17492, *255

of action under the securities laws. The language of the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws; its wording ("no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962") does not make such a connection. *See Hemispherx Biopharma*, 1999 WL 144109 at *4 (agreeing with Defendants that "when Congress stated that 'no person' could bring [*256] a civil RICO action alleging conduct that would have been actionable as securities fraud, it meant just that. It did not mean 'no person except one who has no other actionable securities fraud claim.' It did not specify that the conduct had to be actionable as securities fraud by a particular person to serve as a bar to a RICO claim by that same person.").

Even if the provision were deemed unclear or ambiguous, the legislative history indicates a concern that securities fraud defendants not be exposed to multiple kinds of suits and especially the need to limit the "treble damage blunderbuss" of a RICO claim. Chairman of the SEC Arthur Levitt testified before the Telecommunications and Finance Subcommittee of the House Commerce Committee during hearings on the RICO Amendment on February 10, 1995, *reprinted in* 1996 U.S.C.C.A.N. 679, 746,

> Because the securities laws generally provide adequate remedies for those injured by securities fraud, it is both unnecessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO.

*Quoted by Rowe v. Marietta Corp.*, 955 F. Supp. 836, 847 (W.D. Tenn. 1997). [*257]

Statements, quoted in *Krear*, 961 F. Supp. at 1075-76 and n.16 *(citing* 141 Cong. Rec. H2771), by California Representative Cox, who introduced the bill, explain that the purpose of the RICO Amendment was to provide remedies for injured investors while "reducing the cost of capital" and limiting the "imposition of excessive penalties on all participants in our capital market": because of RICO's "treble damage blunderbuss" that results in exorbitant litigation costs and imposes the rising costs of raising capital on consumers and emerging innovative companies":

> Our economy's health depends on the efficient operation of America's capital markets. We must continue to balance the provisions of adequate remedies for injured investors and the imposition of excessive penalties on all participants in our capital markets. The treble damage blunderbuss of RICO undermines the balance and imposes exorbitant litigation costs, impedes the raising of capital and ultimately puts these costs on the shoulders of consumers and emerging innovative companies.

*Krear*, 961 F. Supp. at 1075, *citing* 141 Cong. Rec. H2773. Cox also made clear that the amendment, [*258] as indicated *supra*, was intended to rein in what many perceived as the misapplication of RICO beyond racketeering and organized crime to matters never intended by Congress, including securities fraud lawsuits, which at the time of the amendment represented forty percent of the cases brought under RICO. *Id.*, at 1075-76 & n.16. Representative Cox further stated,

> Because many claims that could be asserted as securities claims can also be characterized as mail or wire fraud and because mail and wire fraud are also predicates for civil RICO liability, Plaintiffs' attorneys have a devastating, potent, and readily available alternative for bringing actions under RICO instead of under our securities laws.

*Id.* at 1075 and n.16, *citing* 141 Cong. Rec. H2772. In contrast to the express limitation on actual damages available under federal securities statutes, the availability of treble damages under RICO was leading plaintiffs to craft their pleadings to obtain relief, contrary to Congressional intent. *Id.* at 1076. Representative Cox maintained that passage of the RICO Amendment was necessary to stop attorneys from "doing [*259] an end run" around all the reform [of the securities laws] by simply using the RICO statute instead and thereby obtaining "discovery going back 10 years to show a pattern which is part of RICO, not part of the securities laws," and in effect "gin up settlements where a settlement is not in order." *Id.* at 1076, *citing* 141 Cong. Rec. H2771, H27778.

Among the few courts addressing the issue, the Ninth Circuit has held that the RICO Amendment bar applies even if a plaintiff lacks standing to sue under the securities laws because he did not purchase or sell securities. *Howard v. American Online, Inc.*, 208 F.3d 741, 749 (9th Cir.) (claims that AOL misrepresented revenues, profits and number of subscribers, used improper accounting practices, and illegally sold stock at a profit were actionable as fraud in the purchase or sale of securities and are barred by the RICO Amendment even though Plaintiffs lack standing to sue for securities fraud), *cert. denied*, 531 U.S. 828 (2000). *See also Florida Evergreen Foliage*

v. E.I. DuPont De Nemours and Co., 165 F. Supp. 2d 1345, 1356-58 (S.D. Fla. 2001) ("the fact that Plaintiff-Growers [*260] are not DuPont shareholders and therefore cannot bring a securities fraud claim against DuPont does not preclude the use of Section 107 to bar their claim" when it could have been brought "'by a [different] plaintiff with proper standing'"), *affirmed on other grounds sub nom. Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*, F.3d , Nos. 01-13345, 01-15693, 2003 WL 21949591 (11th Cir. Aug. 15, 2003); *Columbraria Ltd. v. Pimienta*, 110 F. Supp. 2d 542, 548 (S.D. Tex. 2000) (RICO Amendment bar applied where plaintiff was time-barred from suing under Rule 10b-5); *Hemispherix Biopharma*, 1999 WL 144109 at *4-5 (holding that the RICO Amendment barred suit even though plaintiffs had no cause of action under § 10(b) of the Securities Exchange Act).

In an attempt to preserve their RICO claims, *Tittle* Plaintiffs have argued that unlike predicate acts of mail and wire fraud, their predicate acts of embezzlement (18 U.S.C. § 664), obstruction of justice (18 U.S.C. § 1512), and interstate transportation offenses (18 U.S.C. § 2314) do not sound [*261] in fraud and therefore cannot be barred by the RICO Amendment as a matter of law. This Court disagrees. Plaintiffs have clearly alleged five types of named predicate acts that are parts of an overarching scheme and conspiracy to defraud current and prospective shareholders of Enron stock in a Ponzi scheme, with all alleged acts and omissions intended to achieve the same goal, personal enrichment of Defendants at the expense of the corporation, its shareholders, and its ERISA plan participants and beneficiaries. A "scheme to defraud" necessarily embraces "'intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end.' To allege intentional fraud there must be 'proof of misrepresentations or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension [citations omitted].'" *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 389-90 (6th Cir. 1996). While a "scheme to defraud" is an express element of mail and wire fraud, the complaint's allegations explicitly relate to all the other predicate acts charged, i.e. [*262] , embezzlement, obstruction of justice and interstate transportation, to lure and keep Enron investors in an overarching Ponzi scheme to defraud. Any conduct that sustains a securities fraud Ponzi scheme is intrinsically conduct undertaken "in connection with the purchase or sale of securities" and is barred by the RICO Amendment. *Bald Eagle*, 189 F.3d at 330.

Similarly, *Tittle* Plaintiffs attempt to limit § 10(b) violations to statements of misrepresentation or omissions. The Court refers the parties to its memorandum and order of December 19, 2002, # 1194, in *Newby*, for its more inclusive determination that § 10(b) and Rule 10b-5 also reach a course of business, a deceptive device, and/or a scheme or artifice that operated as a fraud on sellers or purchasers of securities.

There is little case law addressing the application of the last sentence of § 107, 18 U.S.C. § 1964(c) ("The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date the conviction becomes final"), [*263] dubbed the "criminal conviction exception." The exception was an issue of first impression in *Krear v. Malek*, 961 F. Supp. 1065 (E.D. Mich. 1997), which noted that "the Congressional record is devoid of any substantive discussion of the exception." 961 F. Supp. at 1074.

In a multi-defendant case, the *Krear* court dismissed all RICO claims against one defendant who had not been convicted, noting that if he were subsequently convicted, he could be sued again because the RICO Amendment explicitly provides that the statute of limitations does not start to run until the conviction becomes final. *Id.* at 1076 & n.17. The defendant who had pleaded guilty to an information, which also named other persons who had not pleaded guilty, argued that the conviction exception applied to them, too, because his conviction was based on a Ponzi scheme involving all the defendants. *Id.* at 1076. The court rejected this argument and found that in light of evidence that "Congress was weary of the susceptibility of civil RICO to litigation abuses in the securities fraud area," the court would "interpret the 'conviction exception' as narrowly [*264] as possible so that the exception is only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud. . . . To find otherwise, plaintiffs who were not found to have been criminally defrauded would be allowed to 'bootstrap' their RICO claims to the claims of those plaintiffs who were found to have been criminally defrauded. This would necessarily cause the 'conviction exception' to swallow the rule which prohibits civil RICO claims for securities fraud." *Id.* "Simply put, those plaintiffs who were not found to have been criminally defrauded, cannot, by merely asserting that a Ponzi scheme existed, invoke the 'criminal exception.'" *Id.* at 1077. *See also Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co.*, 165 F. Supp. 2d 1345, 1356-57 (S.D. Fla. 2001) ("Section 107's criminal conviction exception only applies to persons that have been criminally convicted in connection with the fraud . . . .") (citing *Krear*, 961 F. Supp. at 1076, ("The exception is only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud.")), *affirmed on other* [*265] *grounds*

*sub nom. Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*, F.3d , Nos. 01-13345, 01-15693, 2003 WL 21949591 (11th Cir. Aug. 15, 2003).

Moreover, the legislative history also indicates that the conviction exception applies only to a defendant that has been criminally convicted. Senator Biden had offered a broader statement of the conviction exception than that ultimately enacted: "if any participant in the fraud is criminally convicted in connection therewith." 141 Cong. Rec. § 9150, § 9163 (amendment 1481). The Conference Committee rejected such language in favor the more restricted exception that was passed, with Senator Biden noting the distinction:

> Under an amendment I offered, the Senate bill allowed the RICO statute to be used in a securities fraud civil case if at least one person in the civil case has been criminally convicted. Under this bill, RICO could only be used in the civil case against the person who was actually criminally convicted.

141 Cong. Rec. S17991, S17992 (Dec. 5, 1995); *see also Krear*, 961 F. Supp. at 1075 n.14.

Thus although Plaintiffs argue that because of the guilty plea [*266] of Michael Kopper to conspiracy to commit wire fraud and money laundering and Arthur Andersen's conviction for obstruction of justice, n112 all Defendants fall within the criminal exception. This Court disagrees. The language of the § 107's conviction exception is plain and unambiguous; even if it were not, the legislative history reflects, and the available case law supports, the Court's conclusion that the securities-fraud-based RICO claims can be used only against the particular defendant that was criminally convicted of fraud.

> n112 The Court notes that David Duncan has also entered a guilty plea to obstruction of justice.

Moreover, it is unclear at what point the "criminal conviction" exception is triggered; the statute does not state when the criminal exception claim accrues, but indicates that limitations does not begin to run until the conviction becomes *final*, not yet the case with Kopper and David Duncan, who have not been sentenced. Indeed Kopper recently filed a motion to stay discovery in the [*267] civil cases based on his indictment. Arthur Andersen's conviction and sentence are being appealed, and thus its conviction is not final. Others remain under indictment awaiting trial. In the absence of clarity in the statute or authority on the issue, the Court concludes that it is reasonable that the conviction must be final before the exception is triggered.

To hold otherwise would undermine the core purpose of the statutory bar. n113

> n113 Were Arthur Andersen's conviction final, another issue would be whether obstruction of justice is a crime "in connection with fraud" under the statute. Because in the trial of Arthur Andersen, the evidence demonstrated the alteration and the destruction of documents were motivated by Arthur Andersen's desire to conceal its role in the alleged Enron fraud on the investing public from the SEC investigators, the Court finds that the cause of action in this case is a crime in connection with fraud.

## C. COMMON LAW CLAIMS

### 1. Preemption and the Federal Statutes [*268] at Issue

Preemption by ERISA and preemption by SLUSA, defined by the particular statutory language, are different. The Court addresses the law relating to each statute and then the issues of preemption of the Texas common law claims of civil conspiracy and negligent misrepresentation. RICO, of course, has no preemption provision.

#### a. ERISA

Once viewed as a fairly straight forward doctrine, preemption under ERISA has recently become a somewhat complex, uncertain, and thorny issue. n114 The Court addresses the developing doctrine.

> n114 *See, e.g., Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, , 122 S. Ct. 2151, 2158 (2002) ("The 'unhelpful' drafting of [the express preemption provisions under § 514] occupies a substantial share of this Court's time."); *California Division of Labor Standards v. Dillingham*, 519 U.S. 316, 335 (1997) (Justice Scalia noted that despite fourteen attempts by the Supreme Court to resolve preemption issues in cases since the 1974 enactment of ERISA, "our prior decisions have not succeeded in bringing clarity to the law"); *Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136, 139 (1st Cir. 2000) (the Supreme Court has "been at least mildly schizophrenic in mapping [the] contours" of ERISA's preemption phrase, 'relate to any employee benefit plan.'").

[*269]

"State law" is broadly defined by ERISA as including "all laws, decisions, rule, regulations, or other State action having the effect of law." 29 U.S.C. § 1144(c)(1).