There are two conceptually distinct doctrines of pre-emption of state law under ERISA: (1) "ordinary" pre-emption (also called "express" or "conflict" preemption) under § 514, 29 U.S.C. § 1144(a), which occurs when a state law that conflicts with federal law is the basis of the petition, and preemption is asserted as an affir-mative defense to the complaint; and (2) "complete" preemption under § 502(a), 39 U.S.C. § 1132(a), the civil enforcement section (constituting the exclusive rem-edy for rights guaranteed under ERISA, discussed ear-lier under the "Standing and Remedies Under ERISA" section in this memorandum and order). Both ordinary and complete preemption result in the displacement of state law by federal law, but only complete preemption under § 502(a) provides removal jurisdiction. *Haynes v. Prudential Health Care*, 313 F.3d 330, 333–34 (5th Cir. 2002). In other words, only state law claims that duplicate or seek relief falling [*270] within the scope of ERISA's § 502(a) are completely preempted. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 64–66 (1987); *Roark v. Humana, Inc.*, 307 F.3d 298, 305 (5th Cir. 2002), *petition for cert. filed*, 71 U.S.L.W. 3791 (June 20, 2003) (No. 02-1845). The Court examines the preemption issue in greater detail below.

Of the two types of ordinary preemption, express pre-emption occurs by express statutory term, as reflected in § 514(a) of ERISA. *Heimann v. National Elevator Industry Pension Fund*, 187 F.3d 494, 500 (5th Cir. 1999). "Conflict preemption," on the other hand, occurs (1) when there is a direct conflict between the operation of federal and state law so that it is impossible to comply with both, or (2) when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the federal statute. *Boggs v. Boggs*, 520 U.S. 833, 844 (1997); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000); *Id.*

Ordinary preemption falls under § 514(a) of ERISA, 29 U.S.C. § 1144(a) (". [*271] . This provision . . . of this chapter shall supersede any and all State laws inso-far as they may now or hereafter relate to any employee benefit plan . . ."), and preempts such laws unless that state law asserted "regulates insurance" under the sav-ings clause in § 514(b) ("nothing in this title shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking or se-curities"). n115 *McClelland v. Gronwaldt*, 155 F.3d 507, 517 (5th Cir. 1998), *overruled on other grounds, Arana v. Ochsner Health Plan*, F.3d , No. 01–30922, 2003 WL 21554491 (5th Cir. July 10, 2003) n116; *Haynes*, 313 F.3d at 334.

n115 *See, e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47, 52–54 (1987); *Christopher v.*

*Mobil Oil Corp.*, 950 F.2d 1209, 1217 (5th Cir. 1992), *cert. denied*, 506 U.S. 820 (1992).

n116 The Fifth Circuit has recently overruled its previous holding that both kinds of preemption were required for removal to federal court, and now requires only complete preemption under § 502(a). *Arana v. Ochsner Health Plan*, F.3d , , No. 01–30922, 2003 WL 21554491, *4–5 and n.11 (5th Cir. July 10, 2003).

[*272]

Traditionally, under the "well pleaded complaint rule," the plaintiff is the master of his complaint, may choose whether to bring his claim under state or federal law, and must assert a federal cause of action on the face of a complaint before a defendant may remove the case from state court to federal question jurisdiction grounds. *Louisville & Nashville Ry. Co. v. Mottley*, 211 U.S. 149 (1908). "The presence of a federal question . . . in a *defen-sive* argument does not overcome" the well pleaded com-plaint rule. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987) (emphasis added). Thus "ordinary" fed-eral preemption, which occurs where a federal law claim serves only as an affirmative defense, does not appear on the face of the complaint, and does not provide federal question jurisdiction for purposes of removal. *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 9–12, 25–27 (1983).

Ordinary preemption under § 514(a), in contrast to the jurisdictional scope of complete preemption, "gov-erns the law that will apply to state law claims, regardless of whether the case is [*273] brought in state or fed-eral court." *Haynes*, 313 F.3d at 334. Thus if the case is brought in state court, without a basis for federal jurisdic-tion, ERISA would preempt or extinguish the state law claims, but the case would remain in state court.

An exception to the well pleaded rule occurs where Congress intends that a federal statute have "extraordinary preemptive power" and so "completely preempts" a par-ticular field of law that "a state common law complaint [is converted] into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987); *see also Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475 (1998); *McClelland v. Gronwaldt*, 155 F.3d at 516–17 (complete preemption not only displaces substantive state law, but also 'recharacterizes' preempted state law as 'arising un-der' federal law for the purposes of determining federal question jurisdiction, typically making removal available to the defendant. Thus 'complete preemption' is less a principle of substantive preemption than it is a rule of federal jurisdiction. In other words, complete [*274] pre-

emption principally determines not whether state or federal law governs a particular claim, but rather whether that claim will, irrespective of how it is characterized by the complainant, be treated as 'arising under' federal law."). "Complete preemption" is sometimes called "implied preemption" or "field preemption." *See, e.g., Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 380-81 (3d Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000).

The civil enforcement cause of action, § 502(a), 29 U.S.C. § 1132(a), constitutes the complete preemption provision under ERISA; it "functions as an exception to the well-pleaded complaint rule" and "completely preempts any state cause of action seeking the same relief, regardless of how artfully pleaded as a state action." *Haynes*, 313 F.3d at 334 (citations omitted). Whether a state-law claim is subject to complete preemption by ERISA is determined by whether it falls within the scope of the civil enforcement provision of § 502(a). *McClelland*, 155 F.3d at 517 & nn.30 & 31. The Fifth Circuit has succinctly restated the rule for complete preemption: "States [*275] may not duplicate the causes of action listed in ERISA § 502(a)." *Roark v. Humana, Inc.*, 307 F.3d at 310-11.

The complete preemption doctrine is something of a misnomer because it does not completely preempt all state-law claims; only where a state law claim is found to fall "within the scope" of a statute's preemption provision is it considered to be converted to a federal cause of action. *Metropolitan Life*, 481 U.S. at 64-66. In *Metropolitan Life* the Supreme Court examined the language and structure of ERISA and the legislative history to conclude that the statute completely preempted state law contract and tort claims because the plaintiff's claim for benefits was within the scope of § 502(a)(1)(B), 29 U.S.C. § 1132(a), and that the "ultimate touchstone" guiding that determination is Congressional intent. *Id.* at 65-66. The Fifth Circuit interprets the scope of complete preemption as encompassing the whole § 502(a) provision, even though it acknowledges there is some uncertainty about whether its scope is limited to claims falling within § 502(a)(1)(B), which was the only section at issue in *Metropolitan Life*. *McClelland*, 155 F.3d at 517 n.34. [*276]

It is important to note that a federal remedy need not be available under the federal statute for federal preemption of a state law cause of action. *Lister v. Stark*, 890 F.2d 941, 946 (7th Cir. 1989), *cert. denied*, 498 U.S. 1011 (1990). *See, e.g., Pilot Life*, 481 U.S. at 54 ("The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."); *Agrawal v. Paul Revere Life Ins. Co.*, 205 F.3d 297, 302 (6th Cir. 2000)

("As a general rule, the absence of a remedy under ERISA does not mean that state-law remedies are preserved."); *Hubbard v. Blue Cross & Blue Shield Ass'n*, 42 F.3d 942 (5th Cir. 1995) (summary judgment appropriate where preempted claim had no remedy under the statute), *cert. denied*, 515 U.S. 1122 (1995). n117 *See also Caterpillar*, 482 U.S. at 391 n.4 (*rejecting* Court of Appeals' holding that "a case may not be removed on the ground that it is completely [*277] pre-empted unless federal cause of action relied upon provides the plaintiff with a remedy.").

n117 This Court notes that the Fifth Circuit has made an exception under ERISA, not applicable here, to the general rule that availability of a remedy under federal law is not a prerequisite where a claim is brought under ERISA by a third-party health care provider that has provided medical services to a plan participant. *Memorial Hospital Sys. v. Northbrook Life Ins. Co.*, 904 F.3d 236, 248 & n.16 (1990).

After the enactment of ERISA, the Supreme Court initially read the ordinary preemption clause very broadly. It found that Congress intentionally drafted the provisions of ERISA to be expansive and to "establish pension plan regulation as exclusively a federal concern." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981). *See also FMC Corp. v. Halliday*, 498 U.S. 52, 58 (1990) ("The ERISA preemption clause is conspicuous for its breadth. It establishes as an [*278] area of exclusive federal concern the subject of every state law that relates to an employee benefit plan governed by ERISA."). Thus the phrase, "relate to" in § 514(a) was construed in its "broad" common-sense meaning as "having a connection with or reference to such plan" and as not limited to "state laws specifically designed to affect employee benefit plans." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985); *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 98 (1983); *Reliable Home Health Care, Inc. v. Union Central Ins. Co.*, 295 F.3d 505, 515 (5th Cir. 2002). Courts have also held that state law causes of action were preempted by 29 U.S.C. § 1144(a) when two elements are present: 1) the state laws "address an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and 2) the claims directly affect the relationship [among] the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Hollis v. Provident Life and Acc. Ins. Co.*, 259 F.3d 410, 414 (5th Cir. 2002); 29 C.F.R. § 2510.3-3(b) [*279] (2001); *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 245 (5th Cir. 1990).

In recent years the Supreme Court has shown greater

deference to state law in finding its early definition of "relates to" overly inclusive and in narrowing the scope of and establishing a stricter standard for ERISA's § 514(a) preemption. *See, e.g., Arizona Carpenters*, 125 F.3d at 723 ("The 'relates to' test may lead to an overly expansive view of preemption."), *citing New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995). n118 Noting that even if the state law does not "refer to" ERISA plans, it may still be preempted if it has a "connection with" such plans, the Supreme Court realized that "an uncritical literalism" in applying the standard of a "connection with" ERISA plans was not very useful in determining Congress' intent regarding the scope of preemption under § 514(a). *Travelers*, 514 U.S. at 656. Acknowledging ERISA's "unhelpful text and the frustrating difficulty of defining its key terms," the Supreme Court began focusing instead on the "federal interest in uniformity" **[*280]** and the objectives of the statute "as a guide to the scope of the state law that Congress understood would survive." *Bullock v. Equitable Life Ass. Soc. Of U.S.*, 259 F.3d 395, 399 and nn. 10 & 11 (5th Cir. 2001), *quoting inter alia De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 813-15 (1997). ERISA's primary objectives are to "protect . . . the interests of participants . . . and their beneficiaries, by requiring the disclosure and reporting . . . of financial and other information . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, . . . providing for appropriate remedies, sanctions, and ready access to the Federal courts, and by improving the equitable character and soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and requiring plan termination insurance." 29 U.S.C. § 1001(b) and (c). In *California Labor Standards*, the Supreme Court added that the objectives of ERISA should be used to consider the "nature of the effect of the state **[*281]** law on ERISA plans." 519 U.S. at 325. Moreover, Congressional intent focused on the need for uniformity of law regulating ERISA employee benefit plans

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government . . ., [and to prevent] the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

*Travelers Ins. Co.*, 514 U.S. at 656-57, *quoting Ingersoll-*

*Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990).

> n118 In *Travelers*, the Supreme Court noted that the literal language of § 514(a) is "clearly expansive," but emphasized that the text could not be read to "extend to the furthest stretch of its indeterminacy, [or] for all practical purposes preemption would never run its course for 'really, universally, relations stop nowhere' . . . [citations omitted]." 514 U.S. at 655. *See also California Div. of Labor Standards v. Dillingham*, 519 U.S. 316, 335 (1997) (Scalia, J., joined by Ginsberg, J., concurring) ("Applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.").

**[*282]**

As previously discussed, in *Shaw* the Supreme Court defined § 514(a)'s "relates to" an employee benefit plan as "having a connection with or reference to" such a plan. 463 U.S. at 96-97. The Supreme Court subsequently has attempted to refine and to limit the meaning of the phrase, "reference to."

In *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825 (1988), a collection agency obtained money judgments against some participants in an ERISA employee welfare benefit plan. The Supreme Court, reviewing two Georgia statutes, found there was no preemption by ERISA of a state garnishment statute of general applicability that was applied to collect the judgments against ERISA plan fiduciaries even though it might burden the administration of that plan. It reached this determination on the grounds that Congress did not intend ERISA to forbid garnishment of welfare benefit plans and because the statute made no reference to ERISA plans, did not require that a plan be established or maintained, and did not regulate the terms or conditions of the plan. In contrast the Supreme Court found that another statute that expressly singled out ERISA plans **[*283]** for protective treatment was preempted by § 514(a), i.e., because it was "related" by express reference to ERISA plans and was specifically designed to affect ERISA plans. Furthermore the preemption occurred even though the statute might have been enacted to effect ERISA's underlying objectives, because § 514(a) "'displaces all state laws that fall within its sphere, even including those that are consistent with ERISA's substantive requirements.'" *Id.* at 829, *quoting Metropolitan Life*, 471 U.S. at 739.

**DISSENT:**

While most of the cases dealing with the more restric-

tive preemption analysis concern statutes, in *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990), the Supreme Court addressed a wrongful discharge claim brought under state tort and contract theories and seeking compensatory and punitive damages. In that action the plaintiff-employee alleged that his employer wrongfully discharged him, mainly to avoid having to contribute to and pay him benefits under his ERISA pension fund plan. When the litigation had earlier reached the Texas Supreme Court, the state high court had recognized that an at-will employee can state a cause [*284] of action for wrongful discharge where the alleged motive was contrary to public policy, in this instance that the employee was fired by the employer to deprive the employee of pension benefits. *McClendon v. Ingersoll-Rand Co.*, 779 S.W.2d 69, 70–71 (Tex. 1989), *rev'd*, 498 U.S. 133 (1990).

On final appeal, the United States Supreme Court focused on Congressional intent behind ERISA by examining ERISA's language, structure, and purposes to determine if the common law claim was preempted. *McClendon*, 498 U.S. at 137-38. The Supreme Court held that there was express preemption by ERISA, under the language of § 514(a), of the common-law wrongful discharge claim, because the plaintiff had pleaded and the trial court ultimately found (1) as "the critical factor," the existence of an ERISA pension plan, and (2) a "pension-defeating motive" for the termination of plaintiff's employment, which thus "relates to" that plan. *Id.* at 139-40. The Court also emphasized that to allow state-law suits such as this wrongful discharge action to go forward would impose burdensome administrative and financial costs of complying with differing [*285] requirements among states or between a state and the federal government and potential conflicts in substantive law contrary to the purposes of § 514(a). *Id.* at 142. Moreover, the Supreme Court concluded that there was also conflict preemption in *McClendon* because the state common-law claim conflicts with ERISA § 510, 29 U.S.C. § 1140, which prohibits interference with rights provided to plan participants by the statute, including the termination of any plan participant in order to interfere with his attainment of any right . . . under the plan," in combination with the limitations of the civil enforcement provision in § 502(a) with its explicit exclusive federal court jurisdiction and remedy for violation of participants' rights guaranteed by ERISA. *Id.* at 142-44. n119 The high court emphasized, "'The mere existence of a federal regulatory or enforcement scheme'" by itself was not sufficient to imply preemption; the added "special feature" was § 514(a)'s exclusive jurisdiction and remedies for participants deprived of their rights under ERISA, which warranted preemption, even when state law authorized a remedy not available [*286] under ERISA. *Id.* at 143-44.

n119 For another case alleging wrongful denial of benefits to an ERISA plan beneficiary where a statute was not at issue and the existence of an ERISA plan was essential to finding preemption, *see Pilot Life*, 481 U.S. at 48 (holding that state common-law tort and contract actions were preempted under § 514(a) because they were based on "alleged improper processing of a claim for benefits under an insured employee benefit plan").

In *Travelers Ins. Co.*, the Supreme Court determined that a state statute that mandated surcharges on hospital rates for patients with commercial health plans, but not for patients from some HMOs, had too indirect an economic effect on the ERISA plan to "relate to" the plan. *Travelers Ins. Co.*, 514 U.S. at 668. The high court approached the issue of preemption with the "starting presumption that Congress [did] not intend to supplant state law . . . in fields of traditional state regulation." *Id.* at 654-55. [*287] Moreover although the "relate to" language appears to be broad, the Supreme Court acknowledged that an expansive approach to it would "read the presumption against pre-emption out of the law." *Id.* at 655. In addition, the high court "recognized that an 'uncritical literalism' in applying [the "connection with"] standard offered scant utility in determining Congress' intent as to the extent of § 514(a)'s reach." *Id.* at 656, cited by *California Division of Labor*, 519 U.S. at 325, another key case reflecting the shift in ERISA preemption jurisprudence.

The Supreme Court decided that to define what was a "forbidden connection" under § 514(a), it should examine "'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive'" and to the "'nature of the effect of the state law on ERISA plans.'" *California Division of Labor*, 519 U.S. at 325, *citing Travelers*, 514 U.S. at 656, 658-59. Furthermore, where "'federal law is said to bar state action in fields of traditional state regulation,'" the Supreme Court has approached the issue with the "'assumption [*288] that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *California Division of Labor*, 519 U.S. at 325, *citing Travelers*, 514 U.S. at 655. Nevertheless because "the basic thrust of the ["relates to"] pre-emption clause was [a] nationally uniform administration of employee benefit plans," the high court has also concluded that ERISA "pre-empts state laws that mandated employee benefit structures or their administration" and "all state laws providing alternative enforcement mechanisms" because such requirements constituted "connections with" ERISA plans. *California Division of* Labor, 519 U.S. at 328; *Travelers*, 514 U.S. at 657-58.

In *California Division of Labor*, 519 U.S. at 325, the Supreme Court examined both the objectives of ERISA and the nature of the effect of a California prevailing wage statute on ERISA plans and stated that where a state law "acts immediately or exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation," the "'reference' will [*289] result in preemption" of the state law. *Id.* at 325. The Court highlighted its established approach that where "federal law is said to bar state action in fields of traditional state regulation, . . . we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress [citations omitted].'" *Id.* It then observed that "apprenticeship standards and the wages paid on state public works have long been regulated by the States," while they were also "quite remote from areas with which ERISA is expressly concerned—"'reporting, disclosure, fiduciary responsibility and the like.'" *Id.* at 330, *quoting Travelers*, 514 U.S. at 661. The Supreme Court in *California Division of Laborers* found that California's prevailing wage law and the regulations promulgated pursuant to it did not make "reference to" ERISA plans, nor did they have a "connection with" the ERISA plans at issue, and therefore the wage law was not preempted.

In contrast, the Court has concluded that denial of benefits "is an area of core ERISA concern." *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 [*290] (state statute requiring plan administrators to pay beneficiaries chosen by state law rather than those identified in plan documents, as required by ERISA, "implicates as area of core ERISA concern"). *See also Rush Prudential*, 122 S. Ct. at 2166 ("Congress has so completely preempted the field of benefits law that an ostensibly state cause of action for benefits was necessarily a 'creature of federal law' removable to federal court.").

The high court has also recognized that even where there may be a reference to an employee benefit plan, a narrow exception to the federal preemption doctrine under ERISA exists for state law claims that only tenuously, remotely or peripherally relate to an ERISA plan. *Bullock*, 259 F.3d at 399, *citing Shaw*, 463 U.S. at 100 n.21. *See, e.g., Mackey v. Lanier Collection Agency & Service*, 486 U.S. 825, 833 (1988) (ERISA does not preempt "run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan," even though such claims "obviously affect[] and involve ERISA plans and their trustees").

The Ninth Circuit summarizes that the [*291] United States Supreme Court has concluded that Congress intended to preempt state law claims in at least three areas:

(1) state laws that control employee benefit structures or their administration; (2) state laws tying employers or plan administrators to particular choices or barring uniform administrative practice so as to regulate the plan; and (3) state laws that establish alternative enforcement mechanisms for a participant or beneficiary to obtain ERISA plan benefits. *Arizona Carpenters*, 125 F.3d at 723, *citing Travelers*, 514 U.S. at 655-61, and *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468 (4th Cir. 1996). In light of these determinations, the Ninth Circuit has held "that where state law claims fall outside the three areas of concern established in *Travelers*, arise from state laws of general application, do not depend upon ERISA, and do not affect the relationships between the principal ERISA participants[,] the state law claims are not preempted." *Arizona Carpenters*, 125 F.3d at 724.

The Fifth Circuit has previously concluded that § 514(a) preempts state-law civil conspiracy claims that involve misuse [*292] of an ERISA plan's assets. *See, e.g., McDonald v. Provident Indemnity Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995), *cert. denied*, 516 U.S. 1174 (1996). It has also determined that a state-law cause of action relating directly to the operation of an ERISA employee benefit plan is preempted even if it arises under a law of general application that has no connection to employee benefit plans. *Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1218-19 (5th Cir. 1992), *cert. denied*, 506 U.S. 820 (1992). To determine whether there is preemption, a court must consider whether "the underlying conduct" that forms the basis of the claim could "be divorced from its connection to the employee benefit plan." *Id.* at 1220.

Moreover, any state law that does relate to an ERISA plan and that "provides a form of ultimate relief in a judicial forum that add[s] to the judicial remedies provided by ERISA . . . patently violates ERISA's policy of inducing employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders [*293] and awards when a violation has occurred." *Rush Prudential HMO v. Moran*, 536 U.S. 355, 379 (2002). As noted, even if ERISA provides only a limited remedy or even no remedy at all to a plaintiff whose state law claim is preempted, preemption may still occur. *Pilot Life*, 481 U.S. 41.

**b. The Securities Litigation Uniform Standards Act of 1998 (SLUSA)**

If those *Title* Plaintiffs who have standing under the federal securities statutes (and many do not, as will be explained) were to recharacterize and bring their claims under those statutes, or if they were to join the *Newby* class, or if they were to file their class action (meeting

SLUSA's standards) under state law in state court assert-
ing claims based on an alleged misrepresentation or omis-
sion of a material fact in connection with the purchase or
sale of a covered security and/or use by the defendants
of a manipulative or deceptive device or contrivances in
connection with the purchase or sale of Enron stock, their
common law claims of conspiracy and negligence would
be preempted by SLUSA for the reasons explained below.

SLUSA, which amended the Securities Act of 1933
and the Securities [*294] and Exchange Act of 1934,
aimed to protect corporations from securities fraud strike
suits and "meritless class actions" and abusive discov-
ery practices of litigious investors by making federal
courts the exclusive venue for securities class actions n120
and establishing various procedural hoops and plead-
ing requirements designed to screen out frivolous suits.
*Spielman v. Merrill Lynch Pierce, Fenner & Smith*,
F.3d   , No. 01-9189, 2003 WL 21363387, *2-3 (2d Cir.
June 13, 2003). SLUSA does not completely preempt the
field of securities regulation; instead its preemptive scope
is limited by the substantive requirements of its removal
provisions, its unique definition of class action, and its
automatic dismissal of certain kinds of securities-related
claims. *Id.* at *3, 5.

> n120 SLUSA was enacted to cure a perceived
> "loophole" in the PSLRA, which permitted in-
> vestors to avoid the requirements of the PSLRA by
> bringing claims against issuers in state court. When
> the numbers of such state-court filed suits increased
> dramatically, Congress passed SLUSA to close the
> loophole. *See, e.g., Dudek v. Prudential Securities,
> Inc.*, 295 F.3d 875, 877 (8th Cir. 2002); *Gutierrez v.
> Deloitte & Touche*, 147 F. Supp. 2d 584, 589 (W.D.
> Tex. 2001).

[*295]

The statute provides in relevant part,

> No covered class action based upon the statu-
> tory or common law of any state or subdivi-
> sion thereof may be maintained in any State
> or Federal court by any private party alleg-
> ing—
>
> (A) A misrepresentation or omission of a ma-
> terial fact in connection with the purchase or
> sale of a covered security; or
>
> (B) that the defendant used or employed
> any manipulative or deceptive device or con-
> trivance in connection with the purchase or
> sale of a covered security.

Securities Act of 1933, 15 U.S.C. § 77p(b); Securities and
Exchange Act of 1934, 15 U.S.C. § 78bb(f)(1).

Title 15 U.S.C. § 78bb(f)(5)(B) defines a "covered
class action" as

> (i) any single lawsuit in which—
>
> (I) damages are sought on behalf of more
> than 50 persons or prospective class mem-
> bers, and questions of law or fact common to
> those persons or members of the prospective
> class, without reference to issues of individ-
> ualized reliance on an alleged misstatement
> or omission, predominated over any question
> affecting only individual persons or members
> or
>
> (II) one or more named parties seek to
> [*296] recover damages on a representative
> basis on behalf of themselves and other un-
> named parties similarly situated, and ques-
> tions of law or fact common to those persons
> or members of the prospective class predom-
> inate over any questions affecting only indi-
> vidual persons or members; or
>
> (ii) any group of lawsuits filed in or pend-
> ing in the same court and involving common
> questions of law or fact, in which—
>
> (I) damages are sought on behalf of more
> than 50 persons; and
>
> (II) the lawsuits are joined, consolidated,
> or otherwise proceed as a single action for
> any purpose.

15 U.S.C. § 78bb(f)(5)(B).

A "covered security" is defined as "a security that
satisfies the standards for covered security specified in
paragraph (1) or (2) of section 77r(b) of this title, at the
time during which it is alleged that the misrepresentation,
omission, or manipulative or deceptive conduct occurred
. . . ." 15 U.S.C. § 77p(f)(3). Section 77r(b), adopted by §
78bb(f)(5)(E), defines a "covered security" as one listed
on the New York Stock Exchange, the American Stock
Exchange, or the Nasdaq National Market, or a security
issued by an investment company that [*297] is regis-
tered, or for which a registration statement has been filed
under the Investment Company Act of 1940. Enron's stock
was listed on the New York Stock Exchange throughout
the relevant period.

SLUSA thus provides for mandatory removal and/or
dismissal of a specific kind of class action:

(f) LIMITATIONS ON REMEDIES.—
(1) CLASS ACTION LIMITATIONS.—No covered class action based upon the statutory or common law of any state or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.
(2) REMOVAL OF COVERED CLASS ACTIONS.—Any covered class action brought in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).

15 U.S.C. § 78bb(f)(1)(A), (B) & (2). *See, e.g., Dudek v. Prudential Securities Inc.*, 295 F.3d 875, 877 (8th Cir. 2002); [*298] *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1128 (9th Cir. 2002), *amended on other grounds*, 320 F.3d 905 (9th Cir. 2003); *Behlen v. Merrill Lynch*, 311 F.3d 1087, 1091–93 (11th Cir. 2002), *cert. denied*, 123 S. Ct. 2583 (2003).

Thus a claim falls within the preemptive scope of SLUSA if it meets four requirements: (1) the suit is a "covered class action" as defined in the statute; (2) the action is brought under state law; (3) the plaintiffs allege that the defendants misrepresented a material fact or omitted a material fact or used or employed a manipulative or deceptive device or contrivance; and (4) the plaintiffs allege that defendants' wrongful conduct was "in connection with" the purchase or sale of a "covered security." *Green v. Ameritrade*, 279 F.3d 590, 596 (8th Cir. 2002).

Not only SLUSA, but § 10(b) of the 1934 Act and Rule 10b–5 provide a cause of action based on practices prohibited therein, qualified *inter alia* by the phrase, "in connection with the purchase or sale" of a security. 15 U.S.C. § 78j(2)(b); 17 C.F.R. 240.10b–5. SLUSA preempts [*299] all state law class actions based upon alleged untrue statements or omissions of material fact, or use of manipulative or deceptive devices or contrivances, in connection with the purchase or sale of a covered security, as those terms are defined in the statute. 15 U.S.C. § 78bb(f). Although SLUSA does not define "in connection with the purchase or sale of a covered security," and the

Supreme Court has only minimally addressed the issue, n121 most courts addressing the question have applied the judicial construction of the parallel phrase in § 10(b). n122 Most of these cases have dealt only with alleged material misrepresentations or omissions "in connection with the purchase or sale of a covered security." *See, e.g., Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334, 1342 (11th Cir.), *cert. denied*, 537 U.S. 950 (2002); *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1129 (9th Cir. 2002), *amended on other grounds*, 320 F.3d 905 (9th Cir. 2003); *Behlen v. Merrill Lynch*, 311 F.3d 1087, 1093 (11th Cir. 2002), *petition for cert. filed, No. 02-1520*, 71 U.S.L.W. 3680 [*300] (Apr. 14, 2003); *Green v. Ameritrade, Inc.*, 279 F.3d 590, 597–98 (8th Cir. 2002); *Gutierrez v. Deloitte & Touche, L.L.P.*, 147 F. Supp. 2d 584, 595 (W.D. 2001); *Shaev v. Claflin*, No. C 01–0009, 2001 WL 548567, *4 (N.D. Cal. May 17, 2001); *Shen v. Bohan*, 2002 WL 31962136, *3 (C.D. Cal. Oct. 17, 2002); *Zoren v. Genesis Energy, L.P.*, 195 F. Supp. 2d 598, 605 (D. Del. 2002); *Gordon v. Buntrock*, No. 00 CV 303, 2000 WL 556763, *3 (N.D. Ill. 2000). A few did address manipulative or deceptive devices or contrivances "in connection with the purchase or sale of a covered security." *See, e.g., Burns v. Prudential Securities*, 116 F. Supp. 2d 917, 921–23 (N.D. Ohio 2000); *Denton v. H&R Block Financial Advisors, Inc.*, No. 01 C 4185, 2001 WL 1183292, *4 (N.D. Ill. Oct. 4, 2001) ("While it is true that allegations of breach of fiduciary duty alone will not sufficiently plead a securities fraud claim, a breach of fiduciary duty may give rise to a Rule 10b–5 claim where the alleged conduct 'can fairly be viewed as manipulative or deceptive conduct within the meaning [*301] of the [Securities Act].'") (*quoting Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 473–74 (1977)); *Shaw v. Charles Schwab & Co.*, 128 F. Supp. 2d 1270, 1272 (C.D. Cal. 2001), *appeal dismissed for lack of appellate jur.*, 45 Fed. Appx. 651, 2002 WL 1929469 (9th Cir. Aug. 21, 2002).

n121 *See SEC v. Zandford*, 535 U.S. 813, 122 S. Ct. 1899 (2002), in which a unanimous Supreme Court read the "in connection with the purchase or sale of any security" very flexibly to reach the fraudulent practices of a broker with authorization to manage his client's investment accounts who wrote checks to himself from his clients' accountant that required the sale of securities for payment. The Supreme Court found that stock sales and the broker's fraudulent actions were interdependent and coincidental with the stock sales and that the sales furthered the broker's scheme to defraud his clients and misappropriate their assets.

n122 *But see Shaw v. Charles Schwab & Co.*, 128 F. Supp. 2d 1270, 1273–74 (C.D. Cal. 2001)

(("Although Sections 10(b) and 78bb(f) may be phraseologically homologous, the Court cannot simply assume that the two statutes produce meaning in the same way. Different congressional intents gird the two statutes."), *appeal dismissed for lack of appellate jur.*, 45 Fed. Appx. 651, 2002 WL 1929469 (9th Cir. Aug. 21, 2002). In this case, the district court explained that while § 10(b)'s primary purpose is "to protect investors from false and misleading practices," SLUSA's is "'to protect the interest of shareholders and employees of public companies that are the target of meritless 'strike' suits.'" *Id.* at 1273–74 Therefore the district court refused to construe "in connection with" as broadly in the SLUSA context as it would in a § 10(b) context. *Id.* at 1273–74.

[*302]

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) (affirming the rule of *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952)), the Supreme Court held that claimants contending that they were defrauded into not purchasing stock or defrauded into continuing to hold stock, in other words claimants that did not actually sell or purchase stock because of the alleged misrepresentation, have no right of action under § 10(b). *Blue Chip Stamps*, 421 U.S. at 727. The Supreme Court further observed, "Obviously, this disadvantage is attenuated to the extent that remedies are available to non-purchasers and nonsellers under state law." 421 U.S. at 739 n.9. Thus, as the Eleventh Circuit has commented, while the high court in *Blue Chip Stamps* "recognized that 'holding' claims are not actionable under federal securities laws, they may well be actionable under state laws that are more stringent than their federal counterparts." *Riley*, 292 F.3d at 1343. *See generally Ameritrade*, 279 F.3d 590 (absent allegations of the sale and purchase of a covered security, SLUSA did not preclude [*303] a state law claim for breach of contract); *Gutierrez v. Deloitte & Touche*, 147 F. Supp. 2d at 592 (allegations that accounting misfeasance caused plaintiffs to hold securities that they otherwise would have sold are not barred by SLUSA); *Shen v. Bohan*, 2002 WL 31962136 at *3 (where plaintiffs alleged only that the defendants diluted their shareholder voting rights when stock was issued to acquire another company, their suit was not brought in connection with the purchase or sale of securities and may not be removed under SLUSA); *Shaeve v. Caflin*, No. C 01-0009 MJJ, 2001 WL 548567 at *5 (N.D. Cal. 2001) (where claims are not based on purchase or sale of stock but on dilution of a present shareholder's interests, "the complaint essentially claimed that the value of *existing* shareholder's ownership interests were reduced

. . . by the stock option adjustment" and does not meet the "in connection with" requirement for removal under SLUSA); *Gordon v. Buntrock*, No. 00 CV 303, 2000 WL 556763 at *3 (N.D. Ill. Apr. 28, 2001) (complaint alleging common law claims for breach of fiduciary duty, recognized under Delaware law, and seeking [*304] damages for lost value caused by holding onto securities, but not purchase or sale, was not properly removable).

Thus the courts agree that "SLUSA does *not* apply to claims dealing *solely* with the retention of securities, rather than with purchase or sale." *Riley*, 292 F.3d at 1345. Where a plaintiff alleges that a misrepresentation caused him to purchase more stock as well as to hold a particular security, however, as is the case in the *Tittle* complaint, the Eleventh Circuit has concluded that the plaintiff "may not avoid SLUSA's restrictions," the complaint does fall within the ambit of SLUSA, and the rule that SLUSA does not apply to holding claims is not applicable. *Id. In accord, In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 771 (S.D.N.Y. 2003). Such a rule makes good sense to this Court, in light of the concerns that led Congress to enact the PSLRA. Typically plaintiffs will have both transactional and holding claims and could otherwise easily avoid the more stringent requirements of the federal statute by asserting both. Courts have reach the same decision about hybrid complaints based on both covered and non-covered securities or on [*305] securities and non-securities. *See Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 1000 n.21 (C.D. Cal. 2002) ("When a claim concerns a transaction that involves both covered and non-covered securities as alleged, the entire claim is subject to removal under SLUSA), *citing Lasley v. New England Variable Life Ins. Co.*, 126 F. Supp. 2d 1236, 1238–39 (N.D. Cal. 1999) (holding that a complaint alleging fraud in connection with the purchase of a variable life insurance policy (a covered security) and ordinary life insurance (a non-security) was removable under SLUSA); *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 999 F. Supp. 2d 993, 1000 n. 21 (C.D. Cal. 2002).

*Tittle* Plaintiffs argue that in the ESOP, all shares of Enron stock were distributed by the end of 1996, the Class Period did not begin until January 20, 1998, and thus all the participants' claims are solely holding claims because none of the participants or beneficiaries bring claims "in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). Thus they maintain that the claims of the [*306] ESOP participants are not within the preemptive scope of SLUSA, and that any state law claim as to them, such as the civil conspiracy cause of action, is not preempted by that statute. Nor, Plaintiffs insist, has there been any purchase or sale of securities relating to Plaintiffs' phantom stock/compensation claims, n123 the Cash Balance Plan offset based on inflated price of Enron

stock on specified dates, and the Savings Plan employer matching contributions. In sum, insist Defendants, because these fail to fall under the securities laws, the civil conspiracy claim related to them is not preempted.

> n123 As the Court explains in footnote 2 and on pages 231–37 and nn. 126–30 of this memorandum and order, the federal securities laws do not apply to bonus plans like the phantom stock program.

Nevertheless, the language of the complaint differs from Plaintiffs' current account and plainly states that Plaintiffs were deceived into both holding and/or purchasing Enron stock in the ERISA–governed plans. *See, e.g.* [*307] , Complaint at 4, P5 ("Andersen's actions also caused employees to invest in or hold their Enron stock in their ESOP and Savings accounts rather than to diversify or put their retirement funds in safer investments."); at 5, P8 ("Participants in the Savings Plan, the ESOP and the Cash Balance plans, having no knowledge of the accounting improprieties, and further encouraged by the statements of officers of Enron regarding the financial strength of the Company[,] continued to add more Enron stock to their accounts . . . and/or continued to retain Enron shares instead of diversifying their holdings.").

There is no dispute that Savings Plan participants and beneficiaries bring both holding and purchasing claims, and therefore their interests in that portion of the Plan involving the purchase and/or sale of stock might constitute a "security" and be actionable under the securities laws. If Plaintiffs were to replead these claims under the federal securities laws, the related common law conspiracy and negligent misrepresentation claims would be preempted by SLUSA.

Plaintiffs have also argued that the misstatements made by Lay, Skilling, Fastow and other Enron insiders to Enron employees [*308] as part of the conspiracy to fraudulently induce them to retain and acquire Enron stock, as alleged in their complaint, are not actionable under the securities laws because they are not *public* statements intended to artificially inflate the stock's price (under a fraud on the market theory), but statements made inside in-house publications or at employee meetings as part of a fraudulent scheme to convince the employees to keep their retirement assets in, or to accept compensation in the form of, over-valued Enron stock to free up cash for Defendants' personal enrichment. The Court concludes that such an arbitrary division between "non-public" statements made only to employees and statements of virtually identical import to the public at large, included in *Newby*, constitutes the kind of manipulative pleading to circumvent the PSLRA and SLUSA that has

not been permitted by most courts.

Citing *Lemanik, S.A. V. McKinley Allsopp, Inc.*, 125 F.R.D. 602, 607 (S.D.N.Y. 1989), as authority, Defendants have argued that because the plan itself held the Enron stock in the plan and owned the legal interest in those assets, the plan record holder is the real party in interest [*309] and the plan participants and beneficiaries, who hold only the equitable interest, cannot bring securities law claims. n124

> n124 The Court distinguishes the issue of beneficial versus legal ownership from the issue of whether the participants' interest in each of the plans or phantom stock constitutes a "security" within the meaning of the federal securities laws, to be discussed later. See pages 231–37 of this memorandum and order.

This Court disagrees. Federal Rule of Civil Procedure 17(a) provides in relevant part, "Every action shall be prosecuted in the name of the real party in interest. An . . . administrator, . . . trustee of an express trust, . . . or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the actions is brought." Defendants' authority, *Lemanik*, merely held that the record keeper of a plan is *a* party–in–interest, but not the only one, who could bring suit for securities violations. [*310] The established rule is that "nothing in the real party in interest rule precludes a beneficial owner from commencing an action or joining an action with the legal title holder, if the beneficial owner has a right which can be enforced in a court action." 25 Federal Procedure, Lawyers Ed. § 59:54 (Database updated May 2003), *citing Beasoechea v. Sverdrup & Parcel and Associates, Inc.*, 486 F. Supp. 169, 173 (E.D. Pa. 1980) ("The permissive language of [Rule 17(a)] does not preclude the beneficial owner from suing or joining with the legal title holder if the beneficial owner has the right sought to be enforced.").

Furthermore it is not the procedural rule alone, but the substantive law that determines whether the plaintiff is actually the real party in interest. *See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 256–57 (5th Cir. 1980) ("the mere fact that a plaintiff falls within one class of persons enumerated in Rule 17(a) is not dispositive of the real party in interest question, for the rule assumes that the enumerated persons are granted the right to sue by the applicable substantive law."); *HB General Corp. v. Manchester Partners L.P.*, 95 F.3d 1185, 1196–97 (3d Cir. 1996); [*311] *Certain Interested Underwriters at Lloyd's, London, England v. Layne*, 26 F.3d 39, 43 (6th Cir. 1994). The civil enforcement provisions of ERISA, embodied in § 502(a), 29 U.S.C. 1132(a), expressly give

plan participants the right to bring suit. *See also Isola v. Hutchinson*, 780 F. Supp. 1299 (N.D. Cal. 1991) (sole remaining participant in plan with "a beneficial interest in recovering assets that may have been fraudulently removed from the Plan" held to be an appropriate plaintiff under § 502(a)(3)). The same is true of beneficial interest holders under RICO. Title 18 U.S.C. § 1964(c) grants standing to "[any] person injured in his business or property by reason of a violation of section 1962 . . . ." In turn, under 18 U.S.C. § 1961(3), "person" is defined as "including any individual or entity capable of holding a legal or beneficial interest in property." *See, e.g., Joseph v. Algemene Bank Nederland, N.V.*, 592 F. Supp. 141, 148 (W.D. Pa. 1984).

In construing § 10(b)'s use of the term "device," the Supreme Court, relying on *Webster's International Dictionary* [*312] (2d ed. 1934), found that the term involved "knowing and intentional conduct" and equated the word, *inter alia*, with a "scheme; often a scheme to deceive . . . ." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 & n.20 (1976). Moreover, Rule 10b–5 makes it unlawful for any person "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." There are a number of state-law claims, such as breach of contract, breach of fiduciary duty, conversion or negligence, which by themselves, would not fall within the proscriptions of § 10(b), but when they become part of a larger deception, a scheme to defraud, would constitute a violation of the federal statute. For example a number of courts faced with the question of whether unauthorized trading by a broker states a claim for violation of the Securities Act have concluded that unauthorized trading alone does not establish scienter and does not state a claim under the Securities Act. *Burns*, 116 F. Supp. 2d at 923–25 (and cases cited therein). Nevertheless, when such misconduct is alleged [*313] to be part of a larger deception, a scheme to defraud, coupled with scienter (specific facts giving rise to a strong inference of severe recklessness or intent to deceive, manipulate or defraud), the allegations are sufficient to trigger the preemptive effect of SLUSA. *Id.* at 925. *See also SEC v. Zandford*, 535 U.S. 813,  , 122 S. Ct. 1899, 1903 (2002) (although the "statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b), neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act"; the high court found that securities sales and a broker's unauthorized fraudulent acts were not independent events, but coincided because each sale was made to further broker's fraudulent scheme for his own benefit)

n125; *Prager v. Knight/Trimark Group, Inc.*, 124 F. Supp. 2d 229, 234–35 (D.N.J. 2000) ("It must be concluded, therefore, that plaintiff has pleaded what are, in essence, securities fraud claims [for breach of contract, violation of the implied covenant [*314] of good faith, breach of fiduciary duty, unjust enrichment, and violation of New Jersey's Consumer Fraud Act], even though they were framed as state law claims, and that SLUSA governs."); *Behlin*, 311 F.3d at 1093–95.

n125 In *Zandford*, the SEC's complaint alleged "a fraudulent scheme in which the securities transactions and the breaches of fiduciary duty coincide." 122 S. Ct. at 1906. Thus the connection or nexus requirement of "in connection with" need not be causation: the fraud may be "in connection with" the securities purchases or sales if the fraud "coincides" with those transactions. Nevertheless, even with such an expansive and flexible construction of the phrase, some kind of "nexus between the alleged fraud and a securities transaction" must be alleged to satisfy the "in connection with" element. *French v. First Union Securities, Inc.*, 209 F. Supp. 2d 818, 827 (M.D. Tenn. 2002).

A misrepresentation by a person, whose position made it reasonable for [*315] a plaintiff to rely upon that misrepresentation, about the value of a security, which was subsequently bought or sold by the plaintiff in reliance upon that statement, will satisfy the requisite "in connection with" a security for a § 10(b) claim. *See, e.g., In re Ames Dept. Stores, Inc. Stock Litig.*, 991 F.2d 953, 967 (2d Cir. 1993).

Only a purchaser or seller of "securities" may bring a private action for damages under § 10(b) and Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–33 (1975). Many of the *Tittle* Plaintiffs lack an interest in a "security" or a connection with the purchase or sale of a "security," and thus lack standing to bring a claim under § 10(b) and Rule 10b–5. Whether an employee's interest in an employee benefit retirement (pension) plan constitutes a "security" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 n126 does not depend upon whether it is a defined benefit or defined contribution plan; instead it depends on whether the plan is "voluntary or involuntary, and contributory or noncontributory." The S.E.C. defined a "'voluntary' plan [as] 'one in which [*316] the employees may elect whether or not to participate,'" while a "contributory" plan is "one in which employees make direct payments, usually in the form of cash or payroll deductions, to the plan." SEC Release No. 33-6188, 1980 WL 29482, at *33 nn. 19 and 20 (Feb. 1, 1980). In other

words, a "noncontributory" plan would be one where the employer makes all the contributions. The interests of employees in an employee benefit plan "are securities only when the employees voluntarily participate in the plan and individually contribute thereto." *Id.* at *7, *2. On the other hand, ". . . the Securities Acts do not apply to a noncontributory, compulsory plan." *Id.* at *8, *citing International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel*, 439 U.S. 551, 570 (1979). The SEC has long taken the position that interests in voluntary contribution pension and profit-sharing plans are "securities" because "such interests constitute investment contracts, although it has also been suggested that they may be 'certificates of interest or participation in a profit-sharing agreement' as well." 1980 WL 29482, at *9. The **[*317]** SEC's Chairman stated before the Senate Committee on Human Resources on the antifraud provisions of the proposed ERISA Improvements Act of 1979 (S. 209),

> . . . An employee who is given a choice whether to participate in a voluntary pension plan, and decides to contribute a portion of his earnings or savings to such plan, has clearly made an investment decision, particularly when his contribution is invested in securities issued by his employer. Employees making such decisions should continue to be afforded the protections of the antifraud provisions of the federal securities laws.

*Id.* (noting that the reasoning in *Daniel* supports the view that the employee's interest in a voluntary, contributory plan is an investment contract).

n126 Section 2(1) of the 1933 Act, as amended, 15 U.S.C. § 77(b)(1), defines a "security" as

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to sub-

scribe to or purchases, any of the foregoing.

The definition in § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), is nearly identical, and coverage under the two Acts is regarded as the same. *International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel*, 439 U.S. 551, 557 n.7 (1979). Neither statutory provision refers to any kind of pension plan. *Id.* at 558. Section 2(3) of the 1933 Act provides that "the term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security for value." Similarly, Section 3(a)(14) states, "the terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." *See, e.g., Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555, 556 (2d Cir. 1985) (concluding that an individual, who accepted an employment contract from a corporation in return for that corporation's stock or promise of stock was an "investor" and the issuance or transfer of stock was a "sale" (disposition of a security for value) under the federal securities laws).

**[*318]**

The Supreme Court in *Daniel* looked to an "economic realities" test (substance over form) in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), to determine whether a particular financial relationship constitutes an investment contract: "'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.'" 439 U.S. at 558. n127 The Supreme Court explained in *Daniel*,

> An employee who participates in a noncontributory, compulsory pension plan by definition makes no payment into the pension fund. He only accepts employment, one of the conditions of which is eligibility for a possible benefit on retirement . . . . In every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security . . . . Even in those cases where the interest acquired had intermingled security and nonsecurity aspects, the interest obtained had "to a very substantial degree the elements of investment contracts . . . . **[*319]** " In every case the purchaser gave up some tangible and definable consideration in return

2003 U.S. Dist. LEXIS 17492, *319

for an interest that had substantially the characteristics of a security. [citations omitted]

439 U.S. at 559–560 (concluding that an employee's participation in a noncontributory, compulsory pension plan does not constitute a "security" or an "investment contract).

n127 In contrast, in a noncontributory, compulsory pension plan, the investment is a minor part of the employee's compensation package and the employee can only in the most abstract sense be viewed as exchanging part of his labor for the possible benefits of the plan; "he surrenders his labor as a whole, and in return receives a compensation package that is substantially devoid of aspects resembling a security . . . . An employee is selling his labor primarily to obtain a livelihood, not making an investment." *Daniel*, 439 U.S. at 560. The pension fund is largely derived from employer contributions, not earnings from its assets, and does not depend on the efforts of its managers. *Id.* at 562. The employee's expectations of participating in earnings from the plan's assets is only a small part of the total compensation package and are "'far too speculative and insubstantial to bring the entire transaction within the Securities Acts'." *Id.* at 562. The high court further emphasized, "unlike the Securities Acts, ERISA deals expressly and in detail with pension plans," and thus ERISA's comprehensive legislative scheme for such plan "undercuts all arguments for extending the Securities Act to noncontributory, compulsory pension plans." *Id.* at 569–70.

[*320]

In contrast to a noncontributory, involuntary pension plan like that in *Daniel*, a voluntary, contributory plan, such as that portion of the Savings Plan other than the employer match contributions n128 in *Tittle*, has been found to be a "security" for purposes of securities fraud claims under the federal securities statutes. *See Dubin v. E.F. Hutton Group, Inc.*, 695 F. Supp. 138, 144–47 (S.D.N.Y. 1988); *Hood v. Smith's Transfer Corp.*, 762 F. Supp. 1274, 1284 (W.D. Ky. 1991). Thus any state-law claim relating to it might fall within the preemptive scope of SLUSA if the statute's other requirements are met. The intermingling of the employer matching contributions portion to the Savings Plan with the voluntary contributions on which the employer match depends appears to fall within *Daniel's* "cases where the interest acquired had intermingled security and nonsecurity aspects" and thus "to a very substantial degree the elements

of investment contracts," making it a "security." 439 U.S. at 560.

n128 The employer match contributions, furthermore, were made in Enron stock, but not "in connection with the purchase or sale" of these securities.

[*321]

The ESOP at issue in *Tittle* is an involuntary, noncontributory plan, n129 but a plan in which employee participation is compulsory, and the shares distributed represent a mandatory portion of the employees' compensation, not securities that are purchased or sold. *See* discussion *infra; International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel*, 439 U.S. 551 (1979); *Bauman v. Bish*, 571 F. Supp. 1054, 1064 (N.D.W.Va. 1983) (ESOP plan more "a method of deferring income" than an investment in securities. n130). "[A] grant of stock under an Employee Stock Ownership Plan or similar stock bonus program is generally not a 'sale' under the 1933 Act." *Falkowski v. Imation Corp.*, 309 F.3d at 1130, *citing Int'l Brotherhood of Teamsters v. Daniel*, 439 U.S. 551 (1979) (holding that an interest in a compulsory, noncontributory pension plan is not a 'security.'), and SEC Release No. 33-6188, 1980 SEC LEXIS 2141, at *52–53 (Feb. 1, 1980). Moreover, according to the complaint at 51, PP170–171, Enron closed the ESOP to new employees at the end of 1994 and all the shares in [*322] the ESOP were distributed by the end of 1996; therefore any claims by ESOP participants arising during the Class Period appear to be holding claims, n131 another reason why the federal securities laws do not apply, because there was no "connection with the purchase and sale of a covered security." 15 U.S.C. § 78bb(f)(1).

n129 The ESOP plan at § 5.1 states, "Members shall neither be required nor permitted to contribute to the Plan." In contrast, Enron "shall contribute to the Trustee . . . the amount, if any, authorized by its Board of Directors."

n130 As the *Bauman* court, in concluding that an ESOP created when employees bought a corporation did not fall within the scope of the Securities Acts, explained,

Participation in the ESOP for employees of the proposed company is not voluntary and is, in a sense, compulsory. Each participant who meets certain minimum hours of service will have stock allocated to his or her account. Thus there is no affirmative in-

vestment decision. More importantly, there is no furnishing of "value" by participating employees. Instead of giving up some tangible and definable consideration, participants earn stock through labor for the employer.

571 F. Supp. at 1064.

[*323]

n131 The Court has pointed out contrary statements in the complaint. Since, as explained, neither the ESOP nor the Cash Balance Plan qualifies as a security, the federal securities laws do not apply.

The Court lacks sufficient information about the program for compensating employees with phantom stock, but given the nature of the program, presumably the recipients are participating in a compulsory, noncontributory program and would not be subject to the Securities Act. *See* footnote 2 of the memorandum and order.

Although the Court again cannot be certain from the record before it, the Cash Balance Plan, in which the defined benefit is a mixture of an employee's averaged pay benefit offset by the value of one fifth of the Enron stock allocated to his individual ESOP account, calculated at market price on the first day of each of five years, also does not appear to be a security under *Daniel*. As noted, an employee's ESOP account does not appear to qualify as a security under *Daniel*, nor, under the Cash Balance Plan, is there any "connection with the purchase or sale" of Enron securities, [*324] but merely a reference to the market price of the stock on five days in five years. The averaged pay calculation is not a voluntary "contribution." Thus the Cash Balance Plan would also appear not to be a "security" and not to be subject to the federal securities laws.

In addition to that law, the Court notes that the *Newby* class description restricts the number of *Tittle* plaintiffs that would be eligible to join the *Newby* class. In the first consolidated complaint the class action was brought by Plaintiffs "on behalf of all persons who purchased Enron securities including . . . Enron employees who purchased Enron stock individually or for their *401(k) retirement plans* during the Class Period." # 441 at P986 in H-01-3624 [emphasis added]. The recent first amended consolidated complaint, which supersedes the former, has modified that definition and brings suit "on behalf of purchasers of Enron Corporation's publicly traded equity and debt securities between 10/19/98 and 11/27/01." # 1388 at 3. The definition implicitly incorporates the bar against

pure holding claims to limit that group.

The fact that plaintiffs may plead state law claims that do not meet the pleading [*325] of scienter required by the federal law, i.e., § 10(b) and Rule 10b-5's severe recklessness, does not prevent preemption by SLUSA, which does not mention scienter. This Court agrees with the reasoning in *Feitelberg v. Merrill Lynch & Co., Inc.*, 234 F. Supp. 2d 1043, 1051 (N.D. Cal. 2002), where the district court explained,

> If by merely omitting scienter allegations plaintiff can avoid SLUSA's preemption effect, SLUSA would be totally eviscerated. If in fact the claims allege misrepresentations or omissions or use of manipulative or deceptive devices in connection with the purchase of sale of securities and otherwise come within the purview of SLUSA, artful avoidance of those terms or scienter language will not save them from preemption. In other words, if it looks like a securities fraud claim, sounds like a securities fraud claim and acts like a securities fraud claim, it is a securities fraud claim, no matter how you dress it up.

*Id.* at 1051. n132

n132 *But see Burns v. Prudential Sec.*, 116 F. Supp. 2d 917 (N.D. Ohio 2000) (holding that SLUSA does not preempt state law claims for conversion, breach of contract, breach of fiduciary duty and negligent supervision where the federal securities law standards for scienter are not satisfied by the pleadings).

[*326]

The Court observes that negligence is not actionable under § 10(b), which requires that scienter at minimum reach the level of "severe recklessness," which is "properly defined and adequately distinguished from mere negligence," i.e., as "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001), *citing inter alia Broad v. Rockwell Intern. Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981), *cert. denied*, 454 U.S. 965 (1981).

If those *Tittle* Plaintiffs with claims that are cognizable under the federal securities laws were to replead to

assert securities violations or to join the class in *Newby*, or to bring suit in state court alleging the same facts under state law, the common law claims of conspiracy and negligent misrepresentation would also be preempted by SLUSA. The *Tittle* Plaintiffs' [*327] suit, with more than fifty plaintiffs, meets the definition of "covered class action" under SLUSA; shares of Enron stock are a "covered security" within the meaning of SLUSA; the complaint alleges that Defendants have misrepresented or omitted material facts and have used manipulative or deceptive devices and contrivances in connection with the purchase or sale of Enron securities; and Plaintiffs' civil conspiracy and negligent misrepresentation claims relating to what are actually securities violations are common–law causes of action that fall within the preemptive reach of SLUSA.

Even though there may be no remedy under the federal securities statutes, were Plaintiffs to assert violation of the securities laws, Plaintiffs' state-law negligent misrepresentation claim against Arthur Andersen LLP in Count VIII would be preempted by SLUSA because SLUSA expressly preempts all state law class action claims based on alleged false statements or omissions of material fact or the use of a manipulative device or contrivance in connection with the purchase or sale of a covered security. 15 U.S.C. § 77p(b) (Securities Act of 1933); 15 U.S.C. § 78bb [*328] (f)(1) (Securities Exchange Act of 1934). This Court finds that under the facts alleged here, as part of a scheme by Defendants for personal enrichment, Arthur Andersen's alleged fraudulent accounting practices purportedly served to persuade the plan participants to retain and to purchase Enron stock for their retirement funds and thus "were in connection with the purchase or sale of securities," the fraud coincides with the Savings Plan participants' purchase of Enron stock during the Class Period. Furthermore, as noted in the Court's discussion of the RICO Amendment, the scheme encompassed far more that plan participants; Arthur Andersen's accounting misrepresentations were embodied in public records and relied on by investors in the public at large just as they were by plan participants and beneficiaries. The ERISA plan participants constitute only one slice in the pie in the Ponzi scheme set out in the *Newby* securities class action.

Similarly, the facts supporting the state-law conspiracy claim in Count IX duplicate many of those constituting the Ponzi scheme actionable under § 10(b) and Rule 10b–5. SLUSA preempts all state law class actions based upon alleged untrue statements [*329] or omissions of material fact, or use of manipulative or deceptive devices or contrivances in connection with the purchase or sale of a covered security, as those terms are defined in the statute. 15 U.S.C. § 78bb(f).

In sum, as indicated, for those *Tittle* Plaintiffs who have standing to sue under the federal securities laws, or who join the *Newby* class, or who attempt to file claims in state court based on the same facts and alleging under state law that they purchased Enron stock based on alleged misrepresentation, omissions, deceptive devices and contrivances, their common law claims of conspiracy and negligent misrepresentation are preempted by SLUSA.

## 2. ERISA Preemption and Plaintiffs' Common–Law Civil Conspiracy Claim

A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001); *Operation Rescue–Nat'l v. Planned Parenthood of Houston & S.E. Tex., Inc.*, 975 S.W.2d 546, 553 (Tex. 1999). n133 A plaintiff must prove (1) two or more persons are involved, [*330] (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages. *Id.* The plaintiff must prove specific intent to cause injury, "to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by an unlawful means"; moreover the conspirators must be aware of the harm or wrongful conduct when they commence the combination or agreement. *Juhl v. Arlington*, 936 S.W.2d 640, 644 (Tex. 1996); *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995).

n133 The Court presumes this cause of action is brought under Texas law.

More important for our analysis, conspiracy is a derivative tort, so a plaintiff must prove the elements of an underlying tort in which the defendant participated in order to prevail on a civil conspiracy claim. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

Here by the specific factual allegations regarding the scheme of the conspirators, [*331] the underlying tort would be fraud, which would embrace both fraudulent misrepresentation and fraudulent inducement. Under Texas law to prevail on such a claim, a plaintiff must prove (1) a material misrepresentation (2) that was false, (3) that was known to be false when made or made without knowledge of the truth, (4) that was intended to be acted upon, (5) that was relied upon, and (6) that caused the plaintiff injury. *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991). Texas law requires actual reliance; the presumption of reliance under the theory of fraud on the market does not

apply. *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 279, *clarified on other grounds*, 739 F. Supp. 1087 (N.D. Tex. 1990); *Griffin v. GK Intelligent Sys., Inc.*, 87 F. Supp. 2d 684, 690 (S.D. Tex. 1999); *McNamara v. Bre-X Minerals Ltd.*, 197 F. Supp. 2d 622, 697–98 (E.D. Tex. 2001).

Furthermore tort damages, including exemplary damages, are available [*332] for a common–law fraud claim. *Formosa Plastics*, 960 S.W.2d at 46–47 (tort damages, including exemplary damages, are recoverable for fraud claims sounding in tort, such as fraudulent inducement by misrepresentation, "irrespective of whether the fraudulent misrepresentations are later subsumed in a contract or whether the plaintiff only suffers economic loss related to the subject matter of the contract"). "'Exemplary damages' means any damages awarded as a penalty or by way of punishment. 'Exemplary damages' includes punitive damages." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(5) (Vernon's 2003).

As noted, the Texas state-law cause of action for civil conspiracy is not an independent cause of action, but is based on an underlying substantive wrong, a tort committed by the alleged conspirators. Therefore liability is not based on the conspiracy, but on the underlying tort. *See Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 551 (8th Cir. 1996) ("'the gist of the action is not the conspiracy charged, but the tort working the damage to the plaintiff'"; the real purpose of a conspiracy claim is "'to show facts [*333] for vicarious liability of defendants or for the acts committed by others, joinder of joint tortfeasors, and aggravation of damages'") (*citing and quoting Harding v. Ohio Casualty Ins. Co.*, 230 Minn. 327, , 41 N.W.2d 818, 825 (1950)); *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983) ("Since liability for civil conspiracy depends on the performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort."); *In re Orthopedic Bone Screw Products Liability Litig.*, 193 F.3d 781, 789–90 & n.7 (3d Cir. 1999) (and cases cited therein).

If the alleged underlying tort of the conspiracy, here fraud, falls within the scope of a federal statute's "complete" preemption, n134 the conspiracy claim is deemed to arise under the federal law; the conspiracy allegations do not change the nature of the cause of action since liability is based on the underlying tort. *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d at 551 ("claims that fall within the preemptive scope of the particular statute . . . are considered [*334] to make out a federal question") (*citing Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 64–66 (1987) (extending doctrine of complete preemption to ERISA)). n135 In such a case, to allow the civil conspiracy cause to go forward under state law would

allow litigants to "avoid federal question jurisdiction and create causes of action where Congress intended there to be none." *Id.* at 551.

n134 See pages 201–06 of this memorandum and order.

n135 *Gaming Corp.* dealt with the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*, which completely preempts state law relating to the governance of gaming activities, including management of casinos on Indian lands. The case alleged that a law firm representing a Native American tribe during a process for licensing tribal casino management violated the Indian Civil Rights Act. A concurrent cause of action under Michigan law alleging a civil conspiracy to violate the Indian Civil Rights Act was dismissed because (1) it was determined that the conspiracy's underlying tort was completely preempted by the IGRA and (2) because the conspiracy claim arose under the Indian Civil Rights Act, which did not provide for a private cause of action, it had to be dismissed.

[*335]

### 3. ERISA Preemption and Claim of Negligent Misrepresentation against the Andersen Defendants

Plaintiffs assert that the Andersen Defendants performed improper accounting and negligently certified the accuracy of financial statements that they knew or should have known to be false and misleading for Enron and the Savings Plan, reiterated these false statements in Andersen's capacity as auditor of the Savings Plan during part of the Class Period, and helped structure and conceal improper transactions of Enron Defendants, all in order to mislead Plaintiffs, persuade them to retain and add Enron stock to their retirement savings, and thereby enable Defendants to enrich themselves.

In dealing with a duty to use reasonable care in providing information to customers or potential customers, the elements of negligent misrepresentation under Texas law are (1) a false representation is made by a defendant in the course of its business or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant fails to exercise reasonable care or competence in obtaining or communicating [*336] the information; and (4) the plaintiff suffers financial loss by justifiably relying on the representation. *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (agreeing with the definition of Restatement (Second) of Torts § 552 (1977), which *inter*