*alia* restricts damages to "those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is legal cause"). Reliance may not be presumed under Texas law. *McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 549 (5th Cir. 2003).

The *Tittle* consolidated complaint has alleged the elements and supporting facts to state a claim for negligent misrepresentation under Texas common law. It identifies a number of misrepresented transactions and examples of false information in certified financial statements and audit reports that the Andersen Defendants provided as auditor of both Enron and of the Savings Plan and as an Enron consultant, allegedly without the degree of care, skill and competence exercised by a competent member of the accounting profession. The complaint asserts that Andersen issued such [*337] information, which it purportedly knew or should have known was materially false and misleading and would be used, and was used and relied upon, by Plaintiffs in their decision whether to acquire and/or retain Enron stock in the plans, and it demonstrates Andersen's pecuniary interest in substantial fees for its services in providing that information. The complaint further describes the plan's resulting loss.

Under the Restatement (Second) of Torts § 552, which has been adopted by Texas courts, an accountant may be liable for negligent misrepresentations in financial statements to a third party whom the maker of the misrepresentation intends to benefit or to a limited group of persons for whose benefit the maker of the misrepresentation intends to provide the information or knows that the recipient intends to provide the information. *Steiner v. Southmark Corp.*, 739 F. Supp. 1087, 1088 (N.D. Tex. 1990). Texas courts have expanded the parameters of the tort of negligent misrepresentation in § 552 to include not only those that the defendant actually knows will receive the misrepresentation, but to those the accountant should know [*338] will receive it. *Blue Bell, Inc. v. Peat Marwick, Mitchell & Co.*, 715 S.W.2d 408, 411-13 (Tex. App.-Dallas 1986, writ ref'd); *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 614 & n.35 (5th Cir. 1996), *cert. denied*, 519 U.S. 869 (1996). *See generally* # 1194 at 90-98 in *Newby*. Whether a person falls within the class is a fact question related to the risk to which a particular victim is exposed and depends on such factors as "(1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the closeness of the connection between the defendant's conduct and the injury suffered; and (4) the potential liability." *Steiner*, 739 F. Supp. at 1088, citing *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 235 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). The complaint's allegations address each of these elements.

In essence, with respect to issues of preemption by ERISA, *Tittle* Plaintiffs' state-law claims against Arthur Andersen for negligent misrepresentation are claims of professional negligence, or malpractice, [*339] for providing substandard accounting services to the Plans and Enron. As previously discussed, providing regular professional services to a plan does not make the professional a fiduciary of the plan and relates to the ERISA plan only in a peripheral manner. Nearly every court addressing the issue has held that ERISA does not preempt state-law professional negligence or malpractice claims relating to the provision of services to the plan. *See, e.g., Gerosa*, 329 F.3d at 324 ("Courts routinely find that garden-variety state-law malpractice or negligence claims against non-fiduciary plan advisors, such as accountants, attorneys, and consultants, are not preempted" by ERISA); *Dudley Supermarket, Inc. v. Transamerica Life Ins. and Annuity Co.*. 302 F.3d 1, 4-5 (1st Cir. 2002); *Arizona State Carpenters Pension Trust Fund*, 125 F.at 723-24. citing *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1467-72 (4th Cir. 1996) (holding that professional malpractice claims are not preempted by ERISA); *Custer v. Sweeney*, 89 F.3d 1156, 1162, 1166-67 (4th Cir. 1996) (attorney representing ERISA plan) (and cases cited therein); *Airparts Co. v. Benefit Services of Austin, Inc.*, 28 F.3d 1062, 1065-66 (10th Cir. 1994) [*340] (plan consultant); *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1152-53 & n. 7 (3d Cir. 1989) (auditor); *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 540 (7th Cir. 1991) (refusing to imply cause of action under ERISA for malpractice by an actuary); *Bourns, Inc. v. KPMG Peat Marwick*, 876 F. Supp. 1116, 1122 (C.D. Cal. 1994) (auditor); *Pension Plan of Public Serv. Co. of New Hampshire v. KPMG Peat Marwick*, 815 F. Supp. 52, 57-58 (D.N.H. 1993) (auditor); *Carl Colteryahn Dairy, Inc. v. Western Pa. Teamsters & Employers Pension Fund*, 785 F. Supp. 536, 543 (W.D. Pa. 1992) (accountants and actuaries); *Richards v. Union Labor Life Ins. Co.*, 804 F. Supp. 1101, 1105-06 (D. Minn. 1992) (actuary); *Framingham Union Hospital, Inc. v. Travelers Ins. Co.*, 721 F. Supp. 1478, 1490 (D. Mass. 1989).

### III. APPLICATION OF THE LAW TO COMPLAINT'S ALLEGATIONS

#### A. Procedural Objections

A number of Defendants have argued that *Tittle* Plaintiffs have violated Judge Rosenthal's December 13, 2001 order, which consolidated [*341] all securities violation cases into *Newby* and all ERISA-controlled employee benefit plan cases into *Tittle*, by amending their complaint to add RICO claims. Defendants maintain that the RICO claims were asserted to reach the "deep pocket" Defendants that *Newby*'s Lead Plaintiff sued under the

federal securities statutes, but that could not be sued by the *Tittle* Plaintiffs under ERISA because these newly named Defendants have no relationship to, nor involvement in, the ERISA retirement plans. For example, *Tittle* Plaintiffs have no claim for mishandling the plans' assets or for breach of fiduciary duty in connection with the retirement plans under ERISA against the investment banks or Vinson & Elkins lawyers. By extension, urge Defendants, the *Tittle* Plaintiffs have also disregarded the appointment of Lead Plaintiff and Lead Counsel in *Newby* specifically to prosecute under the PSLRA the securities fraud claims common to all shareholders of the corporation. Such circumvention also results in the inapplicability of the PSLRA, which requires the Court to select as Lead Plaintiff the party with "the largest financial interest in the relief sought by the class" with [*342] interests strongly aligned with the prospective class of shareholders to prosecute the action and to retain control over the litigation. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

The Court is not perturbed by the fact that the complaint was amended to assert causes of action in addition to ERISA claims. The Court did not expressly restrict the complaint to its original causes of action, and it has allowed new claims to be asserted in the *Newby* class action. Thus the Court addresses each to determine whether the *Tittle* Plaintiffs have pleaded a viable cause of action for which relief may be provided.

**B. RICO Amendment**

After a careful examination of the *Tittle* and *Newby* complaints and a review of the applicable law, the Court concludes that the RICO claims asserted here are barred by § 107 of the PSLRA, 18 U.S.C. § 1964(c). The alleged enterprises acting to conceal Enron's financial condition and defraud current and future shareholders are based on virtually the same conduct by Defendants that is the basis for, or relates to similar conduct that could have been alleged as further evidence of, the securities fraud [*343] Ponzi scheme alleged in *Newby* under the federal securities statutes. As will be discussed, the alleged predicate acts are an integral part of and/or support the securities fraud Ponzi scheme asserted in *Newby*. Plaintiffs attempt to bring RICO claims to sue deep-pocket parties that they cannot reach under ERISA because these Defendants have no fiduciary relationship to the employee benefit pension plans at issue.

As a side note, the *Tittle* Plaintiffs, both named and putative class members, who have 401(k) Savings Plans individual accounts with mixed holding and purchasing claims or that purchased Enron securities during the Class Period, are expressly included in the definition of the *Newby* class. Other *Tittle* Plaintiffs cannot sue under the federal securities laws. Nevertheless as emphasized in the earlier discussion of the RICO Amendment, the fact that a particular plaintiff may not have a cognizable claim under the securities law is not the issue under the RICO Amendment bar; the focus is on whether the alleged wrongful conduct could be challenged as a violation of the securities laws.

The *Tittle* complaint expressly alleges that Defendants participated "in [*344] a far-ranging multilayered scheme designed to conceal Enron's financial condition" while they personally profited and maintained "the illusion of Enron's profitability and financial strength, and the illusion that Enron was a legitimate enterprise and profitable company, and thereby induced Enron's 24,000 employees to invest in and retain Enron stock in their retirement plans." Complaint at P3.

Although draped in the language of RICO, n136 the *Tittle* Plaintiffs' allegations of wrongdoing in carrying out a scheme to defraud through various combinations of Defendants, characterized as "RICO enterprises," by means of "predicate acts" of embezzlement, mail and wire fraud, obstruction of justice, and interstate transportation offenses, are substantively virtually identical to the Ponzi-scheme allegations brought in *Newby*, against nearly the same Defendants. n137 The alleged acts are all offenses constituting misrepresentations or concealment of Enron's real financial condition to inflate the value of Enron stock and to keep investor money flowing into the alleged lucrative pyramid scheme that permitted Defendants to loot the corporation, and are actionable as parts of the *Newby* [*345] Ponzi scheme. *Bald Eagle*, 189 F.3d at 330 (Where alleged RICO predicate offenses are an integral part of and sustain an alleged securities fraud Ponzi scheme, they are intrinsically conduct undertaken "in connection with the purchase or sale of securities" and are barred by the RICO Amendment; allowing a surgical presentation of parts of that scheme would "undermine the congressional intent behind the RICO Amendment"). The RICO and state-law civil conspiracy and accountant negligent misrepresentation claims of *Tittle* are also actionable as securities fraud claims and have been so characterized in *Newby*.

> n136 *Bald Eagle*, 189 F.3d at 329-30 ("[A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud.").
>
> n137 The RICO claims in *Tittle* target the same kinds of groups, other than Enron directors and employees, as the securities violation claims in *Newby*: investment banks, Arthur Andersen and accoun-

tants, and Vinson & Elkins, L.L.P. and lawyers.

[*346]

Defendants allegedly conspired to commit a pattern of racketeering activity that equates to the Ponzi scheme of *Newby* and engaged in many of the same transactions that support the conspiracies alleged under ERISA and the federal securities statutes to create the same illusion of financial strength by means of (1) the same or same kinds of "extensive 'off-book' transactions to hide and shift debt from its balance sheets," (2) making, certifying, and issuing false financial statements that violated GAAP and GAAS and filing misleading reports with the SEC with the knowledge or reckless disregard that they were false, (3) painting false financial pictures of Enron for the public, investors, and the plan participants, as well as the analysts, credit raters, and lenders and (4) concealing material conflicts of interest, all in connection with the purchase of Enron securities. *See, e.g., id.* at PP3, 5, 203-41, 242-43. Both suits challenge the same allegedly false financial statements, SEC reports, and oral and written misrepresentations to the securities market, the public, and Enron employees, and the involvement of the investment banks, Vinson & Elkins lawyers, and Arthur Andersen [*347] accountants in creating parts of and perpetuating the scheme.

Furthermore, the plan participants' actual losses in essence are the same financial losses suffered by all Enron shareholders: the artificial and fraudulent inflation of value of Enron stock followed by a precipitous decline in price after revelations of Enron's actual financial condition. The fraud was perpetrated on all Enron securities holders, not only on ERISA retirement plan participants and phantom stock recipients. Thus in the larger picture, the RICO claims brought by *Tittle* Plaintiffs are in essence brought in their capacity as Enron shareholders, directly or indirectly, and not merely as plan participants. The fact that the participants' loss was in a retirement plan "pot," stock which the plans purchased and/or held on their behalf, as opposed to in an individual shareholder's portfolio, does not change the fact that in actuality they suffered the same injury, i.e., loss in value of Enron securities, purportedly caused by the same alleged wrongdoing of parties named in both *Newby* and *Tittle*.

Although Plaintiffs have argued that Defendants' conduct caused them merely to hold onto Enron stock, thus [*348] having no connection with the purchase or sale of securities, the Court agrees with what Vinson & Elkins has argued,

> The conduct that allegedly caused some investors to hold stock would, on the facts pleaded, be the same conduct that allegedly caused others to purchase or sell. The fact that the conduct pleaded could have caused some of Enron's employee-investors to continue purchasing Enron stock is sufficient for purposes of the PSLRA bar, even if other employee-investors suffered harm only by holding stock. *Ikon*, 86 F. Supp. 2d at 487 (finding that the fact that the plaintiff was harmed by actions other than securities fraud does not negate the applicability of the PSLRA bar when the conduct pleaded is actionable securities fraud); *see Bald Eagle*, 189 F.3d at 330 (holding that "surgical presentation of the cause of action . . . would undermine the congressional intent behind the RICO Amendment); *Burton v. Ken-Crest Servs., Inc.*, 127 F. Supp. 2d 673, 677 (E.D. Pa. 2001) ("Plaintiff cannot magically revive his claim by picking out discreet [*sic*] details of his allegations and then claiming that they are not actionable [*349] as securities fraud.").

# 232 at 10-11.

The *Tittle* Plaintiffs attempt to argue that their claims are not actionable under securities law by narrowly focusing on the effects of the extensive fraud on the plan participants only, rather than viewing them in their broader context. For instance Plaintiffs argue that the securities laws do not apply because the misrepresentations and omissions made by Lay and Olson to them were not public, but instead occurred during employee meetings or were made in in-house publications. Nevertheless, the alleged misrepresentations were precisely the same kind being made by Enron officials and other Defendants to the public at large to entice more investors to purchase more stock and to retain what they already owned to keep the Ponzi scheme fed. Were Lay, Olson, or any Enron official to paint a different, inconsistent picture to the many thousands of plan participants than the one presented by these and other Defendants to the public at large, the SEC, and the market, they would not only violate insider trading laws, but the Ponzi scheme would have quickly been exposed and undermined.

*Tittle* Plaintiffs have construed § 10(b) and Rule [*350] 10b-5 narrowly and attempt to limit their reach merely to material misrepresentations and omissions. Even if the reach of § 10(b) were so restricted, the content of the alleged misinformation and misrepresentation to plan participants and beneficiaries was parallel to and redundant of that made publicly by the same or other Defendants at other times and has been challenged in *Newby*. Plaintiffs also claim that the conduct of most of

the Defendants cannot be reached under the federal acts. This Court has ruled otherwise. *See* # 1194 in *Newby*. n138

> n138 Even if this Court has read *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1993), and the statute too expansively in concluding that Defendants may be primarily liable under § 10(b) and Rule 10b-5, under a narrow construction the SEC would still have standing to pursue claims against the various Defendants who are not plan fiduciaries for aiding and abetting a securities law violation under § 10(b) and Rule 10b-5 in a civil enforcement action. *See, e.g., SEC v. Fehn*, 97 F.3d 1276, 1284 (9th Cir. 1996), *cert. denied*, 522 U.S. 813 (1997).

[*351]

The alleged "predicate acts," a RICO term manipulated by Plaintiffs to cordon off acts that by another name would be "course of business," a "deceptive device," and/or a "scheme or artifice that operated as a fraud on sellers or purchasers of securities" under the securities laws, all relate to, are part of, and are the direct or indirect effects of the alleged Ponzi scheme to defraud investors in connection with the purchase or sale of securities in *Newby*. The nature of the RICO predicate offenses of embezzlement, mail fraud, wire fraud, interstate transportation, and obstruction of justice arise from the same nucleus of facts and serve the identical scheme alleged in *Newby* for concealing Enron's actual financial condition from investors and creditors, for identical purposes, i.e., ensuring a successful public image and high credit ratings that induced continuing investment in and retention of Enron securities, ultimately for Defendants' personal enrichment.

The *Tittle* Plaintiffs' asserted predicate acts are integral parts of the Ponzi securities fraud scheme alleged in *Newby*. For example, *Tittle* Plaintiffs identify as an alleged embezzlement predicate act, "Enron [*352] Insider Defendants embezzled Plan assets within the meaning of Section 664 by intentionally investing and continuously reinvesting Plan assets in Enron stock, and by diverting Plan assets away from other available investment vehicles . . . ." Complaint at 273, P791. n139 The embezzlement of plan funds included Defendants' making matching contributions in artificially inflated Enron stock in lieu of actual compensation value in cash. That substitution of Enron stock for actual cash value, buttressed by the alleged fraudulent inducement of plan participants to request the trustee to purchase more Enron stock at excessive prices for their individual accounts, ultimately functioned to line Defendants' own pockets in the form of increased salaries and bonuses, according to Plaintiffs.

> n139 The purported substitution of the deceptively over-valued stock for cash compensation, effectively cheating pension plan participants of the true value of compensation, is integral to the *Newby* Ponzi scheme to fraudulently enhance Enron's financial condition to obtain analysts' "buy" recommendations and more credit, to lure more and more investors to purchase Enron securities and to feed the frenzied Ponzi beast. Not only were plan participants subjected to the same alleged misrepresentations about Enron and investment in it, but that fraud on plan participants provided an added avenue of revenue for the Ponzi scheme when the overpriced Enron stock was substituted for cash for the retirement pensions, so that Defendants could allocate the undistributed funds to their own pockets as increased salaries and bonuses.

[*353]

The acts of alleged wire and mail fraud include numerous allegations parallel to those in *Newby*, such as the following: (1) "Merrill Lynch used the wires and mails on dozens of occasions between 1998 and 2001 to promote Enron stock to clients . . ." (complaint at 277, P795(vii)); "Fastow, Kopper and Merrill used the mails and wires to obtain investors in LJM2." (*id.* at P795(ix)); and "CFSB used the wires and mails to help Enron Defendants create approximately 3,500 off balance sheet partnerships whose major purpose was to hide Enron debt and in so doing used the mails and wires on thousands of assets." (*id.* at P795 (xi)). *Tittle* Plaintiffs have alleged that Defendants used the mails and wire facilities "in furtherance of the unlawful scheme in order to (i) encourage employees to invest money in the Savings Plan; (ii) encourage Enron employees to accept over-valued Enron stock as compensation in the Savings Plan." *Id.* at PP798; 826; 830.

The interstate transportation predicate acts involve allegations that Enron Insider Defendants, Arthur Andersen Defendants, and some Investment Banking Defendants conspired to induce Enron employees "to travel . . . in the execution [*354] of the wrongful scheme alleged herein, . . . to Houston, Texas, to attend meetings conducted by the Enron Insider Defendants at which ECSP participants were reassured that their 401(k) funds were safely invested and that they should hold and maintain their investments in Enron stock." (*Id.* at 281-82, P796). The interstate transportation of monies into the plans for fraudulent purposes and for convincing plan participants at meetings in Houston that their Enron investments were safe again were substantively part and parcel of the same kind of wrongful conduct directed at the public at large

and challenged in *Newby*. Like the *Newby* Lead Plaintiff alleging that Defendants employed all kinds of deceptive devices, contrivances, and misrepresentations in a constant struggle for more funds through the sale of more overpriced Enron securities, the *Tittle* Plaintiffs claim that all these racketeering acts fraudulently induced plan participants to accept as part of their retirement benefits and/or to direct the trustee to acquire, and/or to hold Enron securities.

Finally, the obstruction of justice charge against Arthur Andersen LLP, while not a securities violation in itself, [*355] was part of the alleged Ponzi scheme's concealment of its earlier accounting misrepresentations in audits and SEC filings and ultimately of Enron's real worth and financial condition, and serves as evidence of scienter.

Furthermore the SEC has filed a number of civil enforcement actions under the securities statutes against parties that are defendants in the *Tittle* RICO claims. Moreover Joseph Hirko and Kenneth Rice, Defendants in *Tittle*, have been indicted for securities violations related to their roles in Enron's broadband business.

Thus the Court finds that the RICO claims are based on conduct actionable as securities fraud, indeed the same or similar conduct that has been or could have been alleged in *Newby* under the federal securities laws, and are therefore barred by the RICO Amendment. Because the RICO Defendants' alleged wrongful conduct is actionable as securities fraud, the *Tittle* Plaintiffs' RICO claims (Counts VI and VII), including the claim under § 1962(d) for conspiracy to violate § 1962(a) and (c), n140 must be dismissed. The dismissal is proper even though many of the *Tittle* plaintiffs may not have a remedy under the 1933 and 1934 Acts because [*356] the *Tittle* plan participants' interests in the ERISA plans and phantom stock compensation are not deemed securities under, and their pure holding claims are not reached by, the securities laws.

> n140 *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on conspiracy to violate the other subsections of 1962 necessarily must fail if the substantive claims are themselves deficient."); *In re Ikon*, 86 F. Supp. 2d at 487 (where predicate acts are dismissed because they are actionable as securities fraud, a § 1962(d) conspiracy claim to violate the other subsections of § 1962 must fail because the substantive claims are deficient).

Finally, because no Defendant's criminal conviction is final, the Court concludes that the criminal exception to the RICO Amendment is at this point inapplicable.

## C. ERISA BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTY

ERISA does not have heightened pleading requirements, but is subject [*357] to the notice pleading standard of Fed. R. of Civ. Procedure 8, i.e., "a short and plain statement of the claim showing that the pleader is entitled to relief" and that provides a defendant with fair notice of the claim against him. *Heimann v. National Elevator Industry Pension Fund*, 187 F.3d 493, 509, 511 (5th Cir, 1999) ("technical forms of pleading are not required"), *overruled on other grounds, Arana v. Ochsner Health Plan*, F.3d , , No. 01-30922, 2003 WL 21554491 (5th Cir. July 10, 2003). "'The complaint must be liberally construed in favor of the plaintiff, and all the facts pleaded must be taken as true,'" with dismissal proper only if "'it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. [citations omitted]" *Haynes v. Prudential Health Care*, 313 F.3d 330, 333 (5th Cir. 2002).

### 1. Count I (Plaintiffs on behalf of the Savings Plan and the ESOP sue Enron and the Enron ERISA Defendants for inducing and mandating the acquisition and retention of Enron stock in the Savings Plan and the ESOP); [*358] AND

### Count V (Plaintiffs, on behalf of the Savings Plan, the ESOP, and the Cash Balance Plan sue Enron, Lay, n141 and the Compensation Committee Defendants for failure to monitor the Plans' investment fiduciaries and/or disclose to the investing fiduciaries (not limited to the Administrative Committee) material facts regarding Enron's financial condition)

> n141 Lay has argued that Count I does not allege a claim for failure to monitor against him and that Count V does not mention him at all. The amended complaint at 235-36, P674 asserts,
>
>> Under the terms of the [Savings] Plan, the Committee members were selected and monitored by "Enron Corp." Plan § XIII.1. On information and belief, selection and monitoring of the Committee members was performed by the Compensation and Management Development Committee of the Board of Directors ("Compensation Committee"), Lay and others. Enron itself acted as a fiduciary in selecting, monitoring, and removing other plan fiduciaries, such

as the members of the Administrative Committee, and overseeing their investment of Plan assets.

The Court finds these allegations are sufficient to assert a claim against Lay for breach of his fiduciary duty to select and monitor, encompassed within Count V. It appears that Plaintiffs' reference to Count I was a clerical error.

[*359]

With respect to Counts I-V generally, the provisions of the Enron Corporation Savings Plan (Ex. A to # 322) set out the fiduciary obligations of the various players and echo the law established under ERISA, discussed previously.

Under § XIII.1, Enron Corporation has the duty to appoint the members of a Committee which will serve as the Plan administrator and is designated a named fiduciary with respect to general administration of the Plan, except for investment of the assets in the trust fund. Moreover under § XIII.8, Enron must provide the Administrative Committee with "any information that the Committee determines is necessary for the proper administration of the Plan" and to the Trustee any such "facts as are deemed necessary for the Trustee to carry out the Trustee's duties under the Plan."

Under §§ XIV.1 and XV.2, Enron has sole discretion in appointing, removing and replacing the Trustee. n142 Enron, although a Plan sponsor, is also a fiduciary to the Plan to the extent it exercises discretionary control and authority over these specific matters. n143

---

n142 In contrast, under § 16.1 of the ESOP Plan (Ex. C to # 322) Enron's Board of Directors, specifically, has the power to appoint, remove and replace the trustee. Under § 16.8 of the ESOP Plan the trustee is authorized to invest the trust fund up to 100% in Enron stock, but the Administrative Committee "shall determine the extent to which the Trust Fund shall be invested in Company Stock and shall determine the price at which Company Stock will be purchased or sold. The Trustee shall act on the Committee's directions . . . ."

[*360]

n143 Section XV.2 expressly states, "Each fiduciary with respect to the Plan shall have only those specific powers, duties, responsibilities, and obligations as are specifically given him under the Plan."

---

The duties of the Administrative Committee appointed by Enron are laid out in § XIII.7 of the Savings Plan and include directing the Trustee "as to the investment of the Trust Fund in Enron Stock or EO&G Stock," "appointing investment managers pursuant to Section 15.5," and "directing the Trustee as to the exercise of rights or privileges to acquire, convert, or exchange Enron Stock or EO&G Stock." In § XV.2, the Savings Plan provides that the Administrative Committee, "as a co-fiduciary" to the Trustee, may "exercise its power given hereunder at any time, and from time to time, by written notice to the Trustee, to direct the Trustee in the management, investment, and reinvestment of the Trust Fund . . . ."

The Savings Plan Trust Agreement (Ex. B to # 322) invests the Administrative Committee with additional obligations, some ministerial and some fiduciary. Article 1.1 expressly designates [*361] the Administrative Committee as "the named fiduciary for Plan administration" with "the responsibility for allocating the assets of the Fund among the Separate Accounts, for monitoring the diversification of the investments of the Fund, for assuring that the Plan does not violate any provision of ERISA limiting acquisition or holding of securities or other property of the Company, and for the appointment and removal of Investment Advisors . . . ." Under Article Four ("Investment Funds") of the Savings Plan Trust Agreement, the Administrative Committee is to designate Investment Funds, such as a Company Stock Investment Fund, and "is authorized to terminate the existing Investment Funds" by written notice to the Trustee and "to direct the Trustee with respect to the allocation of assets to Investment Funds and with respect to transfers among such Investment Funds."

The Trustee, which is designated by § XIV.1 as "the 'named fiduciary' with respect to investment of the Trust Fund's assets," is invested by § XV.2 with "the sole responsibility for the administration, investment, and management of the assets held under the Plan," which makes it a fiduciary under ERISA, subject [*362] to the Administrative Committee's authority to direct it, as described in the above paragraph. The Plan qualifies that responsibility in § XIV.2, however: when the Administrative Committee, as a co-fiduciary, directs by a written notice "the Trustee in the management, investment, and reinvestment of the Trust Fund, then in such event the Trustee shall be subject to all proper directions of the Committee that are made in accordance with the terms of the Plan and the Act. It is intended under the Plan that each fiduciary shall be responsible for the proper exercise of his own duties, responsibilities, and obligations hereunder and shall not be responsible for any act or failure to act of another fiduciary except to the extent provided by law or as specifically provided herein." (Parallel pro-

vision in ESOP Plan § 17.2.) Plaintiffs have alleged that Northern Trust was the Trustee of the Savings Plan and of the ESOP, in accordance with the express terms of both, and a fiduciary with respect to powers allocated to it under the terms of those plans.

Section 1.24 of the Enron Corp. Savings Plan Trust agreement (Ex. B to # 322) names the Northern Trust and any successor to it as the [*363] trustee for the Savings Plan. Article V, which identifies the powers of the trustee, charges Northern Trust, except as otherwise provided in the Savings Plan Trust agreement, with holding, managing, caring for and protecting the assets of the Plan, including investing and reinvesting those assets, to sue or defend claims against the Trust Fund. n144

> n144 Section 5.12 of the trust agreement gives the trustee the right "to compromise, contest, prosecute or abandon claims in favor of or against the Fund."

Article VI of the Savings Plan, addressing limitations on the trustee's power, sets out its fiduciary obligations and provides,

> Notwithstanding Article Five:
>
> 6.1 The powers of the Trustee shall be exercisable for the exclusive purpose of providing benefits to the Participants and Beneficiaries under the Plan and in accordance with the standards of a prudent person under ERISA;
>
> 6.2 Subject to 6.1 and 6.3, the Trustee shall diversify the investments of that portion of the fund of which it has investment [*364] responsibility so as to minimize the risk of large losses;
>
> 6.3 Subject to 6.1, the Trustee shall, with respect to that portion of the Fund for which it has investment responsibility, follow the investment guidelines established by the Administrative Committee and shall act in accordance with the direction of the Administrative Committee.
> . . . .
> 6.7 No provisions of Sections 6.5 or 6.6 [addressing direction of the trustee by plan participants] shall prevent the Trustee from taking any action relating to its duties under Sections 6.5 or 6.6 if the Trustee determines in its sole discretion that such action is necessary in order for the Trustee to fulfill its fiduciary responsibilities.

Parallel provisions charging the Trustee and the Committee among others with the same fiduciary duties delineated in 6.1 and 6.2 of the Savings Plan are found in § 17.3 of the ESOP Plan and §§ 1.6, 4.1, and 4.4 of the ESOP Trust Agreement (Ex. D to # 322).

As a threshold matter, the Court finds that Plaintiffs' pleadings have raised material issues as to whether the Savings Plan qualifies as a § 404(c) plan, entitling Defendants to immunity from liability for investment decisions controlled [*365] by plan participants, by allegations that the plan did not provide the requisite broad range of diversified investment options, liberal opportunities to transfer assets among allocations, and sufficient information to make sound investment decisions, nor notice to plan participants that it intended to qualify as such a plan. These issues and any defense under § 404(c) asserted by Defendants, on a 12(b)(6) motion review, must be construed in Plaintiffs' favor and cannot properly be resolved prior to discovery.

With respect to the claims in Count I, the Court finds that Plaintiffs have stated a claim, which is intertwined with Plaintiffs' contention that the fiduciaries failed to meet the requirements for a § 404(c) plan, against those Defendants who were authorized by the Plans to invest the Plan assets and who allegedly induced their uninformed Savings Plan participants to direct the fiduciaries to buy more or maintain Enron stock for their individual accounts, in breach of their duties of loyalty and prudence.

Second, some of the allegations under Court I relate to plan design, a settlor function, and do not trigger fiduciary duties: "allowing Savings Plan participants the ability [*366] to direct the Plan's fiduciaries to purchase" Enron stock; and "imposing age and other restrictions on the ability of the participants to direct the Savings Plan's fiduciaries to transfer Savings Plan and ESOP assets" out of Enron stock. See *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) ("Nothing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan."); *Smith v. Contini*, 205 F.3d 597, 602 (3d Cir. 2000) ("ERISA neither mandates the creation of pension plans nor in general dictates the benefits to be afforded once a plan is created. . . . Thus ordinarily only the plan can create an entitlement to a benefit."), *cert. denied*, 531 U.S. 875 (2000); *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 441 (3d Cir. 2001) ("ERISA was enacted to ensure that employer-provided benefit plans are safeguarded and maintained so as to be available to employees when they are due. The Act does not mandate that an employer provide benefits

and has nothing to say about how these plans are designed."); *McGann v. H&H Music Co.*, 946 F.2d 401, 407 (5th Cir. 19991), [*367] *cert. denied sub nom. Greenberg v. H&H Music Co.*, 506 U.S. 981 (1993) (approving Sixth Circuit's comments in *Musto v. American General Corp.*, 861 F.2d 897, 912 (6th Cir. 1988) ("rejecting challenge to an employer's freedom to choose the terms of its employee pension plan"), *cert. denied*, 490 U.S. 1020 (1989): "In enacting ERISA, Congress continued its reliance on voluntary action by employers by granting substantial tax advantages for the creation of qualified retirement programs. Neither Congress not the courts are involved in either the decision to establish a plan or in the decision concerning which benefits a plan should provide. In particular, courts have no authority to decide which benefits employers must confer upon their employees....")) n145; *Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1078-79 (4th Cir.) ("'Congress left employers much discretion in designing their plans under ERISA and in determining the level and conditions of benefits. The judicial role is not to rewrite plan provisions, but to assure that they are fairly administered. . . . Under ERISA the institution of plans is largely voluntary [*368] and the fashioning of plan elements has been largely left in the hands of individual employers"), *cert. denied*, 493 U.S. 919 (1989). Moreover, "The specific payout detail of the [ERISA] plan was, of course a feature that the employer as plan sponsor was free to adopt without breach of any fiduciary duty under ERISA since an employer's decisions about the content of a plan are not themselves fiduciary acts." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

> n145 The Fifth Circuit in *McGann*, 946 F.2d at 407 n.9, pointed out:
>
>> *Musto* involved an ERISA claim by retirees that their former employer violated contractual and fiduciary duties by changing the terms of their medical coverage. The court rejected plaintiffs' claim that they had a vested interest in the terms of their medical coverage. *Musto* . . . noted that "there is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second."

[*369]

Nevertheless, outside of challenging the establishment of these terms by the employer in its settlor, not fiduciary, capacity, the application of which terms Plaintiffs do not object until sometime in 1998 when the alleged scheme began, Plaintiffs have stated a claim for breach of their fiduciary duties of loyalty and prudence based on Defendants' alleged *inducement* of the plan participants to direct the trustee to invest in Enron stock for their individual Savings Plan accounts and inducing Savings Plan and ESOP participants to direct or allow the fiduciaries of both Plans to maintain such investments, under the circumstances from 1998-2000 set forth in the complaint. They also state a claim for breach of fiduciary duty in causing and allowing the Savings Plan to purchase or accept Enron's matching contributions in the form of Enron stock once the fiduciaries allegedly knew or should have known of the inherent risk of such stock in light of the circumstances alleged in the complaint.

A claim has also been stated in Count I against Enron and the Compensation Committee for breach of their fiduciary duty of providing information necessary for Plan Administration because they allegedly [*370] withheld from the Administrative Committee (which in turn purportedly failed in its fiduciary duty to investigate) material information regarding the actual financial condition of Enron. Despite alleged red flags and warnings, Olson n146 and Prentice were among the members of the Administrative Committee who purportedly did nothing to protect plan participants and beneficiaries until November 2001, when Enron was near bankruptcy. The complaint asserts that Lay and Olson were not only forewarned by Enron vice president Sherron Watkins, formerly an Arthur Andersen accountant and thus highly knowledgeable about corporate accounting, of significant accounting malfeasance at Enron, n147 but as a result of Watkins' contentions, Lay became involved in setting up an "investigation" of the allegation by Vinson & Elkins, even though Watkins had voiced concern about the law firm's blatant conflict of interest in performing it. Furthermore, after Watkins' warning, Lay sold substantial amounts of his Enron stock holdings while contemporaneously and repeatedly exhorting plan participants and beneficiaries at meetings and by e-mail to buy more, touted Enron's financial strength, and made no disclosure [*371] of the material concerns, much of which Olson personally observed. He also purportedly misrepresented that the accounting for Enron's off-balance sheet partnerships and SPVs was approved by "all of our internal officers as well as our external auditor and counsel," while failing to mention Watkins' vocalized concerns. *See generally* Complaint at 242-43 PP705-709. The complaint also charges the Administrative Committee with an ongoing conflict of interest:

> In considering the use and continued use

of Enron stock as an investment option in the Plan for participant contributions (deducted from participants' paychecks), and in monitoring the prudence of continuing to implement Enron's decision to match employee contributions in Company stock (the employer matching contribution), the Administrative Committee members as employees and executives of Enron, and Enron itself who oversaw the Committee members, faced a direct, ongoing conflict of interest given the manifold business reasons they had for wanting to see employees heavily invested in Company stock."

Complaint at 240, P694.

n146 Plaintiffs have alleged that Olson had read an article in the March 5, 2001 *Fortune* magazine that discussed Wall Street worries about Enron's increasing secrecy, growing debt, bullish expectations, "opaque accounting and dubious rationalizations" for its high stock price (then $76 per share), all of which constitute a "red flag" that "may increase the chance of a nasty surprise," but did not share that information even with other members of the Administrative Committee. Complaint at 237, PP679-80. Olson purportedly sold over $2 million worth of Enron stock in January and February 2001 and another $350,000 worth of Enron stock at $71 per share on March 8, 2001. The complaint, at 238, PP685-86 and 703, alleges that Olson also concedes that in August 2001 she was warned orally and in writing by Sherron Watkins about Watkins' concerns that the company "would implode in a wave of accounting scandals," and that Olson also learned that Fastow wanted Watkins fired for her warnings. Nevertheless, according to the complaint, Olson, in breach of her fiduciary duties did nothing, even while personally witnessing Lay repeatedly urge employees to invest in Enron stock. Olson purportedly admitted that only in November 2001 did the Committee seek legal and investment advice about the prudence of Enron stock as a Plan investment option. Prentice, who conceded that neither he nor the Committee members had ever questioned the prudence of Enron Stock as a Plan investment until November of 2001 and that he was not competent to evaluate the issue, is alleged to have sold $900,000 worth of company stock in June 2001. Complaint at 240, P693.

[*372]

n147 The complaint, at 238, P687, asserts,

Any prudent, disinterested fiduciary would at that point, among other things, have immediately convened an emergency meeting of the Plan Administrative Committee, made full disclosure of Watkins' allegations to the Committee, the Plan's counsel, the Plan's investment consultant and the Plan's participants; and taken actions to promptly suspend any further use of Enron stock as a Plan investment (based either on employee or employer contributions) pending a Committee investigation conducted independent of Enron, Andersen, and Vinson & Elkins and, upon receiving the result of such independent investigation, liquidate the Plan's Enron stock holdings.

Members of both the Administrative and the Compensation Committees, Enron, and Olson, when they spoke about plan investments, had a fiduciary obligation not to materially mislead plan participants and beneficiaries about Defendants' concealment of Enron's precarious financial condition by means of erroneous accounting and about the risk involved in investing their assets in and retaining its stock. [*373] *Varity Corp. v. Howe*, 516 U.S. at 506 ("Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA"); *Schlumberger*, 338 F.3d at 424-25 ("The Supreme Court's words in *Varity* instruct that when an employer chooses, in its discretion, to communicate about future plan benefits, it does so as an ERISA fiduciary. In speaking it is exercising discretionary authority in the administration of the plan . . . . Thus it has a duty to refrain from 'knowingly and significantly' deceiving a plan's beneficiaries 'in order to save the employer money at the beneficiaries' expense' . . . ."); *Mullins v. Pfizer, Inc.*, 23 F.3d at 668 ("when a plan administrator speaks, it must speak truthfully"). Communication with plan participants about employee benefit plans is an exercise of "discretionary authority" regarding the management or administration of the plans, under 29 U.S.C. § 1001(21)(A)(i) and (iii), and is a fiduciary act. *Varity Corp. v. Howe*, 516 U.S. at 502. These Defendants allegedly breached their fiduciary duty to protect the plan participants [*374] and beneficiaries through failure to disclose to them and to other Committee Members that what they knew or should have known, through prudent investigation, was a threat to the pension plans or to correct any material misinformation. Lay and Olson in particular are described in the complaint

as explicitly encouraging plan participants to direct the Savings Plan and ESOP fiduciaries to purchase and hold Enron stock when they knew or should have known that it was an imprudent investment option. In *Varity Corp.*, 516 U.S. at 502-03, the Supreme Court found that "conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation," was part of a plan administrator's duty "to offer beneficiaries detailed plan information" and, that misinformation about such provided in conjunction with misrepresentations about the business health of the company, constituted an act of plan administration subject to fiduciary standards. Moreover Olson allegedly failed to correct what she knew were material misstatements of fact made by Lay, i.e., statements substantially likely to mislead plan participants [*375] in making informed decisions about investing in Enron stock, in the fall of 2001 that affected the interests of the plan participants and beneficiaries and which plan participants and beneficiaries, to protect their interests, should but did not know were untruthful. Administrative Committee Member Defendants also allegedly failed not only to conduct, but even to consider conducting, a prudent investigation of Enron's financial situation and of Enron stock as an investment option for retirement assets until Enron was on the very edge of bankruptcy.

In sum Plaintiffs have stated claims against Enron, Lay, Olson, other Enron ERISA Defendants (including the Compensation Committee and the Administrative Committees) for breaching duties of undivided loyalty to the interests of the Savings Plan and ESOP plan participants and beneficiaries and duty of care to act with the skill, prudence and diligence under the circumstances to the extent that they were authorized to perform fiduciary duties: these Defendants allegedly exercised, but in specified cases not well, n148 their explicit duty to select and appoint fiduciaries, but, despite knowledge of the threat to the plan participants' retirement [*376] assets, failed to investigate adequately, failed to provide material information or correct misleading information essential to prudent administration of the plans, failed to direct the trustee regarding prudent investment of plan assets in both the Savings Plan, including employer matching contributions, and the ESOP, and failed to monitor or remove their appointees for incompetence. Instead the complaint charges that they permitted, encouraged, or induced uninformed plan participants to invest in or retain Enron stock in their Savings Plan individual accounts. The fact that the Savings Plan is asserted not to be a § 404(c) plan makes the Plan fiduciaries potentially liable for all investment decisions taken by the plan participants.

n148 See, for example, Prentice's alleged admission that he was incompetent to fill his fiduciary duties on the Committee.

Count V addresses breach of the fiduciary duty to appoint, monitor and remove. As indicated earlier, as a matter of law, because Enron (i.e., a corporation [*377] acting through employees who perform functions on behalf of the corporation) has authority and control over appointments of fiduciaries to administer the plan and control its investments, it also has a fiduciary duty to monitor its appointees.

The ESOP (Ex. C to # 322) at § 14.10 designates Enron as the Plan administrator, which is authorized under § 14.1 to appoint a Committee for Administration of the Plan. "For purposes of [ERISA], the Committee shall be the 'named fiduciary' with respect to the general administration of the Plan (except as to the investment of the assets of the Trust Fund)." *Id.* at § 14.1. Among the duties assigned by the ESOP to the Administrative Committee is "to direct the Trustee as to the purchase and sale of Company Stock" and "to instruct the Trustee as to the management, investment and reinvestment of the Trust Fund generally." *Id.* at § 14.7 (1) and (n).

In a supplement (# 619), Outside Director Defendants have argued that the Compensation Committee Defendants are not "named fiduciaries" under the 1994 amendment to the ESOP (Ex. C to # 619), which superseded the 1989 version of the ESOP and deleted any express reference to the Board of Directors' [*378] having powers of appointment of investing fiduciaries and thus the ESOP ERISA claim against them should be dismissed.

Plaintiffs have responded (# 623) that the Board of Directors were not "named" fiduciaries in the 1994 amendment, but "functional fiduciaries" who in exercising the duty to appoint, failed to monitor the fiduciaries of all three Plans. *Landry v. Air Line Pilots Ass'n Intern., AFL-CIO*, 901 F.2d 404, 418 5th Cir.) ("We must emphasize that fiduciary status is to be determined by looking at the actual authority or power demonstrated, as well as the formal title and duties of the party at issue), *cert. denied*, 498 U.S. 895 (1990).

The Secretary of Labor, however, has pointed out that the controlling version of the ESOP for all conduct following the date it became effective here is the January 1, 1999 document (Ex. B to # 625), which was approved by the same Board of Directors now challenging the complaint under the earlier 1994 amendment to the plan. The 1999 version explicitly restated the ESOP "in its entirety . . . except as otherwise indicated herein" according to Ex. A, p. ii, to # 625. Section 1.1(14) of that plan de-

fines "Directors" [*379] as "The Board of Directors of Enron Corp." *Id.* at I-3. Section 16.1 ("The Trustee shall be appointed, removed, and replaced by and in the sole discretion of the Directors") of that document expressly states that the Directors had that authority. Moreover, argues the Secretary, that provision is consistent with Section 17.2's authorization, "The Company shall have the sole authority to appoint and remove the Trustee or members of the Committee," because, as made clear by § 16.1 and as a matter of established law, a corporation acts through its board of directors to effectuate its corporate duties. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 80-81 (1995) (because only natural persons can make decisions and because principles of corporate law provide ready-made rules for determining who has the authority to make decisions on behalf of a corporation, an ERISA plan need not specify individuals or bodies within the "Company" to show who has the authority to perform the action on behalf of the corporation). This Court agrees. In part for the same reason, the Court agrees with the Secretary and disagrees with Outside Directors' reply, which contends that Sections [*380] 16.1 and 17.2 of the 1999 ESOP are inconsistent and ambiguous. Under federal common law, drawing on analogous state law, to the extent that it is consistent with congressional policy concerns, pertaining to the rules of contract construction (applicable because the ERISA plan is administered by a federal agency), one part of a writing should not be construed to nullify another; a contract should be interpreted as a whole, and its provisions should be read to give effect to and harmonize all where possible. *See, e.g., Transitional Learning Community at Galveston, Inc. v. U.S. Office of Personnel Management*, 220 F.3d 427, 431 (5th Cir. 2000); *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1451-52 (5th Cir. 1995). After reviewing the documents, the Court concurs with the Secretary's view that the controlling plan is clear and unambiguous. Should there be a dispute whether the Outside Directors were actually the Company officials involved in the appointments, it can be raised on summary judgment after discovery.

Similarly Outside Directors argue that the Savings Plan did not invest them with any power of appointment. As indicated in the summary of the relevant [*381] terms of the Savings Plan, Enron had and exercised the power of appointment, which, as a corporation, it necessarily did through its Board of Directors. Under the holding of *Curtiss-Wright Corp.*, 514 U.S. at 80-81, an ERISA plan need not specify individuals or bodies within the "Company" to show who has the authority to perform the action on behalf of the corporation.

The Court finds that Plaintiffs on behalf of the Savings Plan and the ESOP have stated claims in Count V for breach of fiduciary duties of loyalty and prudence under ERISA against Enron, Enron ERISA Defendants, including Members of the Compensation and Management Development Committee ("Compensation Committee" made up of Blake, Duncan, Jaedicke and LeMaistre), and Ken Lay, n149 because they were given the power to appoint, retain and remove plan fiduciaries (Enron to appoint members of the Administrative Committee of both plans, and all three Defendants to select, appoint and remove fiduciaries of the Savings Plan and the ESOP) and because they allegedly exercised that discretionary authority of appointment over the management or administration of a plan under § 3(21)(A) of ERISA, 29 U.S.C. § 1002 [*382] (21)(A). n150 They were expressly charged by the plans to perform the selection, and therefore the monitoring, of the Administrative Committee with respect to its control over Plan investment and the prudence of investing in Enron stock as one of the Savings Plan's investment options. *See, e.g., Coyne & Delany Co.*, 98 F.3d 1464-65 ("the power . . . to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)"); *Hickman*, 840 F.2d 564 ("Tosco is a fiduciary within the meaning of ERISA . . . because it appoints and removes the members of the administrative committee that administers the pension plan."); *Sommers Drug Stores*, 794 F.2d at 1459-60; *Leigh v. Engle*, 727 F.2d at 133-35; *Martin v. Feilen*, 965 F.2d at 668-70; *Detroit Terrazzo Contractors Ass'n v. Board of Trustees of B.A.C. Local 32 Ins. Fund*, 176 F. Supp. 2d 733, 739-40 (E.D. Mich. 2001); ERISA Interpretative Bulletin 75-8, 29 C.F.R. § 2509.75-78 (D-4) (members of a board of directors "responsible for the [*383] selection and retention of plan fiduciaries" have "'discretionary authority or discretionary control respecting the management of such plan' and are, therefore, fiduciaries with respect to the plan."). As such, they had a duty to insure that the selected fiduciaries in turn complied with their fiduciary duties. *Leigh v. Engle*, 727 F.2d at 134-35; *Mehling v. New York Life Ins. Co.*, 163 F. Supp. 2d at 509-10; *Liss v. Smith*, 991 F. Supp. at 310, 311.

> n149 Enron may be liable not only as a fiduciary to both the Savings Plan and the ESOP under § 3(21)(A), 29 U.S.C. § 1002(21)(A), but also as a party in interest under § 3(14), 29 U.S.C. § 1002(14), because it provided services to the Plans and was an employer with some employees covered by the Plans.
>
> n150 Although Outside Directors have argued that the Savings Plan's only express allocation of authority and control to the Compensation Committee was to review and approve plan amendments, a task which does not trigger a fiduciary

duty, Plaintiffs' complaint does allege that the Compensation Committee had and exercised the authority to select, monitor and remove fiduciaries to the Plan and that the Plans do explicitly allocate fiduciary duties to Enron, a corporate entity on whose behalf its officers and directors, including the Compensation Committee members, necessarily acted. Discovery will be required to determine precisely what role the Compensation Committee members played.

[*384]

The complaint has also stated a claim in Counts I and V against these Defendants for co-fiduciary liability under § 502(a)(3), 29 U.S.C. § 1132(a)(3), for knowingly participating in or concealing their knowledge of and/or failing to make reasonable efforts to remedy their co-fiduciaries' breach of fiduciary duties in violation of § 404(a), 29 U.S.C. § 1104(a). Section 405(a), 29 U.S.C. § 1105(a); *Landry*, 901 F.2d at 422-23; *American Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y*, 841 F.2d 658, 665 (5th Cir. 1988) (failure to monitor and remove fiduciaries for misconduct may result in § 405 liability). The complaint further asserts that Enron, Lay, and the Compensation Committee are liable as co-fiduciaries for their failure to inform the Administrative Committees about Enron's actual financial status and/or failure to monitor their appointees and to supervise the Administrative Committees of the plans regarding the prudence of their decision to invest assets of the Savings Plan and the ESOP in Enron stock. Plaintiffs also claim that the Committees [*385] failed in their duty to investigate whether the investment options were prudent n151 and that the Committee Members were not competent, had no process in place for fulfilling their duty to make prudent investment decisions, and had corporate conflicts of interest that undermined their duties of loyalty to the plan participants and beneficiaries. *Brock*, 632 F. Supp. at 1524 (holding plan trustees that blindly follow the recommendations of another plan trustee or *de facto* fiduciaries liable for the others' breaches); *Sandoval v. Simmons*, 622 F. Supp. 1174, 1214-15 (C.D. Ill. 1985) (fiduciaries failing to perform independent investigation of plan's investment options because of conflicting loyalties to another plan fiduciary and his corporate interests were liable for that fiduciary's breaches under § 405).

n151 Although Enron Committee members cite several cases for the proposition that Plaintiffs must show that an adequate investigation would have revealed information proving that the trustee's investment decision was objectively imprudent, all of them were decided after discovery at the summary judgment stage of the litigation. # 439 at 7.

[*386]

The Court additionally finds that the complaint states a claim under Count I against Arthur Andersen as a party in interest under § 3(14), 29 U.S.C. § 1002(14), as a provider of professional services to Enron and the Savings Plan, based on Plaintiffs' allegations that Arthur Andersen knowingly participated in the Enron Defendants' fiduciary breaches under § 404(a) by actively concealing from Plan fiduciaries and Plan participants and beneficiaries the truth about Enron's financial condition and the imprudence of investing in the company's stock, a prohibited transaction violation under ERISA's § 406(a). Under § 502(a)(3) and *Great West*, 534 U.S. 204, if they prevail Plaintiffs may recover restitution in equity, disgorgement or other types of equitable relief. Plaintiffs assert that the enormous fees, over $100 million, for aiding Enron and other Defendants to breach their fiduciary duties, are traceable to Andersen's knowing participation is such breaches and are subject to such equitable remedies.

**2. Count II: Lockdowns**

Defendants to Count II have argued that they are not "fiduciaries" with respect to the transition between [*387] service providers. Some Defendants have argued that under § XV.6 (relating to "Third-Party Administrator") of the Savings Plan, Enron "may, in its sole discretion, engage any service provider which is not an employee or a subsidiary of the Company to perform identified administrative services with respect to the Plan," and that if it does engage such a "service provider," "Enron shall be fully responsible and accountable for selecting, credentialling, overseeing and monitoring such service provider, including without limitation, evaluating the quality of performance, determining whether the fees charged are reasonable, and removing or replacing such service provider as the Company deems to be necessary or appropriate in its discretion," and "thereafter the Committee shall have no power, duty, or responsibility to monitor the performance of such service provider." The ESOP Plan has a parallel provision, § 14.7. Defendants argue that Northern Trust fits into this category of Third-Party Administrator and therefore the Administrative Committee has no liability relating to it. Here the Plans have specific provisions directly addressing the responsibilities of the named Trustee and the [*388] Administrative Committee, as distinguished from the general provision for an Enron-selected Third-Party Administrator.

Section XV.6 of the Savings Plan (Ex. A to # 322) provides that only if Enron chooses to hire an independent service provider to perform specific services for the plan

Case 3:01-cv-01737-MRK    Document 52-35    Filed 10/16/2003    Page 13 of 15

Page 103
2003 U.S. Dist. LEXIS 17492, *388

and does so, and only if it informs the Administrative Committee in writing, identifying the service provider and the services to be performed by it, is Enron subsequently fully responsible for that selection and supervision of the service provider. Otherwise it appears that under the Plan's terms, the Administrative Committee, which was given "sole responsibility for the administration of the Plan" (§§ XIII.1, XV.2), is responsible wholly or in part (along with co-fiduciary Enron) for hiring, monitoring and removing third-party service providers under § XIII.7(d) (giving the Administrative Committee "the right, power, authority, and duty . . . to employ and compensate such accountants, attorneys, investment advisors, and other agents, employees, and independent contractors as the Committee may deem necessary or advisable for the proper and efficient administration of the Plan . . . ."). Parallel ESOP [*389] provision P14.7(d) (but without the written notice requirement).

The consolidated complaint alleges that the two Administrative Committees' members exercised that authority to appoint with respect to Northern Trust and recordkeeper Northern Trust Retirement Consulting, LLC. Defendants have not alleged nor demonstrated with documentary attachments that Enron invoked its discretionary authority to select the trustee, and the standard of review for Rule 12(b) motions requires the Court to accept Plaintiffs' factual allegations as true. Moreover at issue in the lockdown count is not the transfer of power from Northern Trust to a new service provider, but the Administrative Committees' discretionary control over the assets of the Plan, cutting off the plan participants' access to their individual accounts when circumstances make clear that the Committees knew or should have known that a lockdown was imprudent. Investment of Plan assets was solely within the control of the Committees and the mutual Trustee.

Olson has also challenged the assertion that she functioned as a fiduciary with respect to the lockdown decision. The complaint asserts that she, not only as a Committee Member, but [*390] also as a corporate officer for Enron, performed fiduciary functions on behalf of Enron relating to the transition in service providers and that the decision to lockdown the plans despite extraordinary circumstances that allegedly made the choice imprudent and disloyal to plan participants and beneficiaries. Lay, Enron's CEO, also is alleged to have exercised supervisory authority over the Committees and over Northern Trust and to have breached his fiduciary and co-fiduciary duty; thus he purportedly had some authority relating to the lockdowns.

According to the complaint, the lockdowns prevented both plan participants from directing the transfer and plan fiduciaries from fulfilling their duties of prudence and loyalty by disregarding, contrary ERISA provisions, and by transferring the participants' assets at a critical time. As a result, the Enron stock in the Savings Plan purportedly lost more than one-third of its value, and in the ESOP, more than two-thirds of its value.

Plaintiffs have stated a claim for breach of fiduciary and co-fiduciary duties to the ESOP and Savings Plan participants and beneficiaries against Enron, the Enron ERISA Defendants (see footnote 4 of this memorandum [*391] and order), and the named fiduciary and trustee Northern Trust, whether deemed a directed trustee or not, for proceeding with a previously scheduled lockdown of the Savings Plan and the ESOP on October 26, 2001 and October 20, 2001, respectively, in spite of the extraordinary circumstances, enumerated below, n152 that obviously made the lockdowns an extreme threat to the participants' interests in their employee benefit plans. Plaintiffs have stated a claim that these exigent circumstances should have triggered the trustee's fiduciary duties to its plan participants and beneficiaries to postpone or at least to limit the duration of the scheduled lockdowns, n153 as Defendants had the ability to do.

> n152 Other courts have also found a duty to disclose based on unique circumstances. *See, e.g., Glaziers and Glassworkers*, 93 F.3d 1171 (holding that plaintiffs, a group of benefit pension plans, stated a claim for breach of fiduciary duty against a former brokerage firm for failure to disclose that one of its brokers had been forced to resign on suspicion that he had committed fraud, after which the pension funds followed that broker to his new employer and the broker embezzled more than $2 million from the funds).

[*392]

> n153 In the face of the outcry from plan participants, the Committee Members purportedly shortened the original month-long lockdown to twelve business days. Plaintiffs claim even that amount of time was a breach of fiduciary duty under the circumstances. Clearly fact questions exist that may not be resolved at this stage of the litigation.

First, the complaint asserts that Enron shocked Wall Street with the announcement on October 16, 2001 that it had lost $618 million in the quarter and was writing down $1.2 billion of its net worth. The media were filled with stories raising questions about the corporation's financial stability. Concerned employees urged Northern Trust and Enron to postpone the lockdowns. Their ques-

tions may have triggered the fiduciaries' duties to respond with truthful and complete information that would apply to the plans as a whole. Even without questions from the plan participants and beneficiaries, the fiduciaries had a duty to disclose to the participants and beneficiaries material facts affecting their interests in the plans' assets of which they were unaware and [*393] which threatened their retirement funds. With Enron's report to Wall Street, if not before, according to the complaint, Olson should have known that Watkins' warnings in August had substance and that Lay had misled plan participants with his representations that Enron's financial picture that quarter was "great." Yet allegedly she continued to do nothing.

Second, on October 22, 2001, Enron announced that the SEC was informally investigating the company.

Third, two days later Fastow was forced to leave his position of Chief Financial Officer, which was taken over by McMahon, who had earlier voiced many of the same concerns about Enron's purportedly massive accounting improprieties as Watkins.

Furthermore, the complaint asserts that in the face of a swell of complaints and demands from panicked Plan participants, Enron actually did inquire about possible postponement of the lockdown and was told by Northern Trust and Hewitt Associates that a postponement was physically possible. Nevertheless, according to the complaint, although they knew or should have known the likely harm that would result for plan participants and although they had the discretion and power to delay the lockdowns, [*394] Enron decided that a postponement would be "inconvenient"; Olson, purportedly without even consulting other members of the Administrative Committee, refused the Plan participants' requests for a postponement; and Northern Trust, the named trustee and a fiduciary for the Savings Plan and the ESOP, n154 recommended that the lockdowns proceed even though it had the power to stop them and despite the extreme circumstances and participants' outcry. In addition, allege Plaintiffs, the objections made to Northern Trust by the participants about their plight triggered a duty in the fiduciary to communicate all material facts in connection with the transaction that the trustee knew or should have known, a duty which it did not fulfill.

> n154 See §§ 1.24. 3.6; Articles V and VI of the Savings Plan Trust Agreement (Ex. B to # 322).

This Court emphasizes that the Fifth Circuit's approach to issues of fiduciary duties has generally been a case-and fact-specific inquiry and a rejection of bright-line rules and "easy formula[s]. [*395] " See, e.g., Schlumberger, 338 F.3d at 427; Ehlmann, 198 F.3d at 556. Such an evaluation requires a record developed through discovery; thus dismissal is not appropriate based on a 12(b)(6) motion.

Plaintiffs have further complained that these Defendants had a duty to provide timely and informative notice of the lockdown to Savings Plan participants so they had an opportunity to safeguard their rights and direct Northern Trust to sell the Enron stock allocated to their individual accounts; instead Enron sent notice to participants by e-mail on October 25, 2001 at 11:44 p.m., the day before the lockdown, and employees did not receive it until they came to work on the day of the lockdown. n155 The complaint asserts they had no reasonable time to "review [their] overall strategy and carefully weigh the potential earnings of each investment choice against its risk before making investment decisions that are aligned with [their] long-term financial plans and [their] risk tolerance," as directed by the e-mail. Consolidated complaint at 244-47, PP710-25. Given the timing of the e-mail and the lack of opportunity for this kind of detailed portfolio review, [*396] the fiduciaries knew or should have known that the notice was clearly inadequate, maintain Plaintiffs.

> n155 An initial notice was sent on October 8, 2001, before any of the "extraordinary circumstances" materialized, providing ESOP participants with the routine notice that unless they filed distribution request forms with Northern Trust by October 20th, their ESOP assets would remain in Enron stock until November 20. Once Enron made its shocking announcement on October 16, plan participants sent "a slew of complaints . . . to Northern Trust urging Northern Trust to postpone the lockdowns." Complaint at 244, 246, PP710, 718.

According to Plaintiffs, the lockdowns denying Plaintiffs access to their retirement investments were an exercise of control over the assets of the plans by Northern Trust. As noted *supra*, exercise of control over the assets of a plan does not require the person exercising control to have discretionary authority to do so in order to be a fiduciary; only the exercise over the management [*397] of a plan requires discretionary authority. *First Tier*, 16 F.3d at 911; *IT Corp.*, 107 F.3d at 1421; *Wetlin*, 237 F.3d at 272-74. Thus Northern Trust was a fiduciary in imposing the lockdowns. Even if it was acting as a directed trustee with lessened discretion or control over imposing lockdowns, Northern Trust was still required to determine whether its directions complied with ERISA and thus disregard allegedly improper instructions of the Administrative Committee.

Finally, Plaintiffs have stated a claim for co-fiduciary liability against the Enron ERISA Defendants, Northern Trust, Olson, and the Administrative Committee relating to their action or inaction in knowingly participating in the lockdowns and failing to make reasonable efforts to remedy the breaches of their co-fiduciaries.

### 3. Count III: Failure to diversify Savings Plan assets

Plaintiffs have also stated a claim against the Enron ERISA Defendants, including the Administrative Committee, and against Northern Trust for failure to diversify Savings Plan assets in accordance with the plan's provisions and ERISA. n156

> n156 Plaintiffs indicate in their memorandum in opposition to Northern Trust's motion to dismiss, # 316 at 38 n.19, that although Count III currently refers only to the Savings Plan, because the ESOP Plan has parallel language requiring the trustee to prudently diversify, it will request leave of Court to amend to add the ESOP to Count III.

[*398]

Section XV.2 of the Savings Plan provides with respect to allocation of fiduciary duties:

> Each fiduciary with respect to the Plan shall have only those specific powers, duties, responsibilities and obligations as are specifically given him under the Plan. Enron Corp. shall have the sole authority to appoint and remove the Trustee and members of the Committee. Except as otherwise specifically provided herein, the Committee shall have the sole responsibility for the administration of the Plan, which responsibility is specifically described herein. Except as otherwise specifically provided herein and in the Trust Agreement, the Trustee shall have the sole responsibility for the administration, investment, and management of the assets held under the Plan. However, if the Committee, as a co-fiduciary, shall exercise its power given hereunder at any time, and from time to time, by written notice to the Trustee, to direct the Trustee in the management, investment, and reinvestment of the Trust Fund, then in such event the Trustee shall be subject to all proper directions of the Committee that are made in accordance with the terms of the Plan and the Act. It is intended under [*399] the Plan that each fiduciary shall be responsible for the proper exercise of his own powers, duties, responsibilities, and obligations hereunder and shall not be responsible for any act or failure to act of another fiduciary except to the extent provided by law or as specifically provided herein.

Section XV.1 makes clear that Article XV, titled "Fiduciary Provisions," "shall control over any contrary, inconsistent or ambiguous provisions contained in the Plan." A critical provision under Article XV for purposes of this suit, § XV.3(c) of the Savings Plan states, "Each fiduciary under the Plan, including, but not limited to, the Committee and the Trustee . . . shall discharge his duties and responsibilities with respect to the Plan" *inter alia* by "diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly not prudent to do so." n157 In addition, § XV.3(d) requires each fiduciary to act "in accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with applicable law."

> n157 Therefore under §§ XV.1, XV.3 and XIX.5 (authorizing but not mandating investment of Plan assets in Enron stock), only if investment of Plan assets in Enron stock were prudent would nondiversification have been appropriate. Plaintiffs contend that not only was the decision to invest the assets in Enron stock imprudent, but that Defendants failed to investigate whether it was prudent.

[*400]

Moreover, while § 1.1 of the Savings Plan Trust agreement (Ex. B to # 322) states that the Administrative Committee "has the responsibility . . . for monitoring the diversification of the investments of the Funds," § 6.2 mandates that, subject to its duty of loyalty and the prudent man standard, "the Trustee shall diversify the investments of that portion of the Fund of which it has investment responsibility so as to minimize the risk of large losses . . . ." Furthermore § 6.3 recites that subject to its duty of loyalty and the prudent man standard, "the Trustee shall, with respect to that portion of the Fund of which it has investment responsibility, follow the investment guidelines established by the Administrative Committee and shall act in accordance with the direction of the Administrative Committee . . . ." Thus the Savings Plan mandates that the Administrative Committee and the Trustee share a fiduciary responsibility to diversify plan assets where prudent. The trustee furthermore has a duty to plan participants not to follow the Administrative Committee's directions where they are contrary to ERISA, i.e., where they would lead to an imprudent result harmful to the plan [*401] participants and beneficiaries.