An exception to the diversification requirement is established by § 404(a)(2) of ERISA, 29 U.S.C. § 1104(a): an "eligible individual account plan" may acquire and hold qualifying employer securities (as defined in § 1107(d)(4) and (5)) without regard to the diversification requirements or the diversification element of the prudent man rule. Section 3(34) of ERISA, 29 U.S.C. § 1002(34), defines an "individual account plan" as one that

> provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains, and losses, and forfeitures of accounts of other participants which may be allocated to such participant's accounts.

*In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 425 n.1 (3d Cir.), *cert. denied*, 519 U.S. 810 (1996). A 401(k) plan is a type of individual account plan.

Under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary has a duty to "diversify the investments of the Plan so as to minimize the risk of large losses, unless under [*402] the circumstances it is clearly prudent not to do so." Since no statute or regulation has defined that duty, the Fifth Circuit has turned to the legislative history for guidance:

> The degree of investment concentration that would violate this requirement to diversify cannot be stated as a fixed percentage, because a fiduciary must consider the facts and circumstances of each case. The factors to be considered include (1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares of stock or otherwise; (5) distribution as to geographical location; (6) distribution as to industries; (7) the dates of maturity.

*Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997), citing H.R. Rep. No. 1280, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5084-85 (Conference report at 304). The appellate court admonished, "It is clearly imprudent to evaluate diversification solely in hindsight—plan fiduciaries can make honest mistakes that do not detract from a conclusion that their decisions were prudent at the time the investment was made." [*403] *Id.* Thus, "prudence is evaluated at the time of investment without the benefit of hindsight." *Id.* As to the question of who bears the burden of proof, to demonstrate a breach of the duty to diversify the plaintiff must show that the portfolio was not diversified "on its face"; the burden then shifts to the defendant fiduciary to show why under the circumstances it was prudent not to diversify the investments of the plan. *Id.*

As noted, the Savings Plan states, "Each fiduciary under the Plan, including, but not limited to, the Committee and the Trustee . . . shall discharge his duties and responsibilities with respect to the Plan" by, *inter alia*, "diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstance it is clearly not prudent to do so." Enron Corp. Savings Plan § XV.3(c). The Plan provision's language is nearly identical to the language of § 404(a)(1)(C) of ERISA, 29 U.S.C. § 1104(a)(1)(C) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interests of participants and beneficiaries and . . . by diversifying the investment of the plan so as to minimize [*404] the risk of large losses, unless under the circumstances it is clearly prudent not to do so. . . .").

Plaintiffs concede in their complaint at P696 that ERISA explicitly exempts defined contribution plans (a/k/a "individual account plans") from the diversification requirement to the extent that the employee benefit plan invests in the employer's own stock. Section 404(a)(2), 29 U.S.C. § 1104(a)(2), provides, "In the case of an eligible individual account plan (as defined in section 407(d)(3) of this title), the diversification requirement of (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is [*sic*] not violated by n158 acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 407(d)(4) and (5))." Section 407(d)(5)(A) defines "qualifying employer security" as "an employer security which is . . . stock." 29 U.S.C. § 1107(d)(5)(A). Plaintiffs also admit that the Savings Plan at issue here was an eligible individual account plan within the meaning of § 407 of ERISA, 29 U.S.C. § 1107. Complaint [*405] at P158. Nevertheless, since an employer may establish the conditions and terms of its plan as long as these conditions and terms do not violate ERISA, and because neither the statute nor the plan mandates non-diversification in the individual account plan, Plaintiffs argue that § XV.3 of the Savings Plan, charging the Administrative Committee and Northern Trust with the duty of "diversifying the investments of the Plan so as to minimize the risk of large losses," controls over § 404(a)(2), 29 U.S.C. § 1104(a)(2).

> n158 Note the statute does not mandate that the plan utilize the exception and not diversify.

Urging that Plaintiffs cannot state a claim for failure of the fiduciaries to diversify the Savings Plan, Defendants highlight a different provision in the Plan, which they

claim is contrary to § XV.3, i.e., § XIX.5, which provides, "The Plan is specifically authorized to acquire and hold up to 100% of its assets in 'qualifying employer securities' as such term is defined in Section [*406] 407(d) of [ERISA]." Moreover, Section V.16 of the Savings Plan (Joint Appendix In Support of Defendants' Motions to Dismiss Amended and Consolidated Complaint, # 271, at Ex. A) provides that Enron's 50% match of employees' contributions would be made "primarily" in Enron stock and remain in such stock until participants reach the age of 50. Complaint at PP677, 161.

After examining the text of the Savings Plan, the Court concludes the provisions are not in conflict and that Plaintiffs can state a claim under the key "clearly prudent under the circumstances" standard established in § XV.3(c): "each fiduciary . . . **shall discharge his duties and responsibilities** with respect to the Plan by *inter alia* "diversifying the investments of the Plan so as to minimize the risk of large losses, **unless under the circumstances it is clearly not prudent to do so** [emphasis added]." While the plan authorizes the trustee to hold "up to 100% of its assets" in Enron stock, it does not mandate that the trustee hold 100%, or even 30% or 20%, of its assets in Enron stock, and, in fact, seemingly allows complete discretion in how much may be invested in Enron stock where the [*407] circumstances make such investment imprudent. There also is substantial discretion permitted in § V.16's requirement that employer matching contributions be "primarily," but not wholly, in Enron stock. The language and grammatical structure of the Savings Plan's § XV.3 indicate that diversification is the general rule, not the exception, and where diversification is not effected, there is a burden to justify that the absence of diversification was clearly prudent under the circumstances. As most investment advisors inform their clients, putting all of one's eggs in a single basket is clearly a risky investment strategy; it is the rare case where diversification "is clearly not prudent." According to the parallel provision to § XV.3(c) in ERISA (§ 404(a)(1)(C)) and, as noted earlier, to case law construing it, if the fiduciary trustee decides not to diversify and is subsequently sued for breach of fiduciary duty, once a plaintiff meets the minimal burden of showing that the portfolio is not diversified on its face, the trustee then bears the much heavier burden to show that the choice was **clearly** prudent under the circumstances. *Metzler*, 112 F.3d at 209. [*408]

The complaint meets its light burden by alleging as facts that immediately before the lockdown, and in light of the red lights and rapidly deteriorating circumstances described in the pleadings, the Plan assets were dangerously overweighted in Enron stock, which constituted 60% of its investments, as Olson conceded during her testimony before Congress. It charges that Defendants breached their responsibility to protect the investments and to diversify.

The complaint states a claim specifically against the Administrative Committee [and its members], which, despite the express Savings Plan provision mandating diversification where prudent, allegedly did not question or investigate the prudence of investing Plan assets in Enron stock and did nothing to direct Trustee Northern Trust to diversify, nor did it supervise to insure that Northern Trust did diversify, the Savings Plan's assets. n159 As further factual support for breach of their fiduciary duty, Plaintiffs have asserted that the Administrative Committee had no process for monitoring the prudence of Enron stock as an investment option nor for discontinuing that option for the Plan if it became imprudent, as evidenced by the [*409] Congressional testimony of Prentice and Olson, both members of the Administrative Committee. The complaint asserts that Prentice and Olson admitted that only in November 2001, just prior to Enron's bankruptcy, did the Committee seek legal and investment advice about the prudence of using Enron stock as an investment option. The Court has previously noted allegations in the complaint regarding prior warnings to Olson about Enron's financial condition. The complaint also asserts that Olson missed most of the Committee meetings in breach of her fiduciary duties. The Court finds that the complaint has stated a claim that Olson failed to act solely in the interest of the Savings Plan participants and beneficiaries with the care skill, prudence and diligence under the circumstances that a prudent person in similar circumstances would use.

> n159 The complaint at 241, P699, states, "Olson agreed with Senator Lieberman that the Savings Plan, which had 60% or more of its total assets invested in Enron stock as of last year, was not in fact 'diversified.'"

[*410]

Furthermore, although Enron's matching contributions under § V.16 of the Savings Plan were to be made "primarily in Enron stock," Plaintiffs have stated a claim in alleging that the Administrative Committee had an overriding fiduciary duty to monitor the prudence of allowing Enron to continue to match employee contributions with Enron stock if the stock became an imprudent investment, as they assert it had. ERISA § 404(a)(1)(D), 29 U.S.C. § 1004(a)91)(D)(a fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . . in accordance with the documents and instruments governing the plan insofar as such documents are consistent with the provisions of this title and title IV."). Plaintiffs have further pointed out

Case 3:01-cv-01737-MRK    Document 52-36    Filed 10/16/2003    Page 3 of 14

Page 108
2003 U.S. Dist. LEXIS 17492, *410

that "primarily" means "for the most part," not "all," and that the leeway provides the plan fiduciaries with considerable discretion, which they allegedly did not exercise prudently or loyally. Moreover, an investment fiduciary must disregard plan documents if following their terms would be imprudent. *Laborers National Pension Fund*, 173 F.3d at 322; *Cunningham*, 716 F.2d at 1467 [*411] (ESOP fiduciaries breached duty of prudent in purchasing company stock); *Eaves*, 587 F.2d at 1459 (ERISA "requires that in making investment decision whether to invest in company stock, an ESOP fiduciary, like a fiduciary from other ERISA plans, is subject to the "solely in the interest" and "prudence" tests of § 404).

Because the complaint states a claim that the Administrative Committee and the Trustee were fiduciaries that breach their duties, Plaintiffs also state a claim against each for co-fiduciary liability relating to the failure to diversify under 29 U.S.C. § 1105(a)(2).

**4. Count IV (Plaintiffs on behalf of certain retirement plan participants and beneficiaries sue Enron and the Enron ERISA Defendants for breach of fiduciary duties to the Cash Balance Plan participants and beneficiaries from 1998-2000 n160 relating to offsets based on the inflated value of Enron stock)**

> n160 Cindy Olson, whom the complaint identifies as one of the ERISA Defendants, insists, and points to P679 of the complaint to demonstrate that she did not join the Administrative Committee, which is charged with making the offset calculations, until January 2001 and thus this claim as to her should be dismissed. Because Plaintiffs have asserted that Olson is liable as a fiduciary in her capacity both as a Committee Member and as a corporate officer for Enron, with a duty to monitor, the fact that she did not become a Committee Member until January 2001 will not relieve her of potential responsibility.

[*412]

Section XVII.1 of the Cash Balance Plan provides in part,

> The general administration of the Plan shall be vested in the Committee, which shall be appointed by the Company and shall consist of one or more persons. . . . For purposes of the Act, the Committee shall be the Plan "administrator" and shall be the "named fiduciary" with respect to the general administration of the Plan (except as to the investment of the assets of the Trust Fund).

Ex. A.3 to # 271. The "Company" denotes Enron Corp. *Id.* at (i). The Committee's duties are set out in § XVII.7. Section XVIII.1, dealing with the Trustee, states that "the Trustee shall be appointed, removed and replaced by and in the sole discretion of the Company. The Trustee shall be the 'named fiduciary' with respect to investment of the Trust Fund's assets." Moreover, under Section XVIII.5, "The Committee shall issue directions to the Trustee concerning all benefits which are to be paid from the Trust Fund pursuant to the provisions of the Plan." Section XVIII.7, entitled "**No Benefits to the Employer**," states, "No part of the corpus or income of the Trust Fund shall be used for any purpose other than the exclusive [*413] purpose of providing benefits for the Members and their beneficiaries and of defraying reasonable expenses of administering the Plan." The Cash Balance **Plan expressly limits** "the power to appoint or otherwise affect the Committee or the Trustee and **the power to amend the Plan and Trust Agreement**" to the "Company, alone [emphasis added]." § XX.3, Ex. A-3 to # 271. Section XXI.1 provides . . . "the Company may from time to time amend, in whole or in part, any or all provisions of the Plan . . . ." Nevertheless, § XXI.2 makes clear, "No amendment of the Plan may be made that would vest in the Employer, directly or indirectly any interest in or control of the Trust Fund."

With respect to the amendment of the Cash Balance Plan, effective in 1996, and its computation of the offset to a plan participant's average pay for retirement benefits under § 5.2(g) of the amended Cash Balance Plan, Plaintiffs have asserted that Enron and the ERISA Defendants, because they knew or should have known that the market price of Enron stock did not reflect its actual value, breached their fiduciary duty by (1) failing to use the true value of Enron stock, which Defendants knew or should [*414] have known, rather than the artificially inflated market price, to compute the offset; (2) failing to fix permanently the market value component of the offset because it did not reflect the stock's real value at the close of the market on the first day of each year from 1996 to 2000; and/or (3) failing to disclose to participants and beneficiaries that the value of the stock used for the offset was artificially inflated or not the actual value of the stock on the relevant dates.

In opposition, Defendants have argued that the offset is part of the design of a plan, for which Enron was wearing its settlor hat and not its fiduciary hat, and thus they are not subject to fiduciary duties. n161

> n161 Plaintiffs have not challenged the amendment of the plan that put the new computation formula into effect. Even if they had, it is black letter law that ERISA's fiduciary standards do not apply

when an employer amends an ERISA benefit plan; the amendment relates to "the composition or design of the plan itself and does not implicate the employer's fiduciary duties.... ERISA's fiduciary duty requirement simply is not implicated where [the employer], acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan, such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated." *Hughes Aircraft Co.*, 525 U.S. at 444. See also *Izzarelli v. Rexene Products Co.*, 24 F.3d 1506, 1522-25 (5th Cir. 1994).

[*415]

Plaintiffs, in turn, insist that their claim is based not on the design of Enron's plan, but on implementation of the plan because Enron undermined the plan when it artificially and fraudulently manipulated the plan's components, specifically the market price of Enron stock. Plaintiffs also contend that Defendants had a fiduciary duty to provide plan participants with the information that the value of the stock was inflated. # 315 at 72.

Plaintiffs have not argued that Enron did not have the right as settlor to amend its earlier plan to create the Cash Balance Plan without triggering fiduciary duties. Nor have Plaintiffs alleged that the Cash Balance Plan was not amended in accordance with the procedures laid out in the plan document nor that use of a stock price on a fixed date (January 1st for five years) is, on its face, an impermissible offset of accrued pension benefits. Nor is their challenge to a decrease in accrued benefits, based on § 204(g), 29 U.S.C. § 1054(g). They also do not challenge the use of the amended formula during at least its first couple of years, since "between 1993 and 1997, Enron's stock did not appreciate significantly," prior [*416] to the Class Period. Complaint at P196.

According to the complaint, beginning in 1998, the company diversified, acquired more and new businesses, and the price of Enron stock increased substantially through 2000; at some point, not clearly pinpointed, the price became fraudulently inflated. While the amount of the offset under the Cash Balance Plan also increased, thereby reducing the participants' and beneficiaries' accrued pension benefits, had that rise in value of Enron reflected Enron's actual worth, the larger offset amount would not have injured Plaintiffs because their ESOP account holdings would also have increased substantially. Thus in essence the target of Plaintiffs' claim is not the new pension benefit plan formula established by the amendment. The cause of the injury is not the structure of the plan itself, but the purported fraud that allegedly began to occur a couple of years after the 1995 amendment became effective and which caused the market value of the stock to rise when the actual financial condition of the company was deteriorating, thereby making the application of the plan's formula injurious to plan participants and beneficiaries.

Plaintiffs have characterized [*417] their claim as a breach of fiduciary duty on the grounds that once Defendants knew or should have known that Enron's precarious financial condition and fraudulent accounting made evident that Enron stock was overpriced (identified by the complaint at 53, P189, as "the three-year period 1998-2000"), the plan fiduciaries should have disregarded the terms of the plan for those three years, determined what the true value of the stock should have been, and computed each component of the offset with that true value, or refused to fix the component permanently at the artificially inflated closing price as the plan mandated, or disclosed to plan participants and beneficiaries that the values of the stock were artificially inflated. Instead Defendants proceeded according to the plan amendment's formula even though they knew that the new formula would unfairly reduce the plan participants' pension benefits. Moreover, in the context of the larger scheme to defraud, Plaintiffs have also charged Defendants with a conflict of interest because at least some of the savings to Enron in paying Plaintiffs with, and reducing the amount of their benefits by use of, artificially inflated stock in their [*418] ESOP accounts allegedly went into higher bonuses and salaries for Defendants' personal gain, another breach of fiduciary duty because Defendants had the authority to amend the pension benefits and the discretion to exercise it.

According to Plaintiffs, Defendants had a fiduciary duty during the last three years of the phase-out "to effectively *disregard* the formula (or at a minimum, not to use the publicly traded share price on the days in question to calculate the offset) in order to avoid an imprudent, disloyal result." *Id.* at 74. Plaintiffs cite § 404(a)(1)(D) (A trustee must act prudently and "in accordance with the documents and instruments governing the plan *insofar as such documents are consistent with ERISA* [emphasis added])", 29 U.S.C. § 1104(a)(1)(D), and, in support of their argument, two cases, *Central States*, 472 U.S. at 569 ("Trust documents cannot excuse trustees from their duties under ERISA, and ... trust documents must generally be construed in light of ERISA's policies."); *NationsBank*, 126 F.3d at 1369 (ESOP trustees are required to follow plan documents only to the extent they are [*419] consistent with ERISA; if the mirror voting provision was imprudent, NationsBank must ignore the provision and vote the unallocated shares prudently). n162

n162 The facts, focus, and the contexts in these

cases are easily distinguishable from those in *Tittle*. More importantly, while the cases in *dicta* support "disregarding" provisions in a plan that would require a trustee to breach its fiduciary duties of loyalty to the participants and prudence, the cases do not stand for the kind of specific affirmative duty to rewrite or amend the plan with the kind of particular plan provisions advocated here by Plaintiffs, i.e., to determine for themselves the real value of Enron stock for each of the last three years and/or not fix the price of the artificially inflated stock as a permanent component of the offset. Instead trustees, not the court, must examine available prudent options, described by the Eleventh Circuit in *NationsBank* as a "fact-laden issue" which is not appropriate for determination before discovery. 126 F.3d at 1369.

*Central States*, 472 U.S. 559, dealt with two ERISA-governed multiemployer welfare and pension benefit plans for employees performing work covered by collective bargaining agreements between a labor union and sixteen trucking companies. Under the collective bargaining agreements, each trucking company employer was required to make weekly contributions to the plans for each covered employee and, because of the size of the plans, to self-report the amount of its contribution liability and relate fluctuations in the employment status (e.g., terminations, new hires) of employees covered by the collective bargaining agreement so that the funds could adjust the weekly invoice. The funds would check on this self-reporting process by conducting random audits of the participating trucking company employers' records. Furthermore, the trust agreements of the plans contained a number of provisions to protect the trust, including one giving the trustees the power to demand and review relevant employer records, which the trustees construed as authorizing the audits. The trucking company employers refused to permit the funds to audit their payroll, tax, and personnel records, including records of employees that the employers maintained were not plan participants. The funds filed suit seeking an order to permit them to do the audits.

The case does not address a plan provision that would cause conflict with a trustee's fiduciary obligations to the participants. The Supreme Court concluded that the trustees' interpretations of the trust agreements as authorizing the audits, including those of non-covered employees to verify the accuracy of the employer's determination of the class of covered employees, was consistent with ERISA and entirely reasonable in light of ERISA's policies. The Supreme Court drew on the traditional common law of trusts to fill in the powers of the trustees not specifically enumerated in ERISA. At common law trustees had all the powers necessary or appropriate for effectuating the purposes of the trusts, which would include the goals of the audit, i.e., to inform plan participants fully of their rights and to check the financial integrity of the plans by determining the group of potential benefit claimants, while simultaneously insuring that the employers made full and prompt contributions. Significantly, as noted, in *Central States* the Supreme Court concluded that there was no inconsistency between the trustees' interpretation of the plan and ERISA. The high court observed that typically an employer is motivated to under-report the number of covered employees to reduce its own liability to the plans. Unlike the *Tittle* Plaintiffs, the court in *Central States* did not impose an affirmative duty on the trustees not merely to ignore the trust agreement, but to create new terms in order to fulfill duties of loyalty and prudence to plan participants and beneficiaries. Instead it determined that the right to monitor the employers' records to insure the financial stability and continuance of the plans was entirely reasonable and consistent with the policies behind the statute to preserve the funds' financial soundness to ensure that workers would receive vested benefits.

The Eleventh Circuit's opinion in *NationsBank* concerned an ESOP, not a Cash Balance Plan, and focused largely on ESOP shares allocated to the participants' individual accounts, regarding which the appellate court determined the trustee was a directed trustee and was relieved of liability in part because it was protected by § 404(c) when informed participants directed the management of those assets. This Court questions whether and how an ESOP would qualify as a § 404(c) plan. The trustee was held to be a fiduciary, however, with respect to ESOP shares not allocated to the participants individual accounts, not at issue here, which required the trustee to satisfy fiduciary standards under § 404(a)(1)(D).

In *NationsBank*, in 1988 Polaroid created an ESOP in part to thwart the threat of a hostile takeover by Shamrock Acquisitions, III, Inc. It allocated some common stock to participants' individual accounts in proportion to that participant's compensation and held other, unallocated stock in a separate account. The ESOP provided for "pass-through voting," which permitted participants to vote their allocated shares as if they were sharehold-

ers. The plan also stated that in the event of a tender offer, the plan participants may direct the trustee, which was NationsBank, to tender or not tender their allocated shares. In addition the ESOP had a mirror voting provision, instructing the trustee to tender the unallocated shares in the same proportion as it tendered the allocated shares. Pass-through voting and mirror voting provisions are common in ERISA-governed ESOPS. The focus of *NationsBank*, unlike the issues before this Court, was on the trustee's responsibilities with respect to these two types of provisions and on evaluating the Department of Labor's stance regarding them.

When Shamrock made its tender offer, followed by one from Polaroid, NationsBank mailed the plan participants a description of the tender offers and informed them that by a specified date they had to direct NationsBank to tender or not tender their allocated shares to Polaroid or Shamrock, and that if they did not return the direction form, NationsBank would consider them to have chosen not to tender their shares. Significantly, the letter did not inform the participants that the unallocated shares would be voted in the same proportions as the allocated shares. Thus NationsBank was a directed trustee under § 403(a) for the plan participants with shares allocated to their individual ESOP.

After considering the prudence of the three options (directing tender to Polaroid, directing tender to Shamrock, and not tendering the ESOP shares in the individual accounts), the bank's Committee decided each was prudent because the post-tender price of Polaroid stock was uncertain; it chose to follow the plan provision for "pass-through voting" and the mirror voting provision.

The Secretary of the Department of Labor sued NationsBank on two causes of action, only one of which is relevant here: that the trustee violated § 404(a)(1)(A) and (B), because it failed to tender all of the unallocated shares and the allocated non-voted shares to Polaroid.

Both parties filed motions for summary judgment. The district court held that NationsBank could not rely on the plan's pass-through and mirror voting provisions, but had to exercise its independent judgment and follow the plan provisions only if they led to a prudent result. It also held that NationsBank had the exclusive responsibility for deciding whether to tender allocated non-voted shares and that ERISA precluded it from construing plan participants' failures to respond to its notice as directions not to tender. It further found that genuine issues of material fact existed regarding whether NationsBank acted prudently in withholding the shares it did and whether NationsBank acted solely in the interest of plan participants. The district court pursuant to a request from NationsBank certified the decision on Count One for interlocutory appeal.

The Eleventh Circuit, whose opinion is not binding on this Court, focused on the directed trustee exception (29 U.S.C. § 1103(a)(1)) to the general rule that trustees have exclusive authority and control over plan assets. It pronounced, "Insofar as a trustee acts at the direction of a named fiduciary in accordance with the terms of the plan and ERISA's requirements, *he is not subject to the fiduciary requirement in § 1104(a) to act prudently* [emphasis added]." *NationsBank*, 126 F.3d at 1361, citing *Maniace*, 40 F.3d at 267 (holding that a directed trustee is not acting as a fiduciary when he follows a named fiduciary's directions). This Court has previously discussed its disagreement with such a general rule. Thus the issue in *NationsBank* became whether the ESOP participants were "named fiduciaries" who can direct NationsBank's decisions regarding specific plan assets, i.e., unallocated and the allocated but non-voted shares.

The Secretary of Labor argued *inter alia* that plan participants cannot ever be named fiduciaries for the purpose of directing the trustee under 29 U.S.C. § 1103(a)(1)) with respect to unallocated shares or allocated non-voted shares and therefore the trustee's decisions regarding those kinds of shares are subject to fiduciary duties, including the prudent man standard of 29 U.S.C. § 1104(a)(1). She insisted that the trustee always has the fiduciary responsibility for managing such unallocated shares, as well as allocated non-voted shares; thus the trustee may choose to follow plan participants' directions regarding those unallocated shares only to the extent that the participants' directions are prudent, consistent with the plan, and not contrary to ERISA. She also argued more narrowly that even if the plan participants were fiduciaries with respect to unallocated shares in some circumstances, because the tender notice sent to the participants did not explain to them the effect on the unallocated shares of their action or inaction in responding to the trustee's notice, they were not properly informed of their power and control over these unallocated shares. In addition, the Secretary maintained that the only prudent course for NationsBank would have been to tender all of the ESOP's shares to Polaroid.

The Eleventh Circuit, noting that under ERISA to be a fiduciary a party must have "discretion to decide the disposition of plan assets or must exercise authority or control over plan assets," reasoned that "[a] person cannot exercise the power of choice or individual judgment unless he is aware of his ability to do so." 126 F.3d at 1366. Because the participants did not receive notice that their action or inaction in voting their allocated shares would also control the disposition of the unallocated shares, they were not fiduciaries. Furthermore, "if ERISA did not limit the definition of fiduciaries to those with knowledge of their authority and discretion, then person or entities could become subject to fiduciary liability without notice. Such a result would not only be unfair, but it would also disserve a core purpose of ERISA, which is to create a system whereby accountable fiduciaries are motivated by their accountability to protect the interests of participants in ERISA plans." *Id.* The Eleventh Circuit emphasized that § 404(c)(1) of ERISA allows individual account plans to give participants control over the assets allocated to their own individual accounts and thus relieve the trustee from being deemed fiduciaries and free the trustee from liability, while simultaneously not saddling the participants with fiduciary responsibilities and liability for what happens when they exercise control over their own accounts. But ERISA does not address unallocated shares nor participant control over unallocated assets, especially where participants are not adequately informed of the power and effect of their decisions. Imprudent decisions by plan participants would then affect not only their own assets, but the interests of other participants, and the participant decision-makers would be subject to suit by co-participants. Moreover, plan participants do not lose control over the assets allocated to their individual accounts merely because they fail to respond with directions for a tender offer after they have been informed that a failure to respond will be treated as a direction not to tender because that failure to respond with directions is an exercise of control or discretion. Thus the plan participants can be named fiduciaries with respect to the allocated, non-voted shares also. The appellate court remanded the case for determinations of fact issues.

[*420]

As was the case in *Central States*, this Court finds that the Cash Balance Plan amendment, itself, is consistent with ERISA. In fact, the use of the closing market price on the designated day of each of five years is consistent with ERISA's own provision, § 3(1), 29 U.S.C. § 1002(18), that "adequate consideration" for purposes "of a security for which there is a generally recognized market" is "the price of the security prevailing on a national securities exchange which is registered under section 6 of the Securities Exchange Act of 1934." Moreover, although the inflated value of Enron stock had the effect of severely reducing the plan participants and beneficiaries' pension benefits, "the Internal Revenue Code does not require that the defined benefit be fixed, but only that it be determinable according to criteria specified in advance that do not permit the plan to play favorites." *Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*, 241 F.3d 609, 612 (7th Cir. 2001), citing 26 U.S.C. § 401(a)(25); 26 C.F.R. § 1.401-1(b)(1)(i). There are no allegations here of discrimination in [*421] the administration of the plan in order to interfere with benefits under § 510 of ERISA. Furthermore, an offset is a permissible method of controlling employer costs; "benefits provided by one plan may be offset by benefits received under other plans provided by the same employer." *Lunn v. Montgomery Ward & Co.*, No. 97 C 3026, 1998 WL 102751, *6 (N.D. Ill. Feb. 26, 1998) (citing *Pritchard v. Rainfair*, 945 F.2d 185, 189-90 (7th Cir. 1991), and *Holliday v. Xerox Corp.*, 732 F.2d 548, 550-52 (6th Cir. 1984)), aff'd, 166 F.3d 880 (7th Cir. 1999). In sum Plaintiffs have failed to point out any specific provisions showing that the plan is inconsistent with the provisions of ERISA or of the Internal Revenue Code.

What Plaintiffs have alleged is that various Defendants' purported fraud made the implementation of the plan, even though it was facially consistent with and permissible under the statute, imprudent for the last three years of a five-year phase-out period and that those circumstances made continued implementation of the plan a violation of their fiduciary duty of loyalty and prudence. It is necessary here to distinguish [*422] the breach of fiduciary duty alleged by Plaintiffs and the remedies they claim the trustee should have followed rather than breach his fiduciary duty. The Court agrees that Plaintiffs have stated a claim for breach of fiduciary duty; it is two of their particular remedies with which this Court takes issue because they offend policies behind ERISA. It addresses the Plaintiffs' proposed remedies first.

Plaintiffs plead that the plan administrators should have not only "disregarded" terms of the amended plan established by the employer in his settlor capacity, even though they facially complied with the statute, but also that the administrators should affirmatively have determined for themselves the real value of Enron stock for each of the last three years and used that amount and/or not fixed the price of the artificially inflated stock as a permanent component of the offset. Plaintiffs cannot mandate

to the plan administrators what they should have done; and a court can only determine after the fact whether the path the administrators took was prudent in light of the circumstances and available options. A fiduciary must independently investigate and examine the prudence of possible [*423] options and determine which to follow, with an eye to the policies underlying ERISA. There is a substantial difference between "disregarding" a plan term and mandating a specific new one that offends the employer/settlor's authority.

The two proposed remedies appear not merely to restrict the administrators' options, but are contrary to ERISA's policies. These proposed remedial actions in essence would constitute a plan amendment without reference to plan procedures. n163 The Court finds no authority for and is not willing to impose as a fiduciary duty on the trustee or plan administrators, as a matter of law, writing such specific terms into the plan; plan amendment is a settlor function, and in the case *sub judicia*, is reserved by the Cash Balance Plan's express terms solely to the Company. *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 511 (5th Cir. 2000) ("An employer who adopts, amends or terminates an employee benefit plan is not acting as a fiduciary.") (*citing Lockheed Corp. v. Spink*, 517 U.S. 882, 889-90 (1996).), *cert. denied*, 534 U.S. 822 (2001). The settlor function protection was created to encourage employers [*424] to establish plans. There are other options open to the trustee to "disregard" the plan's terms under the circumstances.

> n163 The Court points out that § 402(a) of ERISA, 29 U.S.C. § 1102(a) requires, "Every employee benefit plan shall be established and maintained pursuant to a written instrument." Thus the statute "mandates that [a] plan itself and any changes made to it are to be in writing." *Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir. 1989). Indeed, "a written employee benefit plan may not be modified or superceded by oral undertakings on the part of the employer." *Musto v. American General Corp.*, 861 F.2d 897, 910 (6th Cir. 1988), *cert. denied*, 490 U.S. 1020 (1989).

Second, the proposed task (of determining the true worth of Enron stock) would have been complex, costly, and unlikely to yield certain or verifiable figures in light of the alleged fraud. ERISA was enacted not only to provide plan participants and beneficiaries [*425] with a vested right to receive benefits when they reach normal retirement age, but also, as a balance, to hold down the impact of cost increases and burdens on employers, again to induce them to create such plans.

Alternatively Plaintiffs assert that Defendants had a fiduciary duty to disclose the artificially inflated price of the stock to protect the plan participants and beneficiaries. Here Plaintiffs have stated a more appropriate option under the circumstances: affirmative disclosure of the artificially high price of the stock, which, as noted previously, would, because of the securities laws' insider trading provisions, also necessitate a duty to find a means to disclose to all investors and the public at large the fraudulent acts and concealment that inflated the value of Enron stock. As indicated *supra*, the Fifth Circuit has recognized that "Section 404(a) imposes on a fiduciary the duty of undivided loyalty to plan participants and beneficiaries, as well as a duty to exercise care, skill, prudence and diligence. An obvious component of those responsibilities is the duty to disclose material information" to protect plan participants and beneficiaries where the impact of [*426] undisclosed information could cause plan participants and beneficiaries substantial injury. In *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d at 237; *Ehlmann v. Kaiser Foundation Health Plan of Texas*, 198 F.3d at 556 (describing the imposition of a duty to disclose in *McDonald* as based on the "extreme impact" that the change in rate schedules would have on small employers, including the plaintiffs). Plaintiffs have alleged circumstances supporting the extreme impact that implementation of the new formula would have on plan participants and beneficiaries from 1998-2000.

Some Defendants have argued that rather than a cause of action for breach of fiduciary duty, Count IV is actually an improperly framed challenge of and claim for plan benefits that can only be brought under § 502(a)(1)(B), 29 U.S.C. § 1132, n164 authorizing a participant civil suit "to recover benefits due . . . under the terms of [the] plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan" and with remedies limited to "accrued benefits due, a declaratory judgment on entitlement [*427] to benefits, or an injunction against a plan administrator's improper refusal to pay benefits". n165 "When a beneficiary wants what was supposed to have been distributed under a plan, the appropriate remedy is a claim for denial of benefits under § 502(a)(1)(B) of ERISA rather than a fiduciary duty claim brought pursuant to § 502(a)(3)." *McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 512 (5th Cir. 2000), *cert. denied*, 534 U.S. 822 (2001). n166 Moreover, as noted earlier, a § 502(a)(1) claim can only be brought on behalf of the plan, and not by "certain" plan participants and beneficiaries.

> n164 *See* discussion in this memorandum and order addressing Standing and Remedies under ERISA.

n165 *Pilot Life*, 481 U.S. at 53. Furthermore, the Fifth Circuit has held that "an ERISA plaintiff may bring a private action for breach of fiduciary duty only when no other remedy is available under [§ 501(a)(3)], 29 U.S.C. § 1132." *Rhorer v. Raytheon Eng'rs and Constructors, Inc.*, 181 F.3d 634, 639 (5th Cir. 1999), citing *Varity Corp.*, 516 U.S. at 510-16.

[*428]

n166 *McCall*, 237 F.3d at 512, sets out the Fifth Circuit's two-step analysis for determining if a plan administrator abused its discretion in denying a participant benefits under the plan. First, the Court must decide whether the administrator's interpretation of the plan's terms was the legally correct interpretation. If it was, the inquiry ends. If the court determines the administrator's decision was not legally sound, it must then decide if the administrator's decision constituted an abuse of discretion. *Id.* "A decision is not an abuse of discretion if a reasonable person could have reached a similar decision given the evidence before him." *Id.* Elsewhere the Fifth Circuit has elaborated to explain that in deciding if the administrator's interpretation was an abuse of discretion, the court should examine whether the administrator gave the plan a uniform construction, made a fair reading of the plan, and any other unanticipated costs resulting from different interpretations of the plan. *Tolson v. Avondale Industries, Inc.*, 141 F.3d 604, 608 (5th Cir. 1998).

[*429]

On the other hand, Section 502(a)(3) permits a plan participant to bring a suit "to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or . . . to obtain other such appropriate equitable relief . . . to redress such violations or . . . to enforce any provisions of [ERISA] or the terms of the plan."

Plaintiffs insist they do not assert a § 502(a)(1) claim for denied plan benefits, which would require the Court to determine (1) whether the plan administrator made the correct legal interpretation of the plan and (2) whether the administrator interpreted the plan uniformly. *Tolson v. Avondale Industries, Inc.*, 141 F.3d 604, 608 (5th Cir. 1998). Plaintiffs emphasize that their claim does not fall under § 502(a)(1) because they agree that the plan is clear and unambiguous, they are not contending that Defendants did not interpret it properly, and they are not seeking to recover benefits under the terms of the plan. The Court agrees. They seek not to recover benefits, enforce rights, or clarify rights to future benefits under the plan; they seek to nullify the provision in dispute as it applies to certain plan participants [*430] from 1998-2000. *See, e.g., Ross v. Rail Car America Group Disability Income Plan*, 285 F.3d 735, 740, 741 (8th Cir. 2001) (section 502(a)(1)(B) does not authorize a claim to reform a plan by obtaining a declaration that certain amendments are void; suits "which seek to invalidate [plan provisions] can only be characterized as arising under 29 U.S.C. § 1132(a)(3), section 502(a)(3) of ERISA.") (and cases cited therein)), *cert. denied*, 537 U.S. 885 (2002). Normally the defendant in a suit for payable benefits under the terms of a plan is the plan. *Ross*, 285 F.3d at 740, citing *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1490 (7th Cir. 1996) ("The appropriate defendant for a denial of benefits claim would be the Plan . . . ."), and *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1324 (9th Cir 1985) ("ERISA permits suits to recover benefits only against the Plan as an entity. . . ."). Here Plaintiffs have dismissed the Cash Balance Plan. Because Plaintiffs have consciously framed their claim under § 502(a)(3) as a breach of fiduciary duty, they therefore must meet [*431] the burdens of proving a claim for which relief is provided under that statute.

In their complaint, Plaintiffs are vague about the equitable remedy prayer with respect to the Cash Balance Plan. According to the complaint they seek to enjoin Defendants "from computing the value of each component of the ESOP offset according to the market value of the Enron shares on each January 1st of the three-year period 1998-2000 and order those defendants to redress all damages flowing from prior Cash Balance payments made pursuant to the offset arrangement." Complaint at 295. In their memorandum in opposition (# 315 at 76), they assert that they seek "injunctive and declaratory relief from those now in charge of the plan" and from each Committee Member "monetary make-whole relief that was 'typically available in equity.'" They cite as authority *Great-West*, 122 S. Ct. at 712, which ironically may be their undoing.

"In determining the propriety of a remedy, we must look to the real nature of the relief sought, not its label." *Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 321 (2d Cir. 2003), *petition for cert. filed* (Aug. 14, 2003, No. 03-263), citing *Great-West*, 534 U.S. at 210. [*432]

The remedy of an injunction to maintain the status quo in *Tittle* would be to enjoin a three-year practice of offsetting pension benefits with the inflated value of Enron stock; that practice ended in 2000 and thus injunctive relief "to preserve the status quo" is a moot issue. Moreover it would not be an injunction under the language of § 502(a)(3) "to enjoin any act or practice which violates the terms of the plan," since implementation of that offset

was in compliance with the terms of the plan.

Moreover declaratory relief is not necessarily equitable relief. *Bauhaus USA, Inc. v. Copeland*, 292 F.3d 439 (5th Cir. 2002) (Section 502(a)(3) of ERISA does not authorize Bauhaus' suit, because Defendants were not in possession or control of the funds). As noted by Judge Weiner in his dissent to *Bauhaus*, the Declaratory Judgment Act is a procedural statute and does not provide an independent basis for federal jurisdiction. *Id.* at 447. Instead "although declaratory judgment, in and of itself, is neither legal nor equitable, it takes on the character of the underlying right or relation it declares." *Id.* at 448 and nn.17, 19.

Under [*433] § 503(a) a prayer for equitable relief such as disgorgement or restitution to redress violations such as breaches of fiduciary duty must refer to "those categories of relief that were *typically* available in equity" under *Great-West*. Remedies of equitable restitution and disgorgement would have to meet the standard set out in *Great-West*, i.e., remedies that were *typically* available in a court of equity and that are not compensatory damages punishing Defendants for Plaintiffs' loss, but restoration of property subject to imposition of a constructive trust or equitable lien in which money belonging in good conscience to Plaintiffs can clearly be traced to particular funds in the Defendants' possession.

Plaintiffs' complaint alleges that they are seeking "monetary make-whole relief" from Committee Members' personal assets, in essence a claim for the difference in value between what their pensions would have been if calculated by a formula using the true worth of Enron stock and what they were allocated under the inflated value calculation from 1998-2000. As discussed earlier, under *Great-West* such monetary relief is actually compensatory relief for their loss, the [*434] imposition of personal liability on these Defendants' individual resources, unless Plaintiffs can trace some or all of the sum of money to which they claim entitlement, but which was never received by them or by the plan, through Enron's enormous business into the bonuses and increased salaries that went into these particular Defendants' personal pockets and which remains within their possession and control. Plaintiffs have set themselves a daunting task. At this stage of the litigation the Court cannot state that there is no possibility that Plaintiffs can satisfy their burden of proof, but their relief is limited to that defined as typical equitable restitution in *Great-West*.

**D. Texas Common Law Causes of Action**

**1. Count IX: Civil Conspiracy**

Plaintiffs' civil conspiracy claim (Count IX, complaint at 292-95, brought against Andersen, Enron Insiders, Attorney Defendants, and Investment Banking Defendants, asserts that "non-Enron Defendants . . . conspired with Enron and Enron Insider Defendants for the unlawful purpose of masking the true financial condition of Enron, thereby deceiving Enron employees into (i) accepting over-valued Enron stock and "phantom [*435] stock" as compensation; (ii) keeping their retirement assets in artificially inflated Enron stock; and (iii) continuing to work at Enron based on their false belief that it was a strong company." *Id.* at 293, P823. It also states that the Defendants knew that "the falsified financial picture generated by the conspiracy" would *inter alia* cause the plan participants to "accept an offset to their Cash Balance Plan payments based on the artificially inflated price of Enron stock held by the ESOP," "continue to direct that their retirement plans be heavily concentrated in Enron stock which provided further benefits to Enron and, indirectly, to its co-conspirators," and "continue to offer Enron securities to the market." *Id.*, P827.

The Court finds that Plaintiffs have stated a claim for civil conspiracy to defraud under Texas common law. The issue becomes whether it is preempted by ERISA.

In a preemption analysis, the Court finds that some factors weigh against preemption of the civil conspiracy claim by ERISA. Texas common-law fraud or fraudulent misrepresentation as the cause of action underlying Plaintiffs' conspiracy claim does not "relate to" ERISA in the sense that it [*436] does not refer to ERISA or ERISA plans generally; indeed it is a law of general applicability. Moreover the states have traditionally regulated the area of common law fraud. Nevertheless these factors alone are not sufficient to determine the preemptive effect of the statute. *See Christopher*, 950 F.2d at 1218-19 (where a state law fraud claim "relates to the operations of an ERISA plan," "preempted state law includes any state law cause of action as it relates to an employee benefit plan, even if it arises under general law which in and of itself has no connection to employee benefits plans").

To determine whether there is a forbidden "connection" between the alleged wrongful fraudulent conduct and the plans at issue here, that would directly impact the administration and operation of those plans, rather than have merely a tenuous, remote or peripheral connection with the plans, this Court starts with the presumption that Congress does not intend to supplant state law. *Travelers*, 514 U.S. at 654. It looks to the objectives of ERISA to determine the scope of the state law that Congress intended would survive and finds a number of them relevant here: [*437] protecting the interests of participants and their beneficiaries by requiring the disclosure and reporting of financial and other information, establishing standards of

conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and providing appropriate and uniform remedies.

The specific nature of the allegations of fraud here shows that the employee benefit plans at issue were an essential part of Defendants' alleged conspiracy for personal gain. According to the complaint, by paying compensation to plan participants in the form of highly inflated Enron stock rather than cash, Enron was able to save substantial money which it then used for enormous bonuses and fees that purportedly went to the conspiring Defendants. The complaint also states that the block of shares owned by the Savings Plan was "likely to be voted in accordance with Enron management's wishes" and that the participants' purchases of the stock "created extra demand for Enron stock and thus helped increase the market price for Enron stock which was another objective of the Enron Insider Defendants." Complaint at 70, P241. Furthermore, with the participants' shares tied up in the plans where [*438] they could not easily be traded, fewer shares of Enron stock could be sold by worried investors, allowing defendants to sell theirs at higher prices.

The complaint asserts that the conspirators simultaneously engaged in self-dealing and knowingly, fraudulently, and substantially diminished at the outset of the conspiracy (not by decline over the years) the value of the assets contributed by Enron to the plan that would fund benefits to the plan participants and beneficiaries, thus immediately and directly impacting an area of exclusive federal concern, i.e., the plan participants' and beneficiaries' right to receive benefits. The alleged fraudulent conduct falls within the sphere of a "pension-defeating motive" and was central to the conspiracy claim. *Bullock*, 259 F.3d at 400. Moreover, denial of plan benefits "is an area of core ERISA concern." *Egelhoff*, 532 U.S. at 147. Plaintiffs' alleged wrongful conduct in the civil conspiracy/fraud claim directly impacted the administration of the ERISA plans and interfered with the responsibilities of the plans' administrators and fiduciaries with the authority and the duty to invest prudently in appropriate [*439] securities to protect participants and beneficiaries' retirement funds. The conspiracy allegedly directly and substantially looted the assets that should have been placed in trust in the plans to be available as future benefits to the participants and beneficiaries.

Which of the alleged conspirators might qualify as a plan fiduciary is a factual issue not appropriate for resolution on a 12(b)(6) motion; nevertheless that issue in turn also specifically implicates core ERISA issues of fiduciary, co-fiduciary, and interested-party breach of duties. The conspiracy claim also involves and materially affects the relationships among the traditional ERISA entities— the plans' employer, the plans' administrators and fiduciaries, the plans themselves, and the plans' participants and beneficiaries. ERISA was intended to deter mismanagement of ERISA plan benefits:

> In enacting ERISA, Congress' primary concern was the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds. To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's [*440] expectation of the benefit would be defeated through poor management by the plan administrator.

*California Division of Labor*, 519 U.S. at 326-27, *quoting Massachusetts v. Morash*, 490 U.S. 107, 115 (1989).

Moreover the conspiracy to defraud claim triggers both conflict preemption and complete preemption. First it interferes with the rights guaranteed to plan participants by the plans and by ERISA's fiduciary duty standards. Second, the carefully crafted, exclusive enforcement provisions in 29 U.S.C. § 1132(a) demonstrate that Congress did not intend to authorize other remedies. The compensatory and punitive damages that would be available under the Texas common-law tort constitute an alternative enforcement mechanism to that relief available in § 502(a) of ERISA. Against any Enron fiduciary compensatory and punitive monetary damages would not constitute "other appropriate equitable relief" within the meaning of § 1132(a)(3). While ERISA does not permit a civil action by plan participants for money damages against a nonfiduciary, it does permit a claim for "appropriate equitable relief" under section 502(a)(3), 29 U.S.C. § 1132 [*441] (a)(3), by plan participants against a nonfiduciary "party in interest," which would include a provider of services under 29 U.S.C. § 1002(14)(B), such as Arthur Andersen, Vinson & Elkins, and the investment Bank Defendants, who purportedly knowingly participated with plan fiduciaries in a breach of fiduciary duties, i.e., violations of § 406(a)(including payment for furnishing services) and § 404. *See, e.g., Harris Trust*, 530 U.S. 238; *Diduck*, 974 F.2d at 281; *Whitfield*, 853 F.2d at 1303; *Rudowski*, 113 F. Supp. 2d at 1180. Thus the conspiracy claim falls within the scope of ERISA preemption and is preempted by ERISA. n167

> n167 In arguing against preemption, Plaintiffs rely heavily on *Corporate Health Ins., Inc. v. Texas Dept. of Ins.*, 215 F.3d 526 (5th Cir. 2000), but seem unaware that judgment was vacated *sub nom. Montemayor v. Corp. Health Ins.*, 536 U.S. 935

(2002), and remanded for the Fifth Circuit to reconsider in light of *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 122 S. Ct. 2151 (2002) (holding *inter alia* that an Illinois statute requiring HMOs to provide independent reviews of disputes between the HMO and the primary care physician and to cover services found to be "medically necessary" by the independent reviewer did not conflict with ERISA by supplementing or supplanting ERISA's civil enforcement scheme, but was within the ultimate relief authorized by ERISA). The issues in *Rush Prudential* are not on point with those in *Tittle*, which deal with retirement plan assets.

[*442]

In sum, in so far as the civil conspiracy allegations relate to Plaintiffs' ERISA claims, they were directed against ERISA plan assets and affect the relationship of the plan fiduciaries and the employer to the *Tittle* Plaintiffs in ERISA-covered retirement plans. They accordingly are completely preempted by ERISA. *See McDonald*, 60 F.3d at 238 (civil conspiracy claim that ERISA fiduciary failed to disclose material information about health insurance premiums preempted by ERISA); *Christopher*, 950 F.3d at 1219 (ERISA preempted civil conspiracy claim relating to alleged misrepresentations regarding tax consequences of an ERISA plan amendment affecting early retirement benefit). The relief available for civil conspiracy claims would also comprise the kind of alternative enforcement mechanism that is precluded by ERISA's civil enforcement provisions. *Pilot Life*, 481 U.S. at 54; *Arizona Carpenters*, 125 F.3d at 723.

The sole exception to dismissal of the conspiracy claim here might be as it relates to the phantom stock recipients. See footnote 2 of the Memorandum and Order. The phantom stock recipients' claims do not [*443] fall under ERISA and thus a conspiracy claim relating to them is not preempted by that statute. n168 Nevertheless, the Court finds that the phantom stock claims are so vaguely pled by the *Tittle* complaint that they fail to give sufficient notice to Defendants of the conspiracy claim against them; as noted in footnote 2 of this memorandum and order, the particular stock involved is not even identified. Therefore the Court finds that the conspiracy claim relating to the phantom stock recipients, too, should be dismissed, but grants leave to Plaintiffs to amend their pleading to reassert it, if they obtain sufficient information to replead their claim adequately.

> n168 Indeed, the Court observes that the phantom stock claims are part of the conduct charged in the alleged Ponzi scheme actionable under the securities laws and thus not are cognizable under RICO

either. Moreover phantom stock does not qualify as a "security" and thus the recipients cannot sue under the federal securities statutes. Even if they could, their conspiracy claim would be barred by SLUSA.

[*444]

### 2. Count VIII: Negligent Misrepresentation

As indicated previously, pursuant to black letter law, Plaintiffs' negligent misrepresentation claim against Arthur Andersen under Texas common law, which in essence is a professional malpractice claim, is not preempted by ERISA.

Pursuant to reasons indicated throughout this memorandum and order, the Court

ORDERS the following:

> (1) As requested by Plaintiff, all claims against the Cash Balance Plan are DISMISSED without prejudice; all claims under Counts I-IV against Barnhart and Causey are DISMISSED without prejudice; all claims under Counts I and II against Skilling are DISMISSED without prejudice (See # 314 at 10-11); the claim against Lay under Count I for fraudulent promotion of Enron stock, but not for breach of fiduciary duty to monitor appointment and conduct of the savings Plan and ESOP Committee Members [which actually belongs under Count V], is DISMISSED without prejudice;

OTHERWISE IN ALL RESPECTS, OR IN ACCORDANCE WITH THE ABOVE,

> (2) Kopper's motion to dismiss (# 207) the RICO and common-law conspiracy claims against him is GRANTED;

> (3) Arthur Andersen LLP and Andersen Individual Defendants' [*445] motion to dismiss (# 208) is DENIED as to Count I (ERISA) and Count VIII (negligence), but otherwise GRANTED.

> (4) Mark-Jusbasche's motion to dismiss (# 209) the RICO and common-law conspiracy claims against her is GRANTED;

> (5) Odom's motion to dismiss (# 210) is

GRANTED as to the RICO claims, but DENIED as the Texas common-law negligent misrepresentation claim;

(6) Harrison's motion to dismiss (# 216) the RICO and common-law conspiracy claims against him is GRANTED;

(7) Pai's motion to dismiss (# 222) the RICO and common-law conspiracy claims against him is GRANTED;

(8) Citigroup, Inc. and Salomon Smith Barney, Inc.'s motion to dismiss (# 227) the RICO and common-law conspiracy claims against them is GRANTED;

(9) J.P. Morgan Chase & Co.'s motion and corrected motion to dismiss (# 229, # 351) the RICO and common-law conspiracy claims against it are GRANTED;

(10) Enron Corporation Savings Plan Administrative Committee's and the Administrative Committee of the ESOP's motion to dismiss (# 231) is DENIED;

(11) Vinson & Elkins Defendants' motion to dismiss (# 232) the RICO and common-law conspiracy claims against them is GRANTED;

(12) Derrick, [*446] Jr.'s motion to dismiss (# 233) the RICO and common-law conspiracy claims against him is GRANTED;

(12) Olson's motion to dismiss (# 234) ERISA claims against her is DENIED;

(13) Causey's motion to dismiss (# 235) all claims against him is GRANTED;

(14) Credit Suisse First Boston Corporation's motion to dismiss (# 236) the RICO and common-law conspiracy claims against it is GRANTED;

(15) Merrill Lynch & Co.'s motion to dismiss (# 238) the RICO and common-law conspiracy claims against it is GRANTED;

(16) Outside Director Defendants' motion to dismiss (# 240) is DENIED as to the ERISA Counts IV and V against the Compensation Committee members (i.e., Blake, Duncan, Jaedicke and LeMaistre) and is GRANTED in all other respects;

(17) Northern Trust Company's motion to dismiss (# 241) is DENIED;

(18) Fastow's motion to dismiss (# 244) the RICO and conspiracy claims against him is GRANTED;

(19) Sutton's motion to dismiss (# 251) the RICO and conspiracy claims against him is GRANTED;

(20) Skilling's motion to dismiss (# 262) is GRANTED n169;

(21) Lay's motion to dismiss (# 264) is DENIED as to the ERISA claim of breach of fiduciary and co-fiduciary [*447] duty to appoint, monitor, and remove and to make material disclosures necessary to protect the plan and its participants and beneficiaries, but it is GRANTED as to the RICO and common-law conspiracy claims against him;

(22) Certain Officer Defendants' motion to dismiss (# 265) the RICO and common law conspiracy claims against them is GRANTED

(23) Certain Administrative Committee Members' motion to dismiss (# 269) is DENIED;

(24) Enron Corp.'s motion to dismiss (# 370) ERISA claims against it is DENIED.

n169 Although Count III, asserting failure to diversify the assets of the Savings Plan against the Administrative Committee and its members, conclusorily names Skilling, it does not state that he was a member of the Administrative Committee. Moreover the complaint provides no details to support Skilling's liability, and Plaintiffs do not address Skilling's role in their opposition brief.

As a housekeeping matter, Plaintiffs' motion for leave to file notice of supplemental authority regarding [*448] In re Worldcom ERISA Litigation (# 598), the Secretary of Labor's request for leave to file response to supplement Outside Directors' motion to dismiss ERISA claims (#

624), and Plaintiffs' motion for leave to file notice of supplemental authority regarding *Kmart ERISA Litigation* (# 628) are GRANTED.

As a final matter, in light of this ruling, should the *Title* Plaintiffs wish to amend their motion for class certification, they shall notify the Court as soon as possible, with an indication of how much time they will need to file a superseding motion.

**SIGNED** at Houston, Texas, this 30th day of September, 2003.

MELINDA HARMON

UNITED STATES DISTRICT JUDGE