# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KAREN B. COAN, Individually and on behalf        :        CIVIL ACTION NO.
of the K.L.C. Inc 401(k) Profit Sharing Plan,    :        3:01CV1737 (MJK)

      Plaintiffs,        :

      v.        :

ALAN H. KAUFMAN, ET AL.,        :
      Defendants.        :        OCTOBER 15, 2003

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiff Karen Coan ("Coan") was employed by K.L.C., Inc. ("KLC") for 23 years, from 1977 through 2000. During that time, in addition to her salary and other benefits, Coan had access to a number of employer-funded retirement plans:

- KLC had in place a 401(k) Fund to which KLC provided employer matching funds.

- Additionally, KLC through its president, Alan Kaufman ("Kaufman"), and its vice-president, Edgar Lee ("Lee"), contributed approximately $1 million to a Profit-Sharing Fund in which Coan was a participant.

- The Profit-Sharing Fund included a component that had rolled over in 1992 from a previously converted defined benefit plan (the "Rollover Fund") (401k Fund, Profit-Sharing Fund and Rollover Fund referred to collectively as the "KLC Plan"). KLC, through Kaufman and Lee, contributed approximately $200,000 to the Rollover Fund, in which Coan also participated. Indeed, apart from Kaufman and Lee themselves, Coan held the largest share of assets in the Profit-Sharing Fund.

Between 1992 and 1998, Coan earned a return on her vested assets in the Profit-Sharing and Rollover Funds that exceeded by a cumulative total of 4.9 percent the return she would have earned in CalPERS, a widely respected pension fund. By the time these Funds were terminated in 2001, Coan had over $135,000 in vested benefits in the Profit-Sharing Fund and the Rollover Fund, every cent of which was either an employer contribution or the interest on such contribution. Moreover, upon the acquisition of KLC by Unicapital Corporation ("Unicapital") in 1998, Kaufman and Lee made a personal gift to Coan of $40,000 in appreciation for her years of service. Thus, by the time her employment terminated and she received her vested assets from the Profit-Sharing Fund and the Rollover Fund, Coan had received over $175,000 as a result of the generosity of her employers, Kaufman and Lee.

Apparently, however, this was not enough to satisfy Coan. In 2001, she filed this action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), claiming (purportedly on behalf of herself as well as the KLC Plan) that Kaufman and Lee had violated their fiduciary duties as trustees of the KLC Plan by making imprudent investment decisions.

Coan's complaint is notable for what it does not contain:

- She does not make any claim with regard to the 401k Fund – the only segment of the KLC Plan into which employees contributed their own money. Her only allegations concern Kaufman and Lee's investment decisions with respect to the 100-percent-employer-funded Profit-Sharing Fund and Rollover Fund.

- Even as to the Profit-Sharing Fund or the Rollover Fund, Coan makes no claim for the more than a decade prior to 1999 during which those funds were in operation. Her claim is based entirely on Kaufman and Lee's investment decisions from 1999 – after KLC's acquisition by

-2-

Unicapital, when Kaufman and Lee were working to terminate the KLC Plan in accordance with instructions from Unicapital – through 2001, the year the KLC Plan was finally terminated and the benefits disbursed.

- Finally, Coan does not claim that Kaufman and Lee deliberately violated their fiduciary duties, knowingly engaged in any improper conduct, or personally profited in any way from their allegedly unwise investment decisions. Indeed, given that approximately 60 percent of the money in the Profit-Sharing and Rollover Fund belonged to Kaufman and Lee and their children, who were also employees of KLC, such an argument would have been folly. Instead, Coan simply argues that, during the time that the Profit-Sharing and Rollover Funds were in the process of being terminated, Kaufman and Lee did not achieve the best possible returns.

ERISA, however, does not afford Coan any remedy for this alleged "harm." As set forth in detail below, under the plain language of § 502(a) and interpreting case law, Coan is not entitled to bring a claim for damages stemming from the alleged breach of fiduciary duty, either on her own behalf or on behalf of the Plan. Accordingly, this Court should grant summary judgment against Coan and should dismiss her purported ERISA action with prejudice.

## FACTUAL BACKGROUND

Karen Coan began working for KLC in 1977, and eventually became the company's controller. (Complaint at ¶ 6, attached as Exhibit A to Defendants' Local Rule 56(a)(1) Statement of Undisputed Material Facts ("Rule 56(a)(1) Statement").) Coan worked at KLC through its acquisition by Unicapital in 1998 and her subsequent termination by Unicapital

management (not Kaufman or Lee) in July 2000.  (March 18, 2003 Deposition of Karen B. Coan ("Coan Dep.")[1] at pp. 155-56.)

Beginning in the 1990s, Coan was able to contribute a portion of her paycheck to a 401(k) Fund established by Kaufman, as KLC's President, and Lee, as its Vice President.  KLC provided matching funds for its employees' 401(k) contributions.  (See, e.g., "The K.L.C., Inc. Profit Sharing Plan Report for the Plan Year Ending December 31, 1997," at p. 5, attached as Exhibit C to Rule 56(a)(1) Statement.)  In addition to the 401(k) Fund, moreover, KLC implemented additional retirement opportunities for its employees as part of a 401(k) Plan as to which Kaufman and Lee were the sole trustees.  (March 25, 2003 Deposition of Alan H. Kaufman ("Kaufman Dep.")[2] at p. 65.)  In 1987, KLC created a Profit-Sharing Fund, funded entirely by annual KLC contributions that totalled close to $1 million by the year 2000.  (See Summaries of Financial Activity 1991-1998, attached as Group Exhibit E to Rule 56(a)(1) Statement; see Coan Dep. at 91-92; Kaufman Dep. at 65.)  Over 40 KLC employees, including Coan, ultimately participated in the Profit-Sharing Fund.  (See "KLC, Inc. Profit Sharing Account Distribution Factors," attached as Exhibit F to Rule 56(a)(1) Statement.)   Kaufman and Lee, as well as several of their children who were employed by KLC, also participated in the Profit-Sharing Fund.  (Coan Dep. at 59-60.)   Apart from Kaufman and Lee, Coan had the greatest share of assets in the Profit-Sharing Fund.  (See Ex. F hereto.)

During the entire time that the Profit-Sharing Fund was in existence, Kaufman and Lee did not charge the Profit-Sharing Fund for their time spent on behalf of the Fund, meaning that

---

[1] Relevant portions of the Coan Dep. are attached as Exhibit B to Rule 56(a)(1) Statement.

[2] Relevant portions of the Kaufman Dep. are attached as Exhibit D to Rule 56(a)(1) Statement.

-4-

the Fund did not incur management expenses that, in an ordinary plan, can be as high as one and one half percent of assets annually. (See, e.g., Summary Annual Report For Plan Year Ending December 31, 1990, attached as Exhibit G to Rule 56(a)(1) Statement; see also January 8, 2003 Deposition of Vahan Janjigian ("Janjigian Dep.")[3] at 120-22.)

In 1992, KLC rolled over into the 401(k) Plan a Rollover Fund that had been created through the termination of a defined benefit plan, funded entirely by KLC. (See "The Terminated Target Benefit Pension Plan," attached as Exhibit I to Rule 56(a)(1) Statement; see also Coan Dep. at pp. 91-92; Kaufman Dep. at p. 65.) The Rollover Fund contained approximately $260,000 of assets contributed by KLC for the benefit of approximately 20 of its employees, including Coan, plus accrued interest. (See Ex. I to Rule 56(a)(1) Statement.) Kaufman and Lee owned the majority of the assets in the Rollover Fund. (See id.; Kaufman Dep. at p. 192.) Almost all of the other Plan participants with Rollover Fund assets also had assets in the Profit-Sharing Fund. (Kaufman Dep. at pp. 192-93.)

Notwithstanding the fact that they declined any compensation for their efforts, Kaufman and Lee spent countless hours in their role as trustees for the Profit-Sharing Fund (including the Rollover Fund). On a weekly basis, they conferred regularly about appropriate investment vehicles and strategies. (Affidavit of Edgar Lee ("Lee Aff.")[4] at ¶ 7.) These conferences took a minimum of two to three hours weekly. (Id.) As fiduciaries, Kaufman and Lee followed a series of steps, questions and decision-making processes before investing assets. (Id. at ¶ 6.) Among other things, Kaufman and Lee undertook to (1) review the investment vehicle's performance history and prospects, (2) compare that investment vehicle's performance history against market

---

[3] Relevant portions of the Janjigian Dep. are attached as Exhibit H to Rule 56(a)(1) Statement.

[4] The Lee Aff. is attached as Exhibit J to Rule 56(a)(1) Statement.

indexes, (3) telephone the managers of the investment vehicles (i.e., the mutual fund manager or some other official of the mutual fund in question), (4) interview whichever investment broker had suggested the investment, (5) discuss the prospective investment with their informal investment committee, (6) analyze the size of the proposed investment, (7) analyze who the recipient of the funds would be, (8) analyze the proposed investment decision as compared to past decisions, (9) analyze the history of involvement with the investment company, (10) analyze how the investment at issue fit in with other investments and how it would affect liquidity, (11) hold informal discussions with people whose opinion they respected, and (12) review published materials such as the Wall Street Journal, the Investors Business Daily, Morningstar reports (for mutual funds), and various Internet resources. (Lee Aff. at ¶ 8; see Kaufman Dep. at pp. 80-81, 86, 197, 204-07; Coan Dep. at p. 108.)

Through the 1990s, as a result of the investment strategy pursued by Kaufman and Lee, the Profit-Sharing Fund and the Rollover Fund performed very well. Indeed, a comparison of the rates of return generated by the two Funds with the rate of return earned by the investment portfolios of the California Public Employees Retirement System ("CalPERS,") a large and widely respected pension plan, during the same time frame shows that the Profit-Sharing Fund and the Rollover Fund were for the most part meeting or beating CalPERS' performance on an annual basis. (See Affidavit of Warren F. Mulhern and Table I of attached report, "Observations of and Opinions On An Analysis of the Asset Allocation, Diversification, and Performance of the K.L.C. 401(k) Pension/Rollover Fund and Profit Sharing Fund, 1998 to 2001," attached as Exhibit K to Rule 56(a)(1) Statement). Indeed, over the years 1992 through 1998, the 401(k) Plan outperformed the CalPERS plan by a cumulative total of 4.9 percentage points. (See id.)

In 1998, KLC was acquired by Unicapital. (Coan Dep. at p. 132.) As a part of that acquisition, Unicapital directed KLC to terminate its 401(k) Plan, including the Profit-Sharing Plan and the Rollover Plan, and to forward the assets to Unicapital for its own 401(k) plan. (Id. at p. 75.) KLC, through Kaufman and Lee, forwarded the 401(k) Fund portion of the 401(k) Plan as directed by Unicapital. (Id. at p. 87.) However, concerned that Unicapital's 401(k) plan did not offer participants opportunities as attractive as those offered by their own 401(k) Plan, Kaufman and Lee held back the assets in the Profit-Sharing Fund and the Rollover Fund while the Unicapital acquisition was ongoing. (Id. at pp. 75-76, 91.)

Kaufman and Lee knew, however, that ultimately the Profit-Sharing Fund and the Rollover Fund would be terminated as part of the Unicapital acquisition. (Lee Aff. at ¶ 11.) Pension Consultants, the company that administered the Profit Sharing Plan on KLC's behalf, advised Kaufman and Lee that the plan termination process, which included review by the Internal Revenue Service ("IRS") would take between six months and a year. (Id. at ¶ 12.) Accordingly, at the beginning of the termination process in 1999, Kaufman and Lee decided that they needed to improve the Funds' liquidity so that the assets in the Funds could be disbursed easily upon termination. (Id. at. ¶ 13; see Kaufman Dep. at pp. 80-81.) Kaufman and Lee therefore decided to move a substantial portion of the Funds' assets out of the multiple investment vehicles (many of which were equity-based) in which they had been invested and into a single, less volatile, non-equity vehicle to facilitate disbursement. (Lee Aff. at ¶ 13; see Kaufman Dep. at pp. 102-04.)

After consulting with their investment advisers and following the deliberative process described above, in March 1999, Kaufman and Lee decided to invest a portion of the Funds into the BlackRock Government Income Portfolio (the "BlackRock Portfolio"), a large government

-7-

bond fund made up of a variety of the highest-rated government and agency bonds, with at least 65 percent of its assets in obligations issued or guaranteed by the United States government and its agencies. (Lee Aff. at ¶¶ 10-14; see Kaufman Dep. at pp. 80-81, 102-04, 197-99; see also BlackRock Government Income Portfolio, attached as Exhibit L to Rule 56(a)(1) Statement.)  In particular, Kaufman and Lee had obtained advice from Edward Wahlberg, a financial advisor and the Vice President of Wealth Management for Merrill Lynch. (Deposition of Edward J. Wahlberg ("Wahlberg Dep.")[5] at pp. 7-8, 25-31.)    After careful consideration, including his own consultation of sources such as Bloomberg, Morning Star, and Merrill Lynch private research, Wahlberg recommended the BlackRock Portfolio. (Id. at 29-30.)  In rendering this investment decision and moving a large portion of the Funds' assets out of the volatile equity market, Kaufman and Lee believed they were conforming to the appropriate risk profile for a Plan on the brink of termination. (Lee Aff. at ¶ 14; see Kaufman Dep. at pp. 80-81, 102-04, 195-96.)

By early 2000, it became apparent that the IRS' plan termination review would take longer than expected. (Lee Aff. at ¶ 17.) Indeed, the process ultimately took over 16 months. (Coan Dep. at p. 99.) After following the deliberative process described above, Kaufman and Lee decided to revamp their investment strategy to accommodate their growing uncertainty as to when the Plan ultimately would be terminated, and in the interim to achieve even greater stability for the majority of Plan assets than the BlackRock Portfolio had provided. (Lee Aff. at ¶¶ 15-19.) Accordingly, in February, 2000, Kaufman and Lee sold the shares owned in the BlackRock Portfolio and moved the proceeds into a money market account. (Id. at ¶ 16.) Because it was unclear how long the termination process would take, however, Kaufman and Lee determined

_____

[5] Relevant portions of the Wahlberg Dep. are attached as Exhibit M to Rule 56(a)(1)

that leaving all of the Plan's assets in cash would ill serve participants by minimizing possible returns for the duration of ther termination period. (See Lee Aff. at ¶¶ 17-18.) Accordingly, they decided to place a small portion of Plan assets in equity-based mutual funds. (See Lee Aff. at ¶¶ 18-19.)

Ultimately, in hindsight, Kaufman and Lee's decisions resulted in Plan performance between 1999 and 2001 that was just slightly worse than the benchmark identified by Coan's own expert. According to Coan's expert, starting in 1999 when Plan termination commenced and ending in 2001 when the Plan ultimately was terminated, the Plan underperformed a hypothetical, passive 60/40 blend of stocks and bonds by just over six percent in 1999 and just under 6 percent in 2000. It outperformed the hypothetical 60/40 blend by almost 3 percent in 2001. (Compare An Analysis of the Asset Allocation, Diversification, and Performance of the K.L.C. 401(k) Pension/Rollover Fund and Profit Sharing Fund, 1998 to 2001, Table I, attached as Exhibit N to Rule 56(a)(1) Statement, with "401(k) Profit-Sharing Analysis (Gains/Losses)," attached as Exhibit O to Rule 56(a)(1) Statement.) The Plan's overall growth from inception to termination, however, was considerable: from employer contributions totalling approximately $1.3 million, KLC ultimately distributed approximately $2.5 million to Plan participants on termination. (Kaufman Dep. at p. 199.)

As the participants with the largest amount of vested assets in the Plan, Kaufman and Lee, and their children, experienced the greatest "loss" from the Plan's slight underperformance between 1999 and 2001. (See Coan Dep. at 59-60.) Obviously, neither Kaufman nor Lee realized any benefit from any such "losses" to the Plan.

---

Statement.

In the meantime, as set forth above, KLC had been acquired by Unicapital. (Coan Dep. at p. 132.) Upon the acquisition, Kaufman and Lee made a personal gift to Coan of $40,000. (Id. at pp. 138-39.) Coan initially was employed by Unicapital as a controller. (See id. at 155-56.) In July 2000, however, Coan's employment was terminated as part of a reduction in force by Unicapital. (Id.) Neither Kaufman nor Lee played any role in the decision to terminate Coan. (See Kaufman Dep. at p. 166.) Coan has not been employed by either KLC or Unicapital since 2000. (Coan Dep. at pp. 155-56.)

Following Coan's termination from employment at Unicapital, she was principally responsible for administering the termination of the 401(k) Plan and disbursing assets to Plan participants. (See Coan Dep. at pp. 97-98, 111-16.) Unlike Kaufman and Lee, who were never reimbursed for their work performed on behalf of the Plan, Coan billed approximately $8700.00 for her services. (See March 30, 2001 Invoice to K.L.C. Inc. 401(k) Profit Sharing Plan, attached as Exhibit P to Rule 56(a)(1) Statement.)

## ARGUMENT

### A.    Summary Judgment Standard.

"A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law." Russell v. Eldridge, 832 F. Supp. 535, 537 (D. Conn. 1993) (citation omitted); see also Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993). Summary judgment is not a disfavored procedural shortcut, but is rather "an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted). It is a tool designed to "winnow out from the trial calendar those cases whose facts predestine them to result in a directed

verdict." United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 355 (2d Cir. 1993). "Properly used, summary judgment permits a court to streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986).

A plaintiff may not defeat summary judgment by resting on "mere allegations," but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In this case, the record is devoid of facts tending to show that Coan has been damaged by any purported fiduciary breach on Kaufman or Lee's part. Indeed, as set forth above, the undisputed facts demonstrate that (a) Kaufman and Lee exercised caution and care with respect to the exercise of their duties as trustees for 401(k) Plan, and (b) as a result, the Plan's performance was commensurate with the performance of well-regarded pension funds such as CalPERS.[6]

Even more important for purposes of this summary judgment motion, however, are the undisputed facts that Coan is not currently a participant in the 401(k) Plan, has no claim for vested benefits, failed to join any other Plan participants in this action, and is in reality only seeking to recover money damages from Kaufman and Lee. These undisputed facts make clear that Coan has no cause of action against Kaufman and Lee under ERISA, and that her Complaint against them should be dismissed.

---

[6] Although Coan disputes the adequacy of Kaufman and Lee's exercise of their duties as trustees of the Plan, rendering this a contested issue that cannot be resolved on summary judgment, it is important to note that the evidence is uncontroverted as to the specific actions undertaken by both men in fulfilling those duties.

**B.      Coan Has No Standing To Bring A Claim Under ERISA.**

**1.      ERISA's Civil Enforcement Provision is Exclusive.**

Section 502(a) of ERISA, the civil enforcement provision, sets forth with great precision and detail the types of actions that are permissible, and places express limits on the potential plaintiffs who have standing to bring such claims.  The Supreme Court repeatedly has cautioned courts against expanding in any way these carefully delineated statutory provisions, stating that "Congress did <u>not</u> intend to authorize other remedies that it simply forgot to incorporate expressly."  <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 254 (1993) (emphasis in original) (<u>quoting</u> <u>Mass. Mut. Life Ins. Co. v. Russell</u>, 473 U.S. 134, 146-47 (1985); <u>see also</u> <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 54 (1987) (stating that "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive").

Indeed, courts continue to emphasize their belief that "ERISA's express remedies, as the product of long and careful study and compromise, should remain exclusive."  <u>Gerosa v. Savasta</u>, 329 F.3d 317, 322 (2d Cir. 2003) (<u>citing</u> <u>Rush Prudential HMO, Inc. v. Moran</u>, 536 U.S. 355, 375-76 (2002); <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 209 (2002).  The Second Circuit has concluded that there is "little room in this framework for judicially-created, 'interstitial' remedies."  <u>Gerosa</u>, 329 F.3d at 322.  Thus, if a plaintiff cannot sue under one of the provisions of § 502(a), she has no remedy under ERISA.  <u>In re Enron Corp. Sec.</u>, Civ. No. H-01-3913 (consolidated cases), 2003 U.S. Dist. LEXIS 17492, at *201 (S.D. Texas Sept. 30, 2003).

As set forth above, Coan, for herself and purportedly on behalf of the KLC Plan, claims to have been damaged by the allegedly imprudent investments made by Kaufman and Lee with

the funds in the Profit-Sharing Fund and the Rollover Fund. In her complaint, she seeks damages for herself and the 401k Plan pursuant to ERISA § 502(a)(2), and restitution for herself and the Plan pursuant to ERISA § 502(a)(3). However, Coan cannot proceed with a claim under either section of ERISA. First, Coan is not a "participant" as that term is defined under ERISA, and therefore is not a proper plaintiff in this case either on her own behalf or on behalf of the 401k Plan. Second, even if Coan were a "participant," her purported cause of action – for money damages stemming from Kaufman's and Lee's allegedly unwise investment decisions – does not entitle her to standing under either §§ 502(a)(2) or 502(a)(3). Allowing Coan to proceed with her ERISA claim against Kaufman and Lee would be precisely the type of "judicially created, 'interstitial' remedy" that the Second Circuit's case law expressly forecloses.

### 2.     Coan Is Not A "Participant" For Purposes Of ERISA.

Section 502(a) permits civil actions only in certain, carefully delineated instances. The statute reads in pertinent part as follows:

> (a) Persons empowered to bring a civil action. A civil action may be brought--
> . . . (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409 [29 USCS § 1109];
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;

29 U.S.C. § 1132(a). Accordingly, under the plain language of the statute, only a "participant, beneficiary or fiduciary" has standing to bring a claim under ERISA's civil enforcement provisions.

Coan does not claim to be a beneficiary or fiduciary of the 401k Plan, but rather to be a participant in that Plan. She is not, and accordingly she has no standing to bring any claim under ERISA against Kaufman and Lee.

-13-

Under ERISA, the term "participant" is defined as "any employee or former employee of an employer, or any member or former member of an employee organization, *who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization,* or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7) (emphasis added).  As the United States Supreme Court has explained:

> [t]he term "participant" is naturally read to mean either "employees in, or
> reasonably expected to be in, currently covered employment," or former
> employees who "have . . . a reasonable expectation of returning to covered
> employment" or who have "a colorable claim" to vested benefits.  In order to
> establish that he or she "may become eligible" for benefits, a claimant must have
> a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2)
> eligibility requirements will be fulfilled in the future.

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117-18 (1989) (citations omitted).

Coan does not fall within any of these categories.  By her own admission, she is not currently an employee of KLC and has no expectation of returning to employment at KLC. Indeed, that company, along with the KLC Plan, no longer exists.  Moreover, she has no claim, colorable or otherwise, to vested benefits under the KLC Plan.  Coan stated affirmatively in her complaint that the KLC Plan was terminated, and all benefits paid out to then-participants, in 2001.  (See Compl. at ¶ 11.)  She has not challenged the way in which those benefits were calculated, and it is undisputed that she received the entire balance to which she was entitled.  As a matter of law, she cannot be deemed a "participant" entitled to pursue a claim under ERISA. See Evaristo v. Rendeiro, No. 91 Civ. 7950, 1995 U.S. Dist. LEXIS 9147, at *12 (S.D.N.Y. June 27, 1995) (noting that "[e]mployees who have received their vested benefits under the plan and who do not challenge the *calculation of their benefits* are no longer participants") (emphasis added).

The leading case on this issue is <u>Kuntz v. Reese</u>, 785 F.2d 1410 (9th Cir. 1986). In that case, which is factually very similar to the circumstances present here, the Ninth Circuit reversed its prior determination that former employees of a defunct plan had standing to sue as plan participants for breach of fiduciary duty. <u>Id</u>. Specifically, the court concluded that it had erred in finding that the plaintiffs' claim for damages could constitute a "benefit" that would preserve their cause of action:

> We are now persuaded that the Kuntz plaintiffs are not participants because, as former employees whose vested benefits under the plan have already been distributed in a lump sum, the Kuntz plaintiffs were not "eligible to receive a benefit," and were not likely to become eligible to receive a benefit, at the time that they filed the suit. Because, if successful, the plaintiffs' claim would result in a damage award, not in an increase of vested benefits, they are not plan participants. The Kuntz plaintiffs do not allege that their vested benefits were improperly computed, rather they allege breach of fiduciary duty or of a duty to disclose information about benefits, thus any recoverable damages would not be benefits from the plan.
>
> Having decided a damage claim is not a plan benefit, we must also point out that the plaintiffs are not eligible for any other type of benefit either. The Kuntz plaintiffs are all former employees who have already received their vested benefits. There are no allegations of plans to return to work or to start accruing benefits once again under the pension plan. Indeed, the plan is now defunct. Former employees who have neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits simply do not fit within the "may become eligible" language of § 1002(7).

<u>Id</u>. at 1411. Like the plaintiffs in <u>Kuntz</u>, Coan has received all of her vested benefits from a defunct Plan, and is seeking only to recover damages from the Plan's former trustees. Like those plaintiffs, she simply does not fit within the language of § 1002(7).

The Ninth Circuit more recently reaffirmed its holding in <u>Kuntz</u>, in a decision that underscores even more forcefully Coan's lack of standing to pursue an ERISA claim given the gravamen of her complaint. <u>See</u> <u>Waller v. Blue Cross of Calif.</u>, 32 F.3d 1337 (9th Cir. 1994). In <u>Waller</u>, the plaintiffs, a group of participants and beneficiaries in a terminated defined benefit

plan, sued on the theory that Blue Cross, their former employer, had breached its fiduciary duty toward them by deliberately terminating their plan in a manner intended to ensure the maximum reversion of plan assets to the company. Id. at 1339. The court in Waller confirmed that "participants and beneficiaries of a terminated plan have no standing to seek legal damages for breach of fiduciary duty once the Plan was terminated and Plan liabilities were satisfied." Id. (citing Kuntz, 785 F.2d at 1411).[7]

Numerous other courts, including those within the Second Circuit, have adopted similar reasoning and reached the same conclusion as the Kuntz and Waller courts: Former employees who have received their vested benefits have no standing under ERISA to bring claims for damages allegedly caused by a trustee's purported fiduciary breach. See Evaristo, 1995 U.S. Dist. LEXIS 9147, at *18-19 (granting summary judgment against plaintiffs where, at the time they filed their claim, the plan in question had been terminated and they did not have a colorable claim for benefits); see also Yancy v. Am. Petrofina, Inc., 768 F.2d 707 (5th Cir. 1985) (holding that where former employees received all the benefits to which they were entitled under a plan as it existed, their claim is for damages, not vested benefits); Raymond v. Mobil Oil Corp., 983 F.2d 1528 (10th Cir. 1993).

---

[7] While flatly rejecting their claim for damages, the Waller court allowed the plaintiffs in that cae to pursue the equitable remedy of a constructive trust, reasoning that the "ill-gotten profits" allegedly realized by Blue Cross through the improper reversion of plan assets could be disgorged to plaintiffs. 32 F.3d at 1339. Coan, of course, has no such remedy available to her. There are no "ill-gotten profits" in this case – as set forth above, the defendants, Messrs. Kaufman and Lee, had invested money along with the rest of the participants in the 401k Plan and experienced precisely the same results – and accordingly no legal basis for the imposition of a constructive trust. See Harris Trust & Sav. Bank v. Salomon Smith Barney, 530 U.S. 238, 250 (2000).

Indeed, while it permitted the constructive trust theory against Blue Cross, the Waller court specifically disallowed it as against the other defendants in the case, noting that "a

As set forth above, Coan's claim does not turn in any way on the calculation of benefits she concededly received from the 401k Plan on its termination. She received every penny that she was entitled to under that Plan – an amount in excess of $135,000 – and is merely seeking to add to that amount damages allegedly recoverable from Kaufman and Lee due to their purportedly unwise investment decisions. This claim, however, is not cognizable under ERISA. Accordingly, the Court should grant summary judgment against Coan on all causes of action asserted in her complaint.

### 3.    Coan Cannot Recover Damages Under § 502(a).

Even if Coan had standing as a "participant" to pursue an ERISA claim against Kaufman and Lee, which as set forth above she does not, the specific claims she purports to bring – for violations of §§ 502(a)(2) and (a)(3) – are not available to her given that the remedy she seeks is the recovery of alleged damages from Kaufman and Lee.

a.    Coan's Failure To Include Other Former Participants
Precludes Any Action Under § 502(a)(2).

Under ERISA, a plan participant may bring a claim under § 502(a)(2), which provides a remedy for a breach of fiduciary duty, only on behalf of the plan itself. The statute, and the cases interpreting it, flatly preclude individual suits for damages. See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 (1985) (holding that it was "abundantly clear" that § 502(a)(2) addressed "remedies that would protect the entire plan, rather than . . . the rights of an individual beneficiary"); see also Farrell v. Auto. Club of Mich., 870 F.2d 1129, 1133 (6th Cir. 1989) (noting that § 502(a)(2) "authorizes relief only to the plan itself, not to individual beneficiaries"); In re Enron Corp. Sec., 2003 U.S. Dist. LEXIS 17492, at *203-04 (stating that "relief may not

_____

constructive trust remedy is not available against a party that never had possession or title to the money." Id. at 1340 (citation and internal quotations omitted).

-17-

flow directly to individual plan participants") (citing cases).

Coan's complaint identifies herself and the 401k Plan as plaintiffs in this action. Under the well-established case law described above, she has no individual claim for damages under § 502(a)(2). Equally important, however, she has no claim on behalf of the Plan. Second Circuit case law makes clear that, in order to pursue such a remedy, Coan was required to represent a class made up of all Plan participants. See, e.g., Gruby v. Brady, 838 F. Supp. 820, 827 (S.D.N.Y. 1993) (participant's action purportedly on behalf of a plan must include all participants); Bona v. Barasch, No. 01 Civ. 2289 (MBM), 2003 U.S. Dist. LEXIS 4186 (S.D.N.Y. March 20, 2003) (same). Yet in the more than two years since filing this complaint, Coan never sought class certification, nor did she ever seek to join the remaining Plan participants.[8] Even if her purported claim against Kaufman and Lee for their allegedly unwise investment decisions had been cognizable under ERISA, therefore – which, as set forth above, it was not due to her own lack of standing as a "participant" – Coan cannot proceed in the manner she elected to pursue. Accordingly, this Court should grant summary judgment against Coan on her § 502(a)(2) claim.

      b.    **Coan's Claim For Damages Precludes
            Any Action Under § 502(a)(3).**

In addition to her § 502(a)(2) claim, Coan seeks "restitution" under § 502(a)(3), which authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or

---

[8] Pursuant to the parties' Rule 26(f) Report, Coan was to have moved to join additional parties by no later than February 4, 2002. She has never filed such a motion. Moreover, at no point during the litigation did Coan ever seek class certification, or even identify a proposed class. Fed. R. Civ. P. 23(c) requires determination of class certification "[a]s soon as practicable" after the commencement of an action, and this Court's Standing Order on Scheduling in Civil Cases specifies that all motions relating to class certification need be made "within sixty (60) days after the filing of the complaint." Clearly, Coan has failed to meet these requirements, and her complaint cannot be viewed as viable under § 502(a)(2).

practice which violates . . . the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of . . . the terms of the plan." 29 U.S.C. § 1132(a)(3). What Coan is actually seeking, of course, is damages: the (entirely speculative) difference between the assets of the 401k Plan as it was invested and as she now argues it should have been invested. Under United States Supreme Court precedent, this claim is not tenable under Section 502(a)(3). Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002).[9]

In Great-West, the Supreme Court categorically rejected the argument that § 502(a)(3), which is limited on its face to equitable relief, encompasses the type of action that Coan has brought, in which she claims that Kaufman and Lee's alleged fiduciary breach entitles her to compensation. Although the petitioners in Great-West had, like Coan, characterized their suit as one seeking restitution and therefore equitable, the Supreme Court was unpersuaded. In a lengthy discussion, the Court explained why a suit that, like this one, seeks to impose personal liability on defendants for an alleged breach of duty is not equitable and cannot proceed under section 502(a)(3):

> Thus, "restitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case," and whether it is legal or equitable depends on "the basis for [the plaintiff's] claim" and the nature of the underlying remedies sought. Reich v. Continental Casualty Co., 33 F.3d 754, 756 (7th Cir. 1994) (Posner, J.).
>
> In cases in which the plaintiff could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just

---

[9] Great-West overruled an earlier Second Circuit decision that had held that restitution under § 502(a)(3) could include the kind of "make-whole" relief sought by Coan. See Strom v. Goldman, Sachs & Co., 202 F.3d 138 (1999). Although the Second Circuit has not had occasion to reconsider its holding in Strom, numerous courts have confirmed that Justice Scalia's opinion in Great-West directly rejected its reasoning and its result. See, e.g., DePace v. Matsushita Elec. Corp. of Am., 257 F. Supp. 2d 543, 563 (E.D.N.Y. 2003) (citing cases).

grounds for recovering money to pay for some benefit the defendant had received
from him, the plaintiff had a right to restitution *at law* . . . . In such cases, the
plaintiff's claim was considered legal because he sought "to obtain a judgment
imposing a merely personal liability upon the defendant to pay a sum of money."
Restatement of Restitution § 160, Comment a, pp. 641-642 (1936). Such claims
were viewed essentially as actions at law for breach of contract (whether the
contract was actual or implied).

In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a
constructive trust or an equitable lien, where money or property identified as
belonging in good conscience to the plaintiff could clearly be traced to particular
funds or property in the defendant's possession. . . . Thus, for restitution to lie in
equity, the action generally must seek not to impose personal liability on the
defendant, but to restore to the plaintiff particular funds or property in the
defendant's possession.

Id. at 213-14 (emphasis in original) (citations and internal quotations omitted). Accordingly, the

Court concluded, where the basis for the claim is "not that respondents hold particular funds that,

in good conscience, belong to petitioners, but that petitioners are contractually entitled to some

funds for benefits that they conferred," there is no viable cause of action under § 502(a)(3). Id.

at 214.

A legion of cases from this Circuit has applied the Supreme Court's holding in Great-

West to bar claims such as the one brought here by Coan, including claims for breach of

fiduciary duty. See Bona, 2003 U.S. Dist. LEXIS 4186, at *37 (where plaintiffs' claim is

"nothing more than a claim for money damages as compensation for losses," they are barred

from proceeding under § 502(a)(3)); Kishter v. Principal Life Ins. Co., 186 F. Supp. 2d 438, 445

(S.D.N.Y. 2002) (rejecting availability of § 502(a)(3) in breach of fiduciary duty claim: "such an

action cannot be considered an action for restitution or one implicating a constructive trust

because, under Great-West Life, such remedies are appropriate only where the specific property

being sought is identifiable and in the hands of the defendant"); De Pace v. Matsushita Elec.

Corp. of Am., 257 F. Supp. 2d 543, 561 (E.D.N.Y. 2003) (noting that "the Supreme Court's

-20-

recent decision [in <u>Great-West</u>]…has severely curtailed the type of remedies available under [§ 502(a)(3)]," and that "a claim for restitution which seeks to impose 'personal liability' on a defendant is not authorized by [§ 502(a)(3)]"); <u>Augienello v. Coast-to-Coast Fin. Corp.</u>, No. 01 Civ. 11608 (RWS), 2002 U.S. Dist. Lexis 14584 (S.D.N.Y. Aug. 12, 2002) (plaintiffs could not pursue a claim under § 502(a)(3) because their suit for breach of fiduciary duty was not one for equitable relief). Just last month, in a voluminous, carefully reasoned opinion, Judge Harmon of the Southern District of Texas reviewed federal case law on the scope of § 502(a)(3) and concluded unambiguously that the statute does not provide "make-whole" monetary relief. <u>In re Enron Corp. Sec.</u>, 2003 U.S. Dist. LEXIS 17492, at *205-29. As the <u>Enron</u> court stated: "No matter how artfully pled, 'make-whole' relief for a claim of breach of fiduciary duty by a trustee cannot cloak a claim for compensatory damages." <u>Id</u>. at *230.

Because there is no evidence – indeed, no allegation – that Kaufman or Lee hold any funds even arguably belonging to Coan, and because her claim is clearly one for compensatory damages, the Supreme Court's decision in <u>Great-West</u> and its progeny are dispositive of Coan's claim under § 502(a)(3). As such, even if Coan had standing as a Plan participant to bring some action under § 502, she has no standing to bring a claim whose sole aim is the recovery of purported damages for an unwise investment strategy. ERISA's thoughtful and complete framework precludes any action by Coan against Kaufman and Lee, and this Court should grant summary judgment in their favor on her groundless complaint.

## CONCLUSION

For the reasons set forth above, defendants Alan Kaufman and Edgar Lee respectfully request that this Court enter an order (1) granting summary judgment in their favor on plaintiff's complaint and (2) granting such other and further relief as the Court deems just and proper.

DEFENDANTS,
ALAN H. KAUFMAN and EDGAR W. LEE

By _____
Glenn W. Dowd (ct# 12847)
Daniel A. Schwartz (ct# 15823)
Kristin Thomas (ct#24578)
Day, Berry & Howard LLP
CityPlace I, 185 Asylum Street
Hartford, CT  06103-3499
(860) 275-0100
(860) 275-0343 (fax)
email:  gwdowd@dbh.com
            daschwartz@dbh.com
            kthomas@dbh.com


## <u>CERTIFICATION</u>

THIS IS TO CERTIFY that a copy of the foregoing has been sent this date via first-class mail, postage prepaid, to:

Thomas G. Moukawsher                    Ian O. Smith
Moukawsher & Walsh LLC                 Moukawsher & Walsh LLC
328 Mitchell Street                           21 Oak Street, Suite 100
P. O. Box 966                                  Hartford, CT  06106
Groton, CT 06340

_____
Glenn W. Dowd