UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KAREN B. COAN, Individually and on behalf of the K.L.C. Inc 401(k) Profit Sharing Plan<br><br>Plaintiffs,<br><br>V.<br><br>ALAN H. KAUFMAN, ET AL.<br>Defendants. | :<br>:<br>:<br>: CIVIL ACTION NO.<br>: 3:01CV1737 (RNC)<br>:<br>:<br>:<br>: JUNE 2, 2003 |

### AFFIDAVIT OF EDGAR LEE

STATE OF CONNECTICUT)
                           ) ss: Hartford
COUNTY OF HARTFORD )

      BEFORE ME, the undersigned authority, personally appeared Edgar Lee, who, first being duly sworn, deposes and states:

    1.    I am over the age of eighteen (18) years, and believe in the sanctity of the oath.

    2.    I had brain surgery to remove a cancerous tumor in March 2003, and the cancer has since spread and, as a consequence, I may not be able to participate in the proceedings relating to this matter.

    3.    I became a trustee of the K.L.C., Inc. Profit Sharing, Rollover and 401(k) Plans (the "K.L.C. Plans") in approximately 1980.

    4.    I took my role as a fiduciary of K.L.C. Plan assets extremely seriously because my employees meant a great deal to me, and I wanted to be sure that their funds were properly invested and properly protected by using appropriate investment strategies.

5. As a fiduciary of these plans, I made investment decisions with an informal Committee charged with overseeing K.L.C. Plan investments, that was comprised of co-trustee Alan Kaufman, Karen Coan and me.

6. As a fiduciary of the K.L.C. Plan, without exception, I always went through a series of steps, questions and decision-making processes before rendering a decision about the manner of investment of plan assets.

7. Co-trustee Alan Kaufman and I devoted two to three (2-3) hours a week at a minimum to issues related to the K.L.C. Plans and their various investments.

8. Before making any investment decision for the K.L.C., Inc. Profit Sharing Plan, Alan Kaufman and I undertook a series of steps to determine the prudence and appropriateness of that decision which included, without limitation: (1) the review of the investment vehicle's past history of performance and prospects, (2) a comparison of that investment vehicle's past history of performance against market indexes, (3) telephonic interviews with the managers of the investment vehicles (i.e., the mutual fund manager or some other official of the mutual fund in question), (4) conversations with the investment broker that suggested the investment as a possibility for the K.L.C. Plan, (5) discussions with the K.L.C. Plan's informal investment committee, as described above, (6) analysis of the size of the proposed investment, (7) analysis of who the recipient of the Plan funds would be, (8) analysis of the proposed investment decision as compared to past decisions made for the K.L.C. Plan, (9) analysis of past history of involvement with the investment company, (10) analysis of how the investment at issue fit in with the other investments of the K.L.C. Plan, and affected the trust's liquidity, (11) informal discussions with people whose opinion we respected, such as Messrs. Jainchill, Fierston and Wahlberg, and (12) review of published materials such as the Wall Street Journal, the Investors

Business Daily, Morningstar reports (for mutual funds), and various internet resources. Alan Kaufman and I, working together, took the steps described in this paragraph before making the investment decisions at issue in this case.

9. In the twelve (12) years that the K.L.C., Inc. Profit Sharing Plan was in existence, I never once made an investment decision that was spur of the moment, or otherwise not deliberative.

10. In March 1999, a decision was made by the Committee to invest a portion of the K.L.C., Inc. Profit Sharing Plan Fund into the Blackrock Securities Fund.

11. The decision to invest in the Blackrock Securities Fund was motivated by the impending termination of the K.L.C., Inc. Profit Sharing Plan, following the sale of K.L.C., Inc. to Unicapital. At the time we decided to invest in the Blackrock Securities Fund, Mr. Kaufman and I were aware that the K.L.C., Inc. Profit Sharing Plan would be terminated.

12. Pension Consultants, the company that administered the K.L.C., Inc. Profit Sharing Plan on our behalf, advised the informal investment committee that the plan-termination process would take six (6) months to one (1) year to get through the Internal Revenue Service's review, and that following that IRS review procedure the funds could be distributed. We were also advised that it was prudent to have the plan go through the IRS's termination review procedure.

13. Before the K.L.C., Inc. Profit Sharing Plan Funds were invested in the Blackrock Securities Fund, the Funds were invested in multiple investment vehicles, and the Committee's deliberative decision-making process resulted in a decision to move a substantial portion of the Funds into a single vehicle since the funds needed to be disbursed upon the Plan's termination, following the IRS's review procedure.

14. The Blackrock Securities Fund was chosen because the Committee's deliberative decision-making process resulted in the decision that Blackrock Securities Fund was a safe, liquid investment, and less volatile than an equities fund. All three members of the Committee endorsed and approved the decision to invest Plan assets in Blackrock. In rendering this investment decision, the Committee believed it was adopting the appropriate risk profile for the Plan assets on the brink of termination of the Plan.

15. The Internal Revenue Service's review portion of the plan-termination process that had been projected to take six (6) months to one (1) year, was taking longer than expected, and as such, the Committee's deliberative decision-making process led the trustees to revamp the investment strategy due to the uncertainties of the termination process.

16. In February, 2000, the Committee's deliberative decision-making process resulted in the decision to sell the shares owned in the Blackrock Securities Fund, and the proceeds of the sale were moved to a money market account with Merrill Lynch. At this time, Ms. Coan advocated strenuously for a more aggressive stance for the Plan assets than the Blackrock Securities Fund, which had lost some of its value since March 1999.

17. With the Internal Revenue Service's review portion of the plan-termination process taking longer than expected, the Committee determined that the Plan assets may have been missing potential returns as a result of the conservative investment approach adopted in 1999.

18. The PBHG mutual funds were chosen because the Committee's deliberative decision-making process resulted in the decision that a small portion of the Plan's assets would be placed in large, diversified, publicly traded, and highly liquid mutual funds concentrating on

equity investments, while the vast majority of the Plan's assets would be kept in the ultra-safe Merrill Lynch money-market account.

19. All three members of the Committee endorsed and approved the decision to invest Plan assets in the PBHG funds, so as to strengthen assets in the Profit Sharing Plan. In rendering this investment decision, the Committee believed it was adopting the appropriate risk profile for the Plan assets on the brink of termination of the Plan, in anticipation of the Plan's cash needs in liquidation. Furthermore, given the overlap of participants in the Profit Sharing and Rollover plans, the Committee believed that the appropriate risk profile was employed across the investments of all Plan funds.

20. In my experience as a member of the Committee charged with attending to the investment decisions for the K.L.C. Plans, Karen Coan was the Committee member who had the most aggressive stance toward investing, and always wanted the K.L.C. Plans worth to grow at break-neck speed. Ms. Coan consistently argued to have the K.L.C., Inc. Profit Sharing Plan's funds invested heavily in aggressive equity investments.

FURTHER AFFIANT SAYETH NOT

_____
Edgar Lee

The foregoing instrument was sworn to and subscribed before me this 9th day of June, 2003, by Edgar Lee, who is personally known to me.

_____
NOTARY PUBLIC
Print Name: Lynne D. Nesta
My commission expires: 3/31/08

## CERTIFICATION

THIS IS TO CERTIFY a copy of the foregoing has been sent via facsimile and sent via overnight mail service to the following counsel and parties of record on August 14, 2003:

Thomas G. Moukawsher
Moukawsher & Walsh LLC
328 Mitchell Street
P. O. Box 966
Groton, CT 06340

Ian O. Smith
Moukawsher & Walsh LLC
21 Oak Street, Suite 100
Hartford, CT 06106

_____
Kristin Thomas

## CERTIFICATION

THIS IS TO CERTIFY a copy of the foregoing has been sent via facsimile and sent via overnight mail service to the following counsel and parties of record on August 14, 2003:

Thomas G. Moukawsher
Moukawsher & Walsh LLC
328 Mitchell Street
P. O. Box 966
Groton, CT 06340

Ian O. Smith
Moukawsher & Walsh LLC
21 Oak Street, Suite 100
Hartford, CT 06106

_____
Kristin Thomas